UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

UNITED STATES OF AMERICA,      :     10 CR. 0096 (DLC)

                          :   **DECLARATION OF KEVIN H.**

                          :   **MARINO IN SUPPORT OF**

        v.                  :   **DEFENDANT SERGEY**

                          :   **ALEYNIKOV'S MOTION FOR**

                          :   **COURT APPROVAL *NUNC PRO***

SERGEY ALEYNIKOV,       :   ***TUNC* TO SUBPOENA DOCUMENTS**

                          :   **AND MATERIALS FROM**

         Defendant.      :   **GOLDMAN SACHS & COMPANY**

                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      KEVIN H. MARINO, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am a member of the law firm Marino, Tortorella & Boyle, P.C., attorneys

for defendant Sergey Aleynikov ("Aleynikov") in this matter. I respectfully submit this

Declaration in support of Aleynikov's motion, pursuant to Fed. R. Crim. P. 17(c), for

Court approval *nunc pro tunc* to subpoena documents and materials from Goldman Sachs

& Company ("Goldman").

      2.     Federal authorities arrested Aleynikov on July 3, 2009 as he exited a plane

from a meeting at his then new employer, Teza Technologies LLC ("Teza"), in Chicago.

Aleynikov was presented on a criminal complaint in the United States District Court for

the Southern District of New York on July 4, 2009. A true and correct copy of the

transcript of the July 4, 2009 initial appearance and detention hearing is attached hereto

as Exhibit 1. Aleynikov has been charged with, among other things, having allegedly

stolen certain trade secrets from his former employer, Goldman. Although June 5, 2009,

was Aleynikov's last day in the office at Goldman, he continued to be employed at

Goldman through June 30, 2009.

3.　　In May 2010, in anticipation of engaging expert witnesses and drafting pretrial motions on Aleynikov's behalf, I requested that the Government provide Aleynikov with various materials I believed the Government had or should have received from Goldman prior to charging Aleynikov. The requested materials included much technical data regarding the system of computer programs that Goldman used to support and carry out its high-frequency trading activities during the relevant time period (the "Platform") as well as ancillary materials Goldman gathered and conveyed to the Government in making its referral of Aleynikov.

4.　　After considering my request, the Government advised that it would not provide the requested materials and informed me that if I wished to obtain the materials, I would have to subpoena them from Goldman itself.

5.　　Upon receiving that advice from the Government, I promptly prepared a subpoena and, on June 8, 2010, contacted Matthew Friedrich, Esq., a partner at Boies, Schiller & Flexner, to ask that he accept service of that subpoena on Goldman's behalf. I was aware of Mr. Friedrich's representation of Goldman because he moved unsuccessfully before Judge Crotty to quash an earlier subpoena served upon Goldman by Mr. Aleynikov's prior counsel, Assistant Federal Public Defender Sabrina Schroff, for, inter alia, failure to comply with Rule 17(c). A true and correct copy of the transcript of the August 10, 2009 hearing before Judge Crotty is attached hereto as Exhibit 2.

6.　　Mr. Friedrich agreed to bring my service request to Goldman and the following day, June 9, 2010, advised me that I would be required to serve Goldman directly.

7.    On June 10, 2010, I served upon Goldman a subpoena *decus tecum* with a return date of June 21, 2010.  A true and correct copy of the June 10, 2010 subpoena is attached hereto as Exhibit 3.

8.    Thereafter, Mr. Friedrich called to advise me that the subpoena had made its way to him; that he planned to move to quash it; and that he would like me to agree to a non-emergent briefing schedule on that motion.  I advised Mr. Friedrich of the impending July 16th deadline for the filing of pretrial motions and indicated that, given that deadline, I could not agree to his request.

9.    I also offered to meet with Mr. Friedrich to entertain his suggestions for narrowing the subpoena; gave him a summary of Aleynikov's reasons for needing each of the subpoenaed documents; and advised him that Aleynikov had no objection to the entry of a protective order to safeguard any interest Goldman might have in the confidentiality of any of the subpoenaed documents.

10.    When Mr. Friedrich responded that he intended to bring this matter before the Court, I advised that I would write a letter to the Court outlining the dispute from Aleynikov's perspective.  On June 16, 2010, I submitted a letter to the Court in which I outlined the history of the subpoena dispute and requested a conference among counsel for the Government, Goldman, and Aleynikov to resolve it.  A true and correct copy of the June 16, 2010 letter without exhibits is attached hereto as Exhibit 4.

11.    On June 17, 2010, the Court docketed an endorsed copy of the June 16th letter indicating that it had been denied for failure to comply with Rule 17(c).

12. On June 18, 2010, Goldman, through Mr. Friedman, served me with an application for an Order to Show Cause why the June 10th subpoena should not be quashed. Goldman's application argued that the subpoena was defective because, among other reasons, Aleynikov failed to obtain leave of court before serving it.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: June 21, 2010
Chatham, New Jersey

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By: _____

Kevin H. Marino (KM 4941)
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant Sergey Aleynikov*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                       Docket No. 09m1553
 UNITED STATES OF AMERICAS         :

                    Plaintiff,     :

  - against -                      :

 SERGEY ALEYNIKOV,                 : New York, New York
                                     July 4, 2009
                    Defendant.     :

------------------------------------ :

                    PROCEEDINGS BEFORE
              MAGISTRATE JUDGE KEVIN N. FOX,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the United States    U.S. ATTORNEY'S OFFICE,
     of America:         SOUTHERN DISTRICT OF NEW YORK
                         BY:  JOSEPH FACCIPONTE, ESQ.
                         One St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2492

For the Plaintiff:       FEDERAL DEFENDERS OF NEW YORK
                         BY:   SABRINA SHROFF, ESQ.
                         52 Duane St., 10th floor
                         New York, New York
                         (212) 417-8700

Transcription Service:   Carole Ludwig, *Transcription Services*
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

# INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

THE CLERK:    All rise.

THE COURT:    Please be seated.

THE CLERK:    The United States of American versus Sergey Aleynikov.  Would you please state your name for the record?

MR. JOSEPH FACCIPONTE:  Good afternoon, Your Honor, Joseph Facciponte for the Government.  With me at counsel table is Michael McSwaine (phonetic) of the FBI.

THE COURT:    Good afternoon.

MS. SABRINA SHROFF:    Good afternoon, Your Honor, for Sergey Aleynikov, Federal Defenders of New York by Sabrina Shroff.  My client is standing to my right.  Good afternoon.

THE COURT:    Good afternoon.  May I have the date and time of arrest, please?

MR. FACCIPONTE:    Yes, approximately 9:20 p.m. last night, Your Honor.

THE COURT:    Thank you.  Please raise your right hand.

(Witness is Sworn)

THE COURT:    Mr. Aleynikov, the purpose of the proceeding is to advise you of certain rights that you have to inform you of the charge made against you to consider whether counsel should be appointed for you and to determine to what conditions, if any, you might be released.  Do you

2  understand, sir?

3           MR. ALEYNIKOV:   I do.

4           THE COURT:   You have the right to remain silent.

5  You're not required to make any statements.  If you've made

6  statements to authorities already, you need not make

7  additional statements.  Anything that you do say can be used

8  against you.  You have the right to be released either

9  conditionally or unconditionally pending trial, unless find

10 there are no conditions that would reasonably assure your

11 presence in court and the safety of the community.

12          You have the right to be represented by counsel

13 during all court proceedings and during all questioning by

14 authorities.  If you're not able to retain counsel, the

15 court can appoint counsel to represent you.

16          In that connection I have before me a document

17 which is labeled financial affidavit which I shall show you

18 now.  Do you recognize this document, sir?

19          MR. ALEYNIKOV:   Yes, Your Honor.

20          THE COURT:   Would you raise your right hand,

21 please.  Do you swear or affirm that the statements

22 contained in this financial affidavit are true statements

23 and that your true signature appears at the bottom of the

24 affidavit?

25          MR. ALEYNIKOV:   It is.

26          THE COURT:   The information that you provided in

the affidavit suggests to me that you can retain counsel. So I will appoint counsel to appear with you only for this proceeding and you will have to make efforts to retain counsel.

If you're not able to retain counsel you should advise the court and the issue of whether counsel will appointed for you will be revisited.

Ms. Shroff, have you received a copy of the complaint?

MS. SHROFF: I have received the complaint, Your Honor. I have provided my client with a copy. He has read the complaint and he waives its public reading at this time.

THE COURT: Very well. Sir, you have a right to have a preliminary hearing held in connection with the charge that is outlying in the complaint. At the hearing, the government would have the burden of establishing that there's probable cause to believe that a crime was being committed as set forth in the complaint and that you committed it.

If probable cause is not established, you will be released from the charge. If it is established, the government will have the right to proceed to trial against you. If you are in custody, the hearing will be held within ten days. If you at liberty, the hearing will be held within 20 days. No hearing will be held before the date in

which it is scheduled. You're either indicted by a grand jury or information is filed against you by the government. I'll fix the hearing date in just a moment, after we address the issue of bail.

Have both parties received a copy of the pre-trial services report?

MR. FACCIPONTE: Yes, your government has, Your Honor.

MS. SHROFF: We have as well, Your Honor.

THE COURT: What is the government's position on the bail?

MR. FACCIPONTE: We seek detention at this time, Your Honor.

THE COURT: Under what theory or theories?

MR. FACCIPONTE: On theory of danger to community and risk of fight.

THE COURT: What is the defendant's position on bail?

MS. SHROFF: Your Honor, the defendant maintains that he should be released according to the recommendation of the pre-trial services officer.

THE COURT: Very well. I'll hear the --

MS. SHROFF: We're ready to proceed at this time.

THE COURT: I'll hear the government in connection with its application.

MR. FACCIPONTE:    Thank you, Your Honor.  We
believe the defendant poses both a substantial risk of
flight and danger to the community.  I'll address the danger
issue first as I believe it is the more serious and guiding
principle in this case.

What the defendant is accused of having stolen
from this investment bank, which is a major investment bank
in New York, is their proprietary, high-quantity, high-
volume trading platform with which they conduct all of their
trades in all major markets within the United States and
other places.

It is something which they had spent millions upon
millions of dollars in developing over the past number of
years and it's something which provides them with many
millions of dollars of revenue throughout this time.

They guard the secrecy of this code very strictly
and they have no known instance of this code going anywhere
except the defendant's malfeasance here, except for some
exceptions that are noted in the complaint.

If this code is allowed to go to a competitor or
to an entity that is not necessarily legal but can start
trading with this, the bank itself stands to lose its entire
investment in creating this software to begin with, which is
millions upon millions of dollars.

The bank's profit margin will be eroded -- and

1  I'll explain why in a minute -- by the other competit

2  activity.  In addition, because of the way this software

3  interfaces with the various markets and exchanges, the bank

4  has raised a possibility that there is a danger that

5  somebody who knew how to use this program could use it to

6  manipulate markets in unfair ways.

7  What this program does is connect and draw

8  information from stock exchanges around the country, and it

9  draws them in very small increments of time.  One of the

10  bank officers described it as milliseconds of time.  And it

11  is very efficient at processing that stock information and

12  sending to the bank's programs that conduct trades based

13  upon algorithms that are developed by mathematicians and

14  physicists.

15  As we stand right now, according to the

16  defendant's post-arrest statements to the government, he

17  transferred his view -- unwittingly, but nevertheless amidst

18  to having transferred --

19  MS. SHROFF:  I'm sorry, Your Honor, did he say

20  unwittingly?

