UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA                       :     10 CR. 0096 (DLC)
                                              :          ECF Case
                                              :
          v.                                   :
                                              :
                                              :
SERGEY ALEYNIKOV,                              :
                                              :
                    Defendant.                 :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

---

MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
Attorneys for Defendant Sergey Aleynikov

On the Brief:
        Kevin H. Marino
        John D. Tortorella
        John A. Boyle
        Roseann Bassler Dal Pra

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

LEGAL ARGUMENT ................................................................................................... 4

I.    THE FIRST COUNT FAILS TO STATE AN OFFENSE UNDER THE EEA
      BECAUSE THE TRADE SECRET IT ALLEGES WAS STOLEN WAS
      NEITHER RELATED TO NOR INCLUDED IN A PRODUCT THAT WAS
      PRODUCED FOR OR PLACED IN INTERSTATE OR FOREIGN
      COMMERCE. ........................................................................................................ 4

      A.    The Broad Reading Of The EEA Proposed By The Government Would
            Violate The Fundamental Principles Of Statutory Construction That Govern
            The Interpretation Of A Federal Criminal Statute. ...................................... 4

            1.    The Government's Broad And Dismissive Interpretation Of
                  The EEA's Requirement Of A Product Produced For Or Placed
                  In Interstate Or Foreign Commerce Would Alter the Critical
                  Balance Between State And Federal Prosecutions Of A
                  Traditionally State-Law Offense. .................................................... 8

            2.    The Government's Interpretation Of The EEA's Product and
                  Commerce Requirements Violates The Rule Of Lenity Because
                  It Results In The Broadest And Harshest Application Of The
                  Statute. ........................................................................................... 16

      B.    Aleynikov's Interpretation Of the EEA's Product And Commerce
            Requirements Is Properly Based On the Ordinary, Common-Sense Meaning
            Of The Statute's Terms. ............................................................................ 18

II.   THE SOURCE CODE DOES NOT CONSTITUTE "GOODS, WARES,
      MERCHANDISE, SECURITIES OR MONEY" UNDER THE ITSPA
      BECAUSE IT IS NOT TANGIBLE. ..................................................................... 21

      A.    Whether An Item Is The Subject Of Commerce Is A Necessary But Not
            Sufficient Condition For Deeming It A Good, Ware or Merchandise. ....... 21

      B.    Post-Dowling, An Item Must Be Tangible To Constitute A Good, Ware or
            Merchandise. ............................................................................................. 23

      C.    The Reasoning of *United States v. Farraj* is Flawed. ............................... 25

      D.    The Government's Reading of *Bottone* and *Vericker* Would Contravene
            *Dowling* And Frustrate Congress's Purpose In Enacting the EEA. ............ 28

      E.    The Amendment Adding Transmission Applies to Money, Not To Goods,
            Wares and Merchandise. ............................................................................ 29

III.   THE COURT SHOULD FOLLOW THE LINE OF CASES ADOPTING A
       NARROWER VIEW OF THE CFAA BECAUSE THAT VIEW IS SUPPORTED
       BY THE PLAIN LANGUAGE AND LEGISLATIVE HISTORY OF THE CFAA
       AND IS CONSISTENT WITH THE RULES OF CRIMINAL STATUTORY
       CONSTRUCTION...........................................................................................................30

CONCLUSION......................................................................................................................36

# TABLE OF AUTHORITIES

## Cases

Bell v. United States,
   349 U.S. 81 (1955)........................................................................................ 17

Crandon v. United States,
   494 U.S. 152 (1990)...................................................................................... 26

Dowling v. United States,
   473 U.S. 207 (1985)............................................................................... passim

In re Vericker,
   446 F.2d 244 (2d Cir. 1971) ................................................................... passim

Jet One Group, Inc. v. Halycon Jet Holdings, Inc.,
   No. 08 Civ. 3980, 2009 U.S. Dist. LEXIS 72579 (E.D.N.Y. Aug. 14, 2009) ........................ 32

Jones v. United States,
   529 U.S. 848 (2000)............................................................................... passim

Lang v. Elm City Constr. Co.,
   217 F. Supp. 873 (D. Conn.), aff'd, 324 F.2d 235 (2d Cir. 1963) ........................... 24

Lewis-Burke Assocs. LLC v. Widder,
   No. 09 Civ. 302, 2010 U.S. Dist. LEXIS 76180 (D.D.C. July 28, 2010) ..................... 33, 34

LVRC Holdings LLC v. Brekka,
   581 F.3d 1127 (9th Cir. 2009) ....................................................................... 31

Martyn v. United States,
   176 F.2d 609 (8th Cir. 1949) ......................................................................... 24

McBoyle v. United States,
   283 U.S. 25 (1931)........................................................................................ 17

McLeod v. American Fed. Of Tele. & Radio Artists,
   234 F. Supp. 832 (S.D.N.Y. 1964) ................................................................... 24

Orbit One Commc'ns, Inc. v. Numerex Corp.,
   692 F. Supp. 2d 373 (S.D.N.Y. 2010) .......................................................... 29, 32

Ratzlaf v. United States,
   510 U.S. 135 (1994).......................................................................................... 9

Santa Fe Indus. v. Green,
   430 U.S. 462 (1977)...................................................................................... 29

Skilling v. United States,
   130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ...................................................... 16

United States v. Albertini,
   472 U.S. 675 (1985)....................................................................................... 18

United States v. Bass,
    404 U.S. 336 (1971)......................................................................................... 10, 11

United States v. Bottone,
    365 F.2d 389 (2d Cir. 1966) ............................................................................ passim

United States v. Brown,
    925 F.2d 1301 (10th Cir. 1991) ...................................................................... passim

United States v. Caparros,
    No. 85 Cr. 990, 1987 U.S. Dist. LEXIS 2163 (S.D.N.Y. Mar. 25, 1987) .............................. 22

United States v. Farraj,
    142 F. Supp. 2d 484 (S.D.N.Y. 2001) ....................................................... 25, 26, 27

United States v. Gelb,
    700 F.2d 875 (2d Cir. 1983) ........................................................................ 10, 26

United States v. Hersom,
    588 F.3d 60 (1st Cir. 2009)............................................................................... 12

United States v. Kwan,
    No. 02 Cr. 241, 2003 U.S. Dist. LEXIS 8423 (S.D.N.Y. May 20, 2003)......................... 26, 27

United States v. Mennuti,
    639 F.2d 107 (2d Cir. 1981) ................................................................ 11, 13, 14, 15

United States v. Morris,
    928 F.2d 504 (2d Cir. 1991) ......................................................................... 34, 35

United States v. Nosal,
    No. CR 08-0237, 2010 U.S. Dist. LEXIS 31423 (N.D. Cal. Apr. 13, 2010)......................... 20

United States v. Perrotta,
    313 F.3d 33 (2d Cir. 2002) ............................................................................ passim

United States v. Riggs,
    739 F. Supp. 414 (N.D. Ill. 1990) ........................................................................ 25

United States v. Sabhnani,
    599 F.3d 215 (2d Cir. 2010) .............................................................................. 24

United States v. Santos,
    553 U.S. 507, 128 S. Ct. 2020 (2008)............................................................... 16, 17

United States v. Seagraves,
    265 F.2d 876 (3d Cir. 1959.) .............................................................................. 22

United States v. Smith,
    686 F.2d 234 (5th Cir. 1982) ............................................................................. 23

United States v. Southern Advance Bag & Paper Co.,
    46 F. Supp. 105 (W.D. La. 1942) ........................................................................ 20

<u>United States v. Stafford</u>,
  136 F.3d 1109 (7th Cir. 1998) ........................................................................... 29, 30

<u>United States v. Universal C.I.T. Credit Corp.</u>,
  344 U.S. 218 (1952) .............................................................................................. 17

<u>United States v. Wallach</u>,
  935 F.2d 445 (2d Cir. 1991) ........................................................................... 26, 27

<u>United States v. Wiltberger</u>,
  18 U.S. 76 (1820)................................................................................................... 17

<u>United States v. Yang</u>
  281 F.3d 534 (6th Cir. 2002) ............................................................................... 20

<u>United States v. Yian</u>,
  No. 94 Cr. 719, 1995 U.S. Dist. LEXIS 10072 (S.D.N.Y. July 18, 1995) ............ 24

<u>University Sports Publications Co. v. Playmakers Media Co.</u>,
  No. 09 Civ. 8206, 2010 U.S. Dist. LEXIS 70361 (S.D.N.Y. July 14, 2010) .............. 31, 32, 36

<u>Walling v. Comet Carriers, Inc.</u>,
  151 F.2d 107 (2d Cir. 1945) ................................................................................. 20

<u>Younger v. Harris</u>,
  401 U.S. 37 (1971)................................................................................................. 11

**<u>Statutes</u>**

Comprehensive Environmental Response, Compensation, and Liability Act,
  42 U.S.C. § 9601, <u>et seq.</u> ...................................................................................... 19

Computer Fraud and Abuse Act,
  18 U.S.C. § 1030................................................................................................ passim

