UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,              :

          -v.-                         :         10 Cr. 96 (DLC)

SERGEY ALEYNIKOV,                      :

                    Defendant.         :

- - - - - - - - - - - - - - - - -x


**GOVERNMENT'S MOTIONS IN LIMINE**


                              PREET BHARARA
                              *United States Attorney for the*
                              *Southern District of New York,*
                              *Attorney for United States*
                                   *of America.*


JOSEPH P. FACCIPONTI
REBECCA A. ROHR
*Assistant United States Attorneys,*
     *Of Counsel.*

**TABLE OF CONTENTS**

INTRODUCTION....................................................1

PROCEDURAL BACKGROUND...........................................2

FACTUAL BACKGROUND..............................................3

DISCUSSION.....................................................5

    I.    MOTION TO SEAL THE COURTROOM..........................5

        A.    Applicable Law.................................9

        B.    Discussion...................................12

            1.    The Confidentiality and the
Government's Effective Prosecution of
Trade Secrets Theft Are Overriding
Interests that Will be Prejudiced if the
Courtroom Is Not Closed .................12

            2.    The Government's Application is
Narrowly-Tailored To Serve the Interest
Of Protecting the Confidentiality of the
Trade Secrets at Issue in this case ....17

            3.    No Reasonable Alternatives Exist
Other Than the Relief Sought
in this Application .....................18

   II.  THE GOVERNMENT SHOULD BE PERMITTED
TO INTRODUCE CERTAIN EVIDENCE
UNDER FEDERAL RULE 404(b)............................19

        A.    Rule 404(b) Evidence Generally...............20

        B.    The Evidence The Government
Seeks to Introduce...........................22

            1.    Proprietary Computer Code from
Aleynikov's Prior Employer, IDT,
On his Personal Laptop..................22

            2.    Permanent Injunction Against Trademark
Infringement Ordered....................24

C.    The Proffered Evidence is Admissible
      Under Rule 404(b)...........................25

D.    The Evidence the Government Seeks to Admit
      Is Offered for a Proper Purpose and is
      Relevant and Not Unfairly Prejudicial........29

III.  EVIDENCE AND ARGUMENT ABOUT THE FINANCIAL CRISIS
      AND ASPECTS OF THE VICTIM'S BUSINESS UNRELATED TO
      THIS CASE SHOULD BE PRECLUDED......................32

IV.   EXPERT TESTIMONY...................................35

CONCLUSION....................................................40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bambu Sales, Inc. v. Ozak Trading Inc.,
  58 F.3d 849 (2d Cir. 1995) .............................27

CDA of America Inc. v. Midland Life Ins. Co.
  No. 01-CV-837, 2006 WL 5349266 (S.D. Ohio Mar. 27, 2006)16

Globe Newspaper Co. v. Superior Court for the County of
  Norfolk,
  457 U.S. 596 (1982) ................................9, 10

The Iowa Freedom of Information Council,
  724 F.2d 658 (8th Cir. 1984) .......................14, 16

Johnson & Johnson Consumer Companies, Inc. v. Aini,
  540 F. Supp. 2d 374 (E.D.N.Y. 2008) ....................27

In the Matter of the Application of the New York Times
  Company to Unseal  Wiretap & Search Warrant Materials,
  577 F.3d 401 (2d Cir. 2009) ............................10

Nixon v. Warner Communications
      435 U.S. 589, 597 (1978)).........................10

Press-Enterprise Co. v. Superior Court of California,
  478 U.S. 1 (1986) ..................................10, 11

Securities and Exchange Commission v. Goldman Sachs & Co.,
  10-cv-3229 (BSJ) (S.D.N.Y. 2010) .......................32

Tuccillo v. Geisha NYC, LLC,
  635 F. Supp. 2d 227 (E.D.N.Y. 2009) ....................27

Waller v. Georgia,
  467 U.S. 39 (1984) .................................9, 11

Watkins v. Sowders,
  449 U.S. 341 (1981) ....................................31

Williams v. Florida,
  399 U.S. 78 (1970) .....................................38

Woven Electric Corp. v. Advance Group, Inc.,

930 F.2d 913, 1991 WL 54118 (4th Cir. May 6, 1991) .....16

United States v. Alcantara,
    396 F.3d 189 (2d Cir. 2005) ...................10, 11, 12

United States v. Caputo,
    808 F.2d 963 (2d Cir. 1987) ......................22, 29

United States v. Catalan Roman,
    376 F. Supp. 2d 108 (D.P.R. 2005) .................37, 38

United States v. Ebner,
    782 F.2d 1120 (2d Cir. 1986) ..........................31

United States v. Figueroa,
    618 F.2d 934 (2d Cir. 1980) ...........................30

United States v. Gordon,
    987 F.2d 902 (2d Cir. 1993) ...........................22

United States v. Hsu,
    155 F.3d 189 (3d Cir. 1998) ...................13, 15, 16

United States v. Johnson,
    262 F.R.D. 410 (D. Del. 2009) .........................27

United States v. LaFlam,
    369 F.3d 153 (2d Cir. 2004) ...........................21

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) ...........................31

United States v. Meyerson,
    18 F.3d 153 (2d Cir. 1994) ............................21

United States v. Mahaffy,
    No. 05-cr-613 (ILG), 2007 WL 1213738 (E.D.N.Y. April 24,
    2007) .................................................36

United States v. Pascarella,
    84 F.3d 61 (2d Cir. 1996) .............................21

United States v. Pitre,
    960 F.2d 1112 (2d Cir. 1992) ......................29, 30

United States v. Roberts,

08 Cr. 175, 2010 (E.D. Tenn. Mar. 17, 2010) ........passim

United States v. Rodriguez-Berrios,
    573 F.3d 55 (1st Cir. 2009) ............................35

United States v. Roldan-Zapata,
    916 F.2d 795 (2d Cir. 1990) ...........................30

United States v. Ruedlinger,
    976 F. Supp. 976 (D. Kan. 1997) .......................31

United States v. Salaam, 273 Fed. Appx. 285 (4th Cir. 2008)27

United States v. Thomas,
    54 F.3d 73 (2d Cir. 1995) .............................21

United States v. Williams,
    205 F.3d 23 (2d Cir.  2000) ...........................30

United States v. Zackson,
    12 F.3d 1178 (2d Cir. 1993) ...........................22

## FEDERAL STATUTES

28 C.F.R. § 50.9(d).......................................9

18 U.S.C. §§ 1030(a)(2)(C).................................2

18 U.S.C. § 1832(a)(2)..................................2, 20

18 U.S.C. § 1835.....................................passim

18 U.S.C. § 2314.........................................2

Fed. R. Crim. P 16(d)..................................6, 38

Fed. R. Crim. P. 16(d)(2)(A)............................38

Fed. R. Evid. 403....................................passim

Fed. R. Evid. 404(a)(2).................................34

Fed. R. Evid. 404(b).................................passim

Fed. R. Evid. 608(b)...................................34

Federal Rule of Criminal Procedure 16(a)(1)(G)........35, 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,          :

          -v.-                     :          10 Cr. 96 (DLC)

SERGEY ALEYNIKOV,                  :

                    Defendant.     :

- - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MOTIONS IN LIMINE

The Government respectfully submits this brief to: (a) request closure of the courtroom when necessary to protect trade secrets; (b) provide the defense and the Court notice of certain evidence that the Government will seek to introduce at trial and to request a ruling in limine prior to opening statements on the admissibility of such evidence; (c) request that the Court preclude the defense from offering certain other evidence, and (d) request appropriate relief regarding expert discovery.