21  MR. FACCIPONTE:  In the defendant's view in his

22  post-arrest statement.  Nevertheless --

23  THE COURT:  Share the statement with defendant's

24  counsel.

25  MR. FACCIPONTE:  I have provided the copy of the

statements to Ms. Shroff and also to Your Honor's deputy.
In his view he transferred it unwittingly, but nevertheless
admits to having transferred it. And it is sitting on a
server that we believe is in Germany right now.

He admits to having made several copies of that,
that he downloaded to his personal computer, his laptop
computer, and to a flash drive. And he has given consent
for the government to seize those items but the copy in
Germany is still out there. And we at this time do not know
who has access to it and what's going to happen to that
software.

We believe that if the defendant is let at liberty
there is a substantial danger that he will obtain access to
that software and send it on to whoever may need it. And
keep in mind, this is worth millions of dollars.

THE COURT: Well, what makes you think that it
hasn't already been transferred since you do now know
whether other people have access to the Germany server?
It's already compromised, so the financial institution has
to take steps now if you've made it aware of the compromise
to adjust for the loss of its trading platform.

MR. FACCIPONTE: Your Honor is correct. I
could've been disseminated in this time. It does not mean,
however, that if it has not been disseminated we should not
take steps to prevent the defendant from disseminating

1

2  information if it is not already out there.

3        THE COURT:  But my point is if you've made the

4  financial institution aware, that is date of the compromise,

5  and resides in the server in Germany, prudence dictates the

6  financial institution now has to take steps, if it hasn't

7  already, to address the loss of that information.  It can't

8  guess that no one has access to it.  It has to operate as if

9  someone does have access to it and can use it and can affect

10  the financial institution adversely.

11        So I have to image in that it's already taken

12  steps if you've alerted of the existence on the Germany

13  server, the institution I have to imagine has already taken

14  steps to contain any damage that may befall it.

15        MR. FACCIPONTE:  My understanding from the

16  financial institution, they are aware of this, Your Honor,

17  is that they do not believe that any steps they can take

18  would mitigate the danger of this program being released.

19        In other words, they can take steps, they can

20  start building a new program, they can -- I'm not exactly

21  sure what steps they can take.  But even if they could take

22  steps, my understanding from them is that any dissemination

23  of this program would be a substantial loss to them, a very

24  substantial loss to them.

25        And so if has, by some miracle, it has not been

26  disseminated already, the government requests that the

defendant be remanded so that there is no possibility that

he can affect any transfer of the software that is in

Germany.

THE COURT:   Well, whether he is detained is

irrelevant.  The financial institution cannot gamble, if I'm

to believe your presentation that markets will be affected

and so forth, they can't gamble that no one else is going to

get access.  It has to operate as if someone's got access

and has got to take steps to insulate or reduce any damage

it could possibly reduce, not only to itself but to the

financial markets.

MR. FACCIPONTE:   May I have one moment, Your

Honor?

(Pause in proceedings)

MR. FACCIPONTE:   I believe, Your Honor, that the

financial institution, I think the position here is that

whatever steps the financial institution can take, the

financial institution essentially has no way to effectively

protect itself against the loss of this program.  Once it is

out there, anybody will be able to use this.  And fair

market share would be adversely affected.  They would've

lost the substantial investment of millions upon millions of

dollars that they've placed into this software.

Even if they take the most prudent steps available

to them we should not run the risk that something which has

2  not been let out of the box yet, could be let out of the box

3  if the defendant is released.  And if he's released, he

4  doesn't need necessarily access to his home computer.  A

5  smart phone, a black berry, or an Iphone, something that

6  gives him access to the Internet is all he needs, and maybe

7  ten minutes.

8          So until we can say that this information is

9  secure to the best of your knowledge, the government

10  maintains the defendant is danger to the community.

11         In addition, Your Honor, he poses a risk of flight

12  and I believe the risk of flight in connection to a

13  substantial amount of money that could be made in selling

14  this software ought to be noted by the court.

15         He is a dual citizen with the Russian federation.

16  He has ties to Russia in the sense that his parents are

17  there and he visits Russia about every other year or so.  He

18  is facing, if the court were to find a maximum amount of

19  loss possible here, in the worst-case scenario, a very

20  substantial sentence in this case.

21         And considering that he's already partially

22  allocuted to some of the elements of the offense in his

23  post-arrest statement and the other evidence that we're

24  developing and the evidence presented in the complaint, the

25  proof against him is strong at this point.

26         And so therefore, there's just a possibility of

substantial sentence combined with the profit to be made by
selling this software, combined with the fact that he can
flee to Russia, the government believes that the defendant
be detained at this time.

THE COURT:  If as you say, the material is on the
server in Germany, if anyone can access the material through
that server, that is to say it is not only the defendant who
can access it; he might be able to provide other persons
with information that would allow them to access it, if
that's so, then what difference does it make whether he's
detained or not if he can communicate that information?

MR. FACCIPONTE:  Right now our understanding is
that the server can only be accessed by someone who has his
user name and password.

THE COURT:  Who has what, sir?

MR. FACCIPONTE:  His user name and password.

THE COURT:  Okay.  So if he gives that to you,
you can access that, isn't that correct?

MR. FACCIPONTE:  That is correct, Your Honor.

THE COURT:  So whether he's detained or not
doesn't him from communicating that information to you or
anyone else.  And therefore the server could be accessed and
the financial institutions and the markets compromised as
you have described.

MR. FACCIPONTE:  It would certainly be more

1

2 difficult, Your Honor.  And I don't believe the public ought

3 to bear the burden or the risk of that coming to past.  In

4 addition --

5          THE COURT:  But if he's detained, what prevents

6 him from communicating the information?  That's what I don't

7 understand.

8          MR. FACCIPONTE:  It would be a lot harder.  He

9 would have to at the very least enlist and accomplice.

10          THE COURT:  Okay.

11          MR. FACCIPONTE:  Which people may not want to be

12 accomplices.

13          THE COURT:  That's true whether he's detained or

14 at liberty.

15          MR. FACCIPONTE:  Okay.  But if he's at liberty he

16 would not necessarily -- he would not need an accomplice.

17 He could just pass it on to another server somewhere.

18          THE COURT:  He may already have accomplices who

19 may have the information that can access the server in

20 Germany.  Whether he's detained or not, I still don't

21 understand why being detained means the information can't be

22 disseminated to access the server.

23          MR. FACCIPONTE:  Because the server -- if the

24 server had been in the United States, Your Honor, we would

25 already be preparing process to free --

26          THE COURT:  But it's not.

1

2       MR. FACCIPONTE:   The government needs a few days,

3  given the holiday weekend, it would be difficult to do that.

4  But the government needs a few days to consult with German

5  authorities to take the steps to freeze that server.

6       So if the court is not prepared to detain the

7  defendant on a general showing, the government would at

8  least ask that the defendant be detained until such time as

9  they can secure the server, which we are moving to do even

10  as we speak now.

11       THE COURT:   I still don't understand why

12  detaining him prevents him from communicating information so

13  that someone can access the server.  If you make that clear

14  to me, then I understand more acutely why you're arguing

15  that he should be detained.

16       MR. FACCIPONTE:   Well, he would --

17       THE COURT:   If it just makes it difficult, lots

18  of things are difficult, but not impossible.

19       MR. FACCIPONTE:   If he were detained now, for

20  example, I don't believe he would have immediate access to

21  telephone privileges at the NCC or MDC.  I believe it takes

22  days to set those accounts up.  He would have to tell

23  somebody physically.  I don't believe anybody would -- he

24  would have to enlist a co-conspirator right now.

25       And I think when you weigh the probability of him

26  engaging in that behavior and being able to pull that

together, first is the potential risk of just letting him

go, I believe he ought to be detained.  Because he still has

more burdens in prison to disseminate his information than

he does if he's out in the street.

So if he's out in the street, he just needs access

to a cell phone.  In prison, he needs to get access to a

phone which is not a right if he is detained.  He would need

to write a letter.  A letter takes several days to get to

where it needs to go.

In the meantime, we would have -- we would very

likely have the server locked down at that point in time.

THE COURT:  All right.  Ms. Shroff?

MR. FACCIPONTE:  Actually, Your Honor, if I may,

earlier I represented that there had been no breaches before

for the bank.  I should put that there's never been any

breaches in anywhere of this magnitude before of the bank

where the entire platform has gone out.

I can't represent that there have been absolutely

in the past no breaches whatsoever.  But I do want to use

that segue into one thing I overlooked, which is when we

talk about this platform having been sent out, we're talking

about what he did on the last day of his job, on June 5th,

2009.

We have access of substantial file transfers that

are listed in the complaint from June 4th and June 1st

because the banks have not been able to recover the command

history for what he did at those times.  He have no idea of

what he took from the bank on those occasions.

He admits in his post-arrest statement that he has

taken other information from the bank.  So I do want to say

that this is the most substantial theft that the bank can

remember ever happening to it, in the sense that the entire

platform has been stolen.

In addition, the defendant has, on other

occasions, taken information from the bank and we don't know

what that information is or what use he's made of it or

where it is even.  I mean, it also -- some of that was also

sent to the server in Germany but we haven't had access to

that server yet.

THE COURT:  Ms. Shroff?

MS. SHROFF:  Your Honor, let me just pick up with

the issue the court sort of raised and that occurred to me

while I was listening to Mr. Facciponte.  Mr. Facciponte is

assuming, sitting here today, that nobody else has the

password or nobody else can access the server in Germany.

For all he knows, my client was at liberty to give

it to me and may have given it to several other people

before today.  So I don't think detention necessarily has

impact on what -- and I'm not referring to my client here;

I'm referring to any generic defendant who would be accused

of this kind of crime.

Because once the government attributes the motive of theft, then one has to assume that if his goals was to actually steal the proprietary information, he certainly is not so bound that he would not make sure the theft materializes into a profit.

So I'm going back to the defendant's post-arrest statement where it very clearly tells the government that at no point did he intend to, nor did he actually sell any part of the proprietary information.  The proprietary information was never used nor has it been used.  And the government, I believe had custody of my client and spoke to him for well over four hours.

I say this because last night at midnight I emailed Mr. Facciponte and asked him to have his agent stop speaking with the person who was arrested because I was under the impression that the had counsel already but hadn't had a call into me.

And I was informed by the U.S. Attorney's Office that they did not consider counsel and therefore would continue speaking to the client.  And the continued to speak to him.  And as far as I can tell, after four hours of speaking to him were the following facts?

Number one, Goldman Sachs, or whatever the entity is, has known before that this how I work on the program.

I've done it before during the course of my employment and
Goldman Sachs has had nothing to say about it.  I have no
intention of ever selling this information nor did I have
any intention of ever using the information in a way
contrary to my employment agreement with Goldman Sachs.

I have not sold this information to anybody.  I
have not offered to sell it to anybody.  In fact, I'm fully
cooperating with your entity because I did not think I was
doing anything wrong.

I'm going to go ahead, Mr. FBI agent and AUSA and
sign a consent form so you can go to my home which has my
three little children in it, my wife in it, and I'm going to
tell my wife to let you come on into my home and take all
the computers that are over there.

I'm happy to sit down and talk to you and let you
know what other electronic equipment I have, and you can go
right ahead and seize it.

All of this the government has.  So the government
has all of his personal computers.  The government is also
fully knowledgeable about the fact that this employer was in
the past aware that this is how his common work practices
were and Goldman Sachs never took any steps to stop those
work practices.