Fair Labor Standards Act,
  29 U.S.C. § 207................................................................................................. 19, 20

Interstate Transportation of Stolen Property Act,
  18 U.S.C. § 2314.............................................................................................. passim

Magnuson-Moss Warranty Act,
  15 U.S.C. § 2301 <u>et seq.</u> ...................................................................................... 19

The Anti-Arson Act,
  18 U.S.C. § 844(i)............................................................................................... 8, 10

The Economic Espionage Act of 1996,
  18 U.S.C. §§ 1831 to 1839............................................................................... passim

**<u>Journals & Treatises</u>**

James H. A. Pooley, <u>Understanding the Economic Espionage Act of 1996</u>,
  5 Tex. Intell. Prop. L.J. 177 (Winter 1997) ....................................................... 25

## <u>Other Authorities</u>

Leonard B. Sand,
   3-54 Modern Federal Jury Instructions (Criminal), Instruction 54-23 ............................... 23, 24

S. Rep. No. 99-432 (1986), U.S.C.C.A.N. 2479 .......................................................................... 34

## PRELIMINARY STATEMENT

The Government's response to Defendant Sergey Aleynikov's motion confirms that the Indictment must be dismissed.  With respect to the Economic Espionage Act of 1996 (the "EEA"), the Government concedes that: (1) the EEA proscribes the theft of trade secrets related to or included in a product produced for or placed in interstate or foreign commerce; (2) the Indictment charges Aleynikov with violating that statute by stealing a trade secret related to or included in Goldman's high-frequency trading system; and (3) Goldman's high-frequency trading system was neither produced with the intention that it would be placed in interstate commerce nor actually placed in interstate commerce.  These unavoidable concessions, compelled by the plain wording of the statute and the Indictment, make clear that Count One does not state a violation of the EEA.

The Government's attempt to resist that conclusion only underscores it.  The Government begins by casting the EEA's explicit and plainly-worded requirement that the trade secret in question be related to or included in a product produced for or placed in interstate or foreign commerce as "merely jurisdictional" — as though that internally-contradictory phrasing would obscure the critical nature of the statutory element by which Congress defined the theft of a particular type of trade secret as a matter of federal concern.  The Government goes on to urge the Court to ignore the plain meaning of the EEA's time-honored phrases "produced for interstate commerce," which Congress has uniformly used to describe a product that is produced with the intention that it will move from one state to another, and "placed in interstate commerce," which Congress has employed with equal regularity to describe a product that in fact moves from one state to another.  Instead, the Government asks this Court to read these

1

phrases "broadly" to encompass a trading system that was neither intended to move nor in fact moves in interstate commerce.  By the Government's lights, the trading system has such a "strong and undeniable connection to interstate and foreign commerce" that it meets the statutory definition of a product that is both "produced for" and  "placed in" interstate commerce even though it was not intended to and in fact did not enter the stream of commerce.  The Government would thus have this Court re-write the EEA to proscribe the theft of trade secrets related to or included in *a system connected to interstate commerce* and elide the statute's requirement that such trade secrets be related to or included in a product that is truly produced for or placed in interstate or foreign commerce.  In so doing, the Court would not be giving effect to *Congress's* clear intent — to protect manufacturers against the theft of trade secrets related to or included in the products they have produced or are producing for interstate commerce — but rather would be giving effect to *the Government's* intent to prosecute a state law crime in federal court.

In the parlance, that's not how it works.  The theft of a trade secret — any trade secret — violates the criminal laws of New York, New Jersey and many other states.  The EEA did not make it a federal crime to steal *any* trade secret.  Rather, that statute only rendered it a federal offense to steal a trade secret with a clearly-defined and specific nexus to interstate commerce.  The Government's attempt to expand the reach of the EEA belies the care with which Congress adjusts the delicate balance between state and federal criminal laws.

Despite the Government's expansive view of federal criminal jurisdiction, the Supreme Court made clear in <u>Jones v. United States</u>, 529 U.S. 848, 858 (2000), that attempts to expand the jurisdictional element of a federal criminal statute beyond that which Congress expressed in the plain wording of that statute must be turned away.  Here, it can hardly be denied that the

Government is attempting to do just that.  The phrase "produced for interstate commerce" has been uniformly interpreted to mean *produced with the intention of being placed in interstate commerce*.  That phrase does not describe Goldman's trading system, which was never intended to move in interstate commerce.  Neither does the phrase "placed in interstate commerce:" the Government concedes that Goldman has not sold or licensed its trading system, and that trading system has never moved from one state to another.  Under the circumstances, theft of a trade secret related to or included in the trading system is simply not a federal crime.

Counts Two and Three of the Indictment are similarly defective.  Significantly, the EEA was passed in part because the Interstate Transportation of Stolen Property Act (the "ITSPA") does not apply to the interstate transportation of stolen intellectual property.  The Government's decision to include an ITSPA charge in Count Two of the Indictment, while perhaps reflecting its understandable concern that the EEA charge in Count One does not state a crime as a matter of statutory interpretation, is nonetheless unavailing.  The ITSPA, which by its terms applies only to goods, wares, merchandise, securities and money, is no more applicable to the theft of an intellectual property trade secret today than it was prior to passage of the EEA.

Finally, the Computer Fraud and Abuse Act (the "CFAA") charged in Count Three simply does not apply to the theft of computer source code by someone authorized to access that code.  Again, that the Government is unable to establish an EEA violation (because the statutory requirement of a product produced for or placed in interstate or foreign commerce is not present here) or an ITSPA violation (because computer source code does not constitute goods, wares, merchandise, securities or money) does not warrant misreading the CFAA to omit its clear requirement that the computer access in question be unauthorized.  Here, it is undisputed that

3

Goldman authorized Aleynikov to access the computer source code he is charged with stealing. Count Three therefore does not state a claim against him.

For the reasons outlined above and amplified in Aleynikov's moving brief and in this reply brief, the Indictment is fatally defective and must be dismissed.

## **LEGAL ARGUMENT**

I.   **THE FIRST COUNT FAILS TO STATE AN OFFENSE UNDER THE EEA BECAUSE THE TRADE SECRET IT ALLEGES WAS STOLEN WAS NEITHER RELATED TO NOR INCLUDED IN A PRODUCT THAT WAS PRODUCED FOR OR PLACED IN INTERSTATE OR FOREIGN COMMERCE.**

   A.   *The Broad Reading Of The EEA Proposed By The Government Would Violate The Fundamental Principles Of Statutory Construction That Govern The Interpretation Of A Federal Criminal Statute.*

Aleynikov's moving brief (the "Moving Brief") demonstrated that the First Count of the Indictment must be dismissed because the trade secrets he is charged with stealing are included in or related to an item — Goldman's high-frequency trading system (the "Trading System") — that is not a product that is produced for or placed in interstate or foreign commerce pursuant to the ordinary meaning of those plain terms used in 18 U.S.C. § 1832.  Specifically, Aleynikov demonstrated that the Trading System is not a product because it is not tangible personal property that is intended to be or actually is distributed in interstate commerce.  (Moving Br. at 16-25.)  Aleynikov further demonstrated that, in all events, the Trading System is not produced for or placed in interstate or foreign commerce because it does not move in, and is not intended or expected to move in, interstate or foreign commerce.  (Id. at 25-27.)

The Government responded that the Trading System is a product produced for or placed in interstate commerce although it does not move, and is not intended to move, from state to state because it "executes scores of trades in securities and commodities markets in the United States

and abroad" and therefore has an "obvious and indisputable connection" to both interstate and foreign commerce." (Opp. at 21.) But the EEA does not proscribe the theft of trade secrets related to or included in systems that have a connection to interstate commerce (because they execute trades in various securities markets around the world) but do not themselves move in interstate commerce. Rather, it proscribes the theft of treat secrets related to or included in products that themselves move in interstate commerce — that is, from state to state — or are produced with the intention and expectation that they will do so. Despite the Government's insistence that its reading of the EEA's product requirement comports with plain meaning and common understanding, it provides no precedent — and none exists — interpreting the phrase "product produced for or placed in interstate commerce" to mean "system not produced for or placed in interstate commerce, but connected to it." In truth, the Government would have this Court simply dispense with the product requirement altogether and let it prosecute Aleynikov as though this were state court. But that cannot happen. As the case law makes clear, jurisdictional elements must be read carefully and interpreted narrowly, particularly in the context of a criminal statute. Given the prudential considerations discussed below, the Government's attempt to expand the ambit of the EEA by removing its requirement of a product produced for or placed in interstate or foreign commerce should be rejected.

Now that the Government has filed its Opposition to Aleynikov's motion, issue has been joined on the dispositive question presented on this motion: whether, as a matter of statutory interpretation, the facts alleged in the Indictment state an offense under the relevant statutes. The Government agrees that, as the Indictment reflects, the grand jury charged that Goldman's Trading System is the EEA "product" the trade secret in question was related to or included in.