## INTRODUCTION

In its motions in limine, the Government seeks the following rulings: (1) an order sealing the courtroom for portions of the testimony and sealing certain exhibits in order to protect trade secrets; (2) a ruling that the following proffered evidence is admissible under Federal Rule of Evidence 404(b): (a) the presence of proprietary computer code from the prior employer of the defendant, Sergey Aleynikov, on his personal laptop; and (b) the defendant's stipulated entry of a permanent injunction

against him in a trademark infringement suit; and (3) an order precluding evidence or argument of certain topics relating to the financial crisis and the business of the victim in this case, Goldman Sachs & Co. ("Goldman Sachs"), that is not relevant to the charges in the Indictment, as specified further below.

## PROCEDURAL BACKGROUND

The defendant, Sergey Aleynikov, was arrested on July 3, 2009, and charged in Complaint on July 4, 2009, with one count of theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(2) and 2, and one count of transportation of stolen property in interstate and foreign commerce, in violation of 18 U.S.C. § 2314 and 2.  The defendant was charged in a three-count Indictment on February 11, 2010.  Count One charged theft of trade secrets, in violation of 18 U.S.C. §§ 1832(a)(2), 1832(a)(4), and 2; Count Two charged transportation of stolen property in interstate and foreign commerce, in violation of 18 U.S.C. § 2314 and 2; and Count Three charged unauthorized computer access and exceeding authorized access, in violation of 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(2)(B)(i)-(iii) and 2.  On September 3, 2010, the Court granted the defendant's motion to dismiss Count Three, but denied the defendant's motion to dismiss Counts One and Two.

Trial is scheduled to begin on November 29, 2010.

## FACTUAL BACKGROUND

The Indictment alleges[1] that the defendant stole valuable trade secrets from his former employer, Goldman Sachs, with the intent to use those trade secrets for the defendant's own benefit and for the benefit of his new employer, Teza Technologies LLC ("Teza").

Goldman Sachs is a financial institution that engages in high-frequency trading on various financial markets.  (Ind. ¶ 4). High-frequency trading uses sophisticated computer systems to execute multiple trades in extremely short time periods, based on mathematical formulas that evaluate moment-to-moment developments in the markets, as well as historical data.  (Id.).  Goldman Sachs's high-frequency trading system has two major components: the mathematical formulas, or algorithms; and the "Platform," a series of computer programs that obtains and processes the market data.  (Id. ¶ 5).  Goldman Sachs does not license, sell, or distribute its trading algorithms or the Platform to third parties, and it takes several measures to protect the confidentiality of its high-frequency trading system.  (Id. ¶¶ 5-6, 8).

The Indictment alleges that Aleynikov was a computer programmer at Goldman Sachs from May 2007 through June 2009,

---

[1] For a detailed statement of facts, the Government respectfully refers the Court to the Government's Opposition to Defendant's Motion to Dismiss, filed on July 30, 2010.

3

where he was responsible for developing and improving certain
aspects of the Platform. (Ind. ¶ 9).  On the defendant's last day
of work at Goldman Sachs, June 5, 2009, at approximately 5:20
p.m., he copied, encrypted, and transferred to a computer server
outside of Goldman Sachs's computer network hundreds of thousands
of lines of computer source code, without authorization from
Goldman Sachs and in violation of it's polces on
confidentiality.  (Id. ¶ 12).  Contained within the source code
stolen by the defendant were trade secrets belonging to Goldman
Sachs that related to its high-frequency trading business.
(Id.).  After the defendant stole the source code, he deleted
evidence of his theft from Goldman Sachs's computer system.  (Id.
¶ 12(c)).  When he returned to his home that evening, he
downloaded the stolen code from the server in Germany to his home
computer, and copied some of those files to other computers and
devices.  (Id. ¶ 13).

On July 2, 2009, the defendant traveled to the Chicago
offices of Teza, a startup company that was looking to develop
its own high-frequency trading business.  (Id. ¶ 2).  In April
2009, the defendant had accepted an employment offer from Teza,
where he would be responsible for developing Teza's high-
frequency trading business.  (Id. ¶ 10).  On his July 2, 2009
trip, the defendant carried with him a laptop computer and flash
drive, each of which contained a copy of the source code that he

had stolen from Goldman Sachs.  (Id. ¶ 15).

     As the defendant was returning from Chicago on July 3, 2009, he was arrested at Newark airport.  (Compl. ¶ 13).  The defendant waived his Miranda rights and made oral and written statements to agents of the Federal Bureau of Investigation.  The defendant admitted that he had uploaded files from Goldman Sachs's computer system, that he had deleted certain information from his Goldman Sachs desktop after the upload, and that he copied the uploaded information to three different home computers and devices. (Id.).  He claimed, however, that he intended only to collect "open source" code, meaning material not owned by Goldman Sachs, but that he uploaded more files than he intended.  (Id.).

<u>**DISCUSSION**</u>

**I.   Motion to Seal the Courtroom**

     The Government expects both parties to introduce evidence regarding the specific nature of the trade secrets at issue in this case.  On the one hand, the Government bears the burden of proving that the information the defendant allegedly stole is a trade secret.  On the other hand, the defendant has signaled that he intends to raise several defenses regarding the trade secrets, including the defense that the information stolen is not a trade secret at all.  In short, the nature of the trade secrets will very much be contested at trial.  To allow both parties to present this evidence without compromising the

confidentiality of these trade secrets, the Government respectfully requests that the Court enter a narrowly-tailored order[2] requiring that:

1.   Any trial exhibits describing or containing the victim's trade secrets be sealed, that is, be shown to the Court, the parties, and to the jury, but not to the public, and that thereafter they be filed under seal, if there is a need for them to be submitted to the Court; and

2.   That the courtroom be closed to members of the public (except counsel for the victim or other representatives of the victim) during any portion of witness testimony or attorney argument that addresses, other than at a high level of generality, the nature of the victim's trade secrets, and that the transcripts corresponding to those portions of the testimony be sealed as well.