So I'm somewhat confused by how the government can
say that there have been numerous breaches but none of the

breaches were addressed by Goldman Sachs that should've

resulted in an earlier arrest.

        The other thing that the prosecutor just referred

to, and I'm going to ask you just to take a look at page

seven of paragraph seven of the complaint itself.  It says

that there are transfers from between June 1 to June 5th of

32 megabytes.  I'm told that the entire platform would

consist of 1,224 megabytes at the very least.

        So out of 1,224, the government is alleging 32

were transferred.  I don't understand how the government can

say my client has allocuted to any part of this crime

because his statement is replete with his saying, I never

had any intention of using this in any non-proprietary way.

I have violated no non-compete agreement.  He says that very

clearly in what I have received to be his statement.

        So I don't think detaining Mr. Aleynikov has any

relation to danger to the community.  And the one side point

I do want to make is that the server happens to be in

Germany is not known to anybody, nor was it a deliberate

attempt.  Because when you see a URL you don't know where

the server is.

        So I'm really not sure what difference that makes.

And finally, if the government wants to take steps with

Germany, I'm pretty confident that nobody in Germany is

celebrating the 4th of July.  I don't think they got

independence the same year we did and I think the government

is well equipped to deal with whatever they want without

requesting that the time they need to necessarily result in

my client not being at liberty where he's otherwise fully

qualified for bail.

        This brings me to risk of flight.  It is absurd to

say that he's had risk of flight.  He had three young girls

who are under the age of five, the last on being eleven

months old.  His wife is a United States citizen; she is in

court today.  His father lives in the United States.

Although they are not close, he is here.

        My client's entire married into family.  His

father and mother are in the courtroom today.  His mother-

in-law is not here because she's watching the three girls,

but both of them would be willing to sign the bond.

        So the only person he has in a country other than

this country is his mother and step-father.  His mother is

certainly not a draw enough to my client to have not bought

a home in this country, not once but twice, and is certainly

not a draw enough for him to even visit her more than, maybe

once year.

        I am told, and I asked the agent to show me the

passport, but the passport was not available to me, but in

the last 19 years that my client has lived in the United

States he has visited his home country or his mother's home

country ten times, which is less than once every year.

My client's post-arrest statement belies guilt
here.  My client's actions certainly belie guilt.  He gave
them the entire computer.  As I understand it, they have
seized every equipment that was in their home, this morning.
And my client's wife let them in through the door and handed
it over.

I'm also told that my client's passport, both of
them, one which was in his home.  I think his Russian
passport, which I'm not even sure if valid now, but whatever
it is, it's with the agent.  The United States passport is
also with the agent, so my client is certainly not at risk
for flight.

And I think probation recommendation is proper
give the fact that my client is almost 40 years old, has no
prior arrest, no prior contact with the criminal justice
system, and detention is wholly improper given the facts of
this case.

If I've left out anything, Your Honor, I'm happy
to answer it here but I think the court is correct.  There
seems to be no logical relationship between the relief being
sought and the harm that they seek to curtail.  That there
is absolutely no way to say that a person should be detained
because they think that he may not have already passed on
access devices to some proprietary code.

And again, Your Honor, the government has yet to tell the court in any way, shape or form, that there was any intent to sell or misuse this proprietary information. So my client's statement is very clear, after four hours with the agent, he tells the agent, look, I didn't mean to misuse this information. I have not stolen it. I have not made any arrangements to steal it and this is the way I worked when I was fully employed at Goldman Sachs.

And also, Your Honor, January 1st to January 5th I'm pretty sure what time periods between which his employment -- I'm sorry -- June, his employment with Goldman Sachs was not over. I just want to leave the court with one final thought.

If Goldman Sachs cannot possibly protect this kind of proprietary information that the government wants you to think is worth the entire United States market, one has to question how they plan to accommodate any other breach. But that seems like a very farce, wide-open statement to say, that Goldman Sachs has no way of keeping track of their own proprietary information.

I mean, I think that the market is at risk no matter what then. It's not necessarily attributable to my client's actions. So I think that pre-trial service's recommendation should be followed. If the court by any chance were to think that their recommendation is not

enough, we are happy to have, come Monday, confessed

judgment in the home.  We're happy by any conditions that

the court imposes, including that my client not have access

to any electronics, including a telephone or including a

cell phone.  I have no objection to that.

         And I have two people who are ready to sign the

bond in court.  His father-in-law works for ADP and I'm told

his yearly income is about $100,000.  His mother-in-law

would be the second co-signer.  She's a piano teacher.  And

my client's wife would be the third co-signer if the court

would need a person that does not make money but has moral

estuation over Mr. Aleynikov.

         Unless the court has any questions, I'm done.

         THE COURT:   Thank you.  Anything else on behalf

of the government?

         MR. FACCIPONTE:   Yes, Your Honor, if I may

respond to a few points?

         THE COURT:   Sure.

         MR. FACCIPONTE:   Okay.  First of all, in the

government's discussions with the investment bank, we have

heard nothing to indicate that the investment bank at any

time has ever sanctioned the defendant taking any software

out of the bank and doing anything else with it.

         The bank officers were quite clear that they

consider whatever software is being worked on my Goldman

Sachs employees that that software is proprietary and stays within the bank.  In fact, one bank officer recollected that there was a time when defendant himself had asked permission to take what could be considered open soft source software which in the programming community is software which programmers consider anyone can use in that intellectual property rights don't strictly attach to and place it back onto the market, and he was told no.

And the fact that he asked shows that he is aware that he cannot just take software and put it out into the market.  And the defendant signed a confidentiality agreement that is quite clear that nothing that has anything to do with Goldman Sachs goes outside of Goldman Sachs without their permission.

So the notion that they would have to be something we have not heard as the government from the bank.  Because everything that we have heard is that this was not sanctioned conduct whatsoever from him.

Second, I do want to address a few small points.  When the agents were interviewing the defendant last night, he had signed a written consent to be interviewed and a waiver of his Miranda rights.  He did not have counsel appointed at that time.  He did not request counsel to be appointed during that time.

Ms. Shroff was his counsel at that time.  She had

not been appointed yet by this court.  The U.S. Attorney's

Office position was that the defendant is not asking for

counsel at that point in time and he has no appointed

counsel, that Ms. Shroff could unilaterally instruct the

government to terminate the interview, and that's why we did

not terminate the interview.

In any event, I personally did not receive Ms.

Shroff's communication until just about the time when the

interview was being terminated anyway, although she did

attempt to communicate with another assistant in the office

last night.

The second point is the contention that I said

that the defendant had gone to Russia every year.  I believe

I said every other year.  And if Ms. Shroff says he's been

in this country nearly 20 years and he's been to Russia 10

times, that would be correct.

Third, the notion that the software, the

proprietary platform is much bigger than a 32 megabytes.

Our understanding from the bank is that what he took was

essential software to the platform that puts them in extreme

jeopardy of having their software out there in the market.

I also know for the one instance where we do have

logs of what he did, he ran a program that compressed the

files that were a resident on Goldman Sachs' servers, and

compressed it down to a smaller size.  So whether the total

size of this software -- it could be much bigger – it's also
true that he has run a compression program on at least on
the software that went out on that Friday.

Ms. Shroff made some representations about the
defendant's motivations and consenting to searches.  You
know, it's often true that defense attorneys look for
evidence of innocence in a defendant's consent to search.
Another way to look at that is how did they arrest the
defendant might figure that we already know about certain
activities of his and we're going to get a search warrant
anyway, so perhaps he should start cooperating.

We have no indication, however -- well, let me put
it to you this way:  Again, his main contention is that, in
his post-arrest statement, that he took this unwittingly; he
had meant to take something else.  Now the script that he
ran to take this information was very specific as to which
files would be taken and copied and uploaded into his
server.

So I don't know how there could've been a mistake
there, but even assuming there was a mistake, when he
discovered the mistake, which he says he discovered, why not
give it back immediately?  Why hold on to it for a month.
And leave in mind it should be said that he is now working
in a start-up company that is developing the same kind of
software and his salary increased three fold just by joining

that start-up company.

And so it does raise a strong inference that if he's hold on to this software, and he's working in a company that is looking to create its own software that does similar things, that he intends to use this.

Finally, to get back to the court's original concern, there is no guarantees of anything, Your Honor, in terms of what may have happened and what may happen to the defendant. However, we do know right now that in a few days we can seize that server, or at least deny anyone access to it.

And in light of the fact that the bank has made many representations that this would be very harmful to the bank and would lose it millions and millions of dollars we believe that detention is the only way to insure that that harm does not occur.

It may be too late but there is also a substantial risk that the bank should not have to endure. And unless Your Honor has any additional questions, I'm prepared to rest.

MS. SHROFF: Your Honor, if the bank does not bear the risk of insuring that its proprietary information is safe, it's certainly not fair for the bank to stand up and say detain somebody while I put into place procedures that I should have assured the American public that I

already had in place when I first took your money. That's

preposterous. I mean, essentially what Mr. Facciponte is

telling us is this financial institution that takes millions

and millions of dollars of the American public should not

bear the risk of making sure that their millions and

millions of dollars are safe, and that burden in fact should

rest on one of maybe two hundred employees at Goldman Sachs

that has access to their software code. And gee whiz,

because Goldman Sachs didn't bother to do it, could you just

detain him for a couple of days so that Goldman Sachs can

get his act together? That's an absurd argument to make.

It's just as absurd as saying that this guy who

you want to say in the next four days might use the code,

and it's such a big feat, would not have put things in place

to make sure what he took over a month ago was not already

stolen or already put to malfeasance use.

So essentially what the government is saying to

you is this: Listen, a month ago this guy went and stole

something that Goldman Sachs values so much that they didn't

bother to properly protect. For a month they did nothing.

He just kept on going on, using the source code, or whatever

code it is, and for a month and a half, a month at the very

minimum, Goldman Sachs did nothing.

Now suddenly Goldman Sachs has realized that they

want this code that they shouldn't be wherever they think it

is out there.  So now they want to come to you and say, hey,

detain him because for a month we did nothing.  Even though

all the other factors show that this guy might actually be

innocent.  Because were he not innocent, in a month that it

took for him to keep this code, he didn't sell it to

anybody.  They don't have any proof of any selling to

anybody.  He hasn't disseminated to anybody that the

government can pass it to you.

In fact, in all the -- the 20 minutes he's been

talking, he has never once told you what he did with the

code.  It seems the code is encrypted, safe, not spent, and

out there just sitting.  Because surely he started the

start-up way before this weekend, right?  In fact, they've

known about this by their own admission since June 4th.

So whatever start-up he has, if he was going to

use it, he would've used it already.  It would already be

over there and obviously they know it's not over there.  So

it's a very strange argument to say, especially when they're

arguing for detention.  And they're basically saying to you,

the only reason we want to now detain him is we're scared

Goldman Sachs can't get its act together.  That's not a

reason in the Bail Reform Act format to detain somebody.

Okay?

And there is no indication here that his actions

could or would prevent any harm to the general public.

1

2 That's the first argument.

3       The second argument is, I didn't talk about his

4 computers being taken because I'm fishing for some innocent

5 excuse.  I'm telling you he's innocent.  I'm not fishing for

6 an excuse, and I'm also telling you that whatever access he

7 has, they have reduced his access.  And if he really wanted

8 access that badly, he could've had access by now.  He's had

9 the damn thing -- I'm sorry -- he's had it for a month.  He

10 could've done any number of things he wanted with it for a

11 month.  They have yet to tell you that he has sold this or

12 made mal use of it.  Surely Goldman Sachs would've known is

13 he's made mal use of it.  It's been a month.