(Opp. at 20-21.)  The Government also acknowledges that the Trading System is not sold or licensed and is not intended or expected to ever be sold or licensed.  (Id. at 18, 21.)  Despite these concessions, the Government continues to maintain that the Trading System is a "product produced for or placed in interstate or foreign commerce" within the meaning of the EEA.  (Id. at 24.)  Not surprisingly, the Government offers no substantive support for that argument.  Rather than explain how and why the Trading System could ever be said to meet that statutory definition, the Government asks, sub silento, that the Court ignore that requirement altogether.  Arguing that the only reason the product requirement appears in the statute is because "Congress needed to supply a basis for federal jurisdiction to Section 1832 [of the EEA]," (id. at 28), the Government implies that the federal jurisdictional basis Congress expressed in the statute's plain wording is therefore meaningless.  The logic apparently goes like this: because all Congress had to do to make the theft of trade secrets a federal crime was to tie that offense to interstate commerce in some way, the Court should disregard the jurisdictional basis expressed by Congress through the clear wording of the EEA and substitute one crafted by the Government. The Government argues that in light of legislative history evidencing that Congress believed the theft of trade secrets to be an important issue (id. at 25-27), the Court should give those elements their broadest conceivable interpretation so as to impose virtually no limitation on the types of theft of trade secrets — a traditional state-law crime — that can be federally prosecuted under 18 U.S.C. § 1832.  Indeed, throughout its Opposition, the Government criticizes Aleynikov for narrowly interpreting the EEA's language and simultaneously advocates for a far broader reading of the statute's terms.  In that regard, the Government contends that, despite basing his argument squarely on the ordinary meaning of the criminal statute's plain text, Aleynikov "adopts an

6

unduly narrow interpretation of the EEA that holds that the 'product' refers only to tangible items that are sold to consumers through the stream of commerce." (Opp. at 21.) Elsewhere, the Government faults Aleynikov for relying on civil statutes using the term "product" "to foist a narrow definition of 'product' on the EEA." (<u>Id.</u> at 33.)

At the same time, the Government relies on civil trade secret law to argue that "[t]he general context of trade secrets law provides additional support for a broad reading of the EEA." (<u>Id.</u> at 25.) In fact, the Government makes no attempt to disguise that it is seeking a "broad reading of the EEA's requirement that the 'product' be 'produced for or place in' commerce." (<u>Id.</u> at 35 n.12.) To that end, the Government argues that when Congress included the requirement that the stolen trade secret be "related to or included in a product that is produced for or placed in interstate or foreign commerce," 18 U.S.C. § 1832(a), what it really intended to proscribe was theft of trade secrets that relate to or are included in anything that has what the Government deems "a strong and indisputable connection to both interstate and foreign commerce." (Opp. at 16.)

The Government advocates for that broad interpretation of the EEA's "product" and "produced for or placed in interstate or foreign commerce" language without any support and despite myriad cases and legal authorities cited in the Moving Brief demonstrating that the ordinary meaning of that language is that the "product" must be tangible personal property that is or is intended to be sold, distributed or otherwise moved in interstate commerce. Moreover, the Government's broad interpretation of the EEA's product and commerce requirements runs directly contrary to fundamental principles of statutory construction and criminal law, most notably the principle that unless Congress conveys its purpose to do so clearly, it will not be

deemed to have significantly changed the federal-state balance in the prosecution of crimes.

     **1.**   **The Government's Broad And Dismissive Interpretation Of The EEA's Requirement Of A Product Produced For Or Placed In Interstate Or Foreign Commerce Would Alter the Critical Balance Between State And Federal Prosecutions Of A Traditionally State-Law Offense.**

In <u>Jones v. United States</u>, 529 U.S. 848 (2000), the Supreme Court rejected the precise tactic the Government attempts here: ignoring the plain wording by which Congress expressed the nexus between a traditionally state-law crime and interstate commerce in a federal criminal statute in favor of a far broader reading unsupported by the statute's text.  At issue in <u>Jones</u> was the scope of the federal arson statute, 18 U.S.C. § 844(i), which makes it a federal crime "to damage or destroy, 'by means of fire or an explosive, any . . . *property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce*.'"  <u>Id.</u> at 850 (quoting 18 U.S.C. § 844(i) (emphasis added)).  The defendant was charged with violating the federal arson statute by tossing a Molotov cocktail through the window of his cousin's home.  The defendant argued that "§ 844(i), when applied to the arson of a private residence, exceeds the authority vested in Congress under the Commerce Clause."  <u>Id.</u> at 851-52.  In response, the Government offered three bases for the residence's connection to interstate commerce:

> The Government urges that the Fort Wayne, Indiana residence into which Jones tossed a Molotov cocktail was constantly "used" in at least three "activities affecting commerce."  First, the homeowner "used" the dwelling as collateral to obtain and secure a mortgage from an Oklahoma lender; the lender, in turn, "used" the property as security for the home loan.  Second, the homeowner "used" the residence to obtain a casualty insurance policy from a Wisconsin insurer. That policy, the Government points out, safeguarded the interests of the homeowner and the mortgagee.  Third, the homeowner "used" the dwelling to receive natural gas from sources outside Indiana.

<u>Id.</u> at 855.

Rejecting the Government's tortured reading of the arson statute's jurisdictional requirement — that the object of the arson be a building "used in" an activity affecting interstate-commerce — the Supreme Court explained, "[t]hat qualification is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce."  Id.  In so holding, the Court explained that Congress had expressly and intentionally limited the arson statute's reach "to activities 'in commerce,'" rather than (as it could have) "invoking Congress' full power over activity 'affecting . . . commerce'" and thus giving the statute wider application.  Id. at 856.  The Court reasoned that the Government's broad interpretation of the statute's interstate commerce language would eviscerate Congress's decision <u>not</u> to extend the arson statute to the fullest possible extent of the Commerce Clause:

> Were we to adopt the Government's expansive interpretation of §
> 844(i), hardly a building in the land would fall outside the federal
> statute's domain. Practically every building in our cities, towns,
> and rural areas is constructed with supplies that have moved in
> interstate commerce, served by utilities that have an interstate
> connection, financed or insured by enterprises that do business
> across state lines, or bears some other trace of interstate commerce.
> . . .  If such connections sufficed to trigger § 844(i), the statute's
> limiting language, "used in" any commerce-affecting activity,
> would have no office.

Id. at 857 (internal quotations omitted).  Such an application, the Court concluded, would contradict the principle that "'[j]udges should hesitate . . . to treat statutory terms in any setting [as surplusage], and resistance should be heightened when the words describe an element of a criminal offense." Id. (quoting Ratzlaf v. United States, 510 U.S. 135, 140-141 (1994) (brackets in Jones).)  In other words, the Court found that, where Congress uses clear statutory language to invoke federal jurisdiction under the Commerce Clause, courts must be cognizant of and give effect to Congress's decision to limit (for whatever reason) the scope of the jurisdiction invoked

to something less than the full extent of the federal government's power under the Commerce Clause.

Here, the EEA clearly defines the circumstances in which the theft of a trade secret becomes a federal offense: when the trade secret is related to or included in "a product produced for or placed in interstate or foreign commerce." 18 U.S.C. § 1832(a). The Government has attempted to inject ambiguity in that language, as it attempted to do in Jones. But, as Jones made abundantly clear, injecting ambiguity into the jurisdictional reach of a federal criminal statute will not expand the statute's reach. If requiring that a trade secret be related to or included in a product produced for or placed in interstate or foreign commerce could be read other than to require that the product be one intended to be or in fact placed in interstate commerce (which it cannot), that alternative reading must give way. As Jones explained, "[w]e have cautioned, as well, that 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes. . . . To read § 844(i) as encompassing the arson of an owner-occupied private home would effect such a change, for arson is a paradigmatic common-law state crime." 529 U.S. at 858 (citing United States v. Bass, 404 U.S. 336, 349 (1971)); see also United States v. Gelb, 700 F.2d 875, 878-79 (2d Cir. 1983) ("[R]esponsibility for the investigation and prosecution of crimes involving common law arson has traditionally been left to the states, and we are reminded that: 'Unless Congress conveys its purpose clearly, we will not be deemed to have significantly changed the federal-state balance.'") (quoting Bass, 404 U.S. at 349). As the Supreme Court in Bass previously explained regarding the federalization of traditionally state-law crimes:

> Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States.

10

> [Footnote omitted.] This congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines. <u>See, e.g.</u>, <u>Younger v. Harris</u>, 401 U.S. 37 (1971). As this Court emphasized only last Term in [<u>Rewis v. United States</u>, 401 U.S. 808, 812 (1971)], we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.  In <u>Rewis</u>, we declined to accept an expansive interpretation of the Travel Act.  To do so, we said then, "would alter sensitive federal-state relationships [and] could overextend limited federal police resources."

<u>Bass</u>, 404 U.S. at 349.  Prior to <u>Jones</u> (but subsequent to <u>Bass</u>), the Second Circuit addressed the same issue as that in <u>Jones</u> and reached the same conclusion (<u>i.e.</u>, that the federal arson statute did not reach the destruction of an owner-occupied private residence), employing the same reasoning:

> We are not holding that Congress could not, with appropriate findings and language, make it a federal crime to do what appellees were charged with doing here. We hold only that Congress did not choose, as the Government contends, to make nearly every bombing in the country a federal offense; it limited its reach to property currently used in commerce or in an activity affecting it, leaving other cases to enforcement by the states.