The Government expects that it will call several lay witnesses and two expert witness who will describe (i) the specific functions and features of the source code allegedly stolen from the victim, (ii) how those features are kept confidential by the victim, (iii) how those features are proprietary to the victim, and (iv) how those features provide a competitive advantage in high-frequency trading. The Government does not anticipate that the courtroom would need to be closed (and the transcript sealed) for the entirety of these witnesses'

---

[2]This Court has already entered two orders – pursuant to 18 U.S.C. § 1835 and Fed. R. Crim. P 16(d) and dated May 4, 2010 and June 29, 2010 – that are expressly intended "to protect the confidentiality of the trade secrets that are at issue in this case," by prohibiting, among other things, the defendant from disclosing certain confidential information to third parties (other than those hired to assist in the preparation of the defense).

direct testimony; closure would be necessary only for the specific portions of this testimony in which the Government elicits confidential information disclosing proprietary aspects of the victim's trade secrets.  The same would apply to the defendant's cross-examination of these witnesses.  To the extent that the defendant intends to call expert or lay witnesses to discuss the confidential features of the trading system, the courtroom should be closed (and the transcript sealed) for the relevant portions of their testimony as well.  In addition, to the extent that either party wishes to discuss specific confidential details of trade secrets at issue during jury addresses, or during argument over evidentiary or other issues before the Court, the Government seeks that the courtroom be closed and the corresponding portions of the transcript be sealed.

Specifically, the Government will seek to close the courtroom, and seal the corresponding portions of the transcript and any exhibits that address certain categories of confidential information, including but not limited to the following:

1.  Any of the source code files and components of the victim's high-frequency trading system that addresses the function, purpose, performance, features, and composition of those files and components.

2.  How various files and components of the victim's high-frequency trading system interact with each other.

3.  The specific competitive advantages that the victim believes its high-frequency trading system confers upon

the victim as compared to other high-frequency trading
systems, other than at a high level of generality.

4.   Any comparisons, and the results therefrom, that the
     victim has made between the components and features of
     its high-frequency trading system and other,
     commercially-available trading systems, other than at a
     high level of generality.

5.   Any specific lines of source code used in the victim's
     high-frequency trading system.

6.   How the victim's use of any computer programming
     language or operating system in connection with its
     high-frequency trading system differs from the standard
     use of the computer programming language or operating
     system, and any competitive advantage those difference
     confer upon the victim.

7.   How the victim develops and modifies the source code to
     its high-frequency trading system, other than at a very
     high level of generality.

8.   How any of the source code files, components, and
     features of the victim's high-frequency trading system
     implement commonly-known or generally-available models,
     formulas, and protocols, and any modifications made by
     the victim to those models, formulas, and protocols.

9.   Other than at a high level of generality, any exhibit
     that contains or depicts schematics, diagrams,
     flowcharts, and descriptions of the operation of the
     victim's high-frequency trading system, including, but
     not limited to, how the various source code files and
     components of the victim's high-frequency trading
     system interact with each other.

10.  The Government may seek to amend this list to include
     other categories of information, as necessary to
     protect the confidentiality of trade secrets.

The Government's application does not extend to various

other issues that will be litigated at trial, such as, for

example, the defendant's employment at Goldman Sachs (apart from

any evidence regarding specific trade secrets with which he was

involved during his employment by Goldman Sachs), his resignation, and his acceptance of an employment offer by a competitor, Teza Technologies, LLC, and the manner and means by which the defendant allegedly stole portions Goldman Sachs's high-frequency trading source code.

The Government expects that any matters related to the sealing of exhibits and transcripts can be addressed outside of the presence of the jury and that, should the courtroom need to be closed, the jury could be excused while members of the audience are asked to leave.  The Government proposes these measures to eliminate the risk of prejudice to the defendant.

The Government has received permission to make this application from the Deputy Attorney General of the United States, in accordance with 28 C.F.R. § 50.9(d).

A.   Applicable Law

It is well established that the public and the press have a right of access to criminal trials and court documents that is grounded in the First and Sixth Amendments and in federal common law.  See Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 603 (1982) ("[T]he press and general public have a constitutional right of access to criminal trials."); Waller v. Georgia, 467 U.S. 39, 46 (1984) ("[T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the

implicit First Amendment right of the press and public."); In the Matter of the Application of the New York Times Company to Unseal Wiretap & Search Warrant Materials, 577 F.3d 401, 405 (2d Cir. 2009) ("[T]here is a qualified common law 'right to inspect and copy public records and documents, including judicial records and documents.'") (quoting Nixon v. Warner Communications, 435 U.S. 589, 597 (1978)).

These rights, however, are not absolute, and will yield when confronted with a compelling interest in favor of privacy.  See Globe Newspaper, 457 U.S. at 606-07 ("Although the right of access to criminal trials is of constitutional stature, it is not absolute."); New York Times, 577 F.3d at 405 ("[C]ourts administer [the qualified common law right of inspection] by balancing the government's interest in confidentiality and privacy against the public's interest in inspections.").  Thus, courts may close a criminal trial to the public and seal exhibits and transcripts if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 13-14 (1986) (quotation omitted).  However, "the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one."  Globe Newspaper, 457 U.S. at 606; United States

10

v. Alcantara, 396 F.3d 189, 192 (2d Cir. 2005) ("The power to close a courtroom where proceedings are being conducted during the course of a criminal prosecution[ ]is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons.") (quotation omitted).

Thus, criminal trials will be closed only when "closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise, 478 U.S. at 13-14; see also Waller v. Georgia, 467 U.S. at 48 (stating that (i) a "party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (ii) "the closure must be no broader than necessary to protect that interest," and (iii) "the trial court must consider reasonable alternatives to closing the proceeding"); Alcantara, 396 F.3d at 199 (stating that courtrooms may be closed only when "closure is essential to preserve higher values and is narrowly tailored to serve that interest"). Further, the trial court must make detailed findings on the record justifying the closure. Alcantara, 396 F.3d at 192, 199 ("Before excluding the public from such proceedings, district courts must make findings on the record demonstrating the need for the exclusion," and "[t]he interest [in closing the proceedings] is to be articulated along with findings specific enough that a reviewing court can determine whether the closure

11

order was properly entered.").  In addition, "notice to the public" must be provided "before closing a proceeding to which the public has a right to attend."[3]  Id. at 199.

B.   Discussion

The Government's application is justified because (i) closure is necessary to protect the confidentiality of the victim's trade secrets in this case, (ii) the Government's application is narrowly tailored to serve this interest, and (iii) no reasonable alternatives exist.