14       So my point to you in telling you that all of the

15 computers have been taken from his home is to assure you,

16 Your Honor, that were you do release him as you should, he

17 would not have access to it.  And he would agree, as a

18 person of almost 40 years of age with no prior criminal

19 record, that he would not avail himself of any steps to

20 access anything else.  And as an officer of the court, I'm

21 positing to you that those conditions would be honored by my

22 client.

23       Finally, Your Honor, he is a United States

24 citizen, he's naturalized, he's lived here for 20 years.

25 And there is nothing in all that the government has said

26 that require detention.  Nobody but Goldman Sachs, according

to them, is at harm.  And Goldman Sachs has known about this
since June 1.  We are now on July 4th.

Finally, Your Honor, I just want to make sure that
the little anecdote that the government just said was
actually factually incorrect as far as I can tell.  The
question posed to Goldman Sachs was not about accessing
software.  The question was whether a particular thing could
be revealed into open source.

This material that they're claiming is so highly
sensitive is not accessible.  It's encrypted and again, I
cannot make this point more strongly, for a month he has not
sold it.  Every single time he's talked about this code, the
word he's used is Mr. Aleynikov took it.  Taking.  He took
it and he did nothing with it.  They still haven't showed
any sell, anything that is done with it to put Goldman Sachs
or the American public at risk, so he should be released.

THE COURT:  Anything else we have from the
government?

MR. FACCIPONTE:  Just briefly, Your Honor.
Goldman Sachs has not known about this since June 1st.
Goldman Sachs has known about this for a matter of days.

THE COURT:  For how long?

MR. FACCIPONTE:  For a matter of days, Your
Honor.

THE COURT:  But the complaint says differently.

MR. FACCIPONTE: The complaint says that two weeks ago they instituted a program of scanning their https logs for unusual file transfers. That resulted in them determining that this had been taken.

My understanding is that Goldman Sachs realized that this was a problem based upon their review of those logs just a few days ago. The government was not contacted until Wednesday about this matter.

I think what Ms. Shroff is confusing is Goldman's civil remedies, to the extent that it has any, and this criminal case. Maybe Goldman can go out and get whatever the German equivalent is of a TRO. But this is, in the government's view, a crime that we have shown probable cause for, and therefore it is possible that the defendant may compound his crime and pose a danger to the community. And the bail statute allows the court to detain him if he is a danger.

In addition, there is some notion that this is somehow Goldman Sachs' fault. Goldman Sachs has safeguards in place. It was the defendant who had to engage in subterfuge to attempt to cover his tracks when he ran these programs. If this was an innocent thing why was he attempting to cover his tracks? Why he was deleting, attempting to delete the batch history? Why did he encode this and then delete the encryption program afterwards if

this was such an innocent

1

2 activity on his part?

3      And finally, there is a notion of what the

4 defendant may have done or may have done with the program

5 before he knew his activity was detected and what he may do

6 now.  Maybe he didn't disseminate the program before he knew

7 it was detected because he figured he had all the time in

8 the world; he had gotten away with it.  He can wait to find

9 the highest buyer.  He can wait to implement it in his new

10 position, slowly over time, so that his new employers in

11 SLU's factory where he was getting his code from.

12      But now that he has been caught and it is very

13 likely that we will know what is in that German server

14 within a matter of days.  And he may have other stuff there.

15 He has a very strong incentive to get rid of that evidence;

16 to move it some place else.

17      And because he has that strong incentive, he poses

18 a danger and that's why we ask for detention.

19      MS. SHROFF:  Your Honor, the government's

20 complaint says that as of June 1st Goldman Sachs saw some

21 activity that they decided looked strange.  And since June

22 1st until this weekend, or 24 hours, Goldman Sachs did

23 nothing, nothing, absolutely nothing.

24      I don't know what Goldman Sachs did other than

25 flag it or take steps.  But they certainly didn't call the

26 U.S. Attorney's Office by their own admission until almost a

1
2  month later.

3      Secondly, Your Honor, it's -- the government is
4  essentially saying to you that for 30 days they thought some
5  activity was strange but they did nothing about it.  And for
6  30 days my client had this proprietary information but he
7  sat back and he said even though I'm going to do the start-
8  up company, I'm going to just sit around and wait and see
9  who I can sell this proprietary information to, and who is
10 going to be my highest bidder.

11      They can't have it both ways.  I mean, basically
12 their argument is, he stole it, he hid it, but look.  He
13 didn't really do anything with what he's took.  And I'm not
14 confusing a civil remedy with a criminal case.  I was an
15 associate at Weill Gotshal for seven years.  I know what a
16 civil remedy is.

17      My point here is they have no proof of a criminal
18 act because if he did, he wouldn't keep saying Mr. Aleynikov
19 took the code.  He wouldn't keep saying -- he would be able
20 to stand there and tell you what he did with it.  He would
21 be able to tell you Goldman Sachs thinks that the market is
22 compromised because of something he did.  There is no
23 indication that this quote/unquote harm that they are
24 worried about, or that they claim to be worried about,
25 Goldman Sachs did anything about it for a whole month.

26      So essentially basically what they're saying to

you is, why don't you detain him until we've figured out exactly what we can or cannot do?  And that is something that the bail reform act asks you to weigh within a conglomerate of other factors, including the inferences that we draw from misconduct.  And the conduct that the court should focus on is his lack of having done anything improper with the proprietary information.

And, Your Honor, every single personal fact behind this defendant supports release.  There is no prior criminal history, there's not bench warrant history, there's nothing to indicate he's a risk of flight, there's nothing to indicate he doesn't have family here.  There's absolutely nothing to indicate that he would do or take any wrong steps here.

And I think the government is sort of cavaliering throwing out hypotheticals.  Maybe he would compound his criminal behavior.  Well, the equal inference is maybe he wouldn't.  As he said in his statement he took this unwittingly.  If he took this unwittingly, it is certainly must greater an inference that he wouldn't do anything improper with the information.

And again, to just go back to the point you raised, there is no correlation between him being detained and him releasing the proprietary code.  In fact, I could throw out another hypothetical.  Maybe he'll think, oh, I'm

detained. I might as well have this sold to the highest

bidder so that my three children and my wife can be taken

care of. I'll just rot in jail. That's an equally

plausible inference or an equally plausible thought that a

person may have.

There has to be some correlation, as you said,

between the remedy they seek and the harm they seek to

prevail. Detention is not appropriate here. What might be

appropriate is extremely stringent circumstances, and that

should more than suffice given the facts of this case.

THE COURT: Can you be heard further on behalf of

the government?

MR. FACCIPONTE: Not necessarily, Your Honor. I

just don't know where Ms. Shroff sees in the complaint that

Goldman Sachs is aware as of June 1st. Goldman Sachs began

running programs within the past few weeks, recently

identified and issue. There was no contention in the

complaints.

And even if the complaints are ambiguous or

inartfully worded someplace, I can represent to you that my

understanding from Goldman Sachs is they did not know of

this as of June 1st. They learned of this much more

recently and --

MS. SHROFF: Your Honor, I think page eight, I

mean, paragraph eight, as of June 5th, 2009 the financial

institution has recovered a record of series of commands

entered in Aleynikov's desktop which is also known as a

batch history.  So what were they aware of as of June 5th?

MR. FACCIPONTE:  It's not as -- it's as to June

5th.  And what we were trying to say there is as of the June

5th transfer the government has -- the financial institution

has recovered a series of commands that are related to that

transfer on June 5th.  It's not when Goldman Sachs

discovered the transfer.  They didn't discover the transfer

the day it happened.

MS. SHROFF:  And paragraph seven says as a result

of the review the financial institution learned that the

worktop desk and the review is noted in the first line of

paragraph seven.  According to representatives of the

financial institution within the past few weeks I have

learned that the financial institution has begun monitoring.

So they start monitoring in June but they don't

really pay any attention to what they're monitoring.  Is

that what the government wants us to think?  So they stop

monitoring in early June, they start noticing something in

June 1st, but they say, hey, we'll just wait until the 4th

of July and then bring it up?

MR. FACCIPONTE:  I really think Ms. Shroff is

misconstruing the allegations in the complaint.

MS. SHROFF:  It's clear --

2          MR. FACCIPONTE:    In any event --

3          MS. SHROFF:    The English is clear.  What am I

4    misconstruing?  It says, as a result of that review the

5    financial institution learned that the worktop that -- it

6    doesn't say the financial institution learned in July.  And

7    if they learned in July --

8          MR. FACCIPONTE:    It also doesn't say the

9    financial institution hasn't learned --

10          MS. SHROFF:    -- then surely there is something

11   wrong.

12          MR. FACCIPONTE:    -- in June.

13          MS. SHROFF:    Don't interrupt.  You shouldn't, I

14   mean if you're doing a review, surely you look at what

15   you're reviewing within the time frame that you're reviewing

16   it.  Either it's that important to you or it's not.

17          It can't be that important to you that you don't

18   review it for a month and then say detain him because two

19   days are so important to us that the entire American public

20   is going to fall on its face.  It's one or the other; it

21   can't be both.

22          MR. FACCIPONTE:    Our point stands, Your Honor.

23   We do believe that in this situation the bail statute

24   provides that the government can show by preponderance of

25   the evidence that he, the defendant, poses a danger to the

26   community in the form of the defendant going out and

disseminating software which would cause millions of dollars
of damage, if he hasn't done so already, and we have no
reason to believe that he has --

MS. SHROFF:   It's not disseminated.  It is not
disseminated.

MR. FACCIPONTE:   It could be disseminated.

MS. SHROFF:   If were disseminated, the damage
would be done and he would still be released.  And by the
way, this is not a presumption case and the issue is risk of
flight.

MR. FACCIPONTE:   I said the government has the
burden here.  I did not say this was a presumption case.

MS. SHROFF:   This is a non-presumption case.  He
is entitled to the presumption.  The presumption is in favor
of release, and the government certainly hasn't overcome its
burden by claiming that they've reviewed something from June
1st and didn't bother to do anything about it until July
4th.

MR. FACCIPONTE:   Your Honor, that's a specious
argument, that the bank began its review not on June 1st,
much later, and when it discovered there was a problem, it
brought it to the government's attention promptly.

(Pause in proceeding)

MS. SHROFF:   Your Honor, may I just -- Your
Honor, I'm sorry.

THE COURT:   Yes.

MS. SHROFF:   Maybe I'm mistaken, but as I recollect, Judge Ellis, he wrote the opinion on the United States versus Madoff.  I think he drew a distinction on cases that have a presumption of release versus a presumption of detention.  And there is no presumption of detention in a case that has no violence or drug history.  The relevant inquiry remains on risk of flight and not on dangerousness.

I don't have the cite in front of me, and I apologize for that.  But I'm pretty sure the inquiry on a case where there is no presumption of detention as the government has to concede this case is.  The issue is not dangerousness; the issue is risk of flight and there is no risk of flight here.

THE COURT:   Is it your view that in the absence of an offense described in 18 U.S.C. 3142(f) that an accused can never present as a danger to the community?

MS. SHROFF:   No, not that they can ever present as a danger to the community but I could be wrong.  I'm telling you candidly, but I think the inquiry isn't on dangerousness.  The inquiry is on risk of flight.