<u>United States v. Mennuti</u>, 639 F.2d 107, 113 (2d Cir. 1981).

After <u>Jones</u>, the Second Circuit relied on its reasoning — specifically, its emphasis of state-federal balance in criminal prosecutions — to reject the Government's attempt to stretch a criminal statute's invocation of the Commerce Clause beyond that specifically intended by Congress in order to reach traditional state law crimes.  In <u>United States v. Perrotta</u>, 313 F.3d 33 (2d Cir. 2002), the defendant argued that his conviction under the Hobbs Act was defective

11

because the government failed to prove "the necessary jurisdictional nexus with interstate commerce because it showed only that the intended victim of the [defendant's] extortion was an employee of a company participating in interstate commerce." Id. at 34.  Agreeing with the defendant, the Second Circuit explained "the Hobbs Act confers only limited jurisdiction on the federal courts for prosecutions of robberies or extortions." Id. at 36.

In so holding, the court made clear that a federal criminal statute's jurisdictional element (contrary to the Government's dismissive attitude here (see, e.g., Opp. at 28, 30, 39 n.14)) is of critical importance: "The jurisdictional nexus transforms the quintessential state crimes of robbery and extortion into federal crimes.  Thus, 'a robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce.'" Perrotta, 313 F.3d at 37.  On the other hand, the court held, simply showing that the victim worked for a company participating in interstate commerce does not.  Id.  In reaching that conclusion, the Second Circuit opined that "as in Jones, adopting the standard advocated by the government would expand the reach of the Hobbs Act to include nearly every robbery or extortion committed," id., and thus alter the balance between state and federal criminal prosecutions in a manner that can only be done by Congress:

> Merely showing employment with a company that does business in interstate commerce, without more, stretches the Hobbs Act too far. Under such a theory, the extortion or assault of anyone who worked in any capacity at any company that participates in interstate commerce would suffice for federal jurisdiction, blurring the boundaries between state and federal jurisdiction.

Id. at 38; see also United States v. Hersom, 588 F.3d 60, 67 (1st Cir. 2009) (relying on Jones to hold that a statute making it a crime to destroy a building owned by an institution "receiving

12

Federal financial assistance" applied only to the building for which the funding was specifically received and not to all buildings owned by an entity receiving funding because "[a]pplying the statute to cover all property owned by such entities would transform a broad swathe of 'traditionally local criminal conduct' into a 'matter for federal enforcement'") (quoting Jones, 529 U.S. at 858).

Here, the Government's proposed interpretation of the product and interstate/foreign commerce elements of the EEA would drastically alter the state-federal balance regarding the prosecution of a quintessentially state-law crime for the same reason that the Government's statutory interpretations did in Jones, Mennuti and Perrotta.  Like the federal arson statute at issue in Jones, the EEA invokes federal jurisdiction under the Commerce Clause in a limited manner, rather than to the fullest extent constitutionally possible.  Specifically, instead of making it a federal crime to steal any trade secret that "affects interstate or foreign commerce," Congress criminalized *only* the theft of trade secrets that are "related to or included in a product that is produced for or placed in interstate or foreign commerce."  See Jones, 529 U.S. at 856 (noting that Congress expressly limited the arson statute's reach "to activities 'in commerce,'" rather than "invoking Congress' full power over activity 'affecting . . . commerce'").  In effect, the Government argues that the Court should disregard Congress' express decision to employ language specifically limiting the jurisdictional reach of the EEA and interpret the EEA as criminalizing not just the theft of trade secrets included in or related to products produced for or placed in interstate commerce, but also the theft of any and all trade secrets that relate to an item having "a strong and indisputable connection to both interstate and foreign commerce."  (Opp. at 16.)

13

Put simply, the Government's broad interpretation of the product and commerce elements of the EEA would destroy the balance between state and federal criminal prosecutions of trade secrets by making virtually every theft of a trade secret a federal crime, despite Congress's unambiguous intent (as made clear in the EEA) to federalize only a subset of such conduct.  In that regard the theft of trade secrets, like the arson at issue in <u>Jones</u> and <u>Mennuti</u> and the extortion at issue in <u>Perrotta</u>, is a quintessential state-law crime.  Indeed, more than half of the states have criminalized some form of theft of trade secrets, either through special provisions regulating the theft of trade secrets or by extension of the general definition of theft to include trade secrets.[1]  In fact, both New Jersey (where Aleynikov lives) and New York (where he worked for Goldman) have well-defined statutes addressing the theft of trade secrets.  <u>See</u> N.J.S.A. 2C:20-1(g) (defining property as including "trade secrets") and 2C:20-3 (criminalizing theft of property by unlawful taking or disposition); N.Y. Penal Law 155.00(1), (4) & (6) (defining property to include computer data and defining "secret scientific material" to include

---

[1]    Thirty-four states have expressly criminalized some form of theft of trade secrets. <u>See</u> Ala. Code §13A-8-10.4; Alaska Stat. § 11.46.740(a)(4),(b),(c); Ariz. Rev. Stat. Ann. §§ 13-1801(12),(13), 13-1802; Ark. Stat. Ann. § 5-36-107; Cal. Penal Code § 499c; Colo. Rev. Stat. §§ 18-4-408; Del. Code An. tit. 11, §§ 841, 857(6); Fla. Stat. Ann. §§ 815.04(3)(b),(4), 812.081; Ga. Code Ann. §§ 16-8-13; Idaho Code §§ 18-2402(8), 2403; 720 ILCS 5/15-1, 5/16-1; Ind. Code Ann. §§ 35-41-1-23(a)(9), 35-43-4-2, 35-43-4-3; La.R.S. §§ 14:73.1(10), 14:73.2(A)(2), (B); Mass. Gen. Laws Ann. ch. 266 § 30(4); Me. Rev. Stat. Ann. tit. 17A, §§ 352(1)(F), (4), 353; Md. Criminal Law Code §§ 7-101(i)(2)(xii), 7-104; Minn. Stat. § 609.52(1), (6), (8), 609.52(2); Miss. Code Ann. §§ 97-45-1(p), 97-45-9(1)(b),(2); Mont. Code An. §§ 45-2-101(61)(j), (62), 45-6-301; N.C. Gen. Stat. § 14-75.1; Nev. Rev. Stat. §§ 205.08255, 205.0828, 205.0832; N.H. Rev. Stat. Ann. §§ 637:2(I), 637:3; N.J. Stat. Ann. §§ 2C:20-1(g)-(i), 20-3; N.Y. Penal Law §§ 155.00(1), (4), (6), 155.30(3), 165.07; Ohio Rev. Code Ann. §§ 2901.01(10), 2913.02; Okla. Stat tit. 21, § 1732; Or. Rev. Stat. § 164.377(1)(i),(2)(c); 18 Pa. Cons. Stat. § 3930; S.C. Code Ann. § 39-8-90; Tenn. Code Ann. § 39-14-138; Tex. Penal Code § 31.05; Utah Cod Ann. §§ 76-6-702(6), (7), 703(1)(e)(iii), 76-6-401(1), 76-6-404; Wis. Stat. § 943.205; Wyo. Stat. §§ 6-3-501(a)(xi), 6-3-502(a)(iii),(b).

technical processes and formulas); N.Y. Penal Law 155.30(3) (a person is guilty of grand larceny in the fourth degree when he steals property that consists of secret scientific material); N.Y. Penal Law 165.07 (a person is guilty of unlawful use of scientific material when, with intent to appropriate to himself or another, the use of secret scientific material).

Thus, there is no doubt that the theft of trade secrets is a species of crime that has been traditionally prosecuted by the states, including the two states that might have an interest in and jurisdiction over Aleynikov's alleged conduct.  Altering the balance between federal and state prosecution of such conduct is something that can be accomplished only by Congress speaking in explicit terms.  Congress certainly chose to disturb that balance by enacting the EEA, but it did so in a very specific and narrow fashion, federalizing only the theft of trade secrets "related to or included in a product that is produced for or placed in interstate or foreign commerce."  In other words, as the Second Circuit opined in Mennuti with respect to arson, Congress did not elect to make nearly every trade secret theft "in the country a federal offense," Mennuti, 639 F.2d at 113; rather, it limited "its reach" to trade secrets that are "related to or included in a product that is produced for or placed in interstate or foreign commerce," 18 U.S.C. 1832(a), "leaving other cases to enforcement by the states."  Mennuti, 639 F.2d at 113.

As in Jones, Mennuti and Perrotta, the Court should reject the Government's attempt to expand the scope of the EEA by broadly and erroneously interpreting the product and commerce requirements.   In enacting the EEA, Congress (as it did with the arson statute at issue in Jones) declined to invoke the Commerce Clause to the fullest extent constitutionally permitted.  Regardless of its reasons for doing so, that decision by Congress, and its resulting effect on the balance between state and federal prosecution of thefts of trade secrets, must be honored.  As the

15

Government's position would require this Court to second-guess Congress on that critical issue, it must be rejected.