1.   The Confidentiality of a Victim's Trade Secrets and the Government's Effective Prosecution of Trade Secrets Theft Are Overriding Interests that Will Be Prejudiced if the Courtroom Is Not Closed

The Economic Espionage Act of 1996 (the "EEA") serves to protect the owners of trade secrets – which the EEA defines as information that derives its value from being kept secret – against the theft of their intellectual property.  Because trade secrets derive their value from not being generally known to the public, any public disclosure of a trade secret poses the substantial risk that the trade secret's value to its owner will be significantly diminished, if not destroyed outright.

_____

[3]The Government notes that the instant application, which will be filed on the Court's public ECF system, is sufficient notice to the public regarding the Government's application for courtroom closure.  See Alcantara, 396 F.3d at 200 ("[A] closure motion must be docketed sufficiently in advance of a hearing on such motion to permit intervention by interested members of the public.").

Accordingly, prosecutions under the EEA present two compelling interests in preserving the confidentiality of trade secrets: (i) the Government's interest in effectively investigating and prosecuting trade secrets cases and (ii) the victim's interest in preserving its intellectual property rights.

Congress recognized as much when it enacted the EEA.  The statute contains a special provision that mandates that trial courts "shall enter such orders and take other action as may be necessary and appropriate <u>to preserve the confidentiality of trade secrets</u>, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws."  18 U.S.C. § 1835 (emphasis added).  By its plain terms, Section 1835 "represent[s] a clear indication from Congress that trade secrets are to be protected to the fullest extent during EEA litigation."  <u>United States v. Hsu</u>, 155 F.3d 189, 197 (3d Cir. 1998).[4]  Congress expressly found that such protection is necessary "to encourage[]

---

[4]In <u>Hsu</u>, the Third Circuit reversed a district court's order to the Government to disclose trade secrets in a case alleging conspiracy to steal trade secrets and attempted theft of trade secrets.  <u>Hsu</u>, 155 F.3d 189.  The Court noted that it was not deciding a case of actual theft of trade secrets, <u>id.</u> at 198 n.15, but it emphasized "the bizarre effect of forcing the Government to disclose trade secrets to the very person suspected of trying to steal them, thus gutting enforcement efforts under the [Economic Espionage Act]."  The Court continued, "We believe Congress could not have intended such a result, inasmuch as it was striving to prevent economic espionage and maintain the confidentiality of trade secrets."  <u>Id.</u> at 202.

13

enforcement actions by protecting owners who might otherwise 'be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to public view, thus further devaluing or even destroying their worth.'" Id. (Quoting H.R. Rep. No. 104-788, at 13, reprinted in 1996 U.S.C.C.A.N. 4021, 4032 (1996)).

Section 1835 was enacted to "preserve the confidentiality of alleged proprietary economic information during legal proceedings under the Act consistent with existing rules of criminal procedure and evidence, and other applicable laws."  S. Rep. 104-359, 17, 1996 WL 497065.  Thus, Section 1835 "preserves the information's confidential nature and, hence, its value."  Id. Indeed, "[a] certain absurdity exists in requiring [the victim] to publicly disclose the trade secrets at issue in a prosecution of the alleged theft and disclosure of those same trade secrets." United States v. Roberts, 08 Cr. 175, 2010 U.S. Dist. LEXIS 25236, at *14 (E.D. Tenn. Mar. 17, 2010); cf. In re the Iowa Freedom of Information Council, 724 F.2d 658, 662 (8th Cir. 1984) ("Trade secrets are a peculiar kind of property.  Their only value consists in their being kept private.  If they are disclosed or revealed, they are destroyed.").

Accordingly, as Section 1835 and the EEA's legislative history make clear, the protection of the confidentiality of a victim's trade secrets is such an overriding interest as to

warrant court closure and other protective measures as appropriate. Not only do victims of trade secrets theft have a strong interest in not being re-victimized when their trade secrets are disclosed to the public and their competitors during trial, but the Government has an interest in an effective system for the enforcement of the EEA – one that encourages, rather than discourages, victims to come forward and report offenses.[5]

Moreover, courts in other contexts[6] have recognized that

---

[5]In enacting the EEA, Congress was expressly interested in adopting an effective, nationwide mechanism to prosecute trade secret theft. See S. Rep. 104-359, 11-12, 1996 WL 497065 (1996) ("Only by adopting a national scheme to protect U.S. proprietary economic information can we hope to maintain our industrial and economic edge and thus safeguard our national security."); H.R. Rep. 104-788, reprinted in 1996 U.S.C.C.A.N. 4021, 4025 (1996) (finding that a "comprehensive federal criminal statute" "will serve as a powerful deterrent to this type of crime" and would "better facilitate the investigation and prosecution of [trade secret theft]"). Congress was especially concerned with trade secret theft because of the increasing value of intellectual property to the national economy. See, e.g., H.R. Rep. 104-788, at 4, reprinted in 1996 U.S.C.C.A.N. 4021, 4023, 1996 WL 532685 (1996) (recognizing the growing importance of "proprietary economic information" and finding that "[a]s the nation moves into the high-technology, information age, the value of these intangible assets will only continue to grow."); see also S. Rep. 104-359, at 6, 1996 WL 497065 (1996) ("In the last few decades, intangible assets have become more and more important to the prosperity of companies.").

[6]The Government is not aware of any reported case brought under the EEA – a criminal statute – in which the issue of courtroom closure has been decided, although courts have considered applications to adopt other protective measures under Section 1835. See, e.g., Hsu, 155 F.3d 189; and Roberts, 2010 U.S. Dist. LEXIS 25236. The absence of reported decisions may be due in part to the fact that the existence of a trade secret is not always, such as it is in this case, one of the central issues, either because the Government is not required to produce proof of

protecting the confidentiality of trade secrets is an interest that may warrant court closure or other protective measures. See, e.g., CDA of America Inc. v. Midland Life Ins. Co., No. 01-CV-837, 2006 WL 5349266 (S.D. Ohio Mar. 27, 2006) (holding, in a civil trade secrets trial, that the courtroom may be closed "with respect to all portions of the trial in which parties testify as to what they alleged to be a 'trade secret.'"); In re the Iowa Freedom of Information Council, 724 F.2d at 664 (finding that, in appropriate circumstances, proceedings involving trade secrets may be closed to the public); cf. Woven Elec. Corp. v. Advance Group, Inc., 930 F.2d 913, 1991 WL 54118, at *6 (4th Cir. May 6, 1991) (unpublished) (ruling that district court could have closed courtroom and could seal record to protect trade secrets).