THE COURT:   The inquiry is determined by the nature of the application.  If the application is to detain someone based upon a risk of flight only, fine, then you've

addressed issues with respect to flight only.

        But if the application is one such as here where
there is an allegation by the government that the person
presents both as a risk of flight and a danger to the
community, you can't ignore either.  You have to analyze
both of the problems under which the application's being
made.

        MS. SHROFF:  Your Honor, I think, again I'm not
sure I'm correct, but I think that in a non-presumption case
the sole inquiry then would be risk of flight.

        THE COURT:  But that can't be the case if the
argument is that someone who does not commit an offense
described in (f) presents as a danger to the community.

        MS. SHROFF:  But then --

        THE COURT:  If you stole mail, let's say --

        MS. SHROFF:  Right.

        THE COURT:    -- and threatened your supervisor in
a mail facility, if you were to be released, you would
present as a danger to that person in the community.
Notwithstanding the fact that the underlying offense,
stealing mail, is not one recited in (f).  You could present
as a danger.

        MS. SHROFF:  Well, unless he is also charging him
with the threat, then I would have to say yes, I'm of the
opinion that you wouldn't consider that.

2          THE COURT:   Even if you did not, if you made a

3   post-arrest statement and said I hate my supervisor.   When I

4   get out of here, he or she's in for it.   I'm going to do

5   harm to that person.   Whether you charged it or not, you now

6   have information that a person in the community may be in

7   risk or at risk if the person's at liberty.

8          MS. SHROFF:    That may be.   That may be that the

9   person's at risk.

10         THE COURT:   So depending upon how the application

11  is made, what theories under which you are pursuing, in this

12  case the government is pursuing both theory of flight and

13  danger to the community.   Both theories have to be analyzed

14  by the court.   You can't ignore one just because the

15  underlying offense is recited in Supplement (f) of 18 U.S.C.

16  3142.

17         MS. SHROFF:    Well, Your Honor, I guess I'm not

18  saying you should ignore it but I am saying that I'm not

19  quite sure that that's -- that prong is relevant on a non-

20  presumption case.   But I abide by what you are saying.   Like

21  I said, I am not sure.

22         I think I have -- I don't have a presumption to

23  overcome here; they do.   But I think that all the steps that

24  could possibly be taken and again, relying on my

25  recollection of the Ellis/Madoff opinion, the question isn't

26  whether all risk is eradicated.   The question under the --

THE COURT:   Of course.  You can never eliminate all risk.  Otherwise insurance companies wouldn't be in business.

MS. SHROFF:   Thank you, Judge.

THE COURT:   In a circumstance where an application is made that a person be detained, 18U.S.C.36142 requires that certain factors be considered.  Among others, the nature of the charged offense, the evidence against the accused, the background of the accused, his or her ties to the community, employment history, prior criminal history if any, whether at the time of the alleged offense that the accused is under the supervision of a parole or probation entity.

In the instance case, the accused has ties to the community, had an employment history, has no prior criminal history, is not under the supervision of a parole or probation entity.

The strength of the evidence against him is tempered somewhat by the statement that he gave post-arrest, although there is evidence proffered and outlined in the complaint that may demonstrate a degree of strength that militates in favor of the application made by the government.

I am not unmindful that apparently a month has elapsed since the -- almost a month.  Tomorrow will be a

month since the accused severed his ties with this prior
employer, a financial institution, whose proprietary
information is at the heart of the complaint. And there is
no evidence that has been proffered that the material was
taken, or alleged to have been taken, from the financial
institution has been used to harm it or anyone else.

Much during the course of this proceeding is based
on speculation. But we don't deal with speculation when we
come to court; we deal with facts.

Given all of the information that has been
presented to me in support of and against the application
that the accused be held without bail, on the issue of
danger, the court has to find that there is clear and
convincing evidence that the defendant would present as a
danger. I don't think that clear and convince evidence has
been presented to me, so I do not find that he should be
detained under the theory of danger.

With respect to flight, I also am not persuaded
that the quantum of information that's been presented to me
permits a conclusion that the defendant could not be at
liberty under conditions that would insure that he be in
court whenever he is directed to do so. So I'm going to
deny the application that the defendant be detained without
bail.

(Pause in proceeding)

1

2          THE COURT:   Bail condition will be as follows:   A

3   $750,000 personal recognizance bond must be co-signed by

4   three financially responsible persons.  Bond is to be

5   supported by $75,000 cash or property.

6          Defendant's travel is restricted to the Southern

7   and Eastern Districts of New York and the District of New

8   Jersey and he must surrender the travel documents he may

9   possess and not seek or obtain any new or replacement travel

10   documents while this criminal action is pending.

11          He'll be subject to regular pre-trial supervision

12   and he shall not access the computer data that is the

13   subject of the criminal action.

14          The pre-trial services office shall be permitted

15   to the extent possible to monitor defendant's use of

16   computers or other electronic devices at his home or place

17   of business to insure that the defendant does not access the

18   data that is the subject of this criminal action.  All bail

19   conditions must be satisfied before the defendant's release.

20          Sir, if you've satisfied the bail conditions and

21   are at liberty, you must appear in court whenever you are

22   directed to do so.  If you fail to do so, you and any co-

23   signers on your bond will be liable to the government for

24   the full amount of the bond.

25          Any property or cash posted in support of the bond

26   before fitted to the government, a warrant may issue for

your arrest, and you may expose yourself to a new charge in

connection with your failure to appear in court, which would

have a penalty that is independent of any penalty that might

be imposed upon you should you be found guilty of the

offense that is outlined in the complaint.  Do you

understand, sir?

        MR. ALEYNIKOV:   I do.

        THE COURT:   What date would you like for a

preliminary hearing date?

        MS. SHROFF:   Your Honor, first may I just request

that the United States Attorney's Office order my client to

be produced on Monday so that all conditions can be met.

I'm told that those conditions will be met by Monday.  So

I'm going to ask Mr. Facciponte to please produce my client.

        And assuming that he does, then I would like the

30th day.

        MR. FACCIPONTE:   Your Honor, I --

        THE COURT:   Please have the defendant available

so that, if the conditions are satisfied, he may be released

on Monday.

        MR. FACCIPONTE:   Your Honor, we'll put in a

prison production order with the Marshals immediately after

this conference.

        THE COURT:   August 3 will be the preliminary

hearing day.  Is there anything else that we need to

1

2  address?

3      MR. FACCIPONTE:    Nothing from the government.

4  Thank you, Your Honor.

5      MS. SHROFF:    No, Your Honor, thank you.

6      (Whereupon the matter is adjourned to August

7  3rd, 2009.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, United States of American v. Sergey Aleynikov, was prepared using digital electronic transcription equipment and is a true and accurate record of the proceedings.

Signature_____

Date:  July 6, 2009

# EXHIBIT 2

1

98AVALEC                    Conference
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4                   v.
4
5   SERGEY ALEYNIKOV,
5
6                   Defendant.
6
7   ------------------------------x
7
8                                        New York, N.Y.
8                                        August 10, 2009
9                                        4:05 p.m.
9
10
10  Before:
11
11                  HON. PAUL A. CROTTY,
12
12                                      District Judge
13
13
14                  APPEARANCES
14
15
15  LEV L. DASSIN, Acting
16      United States Attorney for the
16      Southern District of New York
17  THOMAS G.A. BROWN
17      Assistant United States Attorney
18
18  FEDERAL DEFENDERS OF NEW YORK
19      Attorneys for Defendant
19  BY:  SABRINA P. SHROFF
20
20  BOIES SCHILLER & FLEXNER
21      Attorneys for Goldman Sachs & Co.
21  BY:  JONATHAN D. SCHILLER
22       MATTHEW W. FRIEDRICH
22       JOSHUA I. SCHILLER
23
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

2

98AVALEC                    Conference
1           (In open court)
2           THE DEPUTY CLERK:  Your Honor, this is the matter of
3   United States America v. Sergey Aleynikov; docket number 09 MJ
4   1553, case unassigned.
5           For the government, please state your appearance for
6   the record.
7           MR. BROWN:  Good afternoon, your Honor.  Thomas Brown
8   for the government.  I'm standing in for Joseph Facciponti.
9           THE DEPUTY CLERK:  For the defendant?

10          MS. SHROFF:  Good afternoon, your Honor.  Federal
11   Defenders of New York by Sabrina Shroff on behalf of
12   Mr. Aleynikov, who is not present in court today.
13          With me at counsel table is Mai Wa Lee, a paralegal in
14   our office.
15          THE DEPUTY CLERK:  For Goldman Sachs?
16          MR. JONATHAN SCHILLER:  Jonathan Schiller, your Honor,
17   and Matt Friedrich of our firm.  Good afternoon.
18          THE COURT:  I understand the first order of business,
19   Mr. Schiller, is to move the admission of a gentleman by the
20   name of Joshua Irwin Schiller?
21          MR. JOSHUA SCHILLER:  Yes, sir, that would be me.
22          THE COURT:  OK.  Do you want to say a few kind words,
23   Mr. Schiller?
24          MR. JONATHAN SCHILLER:  I would like to.  I've known
25   this candidate for admission to your court all of his life,

1    Judge.  He received his law degree from Colombia last May, and
2    he began working with our firm in September.
3           Since he's joined our firm and long before that, he
4    has exhibited a high degree of moral character and fitness,
5    which your Honor would expect attorneys appearing before this
6    Court.  And it is with the great enthusiasm of his father and
7    of his colleague that I move his admission before your Honor.
8           THE COURT:  All right.  Mr. Schiller, has he met all
9    the rules, the Federal Rules of Civil Procedure and the Federal
10   Rules of Evidence.
11          MR. JONATHAN SCHILLER:  Yes, he has.
12          THE COURT:  Answer all my questions on jurisdiction.
13          MR. JONATHAN SCHILLER:  I know he would give you
14   responsible answers, your Honor.
15          THE COURT:  OK.  All right.  The application is
16   granted.
17          MR. JONATHAN SCHILLER:  Thank you, Judge.
18          THE COURT:  Congratulations, Mr. Schiller.
19          MR. JOSHUA SCHILLER:  Thank you, your Honor.
20          THE COURT:  I hope you have a long and distinguished
21   career.
22          All right.  Mr. Schiller, are you going to argue or is
23   it Mr. Friedrich?
24          MR. JONATHAN SCHILLER:  Mr. Friedrich is.  And with
25   the Court's permission, I would just like to introduce him to

1    you, Judge.
2           He joined our firm earlier this year.  Before that, he
3    spent his entire career with the Department of Justice in
4    Washington.  And most recently, in 2008, Mr. Friedrich was the
5    acting assistant attorney general responsible for the criminal
6    division.
7           With your Honor's permission, he will argue our motion
8    today.
9           THE COURT:  Fine.  Before we hear from Mr. Friedrich,
10   does the government have a position on this?
11          MR. BROWN:  No, your Honor.
12          THE COURT:  All right, Mr. Friedrich.
13          MR. FRIEDRICH:  Good afternoon, your Honor.
14          THE COURT:  Good afternoon.

```
15          MR. FRIEDRICH:  Let me begin by saying that I regret
16  that this is a matter which will consume your time this
17  afternoon.
18          THE COURT:  I've assumed that much.  When God made
19  time, he made plenty of it.
20          MR. FRIEDRICH:  Very well.  I have tried on at least
21  two or three occasions to reach some type of compromise with
22  counsel for the defendant, Sabrina Shroff.  Most recently, as
23  of Friday, I had made a proposal wherein Goldman Sachs would
24  produce certain information at some point in time, perhaps a
25  month out from trial, with the understanding that the subpoena
```