### 2. The Government's Interpretation Of The EEA's Product and Commerce Requirements Violates The Rule Of Lenity Because It Results In The Broadest And Harshest Application Of The Statute.

As the Supreme Court recently observed in holding that the honest-services fraud statute has a narrower application than that advocated by the Government, it is a "familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Skilling v. United States, 130 S. Ct. 2896, 177 L. Ed. 2d 619, 661 (2010) (quotation marks omitted). Likewise, in United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020 (2008), the Supreme Court recognized that when a term is undefined (such as the term "product" in the EEA), the court must give it its ordinary meaning. Id. at 2024. Thus, under the rule of lenity, the Court explained, "the tie must go to the defendant." Id. at 2025. The Court elaborated as follows:

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. [Citations omitted.] This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

Id.

Requiring that criminal statutes be clearly worded and that ambiguities be resolved in favor of criminal defendants is critical to ensuring that individuals are given adequate notice of that which constitutes criminal conduct; in that regard, the Second Circuit in In re Vericker, 446

F.2d 244 (2d Cir. 1971), quoted Justice Holmes's insightful explanation that "'[a]lthough it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" Id. at 248 (quoting McBoyle v. United States, 283 U.S. 25, 27 (1931)).  Simply put, it is improper for a court (as the Government would have this Court do here) to "play the part of a mind reader" in interpreting a federal criminal statute, Santos, 128 S. Ct. at 2026, because "'probability is not a guide which a court, in construing a penal statute, can safely take.'"  Id. (quoting United States v. Wiltberger, 18 U.S. 76 (1820) (Marshall, J.)).  Thus, "'[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.'" Id. (quoting Bell v. United States, 349 U.S. 81, 83 (1955) (Frankfurter, J.).

As noted above, the Government argues that the Court should interpret the EEA's product and commerce requirements as criminalizing the theft of any trades secret that relates to an item that "has a strong and indisputable connection to both interstate and foreign commerce." (Opposition at 16.)  That interpretation, which the Government admits is extremely broad in scope, would directly contradict the rule of lenity because it would adopt the harshest possible reading of the EEA's property and commerce requirements and resolve any ambiguity contained therein against, not in favor of, the defendant.  See Jones v. United States, 529 U.S. at 858 (2000) ("'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite'") (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22 (1952)).  The plain language of the EEA requires that the

trade secret in question be included in or related to a product that moves or is intended to move in interstate commerce.  Were a more expansive reading even possible, as the Government erroneously contends, that second reading would certainly be rejected under the rule of lenity.

> **B.**    ***Aleynikov's Interpretation Of the EEA's Product And Commerce Requirements Is Properly Based On the Ordinary, Common-Sense Meaning Of The Statute's Terms.***

As the Moving Brief demonstrated, (1) the term "product" in the EEA means tangible personal property that is intended to be or actually is distributed in interstate commerce; and (2) the phrase "produced for or placed in interstate or foreign commerce" means that the product embodying the trade secret must itself be intended to, or actually, move in interstate or foreign commerce.  (Moving Br. at 16-25.)  While the Government's broad interpretation of the EEA would violate fundamental principles of statutory construction, Aleynikov's view of the statutory language is in keeping with principles of statutory interpretation that the Government readily acknowledges.  (See Opp. at 14-15 ("Generally, statutory construction 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'") quoting United States v. Albertini, 472 U.S. 675, 680 (1985).)

The Moving Brief established that Aleynikov's interpretation of the EEA's "product" and "produced for or placed in" language is consistent with the ordinary meaning of those terms by demonstrating that in every instance in which those terms have been interpreted, regardless of the legal context, they have been read as Aleynikov reads them here.  Thus, the Moving Brief explored the use of the terms in the context of products liability, contractual interpretation, tax law, the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. § 9601, et seq., the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and as used in Black's Law Dictionary and various Restatements of the Law.  (Moving Br. at 16-25.)

In its Opposition, the Government takes issue with and spends considerable time attempting to distinguish each of the above legal contexts in which the terms "product" and "produced for or placed in" interstate commerce are analyzed.  (Opp. at 29-35.)  For instance, the Government argues that Aleynikov's reliance on products-liability cases fails because "[u]nlike the law of intellectual property, the law of products liability is *necessarily* concerned with defective *goods* that cause physical or economic harm to the consumers how purchase them."[2] (Id. at 31 (emphasis in original).)  Likewise, the Government brushes aside as inapposite the discussion of the Magnuson-Moss Warranty Act because it relates to warranties for consumer products and CERCLA because it relates to environmental pollution.  The Government's attempt to distinguish each of the examples cited by Aleynikov, however, misses the forest for the trees. Aleynikov did not cite any of those examples as dispositive or controlling as to the interpretation of the EEA; rather, he cited them to demonstrate that, in every instance in which a court or a legislature has been called upon to interpret the term "product" or the phrase "produced for or

---

[2]     In attempting to distinguish the products-liability cases relied on in the Moving Brief on the ground that they relate to actual tangible products while the EEA involves intellectual property issues, the Government improperly conflates the product requirement with the trade secret requirement of the EEA.  (Opp. at 31, 32.)  For purposes of this motion, Aleynikov does not contest that the Indictment alleges the existence of a trade secret. That a trade secret exists, however, has no bearing on whether the product requirement has been met.  Because the product requirement is expressly written into the statutory language, the law of products liability is undeniably relevant.

placed in interstate commerce," it has interpreted them as Aleynikov does here.[3]   In contrast,

Aleynikov is aware of no instance — and the Government has not brought any to the Court's

attention — in which that language has been read to have the meaning urged by the Government

here.[4]

Also unavailing is the Government's attempt to disavow the prosecutorial manuals of the

Department of Justice and the United States Attorney's Office, which (as demonstrated in the

Moving Brief) clearly support Aleynikov's statutory interpretation.  To that end, the Government

---

[3]   Particularly instructive on this issue is the treatment of the phrase "produced for interstate commerce" in the context of the FLSA.  As the Moving Brief demonstrated, a federal regulation promulgated pursuant to that statute provides: "Goods are produced for interstate commerce 'where the employer intends, hopes, expects, or has reason to believe that the goods or an unsegregated part of them will move . . . in such interstate or foreign commerce.'"  29 C.F.R. § 776.21(a).  Thus, in United States v. Southern Advance Bag & Paper Co., 46 F. Supp. 105, 107, 108 (W.D. La. 1942), the court stated that "[t]he burden will rest upon the prosecution [in an FLSA case] to prove beyond a reasonable doubt . . . that the paper shipped in each instance was manufactured, at least in part, from pulp wood which had been produced for interstate commerce in violation of the statute, that is, by payment of substandard wages for the cutting of it, **and that at the time, it was intended to be shipped in such commerce.**"  See also Walling v. Comet Carriers, Inc., 151 F.2d 107, 109 (2d Cir. 1945) ("The court also found that 'The greater part of the goods handled and transported by employees of defendant are produced for interstate commerce. They have been and are transported and delivered by defendant with knowledge that at some later date the jobbers and manufacturers will sell or ship the garments in interstate commerce.'").

[4]   The Government's citation to United States v. Nosal, No. CR 08-0237, 2010 U.S. Dist. LEXIS 31423, at *20-21 (N.D. Cal. Apr. 13, 2010), is not such an example.  While the Government in that case may have indicted the defendant for theft of a trade secret that did not relate to a product as that term is commonly understood, the defendant did not challenge the indictment on that basis and the court did not rule on the issue.  The Government also relies on United States v. Yang, 281 F.3d 534 (6th Cir. 2002), as support for its broad interpretation that the "product" to which the stolen trade secrets relates need not be sold or distributed to the commercial public.  (Opp. at 30.)  But as the Opposition acknowledges, the interstate commerce nexus in that case was demonstrated by evidence that the product had generated millions of dollars of sales.  (Id.)  Thus, Yang undercuts rather than supports the Government's position.

complains that "[t]he guidance expressed in those manuals is not binding on the Government in this case."  (Opp. at 37 n.13.)  Once again, Aleynikov did not cite those manuals because he believed they bind either the Government or the Court.  To the contrary, he relied upon them because they are particularly instructive in showing that even the Justice Department did not envision the broad interpretation advanced here.

In short, the Government has failed to contradict Aleynikov's showing that his narrow interpretation of the EEA — that the trade secret must be related to or included in an item of tangible personal property that is actually sold, distributed or otherwise put into commerce or is intended or expected to be in the future — is based on the ordinary and commonly understood meaning of the statutory language, maintains the congressionally-mandated balance between state and federal prosecutions of theft of trade secrets, and comports with the rule of lenity. Accordingly, the Court should adopt Aleynikov's interpretation and dismiss Count One for failure to charge an offense under the EEA.

## II.    THE SOURCE CODE DOES NOT CONSTITUTE "GOODS, WARES, MERCHANDISE, SECURITIES OR MONEY" UNDER THE ITSPA BECAUSE IT IS NOT TANGIBLE.