In this case, it is substantially likely that any public testimony or argument at trial that reveals the substance or nature of the unique features of the high-frequency trading computer code would result in harm both to the Government's ability to effectively enforce the EEA and also to the victim itself, whose proprietary and valuable intellectual property would be distributed to the public.  In other words, the very

---

a trade secret at trial, as is the case when conspiracy or attempt is charged under the EEA, see Hsu, 155 F.3d at 198, because there is a way to avoid live witnesses testimony regarding the trade secret, as is the case in Roberts, 2010 U.S. Dist. LEXIS 25236, discussed infra, or because the existence of a trade secret is simply not disputed.

purpose of this trade secrets prosecution would be defeated and
other victims of trade secrets theft would be discouraged from
reporting those crimes.

       2.   <u>The Government's Application is Narrowly-Tailored
          to Serve the Interest of Protecting the
          Confidentiality of the Trade Secrets at Issue in
          this case</u>

As detailed above, the Government will seek to close the
courtroom (and seal any portion of the transcript or trial
exhibits) <u>only</u> when that testimony or evidence (or argument)
being publicly presented would reveal proprietary aspects of the
victim's trade secrets.  To the extent the Government can,
without compromising its case, elicit testimony, introduce
evidence, or present argument at a level general enough to avoid
the need for closure (or sealing), it will endeavor to do so.

The Government cannot, however, predict at this time the
extent to which it will request the Court to exercise these
protective measures, as it will depend, in part, on the level of
detail of the defendant's cross-examination of the Government's
witnesses, the defenses asserted by the defendant, and the
witnesses and evidence the defendant may seek to introduce during
a defense case, if there is one.  The Government respectfully
requests that the Court require the defendant to proffer, in
sufficient time so that the Government will have an opportunity
to seek closure or other protective measures, what testimony,
exhibits, or argument regarding the trade secrets it intends to

17

present at trial.

      3.   <u>No Reasonable Alternatives Exist Other than the Relief Sought in this Application</u>

The Government bears the burden of establishing that what the defendant allegedly stole was a trade secret, and the defendant has indicated that, among other defenses, he will assert that what was allegedly stolen was not a trade secret. Accordingly, the Government expects the issue of the victim's trade secrets will be highly contested, and that both parties will elicit testimony, introduce evidence, and present argument that discloses the nature of those trade secrets. Because any public disclosure of the substance or nature of the trade secrets embodied in the allegedly stolen computer code poses a substantial likelihood of harm to the victim, there does not appear to be any reasonable alternative for the protection of the victim's trade secrets other than to seal the courtroom during any testimony or argument that addresses the substance or nature of those trade secrets, and that corresponding portions of the transcript, and any exhibits containing trade secrets, be sealed.

The Government has considered measures short of sealing the courtroom and has found them to be inadequate. For example, in <u>United States v. Roberts</u>, one of the few cases to apply Section 1835, the Government applied for, and the district court granted, a protective order to seal at trial certain photographic exhibits depicting machine equipment that the Government alleged had been

18

surreptitiously photographed and which depicted the victim's trade secrets.  <u>See</u> 2010 U.S. Dist. 25236, at *28-*29.  Unlike the photographs of machine equipment in <u>Roberts</u>, however, the trade secrets in this case are embodied in computer source code that is all but incomprehensible to anyone without highly specialized training.  Accordingly, live witness testimony will be essential to explain the nature of the trade secrets embodied in the allegedly stolen source code, and a mere protective order pertaining to exhibits would be inadequate.  Likewise, because, as discussed above, the specific nature of the trade secrets will comprise the central issue in this case, it cannot be the subject of a stipulation between the parties.

Accordingly, for the foregoing reasons, the Government respectfully requests that the Court adopt the Government's proposed protective measures.

## II.   The Government Should be Permitted to Introduce Certain Evidence Under Federal Rule of Evidence 404(b)

The Government respectfully requests admission of certain evidence pursuant to Federal Rule of Evidence 404(b).  The Government seeks to introduce evidence of: (1) proprietary computer code from Aleynikov's prior employer, IDT Corp., found on his personal laptop; and (2) the defendant's stipulated entry of a permanent injunction against him in a trademark infringement suit.

One of the critical issues in this case is whether the

defendant intended to convert a trade secret to the economic benefit of anyone other than the owner and intended to injure the owner.  See 18 U.S.C. § 1832.  The proffered 404(b) evidence discussed below is strong evidence of the defendant's intent to steal trade secrets for himself and others – namely, future employers – and his knowledge and intent that the theft would injure the trade secret owner.  The evidence helps prove that the defendant's actions were intentional, criminal acts, not innocent or mistaken ones, so the Government seeks to admit them under Rule 404(b).

> A.   Rule 404(b) Evidence Generally

Under Federal Rule of Evidence 404(b), the Court has the discretion to admit evidence of other crimes, wrongs, or acts committed by the defendant so long as it is relevant proof of some issue at trial other than the defendant's propensity to commit the charged crimes.  Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (emphasis added).

20

The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004). See also United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996) (discussing the Second Circuit's "inclusionary" approach). In order to determine whether a district court properly admitted other act evidence, the reviewing court considers "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004).

Applying these principles, the Second Circuit has routinely approved of the admission of "other bad acts" evidence with respect to the issue of knowledge, intent and motive. See, e.g., United States v. Thomas, 54 F.3d 73, 81-82 (2d Cir. 1995) (affirming admission of 404(b) evidence as relevant to knowledge and intent); United States v. Meyerson, 18 F.3d 153, 166-67 (2d Cir. 1994) (same). Moreover, the Second Circuit has consistently recognized that evidence of the defendant's involvement in prior, similar wrongs is not only probative of his intent, but where,

potentially as here, the defendant claims his conduct has an
innocent explanation, the admission of such evidence of prior
acts is particularly appropriate.  See, e.g., United States v.
Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant
claims that his conduct has an innocent explanation, prior act
evidence is generally admissible to prove that the defendant
acted with the state of mind necessary to commit the offense
charged."); United States v. Gordon, 987 F.2d 902, 908-09 (2d
Cir. 1993) ("Evidence that the defendant had a prior conviction
for nearly identical counterfeiting activity was admissible to
rebut his claim that he had not known that he received
counterfeit money."); United States v. Caputo, 808 F.2d 963, 968
(2d Cir. 1987) (allowing "evidence of appellants' involvement
with previous credit card schemes" because it was "probative of
their intent in possessing the 'access devices' for which they
were charged").

      B.   <u>The Evidence The Government Seeks to Introduce</u>

          1.   <u>Proprietary Computer Code from Aleynikov's
Prior Employer, IDT, on his Personal Laptop</u>

The defendant worked at IDT Corp. from approximately
December 4, 2008 through May 4, 2007.  IDT is a
telecommunications company, and part of its business involves
routing phone calls to their destination telephone numbers.
Calls are routed using a hierarchy developed by IDT within its
call switching infrastructure.  Calls are sent to service

providers based on their positions in the hierarchy, which is determined by several variables, including quantitative measurements such as cost.  Programmers at IDT developed computer code and related information, such as mapping of network elements, as part of this system.