98AVALEC          Conference
```
 1  would be withdrawn with leave for her to refile at a later time
 2  if we weren't giving her -- by simply producing the employment
 3  file or the personnel file -- the things that she was looking
 4  for.
 5          She then told me that she wanted that information now
 6  and not 30 days before trial.  I told her that I would take
 7  that to my client, if she would take it to hers.  When we next
 8  spoke, she indicated that she was not interested in
 9  compromising, but simply wanted to know how your Honor would
10  rule on this matter.  So for that reason, our motion stands and
11  we're prepared to argue before you today.
12          THE COURT:  Apparently, if I read her papers
13  correctly, she wants them so she can negotiate some kind of
14  agreement with the government, and she thinks that the
15  information might be helpful to her.
16          MR. FRIEDRICH:  Yes, your Honor.
17          THE COURT:  Why can't she have it now, if you're
18  willing to produce it closer to trial?
19          MR. FRIEDRICH:  Well, again, some of the materials
20  that are at issue are things like training history information
21  regarding a program that has already been described in other
22  court papers to be proprietary in nature.
23          THE COURT:  It's in his personnel file?
24          MR. FRIEDRICH:  No, it's not in his personnel file.
25          THE COURT:  I thought she wanted his personnel file.
```

98AVALEC          Conference
```
 1          MR. FRIEDRICH:  She wants much more than that, your
 2  Honor.  She is not asking just for the personnel, she is
 3  asking -- personnel file, she is asking for documents
 4  pertaining to the personnel file, including, but not limited
 5  to, his application for employment, interview report form,
 6  employment offer letter, performance reviews by peers and
 7  superiors, complaints, employee progress reports, training
 8  history records, exit interview.
 9          THE COURT:  Wouldn't that be in his personnel file?
10          MR. FRIEDRICH:  I think some of these things might be
11  in his personnel file, your Honor.  I think some would very
12  likely not be in his personnel file.
13          THE COURT:  Are you willing to produce his personnel
14  file?
15          MR. FRIEDRICH:  I'm willing to produce what Goldman
16  Sachs considers to be his personnel file on the condition
17  that --
18          THE COURT:  No conditions.  What are you willing to
19  produce?
```

20          MR. FRIEDRICH:  As we stand here now?
21          THE COURT:  Yeah.
22          MR. FRIEDRICH:  I'm not willing to produce anything as
23  we stand here now.  And the reason for that, your Honor, and
24  the merits of our motion is that the question for the Court is
25  has counsel for the defendant met the relevant legal standard

98AVALEC                    Conference
1   that is set forth in Federal Rule of Criminal Procedure 17(c),
2   in particular the C subprong of that rule and the cases which
3   interpret it.
4           THE COURT:  Right.
5           MR. FRIEDRICH:  The answer to that question, has she
6   met the standard, is a resounding no for three reasons:
7           First, this subpoena should never have issued without
8   the leave of court.  She should have come to court first before
9   getting the subpoena, as the majority of cases that we cite
10  indicate.
11          THE COURT:  Are you familiar with Wright & Henning,
12  Federal Practice and Procedure?
13          MR. FRIEDRICH:  Wright & Henning?
14          THE COURT:  Yeah.
15          MR. FRIEDRICH:  I'm not familiar with that, your
16  Honor.  Wright & Miller I'm familiar with.
17          THE COURT:  It's an updated version of Wright &
18  Miller, now called Wright & Henning.
19          MR. FRIEDRICH:  I'm sorry.  Yes.
20          THE COURT:  Well, they say it's nice if you want to do
21  it that way, but you don't have to do it that way.
22          MR. FRIEDRICH:  I believe that in our briefs, your
23  Honor, we've cited --
24          THE COURT:  Leave of court is not ordinarily required
25  for issuance of subpoena duces tecum.  And then it says you can

98AVALEC                    Conference
1   ask the Court -- this is an orderly and desirable procedure and
2   one frequently followed, the rule doesn't require it -- then
3   the question can be raised, as well on a motion to quash.
4           MR. FRIEDRICH:  Yes, you Honor.  We cited the Court
5   with that specific language in our brief.
6           THE COURT:  So let's get over the point she wasn't
7   entitled to do it because the rules say that she is entitled to
8   do it.  Now, what's the motion to quash?
9           MR. FRIEDRICH:  One of the rules, however, your Honor,
10  in Rule 17, and that is Rule 17(b)(2), talks about an
11  application for subpoena in the context of a defendant's
12  alleged inability to pay, and that's what's asserted here.
13          THE COURT:  More to the point is 517(c)(3).  After a
14  complaint, indictment or information, I think one of the
15  positions you were taking was that she wasn't entitled to the
16  information because an indictment hadn't occurred yet.  But
17  17(c)(3) says after a complaint you can ask for this
18  information; but you must get a court order.  So the rule
19  contemplates getting a court order if you're asking for the
20  information in connection with a victim.
21          MR. FRIEDRICH:  Right.
22          THE COURT:  So you read all that in, and it confirms
23  that you don't need a court order in order to make a subpoena,
24  because the rule doesn't specify that you need a court order.

25     And it also suggests that it's applicable at the complaint

98AVALEC                    Conference
1     stage where the governmental process has been invoked.
2              MR. FRIEDRICH:  Let me answer your Honor in turn.
3              As to whether or not an order needs to be had, I think
4     the point of the case law is that an application needs to be
5     made to the Court in order for an early return subpoena to
6     issue.  And that's the Wright & Miller business we just
7     discussed, in addition to the cases we cite.
8              A separate rule within Rule 17 that is applicable here
9     is Rule 17(b), which talks about the issuance of subpoenas
10    where a defendant has an alleged failure to pay.  In that
11    context, the rule says, Upon a defendant's ex parte
12    application, that's a further indication that advance
13    application needs to be made and was not made here.
14             Coming to your point on the complaint, your Honor,
15    there are no reported cases that address the issuance of a
16    17(c) subpoena for early return for documents in the
17    pre-indictment context.  I'm unable to find any cases
18    whatsoever supporting that proposition.
19             And coming to the merits, I think that the reason for
20    that is clear, which is that where there are no charges, there
21    is no ability of a movant in this situation to show that the
22    Nixon factors apply.  We don't even know what the charges are
23    yet.  This is vastly premature.  And for that reason -- I think
24    that's why there are no cases -- I think that's why there are
25    no reported cases in that context.

98AVALEC                    Conference
1              THE COURT:  We have the complaint.
2              MR. FRIEDRICH:  Yes, sir, we do.
3              THE COURT:  Which is a recitation of what somebody
4     from Goldman Sachs told the FBI agent, correct?
5              MR. FRIEDRICH:  In part, yes.  In part, yes.
6              THE COURT:  So we do know what the charges are.
7              MR. FRIEDRICH:  We do know -- we don't know --
8              THE COURT:  When we get the indictment, the indictment
9     will quote the language of the statute, which is the practice
10    here, I think, throughout the United States, but certainly in
11    the Southern District of New York.  So we learn far more from
12    the complaint than we do from the indictment.
13             MR. FRIEDRICH:  I wouldn't be prepared to judge what
14    an indictment might or might not look like in this case, your
15    Honor.
16             THE COURT:  You've never seen one from the Southern
17    District?
18             MR. FRIEDRICH:  I've seen one from the Southern
19    District, but sometimes --
20             THE COURT:  Usually that's the language of the
21    statute.
22             MR. FRIEDRICH:  Sometimes there's speaking
23    indictments, sometimes there's short-form indictments.  A lot
24    can depend on --
25             THE COURT:  Well, when you get around to a speaking

98AVALEC                    Conference

1  indictment, I'll be glad to read it, because in my experience,
2  limited, not the same as yours, in four years I've never seen
3  anything other than the language of the statute, which we
4  always sustain as being more than sufficient to put the
5  defendant on notice of the charges pending against him.
6         MR. FRIEDRICH:  Yes, your Honor.  But I do think that
7  if this subpoena were to lie and to remain in force, this would
8  be a radical and unprecedented use of Rule 17(c).
9         It shouldn't be the case and it's not the case for any
10 criminal defendant when they are looking at a criminal
11 complaint to think, Aha, I need to turn to X and Y and Z
12 outside parties to see what information they might have that
13 may be helpful to me.  That's simply not the practice --
14        THE COURT:  This is not a shot in the dark, is it?
15        MR. FRIEDRICH:  I'm sorry?
16        THE COURT:  This is not a shot in the dark.
17        MR. FRIEDRICH:  I'm not sure what you mean.
18        THE COURT:  When you say any defendant could then
19 start issuing subpoenas based on the complaint looking for
20 information.  But this -- I say to you in that connection, this
21 is not a shot in the dark.  Goldman Sachs is the complaining
22 witness; he wants to take a look at his file.
23        MR. FRIEDRICH:  That's true, Goldman Sachs is the
24 complaining witness.  And I would submit to you that the
25 relevant time and the manner in which documents are to be

1  produced are for them to be produced in the context of Rule 16,
2  in the ordinary course.  This case shouldn't be different from
3  any other case that way, we would submit.
4         THE COURT:  What else do you have to say?
5         MR. FRIEDRICH:  The other thing I have to say, your
6  Honor, it is the movant's burden to prove that the Nixon
7  factors apply in this case; that they have met all of the
8  standards for relevance, for admissibility and all of the other
9  elements of the Nixon rule.
10        In their papers, the defense -- or, excuse me, counsel
11 for the defendant disputes the Nixon factors apply in the
12 context of the third-party subpoena.  Your Honor, they do apply
13 as held in a number of different cases in this district.  This
14 is one where there is not one circuit case on point, but there
15 are a number of district court cases on point.
16        One I'd like to quote to you is a decision by Judge
17 Ferguson in Connecticut who went on to note -- to survey the
18 applicable authority looking at whether or not the 17(c)
19 standard as advanced in Nixon applies to third-party subpoenas.
20 Judge Droney surveyed a number of cases within district courts
21 within the Second Circuit and went on to note, This Court
22 agrees with the analysis in these cases and finds no compelling
23 reason to employ a lesser standard to the subpoenas at issue
24 here.  Application of the Nachemy test to give the defendants
25 license to obtain possible impeachment materials would

1  eviscerate Rule 17's limitations on criminal discovery, a
2  result for which there is no support in Nixon.
3         That's important, your Honor, because, as you know,
4  under the criminal rules, the defendant has a right to
5  discovery from the government.  There is no right --

6      THE COURT: Under Rule 16.
7      MR. FRIEDRICH: Yes, sir. There is not a right to
8   discovery from third parties under Rule 17(c). There is a
9   narrow right of compulsory process, but that has always in the
10  context of Bowman Dairy, in Nixon, in cases interpreting them,
11  and strictly and narrowly limited it. For the simple point
12  that if Rule 17 is allowed to be a medium for discovery, that
13  sort of opens the floodgates to an unregulated process where
14  any litigant can run out seeking materials.
15      Rule 16 is for discovery, not Rule 17.
16      In the applicant's filing, in the counsel for the
17  defendant's filings, when they talk about why this is important
18  information, they say things like, Well, it could be useful in
19  a disposition; it could be used to show things that such as
20  that he is a -- you know, is a honorable person or a nice guy
21  or, you know, is a valued employee. None of those things, your
22  Honor, are liable to be relevant in a trial. Certainly they
23  can't show that at this point, which is why Goldman Sachs'
24  first position in its papers wasn't to move to quash, but
25  simply to say, Let's defer this until a procedurally