### A.    *Whether An Item Is The Subject Of Commerce Is A Necessary But Not Sufficient Condition For Deeming It A Good, Ware or Merchandise.*

The Government attempts to avoid the tangibility requirement imposed by the ITSPA, and any common understanding of the terms "goods, wares or merchandise," by urging that the intellectual property Aleynikov allegedly stole fits within the statute because it may be a "subject of commerce."  (Opp. at 43.)  The Government urges this interpretation of the phrase based upon a flawed analysis of the Second Circuit's decisions in United States v. Bottone, 365 F.2d 389 (2d Cir. 1966), and In re Vericker, 446 F.2d 244 (2d Cir. 1971), which held that in order for a paper

to constitute a good, ware or merchandise, there must exist a market for it.  Certainly, the Government must prove beyond a reasonable doubt that a market exists for the source code at issue here (although it is doubtful that it can).  But establishing the existence of a market for intellectual property is not sufficient to demonstrate that the information meets the statutory definition of "goods, wares or merchandise."

In United States v. Bottone, 365 F.2d 389, 393 (2d Cir. 1966), the Second Circuit expressed no doubt "that papers describing manufacturing procedures are goods, wares, or merchandise, as was held with respect to geophysical maps in United States v. Seagraves, 265 F.2d 876 (3[d] Cir. 1959)."  Likewise, in Vericker, 446 F.2d at 248, the Second Circuit found that "under some circumstances mere papers may constitute 'goods,' 'wares,' or 'merchandise.'"  From these cases, the Government distills the rule that intellectual property is a good, ware or merchandise if the property is "ordinarily a subject of commerce."   (Opp. at 45.)   The Government then cites several cases purportedly in aid of the proposition.[5]

As Aleynikov explained in the Moving Brief, both Bottone and Vericker adopted the Third Circuit's construction of the phrase "goods, wares and merchandise" as set forth in United States v. Seagraves, 265 F.2d 876 (3d Cir. 1995).  Bottone, 365 F.2d at 393; Vericker, 446 F.2d at 248.  This construction encompasses a two-part test: (1) the item must be tangible and in the

---

[5]     Two of those cases, United States v. Caparros, No. 85 Cr. 990, 1987 U.S. Dist. LEXIS 2163 (S.D.N.Y. Mar. 25, 1987), and United States v. Kwan, No. 02 Cr. 241, 2003 U.S. Dist. LEXIS 8423 (S.D.N.Y. Dec. 17, 2003), relate to theft of papers, which meet the tangibility requirement in any event.  (In Kwan, as the Government points out, there was not sufficient evidence adduced at trial to demonstrate that the papers met the commercial market prong.  Kwan, 2003 U.S. Dist. LEXIS 8423, at *19.)  The other two cases, United States v. Riggs, 739 F. Supp. 414 (N.D. Ill. 1990), and United States v. Farraj, 142 F. Supp. 2d 484 (S.D.N.Y. 2001), do not correctly apply the law post-Dowling as explained below in section II.C.

nature of personal property or chattels; and (2) the personal property must ordinarily be a subject

of commerce.  United States v. Smith, 686 F.2d 234, 241 (5th Cir. 1982); Leonard B. Sand, 3-54

Modern Federal Jury Instructions – (Criminal), Instruction 54-23, comment.  Thus, the Second

Circuit has not, as the Government urges, long-considered a stolen item's commercial nature to

be more significant than its tangibility; rather, both are necessary attributes.  Indeed, as to the

first prong, the Smith court recognized that it is consistent with Judge Friendly's statement in

Bottone that "'to be sure, where no tangible objects were ever taken or transported, a court would

be hard pressed to conclude that 'goods' had been stolen and transported within the meaning of §

2314.'"  Smith, 686 F.2d at 241 (quoting Bottone, 365 F.2d at 393).  Bottone and Vericker taken

alone, therefore, do not support the Government's reading of the statute.  Indeed, the Second

Circuit's admonition in Vericker that "we must give the words actually used [by Congress] their

ordinary meaning," id. at 248, is particularly apt here:  source code is not a good, ware or

merchandise as that term is normally understood.

### B.      Post-*Dowling*, An Item Must Be Tangible To Constitute A Good, Ware or Merchandise.

After Bottone and Vericker were decided, the Supreme Court held, in Dowling v. United

States, 473 U.S. 207 (1985), that section 2314 does not apply to crimes involving mere copyright

infringement, emphasizing the fact that cases under section 2314 have always involved "***physical***

'goods, wares [or] merchandise' that have themselves been 'stolen, converted or taken by

fraud.'"  Id. at 216 (emphasis supplied).  Relying on Dowling, the Tenth Circuit in United States

v. Brown, 925 F.2d 1301 (10th Cir. 1991), met with and decided the very point in question here:

whether computer source code alone, which is intangible intellectual property, constitutes goods,

wares, merchandise, securities or money which have been stolen, converted or taken by fraud

within the meaning of ITSPA.  The Brown court held that it did not, basing its holding on

Dowling.  925 F.2d at 1380.  Neither Congress nor the United States Supreme Court or any

Circuit Court of Appeals has disagreed with Brown's construction of the ITSPA.  Indeed, the

Modern Federal Jury Instructions (Criminal), which are routinely followed by the Second Circuit

and courts in this District, including this Court, see, e.g., United States v. Sabhnani, 599 F.3d

215, 238 (2d Cir. 2010) (describing the treatise as "the leading treatise" on the subject of

willfulness) and United States v. Yian, No. 94 Cr. 719, 1995 U.S. Dist. LEXIS 10072, at *10

(S.D.N.Y. July 18, 1995) (Cote, J.), advises that in light of  Dowling and Brown, "it is now clear

that section 2314 does not apply to any form of intellectual property."  Leonard B. Sand, et al., 3-

54 Modern Federal Jury Instructions (Criminal), Instruction 54-23, cmt. & n.12.

  Although Brown is not controlling on this Court, it is persuasive authority that should be

followed in the absence of any contrary guidance from the Second Circuit or the Supreme Court.

McLeod v. American Fed. Of Tele. & Radio Artists, 234 F. Supp. 832, 838 (S.D.N.Y. 1964); see

also Martyn v. United States, 176 F.2d 609, 610 (8th Cir. 1949) ("It is elementary that a criminal

statute must be strictly construed.  It is also important that it receive a uniform construction.  We

would not be justified in adopting a different construction of the [National Stolen Property] Act

than that which prevails in the Fourth and Ninth Circuits unless we were able to demonstrate that

that construction was clearly wrong."); Lang v. Elm City Constr. Co., 217 F. Supp. 873, 876, 877

(D. Conn.) ("While the decision of the Third Circuit is not controlling on this Court, it is

persuasive and will be followed, absent a decision on the question by the Supreme Court or the

Second Circuit."), aff'd, 324 F.2d 235 (2d Cir. 1963).

C.      **The Reasoning of United States v. Farraj is Flawed.**

The Government relies primarily upon United States v. Farraj, 142 F. Supp. 2d 484 (S.D.N.Y. 2001), to question Brown.  In that case, Judge Marrero stated: "In this Court's view, the reasoning in Brown does not square with the Second Circuit's Bottone decision, and may be based on a misapplication of Dowling."  142 F. Supp. 2d at 489.  The court, however, did not explain the reasons why it was of that view or why it believed that Brown was wrongly decided.

This Court should follow the Tenth Circuit's construction of the ITSPA and decline to adopt Farraj as unpersuasive for several reasons.  First, contrary to Farraj, Brown does square with Bottone insofar as the Second Circuit recognized that where "no tangible objects were ever taken or transported, a court would be hard pressed to conclude that 'goods,' had been stolen and transported within the meaning of § 2314."  Bottone, 365 F.2d at 393.  In any event, Bottone was decided prior to the Supreme Court decision in Dowling and, unlike this case, involved the temporary removal and copying of *physical* documents that outlined manufacturing procedures and *physical* specimen cultures.  Bottone, 365 F.2d at 391, 393.  The Second Circuit's lack of doubt that the stolen papers at issue there were goods, wares or merchandise does not imply that stolen source code is also a good, ware or merchandise.  Id. at 393.

Second, Farraj was based on United States v. Riggs, 739 F. Supp. 414 (N.D. Ill. 1990), which was decided prior to the Tenth Circuit's decision in Brown, and which espoused an erroneous statutory interpretation of the ITSPA.  See Brown, 925 F.2d at 1308-09; see also Pooley, Understanding the Economic Espionage Act of 1996, 5 Tex. Intell. Prop. L.J. 177, 183 (Winter 1997) ("An analysis of the two decisions strongly suggests that Brown, and not Riggs, was correctly decided.").