At the time of Aleynikov's departure from IDT, his title was Director of Routing Research and Development, within the Telecom Routing Research and Development Department.  Aleynikov informed IDT that he was leaving the company because he received an offer at another company that he could not refuse.

A forensic examination of the materials on Aleynikov's laptop that was seized near the time of his arrest identified at least two files containing parts of computer code (known as "STORM" and "STAR") used at IDT, as well as a schematic of the IDT network elements.  The STORM and STAR programs, among other things, calculate prices, rates, and origination fees as part of the call routing system.  IDT considers this code and schematic to be proprietary, confidential, and valuable.  It is developed by IDT programmers for the sole use of IDT.  IDT programmers working on the code from outside of the office were supposed to use a virtual private network (known as a VPN) or employer-issued laptops.  Further, IDT employees with knowledge of the code typically sign non-compete contracts so that those employees do not enter the calling card business after leaving the company.

23

According to IDT, former employees should not be in possession of
the code.  The forensic examination of Aleynikov's laptop also
showed that the IDT files were accessed after the end of his
employment there.

> 2. Permanent Injunction Against Trademark
>    Infringement Ordered

On or about November 14, 1997, Aleynikov was sued civilly in
federal court in a suit alleging trademark infringement,
trademark dilution, copyright infringement, and unfair
competition, among other claims.  See Clifton Productions, Inc.,
d/b/a Merv Griffin Productions, and Hilltop New Media, Inc.,
d/b/a Columbia Tristar Interactive v. Networking Dimension
Corporation, CIS Development Foundation, Inc., Leonid Ivanutenko,
Sergey Aleynikov, Vadim Resyev, a/k/a Vadim Arefiev, No. 97-8408
AAH (RCx) (C.D. Cal. 1997).  At issue in the lawsuit were
Internet websites that copied the television game show "Wheel of
Fortune."  The November 14, 1997 Complaint alleged that defendant
Networking Dimension offered an Internet game called "The Fortune
Wheel" and "Winning Spin" in violation of the intellectual
property rights of the "Wheel of Fortune."  Sergey Aleynikov was
alleged to be the President and a principal of Networking
Dimension and the registered administrative contact for the
"fortune-wheel.com" website.  According to the Complaint, the
plaintiffs notified the defendants of the infringing nature of
the website but the defendants did not cease the use of "fortune-

24

wheel.com."  When the internet service provider terminated its service to the "fortune-wheel.com" website due to its infringing character, the defendants allegedly moved the website to a different provider.

Aleynikov and other defendants entered into a stipulated permanent injunction on or about December 19, 1997.  The Court ordered that Aleynikov and others cease infringing the trademarks and copyrights in "Wheel of Fortune" and cease publishing the "Winning Spin," "The Fortune Wheel," or other like Internet games.  <u>See</u> Stipulation and Order (Ex. A).

Law enforcement agents recovered Aleynikov's resume from a backpack he was carrying at the time of his arrest.  That resume listed employment at Orbit Communications & Networking Dimension, and stated that he "[d]eveloped a customer's project: Fortune-Wheel – an on-line computer game with rules similar to the popular 'Wheel of Fortune' TV show."  <u>See</u> resume (Ex. B).

        C.   <u>The Proffered Evidence is Admissible Under Rule 404(b)</u>

The evidence of the proprietary computer code from IDT, Aleynikov's prior employer, on his laptop computer is relevant and admissible to prove, among other things, proof of motive, intent, plan, knowledge, and absence of mistake and accident. The IDT computer code files are proprietary - they are developed within IDT for only IDT's use - and the company took steps to keep the materials confidential.  The files are valuable and an

important component of IDT's call routing infrastructure.

Aleynikov was not permitted to have personal copies of the IDT code - at the very least, certainly not after his employment there – and he was not permitted to have personal copies of the Goldman Sachs code.  Aleynikov kept the IDT code on his personal laptop, where Goldman Sachs's trade secrets were also found. This evidence is probative, among other things, of Aleynikov's intent and absence of mistake.

The Government expects witness testimony at trial to establish that Aleyniov's experience with telecommunications computer code is relevant to coding in high-frequency trading; as an example, the systems in both industries require computer code that can execute transactions rapidly and that consider pricing variables.  The IDT telecommunications computer code on Aleynikov's personal computer after he left IDT to become a programmer in Goldman Sachs's high-frequency trading business is relevant to Aleynikov's intent to use intellectual property from his prior employer for his own benefit – namely, for his own career.  Further, the fact that he had proprietary computer code from his prior employer on his laptop, and that the files were accessed even after he worked at IDT, tends to negate any defense that the proprietary Goldman Sachs code on his laptop was a mistake or accident.

Likewise, the federal court-ordered permanent injunction

against Aleynikov, on his consent, is admissible because it is
relevant to Aleynikov's motive to infringe on intellectual
property rights held by others and his knowledge of the protected
nature of those materials.  See Bambu Sales, Inc. v. Ozak Trading
Inc., 58 F.3d 849 (2d Cir. 1995) (finding that defendants had
been sued in a trademark infringement case in the past relevant
to issue of wilfulness in a trademark suit); Johnson & Johnson
Consumer Companies, Inc. v. Aini, 540 F. Supp. 2d 374, 392 n.31
(E.D.N.Y. 2008) (in a trademark infringement action, finding that
prior trademark infringement actions brought against defendants
is admissible under Rule 404(b)); Tuccillo v. Geisha NYC, LLC,
635 F. Supp. 2d 227, 236 n. 4 (E.D.N.Y. 2009) (in a trademark
infringement case, admitting evidence of a prior attempt to
register an infringing mark under Rule 404(b)).

The permanent injunction is probative of Aleynikov's intent
here, even though the prior case concerned infringement of
trademarks and copyrights and the instant case involves trade
secrets, because both situations involve infringing on
intellectual property rights of the owners.  See United States v.
Salaam, 273 Fed. Appx. 285 (4th Cir. 2008) (per curiam) (in a
criminal trafficking of counterfeit goods case, affirming
admission under Rule 404(b) of pirated DVDs and CDs seized).  Cf.
United States v. Johnson, 262 F.R.D. 410, 418-19 (D. Del. 2009)
(in a mail and wire fraud case, admitting a Securities and

27

Exchange Commission stipulation and order pursuant to Rule 404(b)).

The California proceedings and Aleynikov's stipulation to the permanent injunction demonstrates his knowledge of the protected nature of intellectual property and his knowledge that theft of intellectual property damages the owner.