98AVALEC              Conference
1   appropriate time when we can evaluate the information sought
2   against the indictment and they can attempt to make their
3   showing. We shouldn't be doing this in the pre-indictment
4   context simply in the face of a complaint and trying to see
5   what pops up next.
6      THE COURT: What about the point that the information
7   may be useful to the defendant in obtaining a deferred
8   prosecution agreement? You're not saying it's of no use.
9      MR. FRIEDRICH: I'm not saying it's no use.
10     THE COURT: Why should the defendant have to wait till
11  he's been indicted, when the whole purpose is to avoid
12  indictment, but after the complaint process has started?
13     MR. FRIEDRICH: Because the framework of our entire
14  system to this point has been that discovery is provided in the
15  context of Rule 16. It's not the case that a defendant can run
16  out to individual parties or even -- and Goldman Sachs is the
17  victim here. It's not the case to this point in our
18  jurisprudence the defendant can simply run out to a victim and
19  say, Here's a subpoena. Tell me everything you know about my
20  case so that I can find it out before the government does. I
21  think that all of the language in Nixon and Bowman that talks
22  about Rule 17 not creating a discovery right runs directly
23  contrary to forcing the production of information from a victim
24  at this procedural stage.
25     THE COURT: All right. Let me hear from Ms. Shroff,

98AVALEC              Conference
1   and I'll give you an opportunity to reply. Ms. Shroff?
2      MS. SHROFF: Thank you, your Honor. Initially, if I
3   might just stress what Nixon stands for. If one were to look
4   at Nixon, Nixon specifically notes that it does not by its
5   opinion address -- and I'm quoting from the Nixon right now --
6   We need not decide whether a lower standard exists. And they
7   are talking about the lower standard being -- existing when a
8   subpoena is being issued to a third party.
9      So we need not decide whether a lower standard exists.
10  We are satisfied that the relevance and evidentiary nature of

11   the subpoena came to sufficiently show.
12         So as a preliminary matter, Nixon itself noted that
13   when the issue is securing documents from third parties and not
14   from the government, there very well could be a different
15   standard.
16         So one turns to, of course, this case law in the very
17   district in which we appear; and, therefore, I cite to the two
18   cases from -- actually, three cases from the Southern District
19   of New York which opposing counsel does not address:
20         United States v. Reyes, which speaks to the issue;
21   United States v. Nachemy which speaks to the issue that I
22   cited; and the third case, which is United States v. Tucker.
23         All three cases speak to the test that defers when the
24   documents being sought are from a third party. And all three
25   cases decided by judges in this district, rather than some
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    other district, talk about the difference between construing a
2    Rule 17 standard for third parties as opposed to the
3    government.
4          THE COURT:  Ms. Shroff, what is it exactly that you
5    want?  Mr. Friedrich takes the position that you're asking for
6    something that's way too broad.
7          MS. SHROFF:  Actually, I don't think I am asking for
8    anything too broad. And if I may just update the Court as to
9    my conversations with Mr. Friedrich.
10         I offered Mr. Friedrich on Friday that were he to
11   produce the documents that I was looking for --
12         THE COURT:  Well, what are you looking for?
13         MS. SHROFF:  I'm looking for Mr. Aleynikov's personnel
14   records; I'm looking for his letters of employment; I'm looking
15   for his peer reviews; I'm looking for the fact that Goldman
16   Sachs had an employee for two years, whether they were
17   satisfied or not with his performance; I'm looking to show the
18   United States Attorney's Office that my client never engaged in
19   any improper behavior, was a well-respected employee, was not
20   fired, was not reprimanded, nor were there any complaints
21   issued against him. And I made this request specifically, your
22   Honor, because I'm seeking a deferred prosecution in this
23   matter, and specifically because the government may be under a
24   false impression from the bail transcript. And I cite to that.
25         THE COURT:  All right. And under the Nixon factors,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    you believe these documents are evidentiary and relevant?
2          MS. SHROFF:  I don't think I have to show that they
3    are evidentiary and relevant, because this is a third party;
4    but absolutely I think they are evidentiary and relevant. If I
5    have to meet that standard --
6          THE COURT:  And they are not procurable from --
7    Goldman Sachs won't release them, so you need some type of
8    process to obtain the documents.
9          MS. SHROFF:  That's correct. And in an effort of
10   compromise, I offered to Goldman Sachs that I would receive
11   those documents pursuant to a confidentiality agreement.
12         THE COURT:  What about the third factor, you cannot
13   properly prepare for trial without such production?
14         MS. SHROFF:  Well, your Honor, as I've said in my
15   papers, this is pretrial. But I cannot possibly make a
                            Page 8

16    full-fledged deferred prosecution request without these papers,
17    especially in light of what Mr. Facciponti said at the bail
18    hearing.
19             And most importantly, your Honor, there is no Goldman
20    Sachs -- Mr. Friedrich talks about Rule 17's framework and
21    esoteric theories that he finds within the language of 17,
22    which I don't even believe exists.  Much like what Judge
23    Scheindlin says, Rule 17(c) applies differently to third
24    parties, applies differently when it's a subpoena issued to
25    third parties and when it is a defendant requesting the

18

98AVALEC                    Conference
1     documents.
2             So much like in Tucker, where she ordered production,
3     and much like in Nachemy where she said that a defendant would
4     have to meet a lesser standard, I believe I've met both
5     standards here.
6             But here's what I'm saying to the Court:  I have
7     offered -- I have asked Goldman Sachs what documents they would
8     provide.  And let me just be clear, because I don't want to be
9     in the position of having misunderstood Mr. Friedrich.
10            Mr. Friedrich's position is that even a month before
11    trial, the only documents Goldman Sachs would give to me
12    pursuant to a subpoena, which they, in a footnote of their
13    brief to the Court, reserve the right to quash again, he
14    advises me that the only thing I would get is a Goldman Sachs
15    letter of employment and other generic documents.  He declines
16    to say that even a month before trial, whether or not he would
17    give me my client's peer reviews or whether he would give me
18    any complaints filed against Mr. Aleynikov, whether
19    Mr. Aleynikov received any reprimand for any other acts he
20    might take.
21            THE COURT:  That's footnote 6 at page 7 -- or footnote
22    4 at page 7.
23            MS. SHROFF:  Yes, your Honor.  So my suggestion to
24    Mr. Friedrich was -- I asked Mr. Friedrich to please tell me
25    what a personnel file was.  Mr. Friedrich declined to answer

19

98AVALEC                    Conference
1     that question.  I asked him, Is it a voluminous file?
2     Mr. Friedrich declined to answer the question.  I asked him if
3     a personnel file is kept in more than one place.  Mr. Friedrich
4     decided not to answer my question.
5             I tried.  I offered to receive the documents pursuant
6     to a confidentiality agreement.  I offered not to make them
7     public.  I offered to share them solely with my client and
8     solely as part of my deferred prosecution, which would be only
9     filed with the United States Attorney's Office.  I don't even
10    recall the last time I submitted a deferred prosecution request
11    to the Court.
12            So in the spirit of compromise, so to speak, I have
13    narrowed the subpoena as best as I can.  I'm assuming that a
14    person who worked at Goldman Sachs for all of two years could
15    not possibly have a personnel file that is longer than it has
16    taken us to argue this motion from 4 o'clock to 4:20.
17            THE COURT:  I'll try to be more prompt in the future.
18            All right.  Mr. Friedrich.
19            MR. FRIEDRICH:  Your Honor, let me take you at one
20    point to the text of Rule 17(c) itself.
                            Page 9

21          THE COURT:  Right.
22          MR. FRIEDRICH:  OK.  The theories that I'm offering
23  your Honor, these are not esoteric and they are not theory.
24  And the language of the rule itself which creates the right to
25  the subpoena that we are now arguing about, 17(c)(1) says, in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

98AVALEC              Conference
1   part, the Court may direct -- the Court may direct the witness
2   to produce the designated items in court before trial or before
3   they are to be offered in evidence.  That phrase, "before
4   trial" or "before they are to be offered in evidence," your
5   Honor, that is clearly creating a nexus between the documents
6   being sought and their evidentiary use at trial or in some
7   proceeding.  The fact that they are sought for a possible and
8   hypothetical use in plea discussions does not satisfy the
9   standard.
10          THE COURT:  Yeah, but they're not asking you for
11  Goldman Sachs records other than this man's records.
12          MR. FRIEDRICH:  No, your Honor, I'm sorry.
13          THE COURT:  I understand Ms. Shroff to say she wants
14  his personnel record, including his application for employment,
15  his interview reports form, his employee offer letter, his
16  performance reviews by his peers and superiors, and any
17  complaints made about his observation.  Now, that's his
18  personnel file, isn't it?  Have you seen the file?
19          MR. FRIEDRICH:  I have not seen the file, your Honor.
20  Well, let me take that back.  I have reviewed portions of the
21  file at one point in time several weeks ago.  I have not --
22          THE COURT:  How extensive is it?
23          MR. FRIEDRICH:  I want to say it's maybe -- the
24  document that I saw was maybe an inch or so thick.
25          But what are not, quote, his records and what should
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

98AVALEC              Conference
1   not be produced in any event are the evaluations of other
2   people at Goldman Sachs about his behavior, his performance,
3   his reviews.  Those are not -- those are things which Goldman
4   Sachs should not be required to produce, your Honor.
5           THE COURT:  Why not?
6           MR. FRIEDRICH:  Because, A, they are proprietary to
7   the firm, and there is -- at a minimum, your Honor, we should
8   wait until a procedurally appropriate time to have an
9   indictment in front of us, to let Ms. Shroff attempt to say why
10  there is any evidentiary merit or relevance to those materials
11  which she has to specifically identify.  Things like
12  complaints, that is a category of information that is exactly
13  of the type routinely quashed by courts evaluating 17(c)
14  subpoenas.  This isn't a request for specific documents.
15  Progress reports, history records, things like that, those are
16  all categories of information, your Honor.
17          I would submit to you, your Honor, there is a reason
18  why to this point the federal rules have not allowed -- at
19  least in the pre-indictment context -- a fishing expedition of
20  this sort to go forward on behalf of a criminal defendant.
21          THE COURT:  Well, it's hardly a fishing expedition.
22  All right.  The motion to --
23          MS. SHROFF:  May I --
24          THE COURT:  No, please.
25          MS. SHROFF:  Thank you.
                         Page 10

98AVALEC                    Conference

1      THE COURT:  The motion to quash is denied.  Goldman
2  Sachs is directed to comply with the subpoena issued on July
3  31st and to produce Mr. Aleynikov's personnel records,
4  including his application for employment, interview report
5  forms, employment offer letters, performance reviews by peers
6  and superiors, employee progress reports and any training that
7  he took.  He has an exit interview, that should be produced, as
8  well.  That constitutes the ruling of the Court.
9      MR. FRIEDRICH:  May I ask that that be produced under
10  a confidentiality order, your Honor?
11      THE COURT:  That will be introduced under a
12  confidentiality order and limited, as Ms. Shroff suggests, to
13  the preparation of a proffer order offered to the federal
14  government, and only for the purpose of seeking a deferred
15  prosecution.
16      Ms. Shroff, will you submit an order for that purpose?
17  But I think the oral record, the record of the transcript, that
18  will be sufficient.  If you want an order, I'll be happy to
19  sign the order.  Make sure you serve it on Mr. Friedrich --
20      MS. SHROFF:  Yes, your Honor.
21      THE COURT:  -- for its consideration.
22      Thank you very much.
23      MS. SHROFF:  Thank you.
24                              *    *    *
25

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| United States of America | ) | |
| v. | ) | |
| Sergey Aleynikov | ) | Case No. 10 CR. 0096 (DLC) |
| | ) | |
| Defendant | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To: Goldman Sachs & Co.
200 West Street
New York, New York 10282

     **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States Courthouse | Courtroom No.: Room 270 |
| | 500 Pearl Street – Room 270 | |
| | New York, New York 10007 | Date and Time: 06/21/2010 9:00 am |
| | Attn.: Court Subpoena Clerk | |

    You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

See Exhibit A to this Subpoena. This Subpoena may be complied with by having the documents, electronically stored information and materials requested in Exhibit A delivered to the following address by June 21, 2010:

Kevin H. Marino, Marino, Tortorella & Boyle, P.C., 437 Southern Boulevard, Chatham, NJ (

*(SEAL)*

RUBY J. KRAJICK

Date: 06/09/2010

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Sergey Aleynikov
_____ , who requests this subpoena, are:

Kevin H. Marino
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ 07928
kmarino@khmarino.com
(973) 824-9300

Civil Action No. 10 CR. 0096

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   Goldman Sachs & Co.

was received by me on *(date)*   06/10/2010   .