Third, to the extent the ITSPA is ambiguous as to whether it covers purely intellectual property, the rule of lenity, which <u>Farraj</u> did not consider, requires that any ambiguities in the statute be resolved in the defendant's favor "unless and until Congress plainly states that we have misconstrued its intent." <u>Crandon v. United States</u>, 494 U.S. 152, 168 (1990); <u>see generally</u> Section I.A.2.  Congress has never stated that <u>Dowling</u> and/or <u>Brown</u> misconstrued its intent.  To the contrary, as Aleynikov discussed in his Moving Brief, Congress was well aware of the <u>Dowling</u> and <u>Brown</u> decisions and never stated that <u>Brown</u> misapplied <u>Dowling</u> or was otherwise wrongly decided in holding that the ITSPA was not intended to cover purely intellectual property.  Congress could easily have responded to those decisions by amending the ITSPA to expressly include intellectual property within its ambit, but it chose instead to enact the EEA.[6]

Although <u>United States v. Kwan</u>, No. 02 Cr. 241, 2003 U.S. Dist. LEXIS 8423 (S.D.N.Y. May 20, 2003), is not apposite because it involved papers, which would have been goods under <u>Bottone</u> if they were regularly the subject of commerce, we address the opinion insofar as it favors the reading of ITSPA made in <u>Farraj</u>.  First, <u>Kwan</u> mistakenly concluded that the Second Circuit's decision in <u>United States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991), "ultimately found <u>Dowling</u> not to be controlling over non-copyright § 2314 cases." <u>Kwan</u>, 2003 U.S. Dist. LEXIS 8423, at *6.  That is simply not a correct reading of the decision.  The Second Circuit in <u>Wallach</u> found <u>Dowling</u> not to be controlling in that particular case because "[i]n contrast to the situation

---

[6]     In <u>Farraj</u>, Judge Marrero failed to take judicial notice that Congress enacted the EEA as a means of filling this gap in the ITSPA and to protect intellectual property and trade secrets.  <u>See</u> <u>United States v. Gelb</u>, 700 F.2d 875, 879 (2d Cir. 1983) (in finding that gasoline was not an explosive or incendiary device within the meaning of the Explosive Control Act, the court took judicial notice that Congress enacted the Anti-Arson Act to meet the arson threat).

in <u>Dowling</u>, the defendants herein were charged simply with transporting checks across state lines[,]" which "unlike the copyrights in <u>Dowling</u>, without a doubt constitute physical property within the meaning of the statute." <u>Wallach</u>, 935 F.2d at 467.  Moreover, in discussing <u>Dowling</u>, the <u>Wallach</u> court recognized that the Supreme Court was concerned with the physical characteristics of the stolen property.  In particular, the Second Circuit stated: "In reversing the convictions, the Court held that the statute does not apply to wholly intangible property interests such as those possessed by a copyright holder. . . . . The Court concluded that a copyright, like other forms of intellectual property, lacks the physical characteristic that the statute contemplates." <u>Wallach</u>, 935 F.2d at 467.

Second, <u>Kwan</u> relied on <u>Farraj</u>, which, as already discussed, is itself not persuasive. <u>Kwan</u>, 2003 U.S. Dist. LEXIS 8423, at *6.  Third, <u>Kwan</u> incorrectly believed that "the Second Circuit has long considered the stolen items' commercial nature to be more significant than their tangibility[,]" citing <u>Bottone</u> and <u>Vericker</u>.  For the reasons stated above, the tangibility requirement is as important as the commercial nature of the item.

Finally, <u>Kwan</u> did, in fact, involve the removal of physical items: "documents and computer diskettes containing confidential pricing and contract information."  <u>Kwan</u>, 2003 U.S. Dist. LEXIS 8423, at *10.  In this case, by contrast, Aleynikov is not alleged to have removed any documents, computer diskettes, or any other physical item belonging to Goldman.

None of the cases cited by the Government casts serious doubt on <u>Brown</u>'s interpretation of ITSPA and <u>Dowling</u>.  Based upon <u>Brown</u> and the plain meaning of the phrase "goods, wares and merchandise," the source code Aleynikov is alleged to have transported does not fit within the meaning of those terms.

### D.     The Government's Reading of <u>Bottone</u> and <u>Vericker</u> Would Contravene <u>Dowling</u> And Frustrate Congress's Purpose In Enacting the EEA.

The Government's reading of the ITSPA — that "even 'intangible' property, such as confidential business information, may be covered by Section 2314 if the property is ordinarily the subject of commerce" (Opp. at 43) — should be rejected for the further reason that it would contravene Congress's purpose in enacting the EEA and encroach on well-established areas of federal and state regulation.

The Government closes its section on ITSPA by remarking that it would be "odd" if transporting confidential business information written on a piece of paper violated 2314, but electronically transmitting it did not.  (Opp. at 52.)  What would truly be odd, however, would be to read the ordinary terms "goods, wares and merchandise" to cover intellectual property. Indeed, the Government's proposed reading of the ITSPA would render the EEA irrelevant. Expressly recognizing the holdings of <u>Dowling</u> and <u>Brown</u> when enacting the EEA, Congress decided to criminalize the theft of trade secrets related to products produced for or placed in interstate commerce.  Congress thus passed the EEA with full knowledge of the holdings in <u>Dowling</u> and <u>Brown</u> and with the understanding that courts had interpreted the ITSPA not to apply to intellectual property.  (Moving Br. at 24-35.)  By the Government's reading, that step was unnecessary because the ITSPA already criminalized the theft of trade secrets without any connection to a product so long as that product was transported or transmitted in interstate commerce.

Congress passed the EEA to criminalize theft of intellectual property under certain limited circumstances — <u>viz.</u>, where it was related to a product produced for or placed in interstate commerce.  18 U.S.C. § 1832(a).  The Government's construction of good, ware or

merchandise, divorced from any tangibility requirement, would frustrate that effort by Congress to carefully and selectively expand the reach of federal criminal law in the area of intellectual property. For example, the Government's reading of the statute would encompass insider trading cases, notwithstanding the carefully crafted balance of federal and state laws relating to securities, because material non-public information about a publicly-traded company is certainly something of value. Santa Fe Indus. v. Green, 430 U.S. 462, 478-80 (1977) (emphasizing the careful balance between federal and state securities laws and declining to extend § 10(b) in the area of internal corporate management). Likewise, it would cover misappropriation of confidential information, a traditional province of state law. See Orbit One Commc'ns, Inc. v. Numerex Corp., 692 F. Supp. 2d 373, 386 (S.D.N.Y. 2010). Such crimes do not involve "goods, wares or merchandise" within any accepted meaning of the terms, but all would be indiscriminately subject to federal criminal prosecution under the Government's broad reading of the ITSPA. Accordingly, the Court should reject that view.

### E.     The Amendment Adding Transmission Applies to Money, Not To Goods, Wares and Merchandise.

Finally, the Government urges that Congress's amendment of the ITSPA in 1988, which added the verbs "transfers" and "transmits," implies that the ITSPA is intended to apply to intangible intellectual property. (Opp. at 48.) As the Seventh Circuit made clear, the 1988 amendment was only intended to clarify that wire transfers of money, which are by their nature intangible, were covered by the statute, not that the statute applied to other intangible property. See United States v. Stafford, 136 F.3d 1109, 1115 (7th Cir. 1998) (rejecting the argument that Comdata codes should be treated like money under section 2314 because wire transfers of money can violate the statute). Then-Senator Biden's statement supporting passage of the 1988

29

amendment makes this plain:

> Noting that the gravamen of the crime in Section 2314 is the movement of illegally obtained *money* from one location to another and that in modern times banks seldom move funds physically from one location to another and that in modern times banks seldom move *funds* physically but rather do so through electronic transfers, three Courts of Appeals have recently rejected contentions that Section 2314 is limited – because of the use of the verb "transports" – to instances of physical transportation of *money*.   [Citations omitted.]   No contrary ruling exists. Nevertheless, in order to clarify the statute and avoid further litigation, it seems appropriate to add verbs – "transmits" and "transfers" – that clearly reach acts of electronic movement of *money*.

134 Cong. Rec. S17360, at S17370 (emphasis supplied).  Certainly, had Congress desired to amend the ITSPA to provide that "goods, wares or merchandise" include non-physical items, or to add intellectual property to the statute's list of covered items, it could have easily done so at that time.[7]  Absent such clear direction, the Court should abide the principle that "the definition of federal crimes is a legislative rather than a judicial function — a principle that places some limits on creative judicial interpretations of federal criminal statutes," <u>Stafford</u>, 136 F.3d at 1115, and decline to interpret intangible source code as goods, wares or merchandise.