Furthermore, long after Aleynikov entered into the stipulated permanent injunction, he described the "Fortune-Wheel" on his resume, and even stated that he created the "Fortune-Wheel" based on the popular televison show, "Wheel of Fortune." The defendant essentially touted on his resume his theft of intellectual property. This evidence is highly probative of the defendant's intent to steal intellectual property and use it to his advantage in his career and search for jobs.

The defendant's past trademark infringement and its placement on his resume, and the computer code from his former employer, IDT, on his personal computer while at his next employer and while looking for a new job, are probative of the defendant's motive to steal computer code from Goldman Sachs before he moved to a new job at a competitor. The proffered evidence of the defendant's theft of intellectual property in order to further his own career helps prove that the defendant's actions at issue in this case were intentional, criminal acts, not innocent or mistaken ones.

Because the proffered evidence here is offered for proper purposes and is relevant to issues likely to be in dispute during the trial, namely, whether the defendant had the motive and intent to commit the charged crimes, and therefore, whether he actually did what he is accused of doing, it is properly admitted.  Further, this evidence is properly admitted during the Government's case-in-chief because it is "apparent that intent will be in dispute."  United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992); Caputo, 808 F.2d at 968 (same).

> D.   The Evidence the Government Seeks to Admit is Offered for a Proper Purpose and is Relevant and Not Unfairly Prejudicial

The proffered evidence satisfies the criteria of Federal Rule of Evidence 403 because none of the proffered evidence is unfairly prejudicial and because the evidence is highly probative.  Rule 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  In this case, there is no basis to exclude the proffered evidence under Rule 403.

As discussed above, the proffered evidence is highly relevant to the defendant's intent and knowledge, and to a determination of whether he committed the charged crimes.  The

evidence is not <u>unfairly</u> prejudicial to him, however, because it does not tend to encourage the jury to make a decision on an improper basis. <u>See</u> Advisory Committee's Notes on Rule 403 ("Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."); <u>United States v. Figueroa</u>, 618 F.2d 934, 943 (2d Cir. 1980) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").

Further, there is no risk of unfair prejudice because the proffered bad acts are no more inflammatory than the charged conduct. The Second Circuit employs a rule of thumb that unfair prejudice cannot result from 404(b) evidence that does not involve conduct more serious or sensational than the charged crime. <u>See</u> <u>United States v. Williams</u>, 205 F.3d 23, 34 (2d Cir. 2000) (affirming admission of 404(b) evidence of prior criminal conduct that was not more serious than the charged crime); <u>United States v. Pitre</u>, 960 F.2d 1112, 1120 (2d Cir. 1992) (Rule 403 did not preclude evidence of prior narcotics transactions that "did not involve conduct any more sensational or disturbing" than the charged crime) (citation omitted); <u>United States v. Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990) (same).

Moreover, the proposed Rule 404(b) evidence would not lengthen the trial in any significant way. The evidence likely

30

will consist of relatively brief witness testimony and admission of relatively few exhibits, so there is no danger that the jury would be overwhelmed or confused by additional evidence.

Any perceived risks of unfair prejudice can be addressed with a limiting instruction from the Court on the proper consideration of Rule 404(b) evidence.  See Watkins v. Sowders, 449 U.S. 341, 347 (1981) (describing a "presumption that juries will follow instructions"); United States v. Ebner, 782 F.2d 1120, 1126 (2d Cir. 1986) ("[L]imiting instructions are an accepted part of our present trial system, and consequently there is a presumption that juries will follow them.") (internal quotations and citations omitted).  Such a limiting instruction would serve as an appropriate "final protection" against possible unfair prejudice.  See United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).

Likewise, a limiting instruction can remind the jury that the burden of proof in a stipulated, civil permanent injunction such as the one ordered against Aleynikov is different from the burden of proof in a criminal case.  See United States v. Ruedlinger, 976 F. Supp. 976, 1005-06 (D. Kan. 1997) (in denying post-trial motions, setting forth text of a limiting instruction regarding admission of civil proceedings in a criminal case).

**III.  Evidence and Argument about the Financial Crisis and Aspects of the Victim's Business Unrelated to this Case Should Be Precluded**

The Government respectfully moves to preclude evidence and argument concerning the current financial crisis and aspects of the business of the victim, Goldman Sachs, that are not related to the high-frequency trading and computer source code at issue in this case.  In particular, the Government moves to preclude evidence of the following topics: (1) the financial crisis and recession; (2) the mortgage market and mortgage securities; (3) Goldman Sachs's receipt of funds from the Troubled Asset Relief Program ("TARP"), or "bailout" funds; (4) the Goldman Sachs bonus pool, and bonuses and salaries paid to Goldman Sachs employees generally (as opposed to salaries of programmers or comparable employees relevant to this case); (5) public statements by Goldman Sachs executives other than any referring to the subject matters in this case; (6) civil and regulatory proceedings and dispositions of matters involving Goldman Sachs, including the litigation, settlement, and underlying issues in Securities and Exchange Commission v. Goldman Sachs & Co., no. 10-cv-3229 (BSJ) (S.D.N.Y. 2010); and (7) investigations of and proposed regulation of high-frequency trading by the Securities and Exchange Commission, the Commodities Futures Trading Commission, and/or any self-regulatory organizations.

There is no evidentiary basis to admit evidence of broader

32

social issues such as the financial crisis or the distribution of TARP funds.  Nor is there any basis to admit evidence relating to the victim's business unless it concerns its high-frequency trading, computer code, confidentiality measures, or other topics specific to this case.  Although the salaries and bonuses paid to computer programmers and certain comparable employees are relevant to the charges against this defendant, evidence of Goldman Sachs's bonus pool and salaries overall are not pertinent to this matter.  Likewise, public statements by Goldman Sachs executives unrelated to this case, and civil and regulatory dispositions of other litigation, are irrelevant to the charges against this defendant.  In addition, the legality of high-frequency trading is not an issue here, and investigations of high-frequency trading and proposed government regulation is not probative of the charges in the Indictment.

Federal Rule of Evidence 608(b) prohibits the introduction of extrinsic evidence of specific instances of conduct of a witness, other than the conviction of a crime, for the purpose of attacking the witness's character for truthfulness.  The Rule vests the Court with discretion to permit inquiry of a witness on cross-examination regarding "specific instances of the conduct of a witness," if the conduct is probative of "truthfulness or untruthfulness."  Fed. R. Evid. 608(b).  Evidence of the financial crisis and other topics discussed above is not

admissible under Rule 608(b) because it is not probative of "truthfulness or untruthfulness" of any testifying witness.