☑ I served the subpoena by delivering a copy to the named individual as follows:  Deborah A. Rivera,

Vice President Litigation & Regulatory Proceedings

at  10:55 a.m.                                              on *(date)*  06/10/2010   ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$      40.00      .

My fees are $                        for travel and $                        for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date:      06/10/2010

_____
*Server's signature*

Reginald Hunter - Process Server
_____
*Printed name and title*

139 Fulton Street, New York, NY 10038
_____
*Server's address*

Additional information regarding attempted service, etc:

## EXHIBIT A

### (Documents, Electronically Stored Information And Materials To Be Produced By Goldman Sachs & Company)

1. All computer files, programs, source code and other components comprising the high-frequency trading system (the "Platform") of Goldman Sachs & Co. ("Goldman").

2. Documents sufficient to evidence any and all measures taken by Goldman to maintain the secrecy, confidentiality and/or proprietary nature of the programs, files, source code and other components comprising the Platform.

3. All documents relating to any employee training provided by Goldman regarding the identification and protection of confidential and/or proprietary information and material.

4. All confidentiality and/or non-disclosure agreements that Sergey Aleynikov ("Aleynikov") executed or to which he was otherwise bound during his employment by Goldman.

5. All written confidentiality and/or non-disclosure policies of Goldman that were effective during Aleynikov's employment by Goldman, including but not limited to all policies mandating or evidencing any mandatory confidentiality legends required to accompany source code containing trade secrets.

6. All written policies of Goldman regarding the copying and/or use of computer source code, files and programs for working at home or otherwise outside of Goldman's premises that were effective during Aleynikov's employment by Goldman.

7. All written policies or procedures of Goldman relating to determining whether departing employees are in possession of any proprietary, confidential or trade secret information or material that were effective during Aleynikov's employment by Goldman.

8. All communications between Goldman and Teza Technologies LLC relating to Aleynikov and/or the Platform.

9. All communications between Goldman and the Federal Bureau of Investigations or the United States Attorney's Office for the Southern District of New York relating to Aleynikov and/or the Platform.

10. All documents relating to any investigation conducted by Goldman of Aleynikov and his alleged theft of the Platform.

11. The content of the https logs from the proxy server containing records from 3/1/2009 to 6/5/2009 showing originating and destination IPs (and host names) and the size of transferred data.

12. The IP addresses of all tws-spice-c1 through tws-spice-c12 machines and qtdev1 through qtdev6 machines as of 3/1/2009, 4/1/2009, 5/1/2009 and 6/5/2009.

13. The full content of all files and subdirectories of the /bld/dev directory as of 6/5/2009.

14. A full recursive list of all files found in the directory and all subdirectories of /bld/pre (showing file path, file name, file size, access permission mask, group name, and user name) as of 6/5/2009.

15. A full recursive list of all files found in the directory and all subdirectories of /bld/ver (showing file path, file name, file size, access permission mask, group name and user name) as of 6/5/2009.

16. A full recursive list of all files found in the directory and all subdirectories of /bld/prod (showing file path, file name, file size, access permission mask, group name and user name) as of 6/5/2009.

17. The full content of all files and subdirectories of the /sw/external/erlang-common directory as of 6/5/2009.

18. The full content of all files and subdirectories of the /sw/external/erlang directory as of 6/5/2009.

19. A full recursive list of all dependencies of the twscore and tsecdb packages as of 6/5/2009.

20. A full recursive list of all files found in the directory and all subdirectories of /sw/external (showing file path, file name, and file size, access permission mask, group name and user name) as of 6/5/2009.

21. All MS Communicator chat records of the aleyns account between 5/20/2009 and 6/5/2009.

22. The content of the /local/tws/rv* directory as of 6/5/2009 on tws-stock-c1 and tws-stock-c5 hosts.

23. The CVS log history of every file in the eq/twscore and eq/tsecdb packages in the interval of 1/1/2008 to 6/5/2009.

24. Slang source code extract of all scripts that have "TSecDb", "Nasdaq" or "TsAlgo" as part of the name (as of 6/5/2009) and/or reference scripts that contain "Nasdaq" keyword.

25. The full content of all files and subdirectories of the /hull3/prod/data directory as of 6/5/2009.

26. A full recursive list of all files found in the directory and all subdirectories of /hull3/prod/bin (showing file path, file name, file size, access permission mask, group name and user name) as of 6/5/2009.

27. Dump of all content of STOCK trading parameter tables from the Animal database (or the database that was used in production on 6/5/2009) in the STOCK production network on 6/5/2009.

28. Daily copies of the directory /tmp/aleyns of tws-spice-c12 and qtdev3 hosts between 3/1/2009 and 6/5/2009.

29. Information security access lists of firewall or router ACLs enumerating outbound access restrictions of hosts in the STOCK development network in the form (from network address mask, protocol, outbound network and outbound port).

30. Information security access lists of firewall or router ACLs enumerating outbound access restrictions of STOCK hosts (i.e., tws-nsdq-stk-c1,2,3) in the Nasdaq co-located network.

31. The UNIX group membership policies showing the group names of which the aleyns account was a part as of 6/5/2009.

32. Records sufficient to indicate whether the aleyns account had root-level access rights in the STOCK development and production networks.

33. Records sufficient to indicate whether the aleyns account or any other account Aleynikov was permitted to use had local administrative rights on Aleynikov's desktop at Goldman.

34. A list of all firewall policies blocking any outbound http and https access either from Aleynikov's desktop or from any production/development networks.

35. Any and all patents Goldman possesses or owns covering or relating to any source code used in or comprising a component of the Platform.

36. A copy of the United States Department of Justice Checklist for Reporting a Theft of Trade Secrets Offense that was filed by Goldman regarding Aleynikov.

# EXHIBIT 4

# MARINO, TORTORELLA & BOYLE, P.C.

ATTORNEYS AT LAW

KEVIN H. MARINO
JOHN D. TORTORELLA*+
JOHN A. BOYLE*
ROSEANN BASSLER DAL PRA*

437 SOUTHERN BOULEVARD
CHATHAM, NEW JERSEY 07928-1488
TELEPHONE (973) 824-9300
FAX (973) 824-8425

*ALSO ADMITTED IN NEW YORK
+ALSO ADMITTED IN PENNSYLVANIA

e-mail: kmarino@khmarino.com

June 16, 2010

**VIA HAND DELIVERY**

Honorable Denise L. Cote, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. Aleynikov*, 10 Cr. 96 (DLC)

Dear Judge Cote:

    We represent defendant Sergey Aleynikov, a former Goldman Sachs ("Goldman") computer programmer who has been indicted in connection with the alleged theft of Goldman's proprietary high-frequency trading platform. Mr. Aleynikov's trial is scheduled to begin before your Honor on November 29, 2010, with pretrial motions to be filed by July 16, 2010. We write to respectfully request that your Honor schedule a conference among counsel for the Government, Goldman and Mr. Aleynikov to resolve a pressing discovery dispute that has arisen among us.

    Last month, in anticipation of engaging expert witnesses and drafting pretrial motions on Mr. Aleynikov's behalf, we requested that the U.S. Attorney provide us with various materials we believed it had received from Goldman prior to charging Mr. Aleynikov. As your Honor may be aware, this case was initiated following a referral to the U.S. Attorney by Goldman. The subpoenaed materials, including much technical data regarding the high-frequency trading platform at the heart of this case as well as ancillary materials Goldman gathered and conveyed to the Government in making its referral, are essential to the preparation and prosecution of our defense and, more immediately, our pretrial motions. After considering our request for some time, the Government advised us that it would not provide the requested materials, and informed us that if we wished to obtain them we would have to subpoena them from Goldman itself.

    Upon receiving that advice from the Government, we promptly prepared a subpoena and reached out to Matthew Friedrich, Esq., a partner at Boies, Schiller & Flexner, to ask that he accept service of that subpoena on Goldman's behalf. We were aware of Mr. Friedrich's representation of Goldman because he moved unsuccessfully before Judge Crotty to quash an

earlier subpoena served upon Goldman by Mr. Aleynikov's previous counsel, Assistant Federal Public Defender Sabrina Schroff. (A transcript of the hearing on that motion to quash is annexed to this letter as Exhibit A.) Mr. Friedrich agreed to bring our service request to Goldman and the following day advised us that we would be required to serve Goldman directly. We promptly served the enclosed subpoena on Goldman, returnable June 21, 2010. (Exhibit B.)

Thereafter, Mr. Friedrich called to advise me that our subpoena had made its way to him after all; that he planned to move to quash it; and that he would like us to agree to a non-emergent briefing schedule on that motion. I advised Mr. Friedrich of the impending due date of our pretrial motions and indicated that, given that deadline, I could not agree to his request. I also offered to meet with Mr. Friedrich to entertain his suggestions for narrowing the subpoena; gave him a summary of my reasons for needing each of the subpoenaed documents; and advised him that I have no objection to the entry of a protective order to safeguard any interest Goldman might have in the confidentiality of any of the subpoenaed documents. Mr. Friedrich indicated that he intended to bring this matter before the Court (presumably by letter if not by motion), and I advised him that I would write a letter to the Court outlining our dispute from Mr. Aleynikov's perspective.

Given the pretrial motion and trial schedule and the importance of the subpoenaed documents to the preparation of Mr. Aleynikov's defense (and the drafting of his pretrial motions), I write to respectfully request that your Honor schedule a conference to address this issue on an expedited basis, as the Court's schedule permits. By copy of this letter, I am sharing this request with Mr. Friedrich and with Joseph Facciponte and Rebecca Rohr, the Assistant United States Attorneys prosecuting this case.

Thank you for your consideration of this request.

Respectfully yours,

Kevin H. Marino

cc:  Matthew Friedrich, Esq. (via email)
     Joseph Facciponte, AUSA (via email)
     Rebecca Rohr, AUSA (via email)