III.   **THE COURT SHOULD FOLLOW THE LINE OF CASES ADOPTING A NARROWER VIEW OF THE CFAA BECAUSE THAT VIEW IS SUPPORTED BY THE PLAIN LANGUAGE AND LEGISLATIVE HISTORY OF THE CFAA AND IS CONSISTENT WITH THE RULES OF CRIMINAL STATUTORY CONSTRUCTION.**

The Government concedes, as it must, that Aleynikov had access to the source code in question in his capacity as a computer programmer responsible for developing and improving

---

[7]     Unlike intellectual property, money is one of the five expressly covered items.

certain aspects of the Trading System.  (Opp. at 53-54; Indictment, ¶¶ 3, 8(b), 9.)  Nevertheless, relying on a line of cases taking a broad view of the CFAA, the Government asks this Court to indulge the fiction that Aleynikov accessed the source code "without authorization" and also "exceed[ed] authorized access" within the meaning of § 1030(a)(2) because he used his access to transfer the source code to his home computer in alleged violation of Goldman's policies and his confidentiality agreement with the company.  (Opp. at 59-65; Indictment, ¶ 20.)   Aleynikov explained in his Moving Brief why the plain language of the CFAA, its legislative history, and principles of criminal statutory construction, including the rule of lenity, favor a reading that criminalizes only unauthorized access, not unauthorized use.  (Moving Br. at 36-43.)   The Government failed to adequately address those arguments in its opposition, and several recently decided cases highlight the trend away from the broad approach to the statute urged by the Government.

In University Sports Publications Co. v. Playmakers Media Co., No. 09 Civ. 8206, 2010 U.S. Dist. LEXIS 70361 (S.D.N.Y. July 14, 2010), Judge Holwell rejected a theory similar to that advanced by the Government here.  In Playmakers, the plaintiff-company admitted that the defendant-former employee had full access to the company's database, but argued that the former employee nonetheless violated the CFAA because he accessed the database "without authorization" or at least "exceeded [his] authorized access," by using the database for an improper purpose — namely, to provide confidential information to another former employee who joined a competitor of the company.  Id. at *10.  The court found that "Plaintiff's theory runs afoul of a persuasive line of recent precedent[,]" including that relied on by Aleynikov in his Moving Brief, LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1130-31 (9th Cir. 2009);

Orbit One, 692 F. Supp. 2d at 385 (Kaplan, J.); and Jet One Group, Inc. v. Halycon Jet Holdings,

Inc., No. 08 Civ. 3980, 2009 U.S. Dist. LEXIS 72579 (E.D.N.Y. Aug. 14, 2009) (Seybert, J.).

Playmakers, 2010 U.S. Dist. LEXIS 70361, at *11.  As Judge Holwell recognized:

> These cases rest on three primary rationales.  First, the CFAA, by
> its plain language, prohibits improper "access," not misuse or
> misappropriation.  [Citations omitted.]  Second, because the CFAA
> is principally a criminal statute, the rule of lenity requires courts to
> interpret it narrowly.  Thus, to the extent the statute is ambiguous
> as to whether it punishes wrongful use of lawfully obtained access,
> that ambiguity must be resolved in defendant's favor.  [Citations
> omitted.]  And third, the statute's language and legislative history
> show that Congress intended to proscribe hacking, not
> misappropriation of lawfully accessed information.  [Citations
> omitted.]

Id. at *11-12.  Addressing the cases relied on by the Government here, the Court stated:  "Put

simply, this other line of cases identifies no statutory language that supports interpreting the

CFAA to reach mere misuse or misappropriation of information, let alone language strong

enough to justify that interpretation where the rule of lenity counsels a narrow reading."  Id. at

*12-13.

       Like the Government here, the plaintiff in Playmakers also argued that, even under a

narrow reading of the CFAA, the defendant's actions "exceeded his authorized access" because

although he was given full access to the database and all is contents, his job duties did not

require him to read or analyze the substantive customer information and thus the act of obtaining

confidential data and sending it to the other former employee fell beyond the scope of the

defendant's authorized access.   Id. at *13-14.   Rejecting that argument, Judge Holwell

recognized that courts applying the narrow interpretation have construed the statutory definition

of "exceeds authorized access" as applying to a person who uses a limited level of initial access

authority to obtain other information that he is not entitled to access.  Id. at *14.  In other words, there must be proof that "the offender entered some forbidden space[.]"  Id.  Because the plaintiff admitted that the defendant had "full access" to the database," the court found that any CFAA claim based on his conduct was foreclosed.  Id. at *15.

Noting that confidentiality agreements prohibited the defendant from disclosing or divulging the company's confidential information, the Court held that although his alleged violation of those agreements "might sustain a breach of contract, breach of fiduciary duty, or theft of trade secrets claim, it does not, for reasons already discussed, support a CFAA claim." Id. at *17.  In short, "[e]vidence that [the defendant] breached the agreements by disclosing information shows that he used the database for an improper purpose, but it does not show that he exceeded his authority to access or obtain information from the database."  Id.

In another very recent case, Lewis-Burke Assocs. LLC v. Widder, No. 09 Civ. 302, 2010 U.S. Dist. LEXIS 76180 (D.D.C. July 28, 2010), the court granted a motion to dismiss a CFAA claim where there was no dispute that the employee was still employed by the company when he allegedly copied certain company files to a thumb drive on his last day at work.  Id. at *12-13. The employee accessed some of the files after he was no longer employed by the company, but there was no allegation that he accessed the company computer or server after termination of his employment.  Id. at *13.  The court was persuaded by the line of cases adopting a narrower view of the CFAA, recognizing that if the broader interpretation were followed, it "would mean that the same employee might have different authorization to access the same document on the same computer throughout his or her employ."   Id. at *14.  By way of example, the court described a scenario where an employee had authority to access a report to e-mail it to his superior to review,

but then also decided to blind copy his personal e-mail account so that he would have a copy of the report to use as a writing sample for a future job search.  Id. at *15.  The court stated: "Congress could not have intended a person's criminal and civil liability to be so fluid, turning on whether a person's interests were adverse to the interests of an entity authorizing the person's access."  Id. at *15-16 (citing S. Rep. No. 99-432, at 21 (1986), as reprinted in 1986 U.S.C.C.A.N. 2479, 2494-95 (discussing amendment that "eliminate[d] coverage for authorized access that aims at 'purposes to which such authorization does not extend'" and thereby "remove[d] from the sweep of the statute one of the murkier grounds of liability, under which [an] employee's access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances that might be held to exceed his authorization").

As demonstrated by these cases and the authorities relied on by Aleynikov in his Moving Brief, the Government's theory that Aleynikov's use of Goldman's computer for an allegedly improper purpose, even though his access was itself indisputably lawful, cannot sustain a CFAA claim because it is contrary to (1) the plain language of the statute; (2) the rule of lenity; and (3) congressional intent to prohibit improper *access*, not improper *use*.

Finally, the Government relies on United States v. Morris, 928 F.2d 504 (2d Cir. 1991), for the proposition that one may exceed authorization under the CFAA by violating a confidentiality agreement or the intent of an employer.  (Opp. 59-60.)  The Government's reliance on Morris is misplaced.   Morris involved an earlier version of a different provision of the CFAA, which penalized an individual who intentionally accessed a federal interest computer "without authorization" and altered, damaged or destroyed information in any such federal

interest computer, or prevented authorized use of such computer and caused a $1,000 loss or more. 928 F.2d at 506. It also involved facts having no relation to those here: a college student's release of a computer worm from a computer at the Massachusetts Institute of Technology. Id. Relying on legislative history of the particular CFAA provision, the student in Morris argued that his conduct could only be argued as exceeding authorized access, which the CFAA provision did not address, because he had authorized access to a federal interest computer. Id. at 510. In reviewing the legislative history relied on by the defendant, however, the court observed that "Congress contemplated that individuals with access to some federal interest computers would be subject to liability under the computer fraud provisions for gaining authorized access to other federal interest computers[,]" such as where a Labor Department employee gains access without authorization to an FBI computer. Id. The court found that the student's conduct fell within the area of unauthorized access because "he found holes in both programs that permitted him a special and unauthorized access route into other computers." Id. The Second Circuit also agreed with the district court's denial of the student's motion for acquittal, finding that although the evidence may have shown that the defendant's initial insertion of the worm simply exceeded his authorized access, the evidence also demonstrated that the worm was designed to spread to other computers for which he had no account and no authority, express or implied, to unleash the worm program. There was also evidence that the worm was designed to gain access to computers for which he had no account by guessing their passwords. Id.

This case, in stark contrast to Morris, does not involve any allegation that Aleynikov, with lawful access to one of Goldman's computers, engaged in conduct that allowed him to

35

improperly gain access to another Goldman computer to which he had no authority to access. There is thus no allegation, as the <u>Playmakers</u> court phrased it, that Aleynikov "entered some forbidden space."  2010 U.S. Dist. LEXIS 70361, at *14.

In sum, because the Indictment alleges that Aleynikov had valid authorization from Goldman to use its computers and to access the source code when he did, and because it contains no allegation that Goldman ever rescinded that authorization prior to his last day as a Goldman employee, Aleynikov did not act "without authorization" and did not "exceed[] [his] authorized access" when he accessed the source code.  Accordingly, Count Three of the Indictment fails to state a CFAA offense under § 1030(a)(2) and must be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above and in his Moving Brief, Defendant Sergey Aleynikov respectfully requests that the Court dismiss the Indictment in its entirety.

Dated:  August 6, 2010
Chatham, New Jersey

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By:      s/Kevin H. Marino
        Kevin H. Marino
        437 Southern Boulevard
        Chatham, New Jersey 07928-1488
        (973) 824-9300
        *Attorneys for Defendant*
        *Sergey Aleynikov*

36