Nor is the evidence permissible character evidence under Rule 404.  That rule prohibits the admission of character evidence absent certain exceptions, which do not apply here because the evidence sought to be precluded is not a pertinent character trait of a testifying witness.  See Fed. R. Evid. 404(a)(2).  The evidence is not a character trait that is pertinent to the charges against the defendant, and it does not have a reasonable relationship to the credibility of any witness at trial.  The only purpose of offering such evidence or making related arguments would be an improper one: to attempt to impugn the "corporate character" of the victim in front of the jury. Doing so would increase the likelihood that the jury would render a verdict on an improper basis.

None of the evidence sought to be precluded concerns conduct relevant to the case here.  Thus, the topics discussed above should be excluded under Rule 401 because they are not relevant, and under Rule 403 because they have no probative value.  The evidence sought to be excluded has no bearing on proving or disproving the elements of the charges against the defendant and would needlessly confuse the issues before the jury.  Any tangential relevance of the evidence would be outweighed by the prejudicial nature of it because it would serve

34

only to attack the victim.  It would then increase the chance
that a jury would base its decision on facts other than ones
relevant to whether the defendant committed the crimes charged.
See United States v. Rodriguez-Berrios, 573 F.3d 55, 70 (1st Cir.
2009) (in a carjacking case, affirming exclusion of evidence
about an affair of the victim/ex-wife under Rule 403, and finding
that the evidence "could reasonably be seen as merely an attempt
to impugn the character of the victim.").  The topics discussed
above are prejudicial, not probative, and would serve only to
shift the emphasis at trial away from the crimes charged in the
indictment; thus, they should not be admitted.

## IV.  Expert Testimony

The Government moves the Court to compel the defendant to
disclose experts he intends to call as witnesses at trial, and to
set a schedule for disclosure of expert reports.

Federal Rule of Criminal Procedure 16(a)(1)(G) provides that
the Government, at the defendant's request, must provide a
written summary of expert testimony that the Government intends
to use at trial.  Rule 16(b)(1)(C) provides that the defendant,
at the Government's request, must provide a written summary of
expert testimony that the defendant intends to use at trial, if
the defendant has requested disclosure under Rule 16(a)(1)(G) and
the Government complied.

Counsel for the defendant wrote to counsel for the

35

Government on September 25, 2010, stating that he was withdrawing his previous request for expert disclosure, and that he did not intend to provide the Government with expert disclosure.

On October 21, 2010, the Government provided the defendant with notice of two expert witnesses it intends to call at trial, with a summary of the topics about which the witnesses will testify, along with their resumes listing their qualifications. The Government intends to call, in essence, an expert on high frequency trading systems, and an expert who has conducted a forensic analysis of the defendant's computers and other devices.

Even though the defendant apparently wants the experts at trial to be a surprise, the Government requests that the Court exercise its authority over discovery and require the defendant to provide expert notice and a summary of the expert's opinions and bases for those opinions.

The purpose of the expert disclosure provisions of Rule 16 is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  See Fed. R. Crim. P. 16, Advisory Committee's Note (1993); United States v. Mahaffy, No. 05-cr-613 (ILG), 2007 WL 1213738 at *2 (E.D.N.Y.  April 24, 2007) (quoting Advisory Committee's note). This principle is especially true in a case like this, where the

nature of the expert testimony is expected to be technical.

At least one court has rejected an argument that the defendants had eschewed reciprocal discovery so were not required to provide expert discovery.  See United States v. Catalan Roman, 376 F. Supp. 2d 108 (D.P.R. 2005).  In Catalan Roman, the court examined whether it may compel a capital defendant to disclose its expert witness before sentencing "where that defendant spurns reciprocal disclosure."  Id. at 111.  The defendants argued that Rule 16 disclosure is reciprocal and triggered only at a defendant's behest, so they could not be compelled to reciprocate.  Id. at 112.  The court rejected that argument and stated:

> [T]heir decision to follow a closefisted strategy does not put an end to the matter of disclosure.  Regardless of whether Rule 16 is inapplicable on its own terms [due to the sentencing phase of the case] or because defendants never triggered it, it is well-settled that district courts have inherent power to make and enforce reasonable rules of procedure, including disclosure rules.

Id. at 114-15.  The court discussed several cases finding that the trial court may require pretrial discovery from the defendant under its inherent powers, and noted that the court's inherent power is codified in Federal Rule of Criminal Procedure 57(b). Id. at 115.  The court concluded that disclosure of the defendants' expert was warranted to allow the Government to acquire its own expert "if there is to be some semblance of meaningful expert rebuttal."  Id. at 116.

In addressing whether requiring disclosure would violate any constitutional rights of the defendants, the Catalan Roman court determined that there was "no constitutional violation by requiring a defendant to disclose mitigating information he intended to offer the jury anyway." Id. at 117.  It continued: "Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense . . ." Id. (quoting Williams v. Florida, 399 U.S. 78, 85 (1970)).  As the court observed, "a criminal trial is not a 'poker game in which players enjoy an absolute right always to conceal their cards until played.'" Id. (quoting Williams, 399 U.S. at 82).

The advisory notes to Rule 16 instruct that the rule is intended to prescribe the "minimum amount of discovery to which the parties are entitled.  It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." Fed. R. Crim. P. 16, Adv. Comm. Note (1974). See also Fed. R. Crim. P. 16(d)(2)(A) (describing the court's powers if a party fails to comply with the Rule).  Thus, the Court has the inherent power to order the defendant to provide expert disclosure in this case, despite the defendant's ploy of retracting its demand for expert discovery.

The defendant appears to want to ambush the Government at trial by not providing advance notice of its expert witness.

38

That kind of gamesmanship should not have a place in this criminal trial, especially given the technical nature of the expected expert testimony.  Pre-trial disclosure would permit more complete pretrial preparation by both parties and would avoid needless recesses or delays during trial.  The Government respectfully requests that the Court order that the defendant provide notice of experts it intends to call at trial, and set a date for exchange of expert reports that will contain the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant its Motions in Limine.


Dated:      October 22, 2010
            New York, New York

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney


                              /s/ J.P.F.
                    By:_____
                         Joseph P. Facciponti
                         Rebecca A. Rohr
                         Assistant United States Attorneys
                         Tel: (212) 637-2522/2531
                         Fax: (212) 637-2620

**Certificate of Service**                                    **Electronically**

The undersigned attorney, duly admitted to practice before this
Court, hereby certifies that on the below date, he served or
caused to be served the following document in the manner
indicated:

    **Government's Motions in Limine**

Via e-mail upon the following attorneys:

    Kevin H. Marino, Esq.
    John Boyle, Esq.
    John Tortorella, Esq.


Dated:    October 22, 2010
        New York, New York


                        /s/ Joseph P. Facciponti
                        Joseph P. Facciponti