UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,       :     10 CR. 0096 (DLC)

                             :

       v.                     :          **DECLARATION**
                             :       **OF KEVIN H. MARINO**

                             :

SERGEY ALEYNIKOV,             :

         Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

       KEVIN H. MARINO, hereby declares, pursuant to 28 U.S.C. § 1746(2), as follows:

       1.       I am a member of the law firm Marino, Tortorella & Boyle, P.C., attorneys for defendant Sergey Aleynikov ("Aleynikov") in this matter. I am fully familiar with the facts of this case and make this Declaration in support of Aleynikov's Motion to Admit Statements of the Government under F.R.E. 801(d)(2)(B) and (D), which is being filed contemporaneously with this Declaration.

       2.       Attached hereto as Exhibit A is a document containing true and correct excerpts from the transcript of the detention hearing in this matter on July 4, 2009 before the Honorable Kevin N. Fox, U.S.M.J. and from the transcript of the hearing in this matter on June 29, 2010 regarding Goldman Sachs's motion to quash a defense counsel subpoena seeking discovery of those components of its trading platform the defendant is not alleged to have stolen.

       3.       Attached hereto as Exhibit B is a true and correct copy of the complete transcript of the detention hearing in this matter on July 4, 2009 before the Honorable Kevin N. Fox, U.S.M.J.

4. Attached hereto as Exhibit C is a true and correct copy of the complete transcript of the hearing in this matter on June 29, 2010 regarding Goldman Sachs's motion to quash a defense counsel subpoena seeking discovery of those components of its trading platform the defendant is not alleged to have stolen.

5. Attached hereto as Exhibit D is a true and correct copy of the court's decision in United States v. Paloscio, No. 99 Cr. 1199 (LMM), 2002 U.S. Dist. LEXIS 12976 (S.D.N.Y. July 17, 2002).

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct.

Dated: November 22, 2010
Chatham, New Jersey

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By: _____
Kevin H. Marino
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant Sergey Aleynikov*

# EXHIBIT A

*Excerpts from transcript of Detention Hearing (July 4, 2009)*

        THE COURT: What is the government's position on the bail?

        MR. FACCIPONTE: We seek detention at this time, Your Honor.

        THE COURT: Under what theory or theories?

        MR. FACCIPONTE: On theory of danger to community and risk of fight.

(7/4/09 Tr. at 6:11-17.)

***

        MR. FACCIPONTE: Thank you, Your Honor. We believe the defendant poses both a substantial risk of flight and danger to the community. I'll address the danger issue first as I believe it is the more serious and guiding principle in this case. What the defendant is accused of having stolen from this investment bank, which is a major investment bank in New York, is their proprietary, high-quantity, high-volume trading platform with which they conduct all of their trades in all major markets within the United States and other places. It is something which they had spent millions upon millions of dollars in developing over the past number of years and it's something which provides them with many millions of dollars of revenue throughout this time. They guard the secrecy of this code very strictly and they have no know instance of this code going anywhere except the defendant's malfeasance here, except for some exceptions that are noted in the complaint. If this code is allowed to go to a competitor or to an entity that is not necessarily legal but can start trading on this, the bank itself stands to lose its entire investment in creating this software to begin with, which is millions upon millions of dollars. The bank's profit margin will be eroded – and I'll explain why in a minute – by the other competit[ive] activity. In addition, because of the way this software interfaces with various markets and exchanges, the bank has raised a possibility that there is a danger that somebody who knew how to use this program could use it to manipulate markets in unfair ways. . . . As we stand right now, according to the defendant's post-arrest statements to the government, he transferred his view -- unwittingly, but nevertheless amidst to having transferred --

MS. SHROFF: I'm sorry, Your Honor, did he say unwittingly?

MR. FACCIPONTE: In the defendant's view in his post-arrest statement. Nevertheless --

 THE COURT: Share the statement with defendant's counsel.

MR. FACCIPONTE: I have provided the copy of the statements to Ms. Shroff and also to Your Honor's deputy. In his view he transferred it unwittingly, but nevertheless admits to having transferred it. And it is sitting on a server that we believe is in Germany right now. He admits to having made several copies of that, that he downloaded to his personal computer, his laptop computer, and to a flash drive. And he has given consent for the government to seize those items but the copy in Germany is still out there. And we at this time do not know who has access to it and what's going to happen to that software. We believe that if the defendant is let at liberty

there is a substantial danger that he will obtain access to that software and send it on to whoever may need it. And keep in mind, this is worth millions of dollars.

THE COURT: Well, what makes you think that it hasn't already been transferred since you do now know whether other people have access to the Germany server? It's already compromised, so the financial institution has to take steps now if you've made it aware of the compromise to adjust for the loss of its trading platform.

MR. FACCIPONTE: Your Honor is correct. I could've been disseminated in this time. It does not mean, however, that if it has not been disseminated we should not take steps to prevent the defendant from disseminating information if it is not already out there.

THE COURT: But my point is if you've made the financial institution aware, that is date of the compromise, and resides in the server in Germany, prudence dictates the financial institution now has to take steps, if it hasn't already, to address the loss of that information. It can't guess that no one has access to it. It has to operate as if someone does have access to it and can use it and can affect the financial institution adversely.  So I have to image in that it's already taken steps if you've alerted of the existence on the Germany server, the institution I have to imagine has already taken steps to contain any damage that may befall it.

MR. FACCIPONTE: My understanding from the financial institution, they are aware of this, Your Honor, is that they do not believe that any steps they can take would mitigate the danger of this program being released.  In other words, they can take steps, they can start building a new program, they can -- I'm not exactly sure what steps they can take. But even if they could take steps, my understanding from them is that any dissemination of this program would be a substantial loss to them, a very substantial loss to them.  And so if has, by some miracle, it has not been disseminated already, the government requests that the defendant be remanded so that there is no possibility that he can affect any transfer of the software that is in Germany.

THE COURT: Well, whether he is detained is irrelevant. The financial institution cannot gamble, if I'm to believe your presentation that markets will be affected and so forth, they can't gamble that no one else is going to get access. It has to operate as if someone's got access and has got to take steps to insulate or reduce any damage it could possibly reduce, not only to itself but to the financial markets.

MR. FACCIPONTE: May I have one moment, Your Honor?

(Pause in proceedings)

MR. FACCIPONTE:  I believe, Your Honor, that the financial institution, I think the position here is that whatever steps the financial institution can take, the financial institution essentially has no way to effectively protect itself against the loss of this program. Once it is out there, anybody will be able to use this. And fair market share would be adversely affected. They would've lost the substantial investment of millions upon millions of dollars that they've placed into this software.  Even if they take the most prudent steps available to them we should not run the risk that something which has not been let out of the box yet, could be let out of the box if the

defendant is released. And if he's released, he doesn't need necessarily access to his home computer. A smart phone, a black berry, or an Iphone, something that gives him access to the Internet is all he needs, and maybe ten minutes. So until we can say that this information is secure to the best of your knowledge, the government maintains the defendant is danger to the community. In addition, Your Honor, he poses a risk of flight and I believe the risk of flight in connection to a substantial amount of money that could be made in selling this software ought to be noted by the court. He is a dual citizen with the Russian federation. He has ties to Russia in the sense that his parents are there and he visits Russia about every other year or so. He is facing, if the court were to find a maximum amount of loss possible here, in the worst-case scenario, a very substantial sentence in this case. And considering that he's already partially allocuted to some of the elements of the offense in his post-arrest statement and the other evidence that we're developing and the evidence presented in the complaint, the proof against him is strong at this point. And so therefore, there's just a possibility of substantial sentence combined with the profit to be made by selling this software, combined with the fact that he can flee to Russia, the government believes that the defendant be detained at this time.

THE COURT: If as you say, the material is on the server in Germany, if anyone can access the material through that server, that is to say it is not only the defendant who can access it; he might be able to provide other persons with information that would allow them to access it, if that's so, then what difference does it make whether he's detained or not if he can communicate that information?

MR. FACCIPONTE: Right now our understanding is that the server can only be accessed by someone who has his user name and password.

THE COURT: Who has what, sir?

MR. FACCIPONTE: His user name and password.

THE COURT: Okay. So if he gives that to you, you can access that, isn't that correct?

MR. FACCIPONTE: That is correct, Your Honor.

THE COURT: So whether he's detained or not doesn't him from communicating that information to you or anyone else. And therefore the server could be accessed and the financial institutions and the markets compromised as you have described.

MR. FACCIPONTE: It would certainly be more difficult, Your Honor. And I don't believe the public ought to bear the burden or the risk of that coming to past. In addition --

THE COURT: But if he's detained, what prevents him from communicating the information? That's what I don't understand.

MR. FACCIPONTE: It would be a lot harder. He would have to at the very least enlist and accomplice.

THE COURT: Okay.

MR. FACCIPONTE: Which people may not want to be accomplices.

THE COURT: That's true whether he's detained or at liberty.

MR. FACCIPONTE: Okay. But if he's at liberty he would not necessarily -- he would not need an accomplice. He could just pass it on to another server somewhere.

THE COURT: He may already have accomplices who may have the information that can access the server in Germany. Whether he's detained or not, I still don't understand why being detained means the information can't be disseminated to access the server.

MR. FACCIPONTE: Because the server -- if the server had been in the United States, Your Honor, we would already be preparing process to free --

THE COURT: But it's not.

MR. FACCIPONTE: The government needs a few days, given the holiday weekend, it would be difficult to do that. But the government needs a few days to consult with German authorities to take the steps to freeze that server.

So if the court is not prepared to detain the defendant on a general showing, the government would at least ask that the defendant be detained until such time as they can secure the server, which we are moving to do even as we speak now.

THE COURT: I still don't understand why detaining him prevents him from communicating information so that someone can access the server. If you make that clear to me, then I understand more acutely why you're arguing that he should be detained.

MR. FACCIPONTE: Well, he would --

THE COURT: If it just makes it difficult, lots of things are difficult, but not impossible.

MR. FACCIPONTE: If he were detained now, for example, I don't believe he would have immediate access to telephone privileges at the NCC or MDC. I believe it takes days to set those accounts up. He would have to tell somebody physically. I don't believe anybody would -- he would have to enlist a co-conspirator right now. And I think when you weigh the probability of him engaging in that behavior and being able to pull that together, first is the potential risk of just letting him go, I believe he ought to be detained. Because he still has more burdens in prison to disseminate his information than he does if he's out in the street. So if he's out in the street, he just needs access to a cell phone. In prison, he needs to get access to a phone which is not a right if he is detained. He would need to write a letter. A letter takes several days to get to where it needs to go. In the meantime, we would have -- we would very likely have the server locked down at that point in time.

THE COURT: All right. Ms. Shroff?

MR. FACCIPONTE: Actually, Your Honor, if I may, earlier I represented that there had been no breaches before for the bank. I should put that there's never been any breaches in anywhere of this magnitude before of the bank where the entire platform has gone out. I can't represent that there have been absolutely in the past no breaches whatsoever. But I do want to use that segue into one thing I overlooked, which is when we talk about this platform having been sent out, we're talking about what he did on the last day of his job, on June 5th, 2009. We have access of substantial file transfers that are listed in the complaint from June 4th and June 1st because the banks have not been able to recover the command history for what he did at those times. [W]e have no idea of what he took from the bank on those occasions. He admits in his post-arrest statement that he has taken other information from the bank. So I do want to say that this is the most substantial theft that the bank can remember ever happening to it, in the sense that the entire platform has been stolen. In addition, the defendant has, on other occasions, taken information from the bank and we don't know what that information is or what use he's made of it or where it is even. I mean, it also -- some of that was also sent to the server in Germany but we haven't had access to that server yet.

(7/4/09 Tr. at 7:2-17:15.)

***

MR. FACCIPONTE: Okay. First of all, in the government's discussions with the investment bank, we have heard nothing to indicate that the investment bank at any time has ever sanctioned the defendant taking any software out of the bank and doing anything else with it. The bank officers were quite clear that they consider whatever software is being worked on my Goldman Sachs employees that that software is proprietary and stays within the bank. In fact, one bank officer recollected that there was a time when defendant himself had asked permission to take what could be considered open soft source software which in the programming community is software which programmers consider anyone can use in that intellectual property rights don't strictly attach to and place it back onto the market, and he was told no. And the fact that he asked shows that he is aware that he cannot just take software and put it out into the market. And the defendant signed a confidentiality agreement that is quite clear that nothing that has anything to do with Goldman Sachs goes outside of Goldman Sachs without their permission. So the notion that they would have to be something we have not heard as the government from the bank. Because everything that we have heard is that this was not sanctioned conduct whatsoever from him. . . . Third, the notion that the software, the proprietary platform is much bigger than a 32 megabytes. Our understanding from the bank is that what he took was essential software to the platform that puts them in extreme jeopardy of having their software out there in the market. I also know for the one instance where we do have logs of what he did, he ran a program that compressed the files that were a resident on Goldman Sachs' servers, and compressed it down to a smaller size. So whether the total size of this software -- it could be much bigger – it's also true that he has run a compression program on at least on the software that went out on that Friday.

(24:20-27:4.)

\*\*\*

And in light of the fact that the bank has made many representations that this would be very harmful to the bank and would lose it millions and millions of dollars we believe that detention is the only way to insure that that harm does not occur.

(7/4/09 Tr. at 28:13-17.)

\*\*\*

MR. FACCIPONTE: Just briefly, Your Honor. Goldman Sachs has not known about this since June 1st. Goldman Sachs has known about this for a matter of days.

THE COURT: For how long?

MR. FACCIPONTE: For a matter of days, Your Honor.

THE COURT: But the complaint says differently.

MR. FACCIPONTE: The complaint says that two weeks ago they instituted a program of scanning their https logs for unusual file transfers. That resulted in them determining that this had been taken. My understanding is that Goldman Sachs realized that this was a problem based upon their review of those logs just a few days ago. The government was not contacted until Wednesday about this matter.

(7/4/09 Tr. at 32:20-33-9.)

\*\*\*

And even if the complaints are ambiguous or inartfully worded someplace, I can represent to you that my understanding from Goldman Sachs is they did not know of this as of June 1st. They learned of this much more recently and --

(7/4/09 Tr. at 38:20-24.)

\*\*\*

We do believe that in this situation the bail statute provides that the government can show by preponderance of the evidence that he, the defendant, poses a danger to the community in the form of the defendant going out and disseminating software which would cause millions of dollars of damage….

(7/4/09 Tr. at 40:23-41:3.)

*Excerpts from transcript of hearing on defense subpoena to Goldman (June 29, 2010)*

MS. ROHR:   As stated by Goldman's counsel the government has not alleged theft of the entire trading platform, the indictment in paragraph 12 makes that clear.  The complaint also did not allege the entire trading platform. There were statements at the bail argument about the platform, but in any case the indictment now alleges just a portion of the trading platform and as I said in my paper that has been provided to the defendant.

(6/29/10 Tr. at 15:7-13.)

THE COURT: The thrust of the written presentation by the defendant, and he moved beyond that, but at least initially the thrust of his presentation which was presented to the court in a memorandum was to focus on the government's statements at his detention hearing.  Whatever those statements were and whether they were overbroad characterizations in the heat of the moment, whatever they were that is not the charge that the defendant is going to trial on.  I've read the indictment with care.   There is nothing in the indictment that would permit the defendant to be confused and, indeed, he is not confused, about whether or not he is charged with the theft of the entire platform.

(6/29/10 Tr. at 15:22-16-9.)

***

MR. MARINO: I have a lot of questions in my mind now about how if the government initially thought the entire platform was taken and then alleged in the indictment that something less was taken what caused it to go from point A to point B, but that's not for your Honor today.

THE COURT: No, and I don't think I would spend too much time on that, Mr. Marino. You are a very experienced and savvy attorney.  You know that people say things in hearings that are perhaps less precise than when they are crafting a document.  So, you know, I don't want to revisit my ruling on number 1.

(6/29/10 Tr. at 20:2-12.)

# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket No. 09m1553
 UNITED STATES OF AMERICAS           :

                      Plaintiff,     :

  - against -                        :

 SERGEY ALEYNIKOV,                   : New York, New York
                                       July 4, 2009
                      Defendant.     :

------------------------------------ :


                      PROCEEDINGS BEFORE
                 MAGISTRATE JUDGE KEVIN N. FOX,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the United States    U.S. ATTORNEY'S OFFICE,
      of America:        SOUTHERN DISTRICT OF NEW YORK
                         BY:  JOSEPH FACCIPONTE, ESQ.
                         One St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2492


For the Plaintiff:       FEDERAL DEFENDERS OF NEW YORK
                         BY:   SABRINA SHROFF, ESQ.
                         52 Duane St., 10th floor
                         New York, New York
                         (212) 417-8700
```

```
Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007
```

```
Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

THE CLERK:   All rise.

THE COURT:   Please be seated.

THE CLERK:   The United States of American versus Sergey Aleynikov.  Would you please state your name for the record?

MR. JOSEPH FACCIPONTE:  Good afternoon, Your Honor, Joseph Facciponte for the Government.  With me at counsel table is Michael McSwaine (phonetic) of the FBI.

THE COURT:   Good afternoon.

MS. SABRINA SHROFF:   Good afternoon, Your Honor, for Sergey Aleynikov, Federal Defenders of New York by Sabrina Shroff.  My client is standing to my right.  Good afternoon.

THE COURT:   Good afternoon.  May I have the date and time of arrest, please?

MR. FACCIPONTE:   Yes, approximately 9:20 p.m. last night, Your Honor.

THE COURT:   Thank you.  Please raise your right hand.

(Witness is Sworn)

THE COURT:   Mr. Aleynikov, the purpose of the proceeding is to advise you of certain rights that you have to inform you of the charge made against you to consider whether counsel should be appointed for you and to determine to what conditions, if any, you might be released.  Do you

2  understand, sir?

3           MR. ALEYNIKOV:    I do.

4           THE COURT:    You have the right to remain silent.

5  You're not required to make any statements.  If you've made

6  statements to authorities already, you need not make

7  additional statements.  Anything that you do say can be used

8  against you.  You have the right to be released either

9  conditionally or unconditionally pending trial, unless find

10  there are no conditions that would reasonably assure your

11  presence in court and the safety of the community.

12           You have the right to be represented by counsel

13  during all court proceedings and during all questioning by

14  authorities.  If you're not able to retain counsel, the

15  court can appoint counsel to represent you.

16           In that connection I have before me a document

17  which is labeled financial affidavit which I shall show you

18  now.  Do you recognize this document, sir?

19           MR. ALEYNIKOV:    Yes, Your Honor.

20           THE COURT:    Would you raise your right hand,

21  please.  Do you swear or affirm that the statements

22  contained in this financial affidavit are true statements

23  and that your true signature appears at the bottom of the

24  affidavit?

25           MR. ALEYNIKOV:    It is.

26           THE COURT:    The information that you provided in

the affidavit suggests to me that you can retain counsel.
So I will appoint counsel to appear with you only for this
proceeding and you will have to make efforts to retain
counsel.

If you're not able to retain counsel you should
advise the court and the issue of whether counsel will
appointed for you will be revisited.

Ms. Shroff, have you received a copy of the
complaint?

MS. SHROFF:  I have received the complaint, Your
Honor.  I have provided my client with a copy.  He has read
the complaint and he waives its public reading at this time.

THE COURT:  Very well.  Sir, you have a right to
have a preliminary hearing held in connection with the
charge that is outlying in the complaint.  At the hearing,
the government would have the burden of establishing that
there's probable cause to believe that a crime was being
committed as set forth in the complaint and that you
committed it.

If probable cause is not established, you will be
released from the charge.  If it is established, the
government will have the right to proceed to trial against
you.  If you are in custody, the hearing will be held within
ten days.  If you at liberty, the hearing will be held
within 20 days.  No hearing will be held before the date in

2  which it is scheduled.  You're either indicted by a grand

3  jury or information is filed against you by the government.

4  I'll fix the hearing date in just a moment, after we address

5  the issue of bail.

6               Have both parties received a copy of the pre-trial

7  services report?

8               MR. FACCIPONTE:   Yes, your government has, Your

9  Honor.

10              MS. SHROFF:   We have as well, Your Honor.

11              THE COURT:   What is the government's position on

12  the bail?

13              MR. FACCIPONTE:   We seek detention at this time,

14  Your Honor.

15              THE COURT:   Under what theory or theories?

16              MR. FACCIPONTE:   On theory of danger to community

17  and risk of fight.

18              THE COURT:   What is the defendant's position on

19  bail?

20              MS. SHROFF:   Your Honor, the defendant maintains

21  that he should be released according to the recommendation

22  of the pre-trial services officer.

23              THE COURT:   Very well.  I'll hear the --

24              MS. SHROFF:   We're ready to proceed at this time.

25              THE COURT:   I'll hear the government in

26  connection with its application.

1

2      MR. FACCIPONTE:   Thank you, Your Honor.  We

3   believe the defendant poses both a substantial risk of

4   flight and danger to the community.  I'll address the danger

5   issue first as I believe it is the more serious and guiding

6   principle in this case.

7        What the defendant is accused of having stolen

8   from this investment bank, which is a major investment bank

9   in New York, is their proprietary, high-quantity, high-

10  volume trading platform with which they conduct all of their

11  trades in all major markets within the United States and

12  other places.

13       It is something which they had spent millions upon

14  millions of dollars in developing over the past number of

15  years and it's something which provides them with many

16  millions of dollars of revenue throughout this time.

17       They guard the secrecy of this code very strictly

18  and they have no known instance of this code going anywhere

19  except the defendant's malfeasance here, except for some

20  exceptions that are noted in the complaint.

21       If this code is allowed to go to a competitor or

22  to an entity that is not necessarily legal but can start

23  trading with this, the bank itself stands to lose its entire

24  investment in creating this software to begin with, which is

25  millions upon millions of dollars.

26       The bank's profit margin will be eroded -- and

1   I'll explain why in a minute -- by the other competit

2   activity.  In addition, because of the way this software

3   interfaces with the various markets and exchanges, the bank

4   has raised a possibility that there is a danger that

5   somebody who knew how to use this program could use it to

6   manipulate markets in unfair ways.

7           What this program does is connect and draw

8   information from stock exchanges around the country, and it

9   draws them in very small increments of time.  One of the

10  bank officers described it as milliseconds of time.  And it

11  is very efficient at processing that stock information and

12  sending to the bank's programs that conduct trades based

13  upon algorithms that are developed by mathematicians and

14  physicists.

15          As we stand right now, according to the

16  defendant's post-arrest statements to the government, he

17  transferred his view -- unwittingly, but nevertheless amidst

18  to having transferred --

19          MS. SHROFF:   I'm sorry, Your Honor, did he say

20  unwittingly?

21          MR. FACCIPONTE:   In the defendant's view in his

22  post-arrest statement.  Nevertheless --

23          THE COURT:   Share the statement with defendant's

24  counsel.

25          MR. FACCIPONTE:   I have provided the copy of the

statements to Ms. Shroff and also to Your Honor's deputy.
In his view he transferred it unwittingly, but nevertheless
admits to having transferred it.  And it is sitting on a
server that we believe is in Germany right now.

He admits to having made several copies of that,
that he downloaded to his personal computer, his laptop
computer, and to a flash drive.  And he has given consent
for the government to seize those items but the copy in
Germany is still out there.  And we at this time do not know
who has access to it and what's going to happen to that
software.

We believe that if the defendant is let at liberty
there is a substantial danger that he will obtain access to
that software and send it on to whoever may need it.  And
keep in mind, this is worth millions of dollars.

THE COURT:  Well, what makes you think that it
hasn't already been transferred since you do now know
whether other people have access to the Germany server?
It's already compromised, so the financial institution has
to take steps now if you've made it aware of the compromise
to adjust for the loss of its trading platform.

MR. FACCIPONTE:  Your Honor is correct.  I
could've been disseminated in this time.  It does not mean,
however, that if it has not been disseminated we should not
take steps to prevent the defendant from disseminating

information if it is not already out there.

THE COURT:  But my point is if you've made the financial institution aware, that is date of the compromise, and resides in the server in Germany, prudence dictates the financial institution now has to take steps, if it hasn't already, to address the loss of that information.  It can't guess that no one has access to it.  It has to operate as if someone does have access to it and can use it and can affect the financial institution adversely.

So I have to image in that it's already taken steps if you've alerted of the existence on the Germany server, the institution I have to imagine has already taken steps to contain any damage that may befall it.

MR. FACCIPONTE:  My understanding from the financial institution, they are aware of this, Your Honor, is that they do not believe that any steps they can take would mitigate the danger of this program being released.

In other words, they can take steps, they can start building a new program, they can -- I'm not exactly sure what steps they can take.  But even if they could take steps, my understanding from them is that any dissemination of this program would be a substantial loss to them, a very substantial loss to them.

And so if has, by some miracle, it has not been disseminated already, the government requests that the

defendant be remanded so that there is no possibility that

he can affect any transfer of the software that is in

Germany.

THE COURT: Well, whether he is detained is

irrelevant. The financial institution cannot gamble, if I'm

to believe your presentation that markets will be affected

and so forth, they can't gamble that no one else is going to

get access. It has to operate as if someone's got access

and has got to take steps to insulate or reduce any damage

it could possibly reduce, not only to itself but to the

financial markets.

MR. FACCIPONTE: May I have one moment, Your

Honor?

(Pause in proceedings)

MR. FACCIPONTE: I believe, Your Honor, that the

financial institution, I think the position here is that

whatever steps the financial institution can take, the

financial institution essentially has no way to effectively

protect itself against the loss of this program. Once it is

out there, anybody will be able to use this. And fair

market share would be adversely affected. They would've

lost the substantial investment of millions upon millions of

dollars that they've placed into this software.

Even if they take the most prudent steps available

to them we should not run the risk that something which has

not been let out of the box yet, could be let out of the box

if the defendant is released. And if he's released, he

doesn't need necessarily access to his home computer. A

smart phone, a black berry, or an Iphone, something that

gives him access to the Internet is all he needs, and maybe

ten minutes.

So until we can say that this information is

secure to the best of your knowledge, the government

maintains the defendant is danger to the community.

In addition, Your Honor, he poses a risk of flight

and I believe the risk of flight in connection to a

substantial amount of money that could be made in selling

this software ought to be noted by the court.

He is a dual citizen with the Russian federation.

He has ties to Russia in the sense that his parents are

there and he visits Russia about every other year or so. He

is facing, if the court were to find a maximum amount of

loss possible here, in the worst-case scenario, a very

substantial sentence in this case.

And considering that he's already partially

allocuted to some of the elements of the offense in his

post-arrest statement and the other evidence that we're

developing and the evidence presented in the complaint, the

proof against him is strong at this point.

And so therefore, there's just a possibility of

substantial sentence combined with the profit to be made by

selling this software, combined with the fact that he can

flee to Russia, the government believes that the defendant

be detained at this time.

THE COURT:  If as you say, the material is on the

server in Germany, if anyone can access the material through

that server, that is to say it is not only the defendant who

can access it; he might be able to provide other persons

with information that would allow them to access it, if

that's so, then what difference does it make whether he's

detained or not if he can communicate that information?

MR. FACCIPONTE:  Right now our understanding is

that the server can only be accessed by someone who has his

user name and password.

THE COURT:  Who has what, sir?

MR. FACCIPONTE:  His user name and password.

THE COURT:  Okay.  So if he gives that to you,

you can access that, isn't that correct?

MR. FACCIPONTE:  That is correct, Your Honor.

THE COURT:  So whether he's detained or not

doesn't him from communicating that information to you or

anyone else.  And therefore the server could be accessed and

the financial institutions and the markets compromised as

you have described.

MR. FACCIPONTE:  It would certainly be more

difficult, Your Honor.  And I don't believe the public ought

to bear the burden or the risk of that coming to past.  In

addition --

THE COURT:  But if he's detained, what prevents

him from communicating the information?  That's what I don't

understand.

MR. FACCIPONTE:  It would be a lot harder.  He

would have to at the very least enlist and accomplice.

THE COURT:  Okay.

MR. FACCIPONTE:  Which people may not want to be

accomplices.

THE COURT:  That's true whether he's detained or

at liberty.

MR. FACCIPONTE:  Okay.  But if he's at liberty he

would not necessarily -- he would not need an accomplice.

He could just pass it on to another server somewhere.

THE COURT:  He may already have accomplices who

may have the information that can access the server in

Germany.  Whether he's detained or not, I still don't

understand why being detained means the information can't be

disseminated to access the server.

MR. FACCIPONTE:  Because the server -- if the

server had been in the United States, Your Honor, we would

already be preparing process to free --

THE COURT:  But it's not.

MR. FACCIPONTE:  The government needs a few days,
given the holiday weekend, it would be difficult to do that.
But the government needs a few days to consult with German
authorities to take the steps to freeze that server.

So if the court is not prepared to detain the
defendant on a general showing, the government would at
least ask that the defendant be detained until such time as
they can secure the server, which we are moving to do even
as we speak now.

THE COURT:  I still don't understand why
detaining him prevents him from communicating information so
that someone can access the server.  If you make that clear
to me, then I understand more acutely why you're arguing
that he should be detained.

MR. FACCIPONTE:  Well, he would --

THE COURT:  If it just makes it difficult, lots
of things are difficult, but not impossible.

MR. FACCIPONTE:  If he were detained now, for
example, I don't believe he would have immediate access to
telephone privileges at the NCC or MDC.  I believe it takes
days to set those accounts up.  He would have to tell
somebody physically.  I don't believe anybody would -- he
would have to enlist a co-conspirator right now.

And I think when you weigh the probability of him
engaging in that behavior and being able to pull that

together, first is the potential risk of just letting him

go, I believe he ought to be detained.  Because he still has

more burdens in prison to disseminate his information than

he does if he's out in the street.

So if he's out in the street, he just needs access

to a cell phone.  In prison, he needs to get access to a

phone which is not a right if he is detained.  He would need

to write a letter.  A letter takes several days to get to

where it needs to go.

In the meantime, we would have -- we would very

likely have the server locked down at that point in time.

THE COURT:  All right.  Ms. Shroff?

MR. FACCIPONTE:  Actually, Your Honor, if I may,

earlier I represented that there had been no breaches before

for the bank.  I should put that there's never been any

breaches in anywhere of this magnitude before of the bank

where the entire platform has gone out.

I can't represent that there have been absolutely

in the past no breaches whatsoever.  But I do want to use

that segue into one thing I overlooked, which is when we

talk about this platform having been sent out, we're talking

about what he did on the last day of his job, on June 5th,

2009.

We have access of substantial file transfers that

are listed in the complaint from June 4th and June 1st

because the banks have not been able to recover the command

history for what he did at those times. He have no idea of

what he took from the bank on those occasions.

He admits in his post-arrest statement that he has

taken other information from the bank. So I do want to say

that this is the most substantial theft that the bank can

remember ever happening to it, in the sense that the entire

platform has been stolen.

In addition, the defendant has, on other

occasions, taken information from the bank and we don't know

what that information is or what use he's made of it or

where it is even. I mean, it also -- some of that was also

sent to the server in Germany but we haven't had access to

that server yet.

THE COURT: Ms. Shroff?

MS. SHROFF: Your Honor, let me just pick up with

the issue the court sort of raised and that occurred to me

while I was listening to Mr. Facciponte. Mr. Facciponte is

assuming, sitting here today, that nobody else has the

password or nobody else can access the server in Germany.

For all he knows, my client was at liberty to give

it to me and may have given it to several other people

before today. So I don't think detention necessarily has

impact on what -- and I'm not referring to my client here;

I'm referring to any generic defendant who would be accused

of this kind of crime.

Because once the government attributes the motive of theft, then one has to assume that if his goals was to actually steal the proprietary information, he certainly is not so bound that he would not make sure the theft materializes into a profit.

So I'm going back to the defendant's post-arrest statement where it very clearly tells the government that at no point did he intend to, nor did he actually sell any part of the proprietary information. The proprietary information was never used nor has it been used. And the government, I believe had custody of my client and spoke to him for well over four hours.

I say this because last night at midnight I emailed Mr. Facciponte and asked him to have his agent stop speaking with the person who was arrested because I was under the impression that the had counsel already but hadn't had a call into me.

And I was informed by the U.S. Attorney's Office that they did not consider counsel and therefore would continue speaking to the client. And the continued to speak to him. And as far as I can tell, after four hours of speaking to him were the following facts?

Number one, Goldman Sachs, or whatever the entity is, has known before that this how I work on the program.

I've done it before during the course of my employment and

Goldman Sachs has had nothing to say about it. I have no

intention of ever selling this information nor did I have

any intention of ever using the information in a way

contrary to my employment agreement with Goldman Sachs.

I have not sold this information to anybody. I

have not offered to sell it to anybody. In fact, I'm fully

cooperating with your entity because I did not think I was

doing anything wrong.

I'm going to go ahead, Mr. FBI agent and AUSA and

sign a consent form so you can go to my home which has my

three little children in it, my wife in it, and I'm going to

tell my wife to let you come on into my home and take all

the computers that are over there.

I'm happy to sit down and talk to you and let you

know what other electronic equipment I have, and you can go

right ahead and seize it.

All of this the government has. So the government

has all of his personal computers. The government is also

fully knowledgeable about the fact that this employer was in

the past aware that this is how his common work practices

were and Goldman Sachs never took any steps to stop those

work practices.

So I'm somewhat confused by how the government can

say that there have been numerous breaches but none of the

breaches were addressed by Goldman Sachs that should've
resulted in an earlier arrest.

The other thing that the prosecutor just referred
to, and I'm going to ask you just to take a look at page
seven of paragraph seven of the complaint itself. It says
that there are transfers from between June 1 to June 5th of
32 megabytes. I'm told that the entire platform would
consist of 1,224 megabytes at the very least.

So out of 1,224, the government is alleging 32
were transferred. I don't understand how the government can
say my client has allocuted to any part of this crime
because his statement is replete with his saying, I never
had any intention of using this in any non-proprietary way.
I have violated no non-compete agreement. He says that very
clearly in what I have received to be his statement.

So I don't think detaining Mr. Aleynikov has any
relation to danger to the community. And the one side point
I do want to make is that the server happens to be in
Germany is not known to anybody, nor was it a deliberate
attempt. Because when you see a URL you don't know where
the server is.

So I'm really not sure what difference that makes.
And finally, if the government wants to take steps with
Germany, I'm pretty confident that nobody in Germany is
celebrating the 4th of July. I don't think they got

independence the same year we did and I think the government
is well equipped to deal with whatever they want without
requesting that the time they need to necessarily result in
my client not being at liberty where he's otherwise fully
qualified for bail.

This brings me to risk of flight. It is absurd to
say that he's had risk of flight. He had three young girls
who are under the age of five, the last on being eleven
months old. His wife is a United States citizen; she is in
court today. His father lives in the United States.
Although they are not close, he is here.

My client's entire married into family. His
father and mother are in the courtroom today. His mother-
in-law is not here because she's watching the three girls,
but both of them would be willing to sign the bond.

So the only person he has in a country other than
this country is his mother and step-father. His mother is
certainly not a draw enough to my client to have not bought
a home in this country, not once but twice, and is certainly
not a draw enough for him to even visit her more than, maybe
once year.

I am told, and I asked the agent to show me the
passport, but the passport was not available to me, but in
the last 19 years that my client has lived in the United
States he has visited his home country or his mother's home

country ten times, which is less than once every year.

My client's post-arrest statement belies guilt
here.  My client's actions certainly belie guilt.  He gave
them the entire computer.  As I understand it, they have
seized every equipment that was in their home, this morning.
And my client's wife let them in through the door and handed
it over.

I'm also told that my client's passport, both of
them, one which was in his home.  I think his Russian
passport, which I'm not even sure if valid now, but whatever
it is, it's with the agent.  The United States passport is
also with the agent, so my client is certainly not at risk
for flight.

And I think probation recommendation is proper
give the fact that my client is almost 40 years old, has no
prior arrest, no prior contact with the criminal justice
system, and detention is wholly improper given the facts of
this case.

If I've left out anything, Your Honor, I'm happy
to answer it here but I think the court is correct.  There
seems to be no logical relationship between the relief being
sought and the harm that they seek to curtail.  That there
is absolutely no way to say that a person should be detained
because they think that he may not have already passed on
access devices to some proprietary code.

And again, Your Honor, the government has yet to tell the court in any way, shape or form, that there was any intent to sell or misuse this proprietary information. So my client's statement is very clear, after four hours with the agent, he tells the agent, look, I didn't mean to misuse this information. I have not stolen it. I have not made any arrangements to steal it and this is the way I worked when I was fully employed at Goldman Sachs.

And also, Your Honor, January 1st to January 5th I'm pretty sure what time periods between which his employment -- I'm sorry -- June, his employment with Goldman Sachs was not over. I just want to leave the court with one final thought.

If Goldman Sachs cannot possibly protect this kind of proprietary information that the government wants you to think is worth the entire United States market, one has to question how they plan to accommodate any other breach. But that seems like a very farce, wide-open statement to say, that Goldman Sachs has no way of keeping track of their own proprietary information.

I mean, I think that the market is at risk no matter what then. It's not necessarily attributable to my client's actions. So I think that pre-trial service's recommendation should be followed. If the court by any chance were to think that their recommendation is not

enough, we are happy to have, come Monday, confessed

judgment in the home.  We're happy by any conditions that

the court imposes, including that my client not have access

to any electronics, including a telephone or including a

cell phone.  I have no objection to that.

        And I have two people who are ready to sign the

bond in court.  His father-in-law works for ADP and I'm told

his yearly income is about $100,000.  His mother-in-law

would be the second co-signer.  She's a piano teacher.  And

my client's wife would be the third co-signer if the court

would need a person that does not make money but has moral

estuation over Mr. Aleynikov.

        Unless the court has any questions, I'm done.

        THE COURT:   Thank you.  Anything else on behalf

of the government?

        MR. FACCIPONTE:   Yes, Your Honor, if I may

respond to a few points?

        THE COURT:   Sure.

        MR. FACCIPONTE:   Okay.  First of all, in the

government's discussions with the investment bank, we have

heard nothing to indicate that the investment bank at any

time has ever sanctioned the defendant taking any software

out of the bank and doing anything else with it.

        The bank officers were quite clear that they

consider whatever software is being worked on my Goldman

2   Sachs employees that that software is proprietary and stays

3   within the bank.  In fact, one bank officer recollected that

4   there was a time when defendant himself had asked permission

5   to take what could be considered open soft source software

6   which in the programming community is software which

7   programmers consider anyone can use in that intellectual

8   property rights don't strictly attach to and place it back

9   onto the market, and he was told no.

10          And the fact that he asked shows that he is aware

11  that he cannot just take software and put it out into the

12  market.  And the defendant signed a confidentiality

13  agreement that is quite clear that nothing that has anything

14  to do with Goldman Sachs goes outside of Goldman Sachs

15  without their permission.

16          So the notion that they would have to be something

17  we have not heard as the government from the bank.  Because

18  everything that we have heard is that this was not

19  sanctioned conduct whatsoever from him.

20          Second, I do want to address a few small points.

21  When the agents were interviewing the defendant last night,

22  he had signed a written consent to be interviewed and a

23  waiver of his Miranda rights.  He did not have counsel

24  appointed at that time.  He did not request counsel to be

25  appointed during that time.

26          Ms. Shroff was his counsel at that time.  She had

not been appointed yet by this court.  The U.S. Attorney's
Office position was that the defendant is not asking for
counsel at that point in time and he has no appointed
counsel, that Ms. Shroff could unilaterally instruct the
government to terminate the interview, and that's why we did
not terminate the interview.

In any event, I personally did not receive Ms.
Shroff's communication until just about the time when the
interview was being terminated anyway, although she did
attempt to communicate with another assistant in the office
last night.

The second point is the contention that I said
that the defendant had gone to Russia every year.  I believe
I said every other year.  And if Ms. Shroff says he's been
in this country nearly 20 years and he's been to Russia 10
times, that would be correct.

Third, the notion that the software, the
proprietary platform is much bigger than a 32 megabytes.
Our understanding from the bank is that what he took was
essential software to the platform that puts them in extreme
jeopardy of having their software out there in the market.

I also know for the one instance where we do have
logs of what he did, he ran a program that compressed the
files that were a resident on Goldman Sachs' servers, and
compressed it down to a smaller size.  So whether the total

size of this software -- it could be much bigger – it's also
true that he has run a compression program on at least on
the software that went out on that Friday.

Ms. Shroff made some representations about the
defendant's motivations and consenting to searches.  You
know, it's often true that defense attorneys look for
evidence of innocence in a defendant's consent to search.
Another way to look at that is how did they arrest the
defendant might figure that we already know about certain
activities of his and we're going to get a search warrant
anyway, so perhaps he should start cooperating.

We have no indication, however -- well, let me put
it to you this way:  Again, his main contention is that, in
his post-arrest statement, that he took this unwittingly; he
had meant to take something else.  Now the script that he
ran to take this information was very specific as to which
files would be taken and copied and uploaded into his
server.

So I don't know how there could've been a mistake
there, but even assuming there was a mistake, when he
discovered the mistake, which he says he discovered, why not
give it back immediately?  Why hold on to it for a month.
And leave in mind it should be said that he is now working
in a start-up company that is developing the same kind of
software and his salary increased three fold just by joining

that start-up company.

And so it does raise a strong inference that if he's hold on to this software, and he's working in a company that is looking to create its own software that does similar things, that he intends to use this.

Finally, to get back to the court's original concern, there is no guarantees of anything, Your Honor, in terms of what may have happened and what may happen to the defendant.  However, we do know right now that in a few days we can seize that server, or at least deny anyone access to it.

And in light of the fact that the bank has made many representations that this would be very harmful to the bank and would lose it millions and millions of dollars we believe that detention is the only way to insure that that harm does not occur.

It may be too late but there is also a substantial risk that the bank should not have to endure.  And unless Your Honor has any additional questions, I'm prepared to rest.

MS. SHROFF:  Your Honor, if the bank does not bear the risk of insuring that its proprietary information is safe, it's certainly not fair for the bank to stand up and say detain somebody while I put into place procedures that I should have assured the American public that I

already had in place when I first took your money. That's
preposterous. I mean, essentially what Mr. Facciponte is
telling us is this financial institution that takes millions
and millions of dollars of the American public should not
bear the risk of making sure that their millions and
millions of dollars are safe, and that burden in fact should
rest on one of maybe two hundred employees at Goldman Sachs
that has access to their software code. And gee whiz,
because Goldman Sachs didn't bother to do it, could you just
detain him for a couple of days so that Goldman Sachs can
get his act together? That's an absurd argument to make.

It's just as absurd as saying that this guy who
you want to say in the next four days might use the code,
and it's such a big feat, would not have put things in place
to make sure what he took over a month ago was not already
stolen or already put to malfeasance use.

So essentially what the government is saying to
you is this: Listen, a month ago this guy went and stole
something that Goldman Sachs values so much that they didn't
bother to properly protect. For a month they did nothing.
He just kept on going on, using the source code, or whatever
code it is, and for a month and a half, a month at the very
minimum, Goldman Sachs did nothing.

Now suddenly Goldman Sachs has realized that they
want this code that they shouldn't be wherever they think it

is out there.  So now they want to come to you and say, hey,

detain him because for a month we did nothing.  Even though

all the other factors show that this guy might actually be

innocent.  Because were he not innocent, in a month that it

took for him to keep this code, he didn't sell it to

anybody.  They don't have any proof of any selling to

anybody.  He hasn't disseminated to anybody that the

government can pass it to you.

In fact, in all the -- the 20 minutes he's been

talking, he has never once told you what he did with the

code.  It seems the code is encrypted, safe, not spent, and

out there just sitting.  Because surely he started the

start-up way before this weekend, right?  In fact, they've

known about this by their own admission since June 4th.

So whatever start-up he has, if he was going to

use it, he would've used it already.  It would already be

over there and obviously they know it's not over there.  So

it's a very strange argument to say, especially when they're

arguing for detention.  And they're basically saying to you,

the only reason we want to now detain him is we're scared

Goldman Sachs can't get its act together.  That's not a

reason in the Bail Reform Act format to detain somebody.

Okay?

And there is no indication here that his actions

could or would prevent any harm to the general public.

1

2 That's the first argument.

3        The second argument is, I didn't talk about his

4 computers being taken because I'm fishing for some innocent

5 excuse.  I'm telling you he's innocent.  I'm not fishing for

6 an excuse, and I'm also telling you that whatever access he

7 has, they have reduced his access.  And if he really wanted

8 access that badly, he could've had access by now.  He's had

9 the damn thing -- I'm sorry -- he's had it for a month.  He

10 could've done any number of things he wanted with it for a

11 month.  They have yet to tell you that he has sold this or

12 made mal use of it.  Surely Goldman Sachs would've known is

13 he's made mal use of it.  It's been a month.

14        So my point to you in telling you that all of the

15 computers have been taken from his home is to assure you,

16 Your Honor, that were you do release him as you should, he

17 would not have access to it.  And he would agree, as a

18 person of almost 40 years of age with no prior criminal

19 record, that he would not avail himself of any steps to

20 access anything else.  And as an officer of the court, I'm

21 positing to you that those conditions would be honored by my

22 client.

23        Finally, Your Honor, he is a United States

24 citizen, he's naturalized, he's lived here for 20 years.

25 And there is nothing in all that the government has said

26 that require detention.  Nobody but Goldman Sachs, according

to them, is at harm.  And Goldman Sachs has known about this
since June 1.  We are now on July 4th.

Finally, Your Honor, I just want to make sure that
the little anecdote that the government just said was
actually factually incorrect as far as I can tell.  The
question posed to Goldman Sachs was not about accessing
software.  The question was whether a particular thing could
be revealed into open source.

This material that they're claiming is so highly
sensitive is not accessible.  It's encrypted and again, I
cannot make this point more strongly, for a month he has not
sold it.  Every single time he's talked about this code, the
word he's used is Mr. Aleynikov took it.  Taking.  He took
it and he did nothing with it.  They still haven't showed
any sell, anything that is done with it to put Goldman Sachs
or the American public at risk, so he should be released.

THE COURT:  Anything else we have from the
government?

MR. FACCIPONTE:  Just briefly, Your Honor.
Goldman Sachs has not known about this since June 1st.
Goldman Sachs has known about this for a matter of days.

THE COURT:  For how long?

MR. FACCIPONTE:  For a matter of days, Your
Honor.

THE COURT:  But the complaint says differently.

MR. FACCIPONTE:     The complaint says that two
weeks ago they instituted a program of scanning their https
logs for unusual file transfers.     That resulted in them
determining that this had been taken.

My understanding is that Goldman Sachs realized
that this was a problem based upon their review of those
logs just a few days ago.     The government was not contacted
until Wednesday about this matter.

I think what Ms. Shroff is confusing is Goldman's
civil remedies, to the extent that it has any, and this
criminal case.     Maybe Goldman can go out and get whatever
the German equivalent is of a TRO.     But this is, in the
government's view, a crime that we have shown probable cause
for, and therefore it is possible that the defendant may
compound his crime and pose a danger to the community.     And
the bail statute allows the court to detain him if he is a
danger.

In addition, there is some notion that this is
somehow Goldman Sachs' fault.     Goldman Sachs has safeguards
in place.     It was the defendant who had to engage in
subterfuge to attempt to cover his tracks when he ran these
programs.     If this was an innocent thing why was he
attempting to cover his tracks?     Why he was deleting,
attempting to delete the batch history?     Why did he encode
this and then delete the encryption program afterwards if

this was such an innocent

activity on his part?

And finally, there is a notion of what the defendant may have done or may have done with the program before he knew his activity was detected and what he may do now. Maybe he didn't disseminate the program before he knew it was detected because he figured he had all the time in the world; he had gotten away with it. He can wait to find the highest buyer. He can wait to implement it in his new position, slowly over time, so that his new employers in SLU's factory where he was getting his code from.

But now that he has been caught and it is very likely that we will know what is in that German server within a matter of days. And he may have other stuff there. He has a very strong incentive to get rid of that evidence; to move it some place else.

And because he has that strong incentive, he poses a danger and that's why we ask for detention.

MS. SHROFF: Your Honor, the government's complaint says that as of June 1st Goldman Sachs saw some activity that they decided looked strange. And since June 1st until this weekend, or 24 hours, Goldman Sachs did nothing, nothing, absolutely nothing.

I don't know what Goldman Sachs did other than flag it or take steps. But they certainly didn't call the U.S. Attorney's Office by their own admission until almost a

1   
2   month later.

3   Secondly, Your Honor, it's -- the government is
4   essentially saying to you that for 30 days they thought some
5   activity was strange but they did nothing about it.  And for
6   30 days my client had this proprietary information but he
7   sat back and he said even though I'm going to do the start-
8   up company, I'm going to just sit around and wait and see
9   who I can sell this proprietary information to, and who is
10  going to be my highest bidder.

11  They can't have it both ways.  I mean, basically
12  their argument is, he stole it, he hid it, but look.  He
13  didn't really do anything with what he's took.  And I'm not
14  confusing a civil remedy with a criminal case.  I was an
15  associate at Weill Gotshal for seven years.  I know what a
16  civil remedy is.

17  My point here is they have no proof of a criminal
18  act because if he did, he wouldn't keep saying Mr. Aleynikov
19  took the code.  He wouldn't keep saying -- he would be able
20  to stand there and tell you what he did with it.  He would
21  be able to tell you Goldman Sachs thinks that the market is
22  compromised because of something he did.  There is no
23  indication that this quote/unquote harm that they are
24  worried about, or that they claim to be worried about,
25  Goldman Sachs did anything about it for a whole month.

26  So essentially basically what they're saying to

2    you is, why don't you detain him until we've figured out

3    exactly what we can or cannot do?  And that is something

4    that the bail reform act asks you to weigh within a

5    conglomerate of other factors, including the inferences that

6    we draw from misconduct.  And the conduct that the court

7    should focus on is his lack of having done anything improper

8    with the proprietary information.

9         And, Your Honor, every single personal fact behind

10   this defendant supports release.  There is no prior criminal

11   history, there's not bench warrant history, there's nothing

12   to indicate he's a risk of flight, there's nothing to

13   indicate he doesn't have family here.  There's absolutely

14   nothing to indicate that he would do or take any wrong steps

15   here.

16        And I think the government is sort of cavaliering

17   throwing out hypotheticals.  Maybe he would compound his

18   criminal behavior.  Well, the equal inference is maybe he

19   wouldn't.  As he said in his statement he took this

20   unwittingly.  If he took this unwittingly, it is certainly

21   must greater an inference that he wouldn't do anything

22   improper with the information.

23        And again, to just go back to the point you

24   raised, there is no correlation between him being detained

25   and him releasing the proprietary code.  In fact, I could

26   throw out another hypothetical.  Maybe he'll think, oh, I'm

detained.  I might as well have this sold to the highest
bidder so that my three children and my wife can be taken
care of.  I'll just rot in jail.  That's an equally
plausible inference or an equally plausible thought that a
person may have.

There has to be some correlation, as you said,
between the remedy they seek and the harm they seek to
prevail.  Detention is not appropriate here.  What might be
appropriate is extremely stringent circumstances, and that
should more than suffice given the facts of this case.

THE COURT:  Can you be heard further on behalf of
the government?

MR. FACCIPONTE:  Not necessarily, Your Honor.  I
just don't know where Ms. Shroff sees in the complaint that
Goldman Sachs is aware as of June 1st.  Goldman Sachs began
running programs within the past few weeks, recently
identified and issue.  There was no contention in the
complaints.

And even if the complaints are ambiguous or
inartfully worded someplace, I can represent to you that my
understanding from Goldman Sachs is they did not know of
this as of June 1st.  They learned of this much more
recently and  --

MS. SHROFF:  Your Honor, I think page eight, I
mean, paragraph eight, as of June 5th, 2009 the financial

institution has recovered a record of series of commands
entered in Aleynikov's desktop which is also known as a
batch history. So what were they aware of as of June 5th?

MR. FACCIPONTE: It's not as -- it's as to June
5th. And what we were trying to say there is as of the June
5th transfer the government has -- the financial institution
has recovered a series of commands that are related to that
transfer on June 5th. It's not when Goldman Sachs
discovered the transfer. They didn't discover the transfer
the day it happened.

MS. SHROFF: And paragraph seven says as a result
of the review the financial institution learned that the
worktop desk and the review is noted in the first line of
paragraph seven. According to representatives of the
financial institution within the past few weeks I have
learned that the financial institution has begun monitoring.

So they start monitoring in June but they don't
really pay any attention to what they're monitoring. Is
that what the government wants us to think? So they stop
monitoring in early June, they start noticing something in
June 1st, but they say, hey, we'll just wait until the 4th
of July and then bring it up?

MR. FACCIPONTE: I really think Ms. Shroff is
misconstruing the allegations in the complaint.

MS. SHROFF: It's clear --

2            MR. FACCIPONTE:    In any event --

3            MS. SHROFF:    The English is clear.  What am I

4  misconstruing?  It says, as a result of that review the

5  financial institution learned that the worktop that -- it

6  doesn't say the financial institution learned in July.  And

7  if they learned in July --

8            MR. FACCIPONTE:    It also doesn't say the

9  financial institution hasn't learned --

10           MS. SHROFF:    -- then surely there is something

11  wrong.

12           MR. FACCIPONTE:    -- in June.

13           MS. SHROFF:    Don't interrupt.  You shouldn't, I

14  mean if you're doing a review, surely you look at what

15  you're reviewing within the time frame that you're reviewing

16  it.  Either it's that important to you or it's not.

17           It can't be that important to you that you don't

18  review it for a month and then say detain him because two

19  days are so important to us that the entire American public

20  is going to fall on its face.  It's one or the other; it

21  can't be both.

22           MR. FACCIPONTE:    Our point stands, Your Honor.

23  We do believe that in this situation the bail statute

24  provides that the government can show by preponderance of

25  the evidence that he, the defendant, poses a danger to the

26  community in the form of the defendant going out and

disseminating software which would cause millions of dollars
of damage, if he hasn't done so already, and we have no
reason to believe that he has --

MS. SHROFF:  It's not disseminated.  It is not
disseminated.

MR. FACCIPONTE:  It could be disseminated.

MS. SHROFF:  If were disseminated, the damage
would be done and he would still be released.  And by the
way, this is not a presumption case and the issue is risk of
flight.

MR. FACCIPONTE:  I said the government has the
burden here.  I did not say this was a presumption case.

MS. SHROFF:  This is a non-presumption case.  He
is entitled to the presumption.  The presumption is in favor
of release, and the government certainly hasn't overcome its
burden by claiming that they've reviewed something from June
1st and didn't bother to do anything about it until July
4th.

MR. FACCIPONTE:  Your Honor, that's a specious
argument, that the bank began its review not on June 1st,
much later, and when it discovered there was a problem, it
brought it to the government's attention promptly.

(Pause in proceeding)

MS. SHROFF:  Your Honor, may I just -- Your
Honor, I'm sorry.

THE COURT:   Yes.

MS. SHROFF:   Maybe I'm mistaken, but as I recollect, Judge Ellis, he wrote the opinion on the United States versus Madoff.  I think he drew a distinction on cases that have a presumption of release versus a presumption of detention.  And there is no presumption of detention in a case that has no violence or drug history. The relevant inquiry remains on risk of flight and not on dangerousness.

I don't have the cite in front of me, and I apologize for that.  But I'm pretty sure the inquiry on a case where there is no presumption of detention as the government has to concede this case is.  The issue is not dangerousness; the issue is risk of flight and there is no risk of flight here.

THE COURT:   Is it your view that in the absence of an offense described in 18U.S.C.3142(f) that an accused can never present as a danger to the community?

MS. SHROFF:   No, not that they can ever present as a danger to the community but I could be wrong.  I'm telling you candidly, but I think the inquiry isn't on dangerousness.  The inquiry is on risk of flight.

THE COURT:   The inquiry is determined by the nature of the application.  If the application is to detain someone based upon a risk of flight only, fine, then you've

addressed issues with respect to flight only.

But if the application is one such as here where there is an allegation by the government that the person presents both as a risk of flight and a danger to the community, you can't ignore either. You have to analyze both of the problems under which the application's being made.

MS. SHROFF: Your Honor, I think, again I'm not sure I'm correct, but I think that in a non-presumption case the sole inquiry then would be risk of flight.

THE COURT: But that can't be the case if the argument is that someone who does not commit an offense described in (f) presents as a danger to the community.

MS. SHROFF: But then --

THE COURT: If you stole mail, let's say --

MS. SHROFF: Right.

THE COURT: -- and threatened your supervisor in a mail facility, if you were to be released, you would present as a danger to that person in the community. Notwithstanding the fact that the underlying offense, stealing mail, is not one recited in (f). You could present as a danger.

MS. SHROFF: Well, unless he is also charging him with the threat, then I would have to say yes, I'm of the opinion that you wouldn't consider that.

2          THE COURT:   Even if you did not, if you made a

3    post-arrest statement and said I hate my supervisor.   When I

4    get out of here, he or she's in for it.   I'm going to do

5    harm to that person.   Whether you charged it or not, you now

6    have information that a person in the community may be in

7    risk or at risk if the person's at liberty.

8          MS. SHROFF:   That may be.   That may be that the

9    person's at risk.

10          THE COURT:   So depending upon how the application

11   is made, what theories under which you are pursuing, in this

12   case the government is pursuing both theory of flight and

13   danger to the community.   Both theories have to be analyzed

14   by the court.   You can't ignore one just because the

15   underlying offense is recited in Supplement (f) of 18 U.S.C.

16   3142.

17          MS. SHROFF:   Well, Your Honor, I guess I'm not

18   saying you should ignore it but I am saying that I'm not

19   quite sure that that's -- that prong is relevant on a non-

20   presumption case.   But I abide by what you are saying.   Like

21   I said, I am not sure.

22          I think I have -- I don't have a presumption to

23   overcome here; they do.   But I think that all the steps that

24   could possibly be taken and again, relying on my

25   recollection of the Ellis/Madoff opinion, the question isn't

26   whether all risk is eradicated.   The question under the --

 1

 2          THE COURT:   Of course.  You can never eliminate

 3 all risk.  Otherwise insurance companies wouldn't be in

 4 business.

 5          MS. SHROFF:   Thank you, Judge.

 6          THE COURT:   In a circumstance where an

 7 application is made that a person be detained, 18U.S.C.36142

 8 requires that certain factors be considered.  Among others,

 9 the nature of the charged offense, the evidence against the

10 accused, the background of the accused, his or her ties to

11 the community, employment history, prior criminal history if

12 any, whether at the time of the alleged offense that the

13 accused is under the supervision of a parole or probation

14 entity.

15          In the instance case, the accused has ties to the

16 community, had an employment history, has no prior criminal

17 history, is not under the supervision of a parole or

18 probation entity.

19          The strength of the evidence against him is

20 tempered somewhat by the statement that he gave post-arrest,

21 although there is evidence proffered and outlined in the

22 complaint that may demonstrate a degree of strength that

23 militates in favor of the application made by the

24 government.

25          I am not unmindful that apparently a month has

26 elapsed since the -- almost a month.  Tomorrow will be a

month since the accused severed his ties with this prior
employer, a financial institution, whose proprietary
information is at the heart of the complaint. And there is
no evidence that has been proffered that the material was
taken, or alleged to have been taken, from the financial
institution has been used to harm it or anyone else.

Much during the course of this proceeding is based
on speculation. But we don't deal with speculation when we
come to court; we deal with facts.

Given all of the information that has been
presented to me in support of and against the application
that the accused be held without bail, on the issue of
danger, the court has to find that there is clear and
convincing evidence that the defendant would present as a
danger. I don't think that clear and convince evidence has
been presented to me, so I do not find that he should be
detained under the theory of danger.

With respect to flight, I also am not persuaded
that the quantum of information that's been presented to me
permits a conclusion that the defendant could not be at
liberty under conditions that would insure that he be in
court whenever he is directed to do so. So I'm going to
deny the application that the defendant be detained without
bail.

(Pause in proceeding)

1

2          THE COURT:   Bail condition will be as follows:   A

3   $750,000 personal recognizance bond must be co-signed by

4   three financially responsible persons.   Bond is to be

5   supported by $75,000 cash or property.

6          Defendant's travel is restricted to the Southern

7   and Eastern Districts of New York and the District of New

8   Jersey and he must surrender the travel documents he may

9   possess and not seek or obtain any new or replacement travel

10  documents while this criminal action is pending.

11         He'll be subject to regular pre-trial supervision

12  and he shall not access the computer data that is the

13  subject of the criminal action.

14         The pre-trial services office shall be permitted

15  to the extent possible to monitor defendant's use of

16  computers or other electronic devices at his home or place

17  of business to insure that the defendant does not access the

18  data that is the subject of this criminal action.   All bail

19  conditions must be satisfied before the defendant's release.

20         Sir, if you've satisfied the bail conditions and

21  are at liberty, you must appear in court whenever you are

22  directed to do so.   If you fail to do so, you and any co-

23  signers on your bond will be liable to the government for

24  the full amount of the bond.

25         Any property or cash posted in support of the bond

26  before fitted to the government, a warrant may issue for

your arrest, and you may expose yourself to a new charge in

connection with your failure to appear in court, which would

have a penalty that is independent of any penalty that might

be imposed upon you should you be found guilty of the

offense that is outlined in the complaint.  Do you

understand, sir?

MR. ALEYNIKOV:   I do.

THE COURT:   What date would you like for a

preliminary hearing date?

MS. SHROFF:   Your Honor, first may I just request

that the United States Attorney's Office order my client to

be produced on Monday so that all conditions can be met.

I'm told that those conditions will be met by Monday.  So

I'm going to ask Mr. Facciponte to please produce my client.

And assuming that he does, then I would like the

30th day.

MR. FACCIPONTE:   Your Honor, I --

THE COURT:   Please have the defendant available

so that, if the conditions are satisfied, he may be released

on Monday.

MR. FACCIPONTE:   Your Honor, we'll put in a

prison production order with the Marshals immediately after

this conference.

THE COURT:   August 3 will be the preliminary

hearing day.  Is there anything else that we need to

1

2 address?

3          MR. FACCIPONTE:    Nothing from the government.

4 Thank you, Your Honor.

5          MS. SHROFF:    No, Your Honor, thank you.

6          (Whereupon the matter is adjourned to August

7 3rd, 2009.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the United States District
Court, Southern District of New York, United States of
American v. Sergey Aleynikov, was prepared using digital
electronic transcription equipment and is a true and
accurate record of the proceedings.

Signature_____

Date:  July 6, 2009

# EXHIBIT C

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------------------------------x

3    
     UNITED STATES OF AMERICA,
4    
                    v.                        10 Cr. 96 (DLC)
5    
6    SERGEY ALEYNIKOV,

7                    Defendant.

8    ------------------------------x

9    

10   

11                                          June   29, 2010,
                               9:30 a.m.
12   

13   

14   

15   
     Before:
16   
              HON. DENISE L. COTE,
17   
                                        District Judge
18   

19   

20   

21   

22   

23   

24   

25

1                        APPEARANCES

2    PREET BHARARA,
          United States Attorney for the
3              Southern District of New York
     REBECCA ROHR, ESQ.,
4         Assistant United States Attorney

5
     KEVIN H. MARINO, ESQ.,
6         Attorney for Defendant
          437 Southern Blvd.
7         Chatham, New Jersey
                    and
8    JOHN BOYLE, ESQ.,

9

10   BOIES SCHILLER FLEXNER, LLP
          Attorneys for Goldman Sachs & Company
11        5301 Wisconsin Avenue, N.W.
          Washington, D.C.
12   MATTHEW FRIEDRICH, ESQ.,
     ALAN B. VICKERY, ESQ.,
13
     ALSO PRESENT:
14
          MICHAEL McSWAIN, Special Agent FBI
15

16                        - - -

17

18        THE CLERK:   United States of America against Sergey

19   Aleynikov.

20             Is the government ready to proceed?

21             MS. ROHR:   Yes.   Good morning, your Honor.   Rebecca

22   Rohr for the United States.

23             With me is Special Agent Michael McSwain from the FBI.

24             THE CLERK:   For the defendant, are you ready to

25   proceed?

1           MR. MARINO:  Yes.

2           Good morning, your Honor.  Kevin Marino and John Boyle

3    · on behalf of the defendant Sergey Aleynikov.

4           THE COURT:  Counsel for Goldman Sachs & Company.

5           MR. FRIEDRICH:  Matt Friedrich from Boies Schiller

6    along with my colleague Alan Vickery.

7           THE COURT:  Good morning, everyone.

8           I want to thank you, Mr. Friedrich, for I assume

9    traveling to New York to meet and confer.  Was there any

10·  further progress made?

11          MR. FRIEDRICH:  I wish that I could have made it here.

12   The time changed.  I had my shuttle ticket, three flights were

13   cancelled and I was not able to make it here, but I was able to

14   participate by phone.

15          THE COURT:  Good.

16          Was there any further progress made?

17          MR. FRIEDRICH:  The only progress I can report, your

18   Honor, I believe I have an agreement with Mr. Marino as to the

19   content of our proposed protective order.

20          THE COURT:  Great.  Good.

21          Okay.

22          I received submissions from all the counsel, and I am

23   going to be working from Exhibit A provided by the defendant.

24          I marked my Exhibit A in light of the report I got

25   from Mr. Friedrich in his June 28 submission and I appreciate

1   the attachments to that June 28 submission, they were helpful

2   to me, and, of course, yesterday I also received another

3   submission from the government.

4           And so what I think I would like to do is march

5   through these remaining disputes in terms of categories, and I

6   think the first broad category has to do with -- and I am

7   looking at Mr. Friedrich's June 28 letter -- the requests that

8   asks for more source codes from Goldman Sachs. They include,

9   one -- well, let's start with 1. Let's just start with 1. And

10  then we will resolve 1 and see how that ruling might apply to

11  any additional requests that are related.

12          So, Mr. Marino.

13          MR. MARINO: Thank you very much, your Honor.

14          I appreciate the court's manner of proceeding

15  beginning with item 1 and then seeing what else that impacts,

16  because actually I think the court is correct that these

17  requests are interrelated.

18          Item number 1, we have a fundamental disagreement with

19  the government as to the relevancy of the rest of the platform,

20  for lack of a better phrase, and much of what is sought, there

21  is some variation and I'm sure, your Honor, we will get to

22  that, but much of what is sought in these requests goes to that

23  need to have the rest of the platform.

24          The reason we need that, your Honor, is this is not

25  simply a case of the government alleging the theft of a trade

1    secret without more. That's not a federal crime.  The theft of

2    a trade secret, as the court is well aware, is a matter that is

3    in the normal course handled in the civil courts.

4         The Economic Espionage Act is a very specific type of

5    legislation and codifies a specific intent crime.  It's not

6    about simply taking something that was proprietary or a trade

7    secret.  That's why when the government initially introduced

8    these charges with such fanfare it was at pains to tell the

9    court at a detention hearing that what had been taken was the

10   entire platform, and it didn't say that once or twice, it said

11   it repeatedly.  It's the gist of what the government was

12   saying.

13        What the defendant is accused of having stolen from

14   this investment bank, which is a major investment bank in New

15   York, is their propriety high-quantity high-volume trading

16   platform with which they conduct all of their trades in all

17   major markets in the United States and other places.  If this

18   code is allowed to go to a competitor or to an entity that is

19   not necessarily legal but can start trading with this, the bank

20   itself stands to lose its entire investment in creating this

21   software to begin with, which is millions upon millions of

22   dollars.

23        THE COURT:  I think that was the thrust of your

24   argument in your opening brief to me, the statement that the

25   government made at the detention hearing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      MR. MARINO: That is the beginning of the story, but

2  it doesn't change in a material way in the indictment.

3          The indictment alleges, and I'm looking at paragraph

4  5, which is at the bottom of page 2, at all times relevant to

5  this indictment, Goldman's high-frequently trading was

6  supported by a proprietary system of computer programs, the

7  platform, which, among other things, rapidly obtained

8  information regarding the latest market movements and trends

9  and so forth.

10         Paragraph 7. Goldman's high-frequency trading system,

11 the platform and the trading algorithms were complied of

12 different computer programs.

13         And paragraph 8, the top of page 4, Goldman has taken

14 various measures to protect its high-frequency trading system's

15 source code, and goes on to describe it.

16         When you go to page 10 and get to the statutory

17 allegation, the allegation is that Sergey Aleynikov -- I'm at

18 paragraph 16 -- downloaded a trade secret with intent to

19 convert such trade secret that was related to and included in a

20 product that was produced for and placed in interstate and

21 foreign commerce to the economic benefit of someone other than

22 the owner thereof and intending and knowing that the offense

23 would injure the owner of that trade secret, to wit, Aleynikov,

24 while in New York, New York, and elsewhere, without

25 authorization, copied and transmitted to his home computer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Goldman's proprietary computer source code for Goldman's

2   high-frequency trading business with the intent to use that

3   source code for the economic benefit of himself and his new

4   employer.

5           The heart of what is being alleged in this indictment

6   is that what Mr. Aleynikov downloaded and took was of value.

7   It was not just a trade secret, but it was a trade secret that

8   he would be able to benefit himself by, that is, he could sell

9   it to a third party and benefit himself, that he could hurt

10   Goldman by, that is, by taking something of value from Goldman.

11           That is going to be very much contested at this trial.

12           THE COURT: Which part of that?

13           MR. MARINO: That what Mr. Aleynikov downloaded was of

14   independent inherent intrinsic economic value.

15           What the government says --

16           THE COURT: You are saying that what he took the

17   government will not be able to show would benefit others?

18           MR. MARINO: That's correct, without showing, without

19   showing the platform which comprised it.

20           THE COURT: Are you saying that you are also going to

21   be contesting that what he took did not have value in that it

22   would not hurt Goldman to have it shared with others?

23           MR. MARINO: Yes.

24           THE COURT: So those are the two defenses that you

25   want me to focus on?

1            MR. MARINO:   Yes.

2            And the reason I want you to focus on those, your

3    Honor, they shine the light on what's really going on here.

4    When they came to court -- and I return to that for a couple of

5    reasons, but the heart of this case when they came to court was

6    if you don't detain this fellow, he's going to alienate

7    something of value of us, to wit, our entire trading platform.

8            Now, the judge rejected that for a whole bunch of

9    reasons, but when the indictment emerges, although it doesn't

10   specifically state he took the entire platform, it persists in

11   the allegation that what Mr. Aleynikov downloaded was of value

12   to Goldman in that it was part of the trading platform.

13           So they make the allegations that we just went through

14   in the initial portion of the indictment where they say he

15   executed the transfer of hundreds of thousands of lines of

16   source code for Goldman's high-frequency trading system and

17   then, of course, the statutory allegation at paragraph 16

18   simply parrots the wording of the statute itself saying that he

19   downloaded a trade secret with intent to convert it and

20   specifically stating that it was related to and included in a

21   product that was produced for and placed in interstate and

22   foreign commerce to the economic benefit of someone other than

23   the owner and intending and knowing that the offense would

24   injure the owner.

25           If we don't have the platform that comprises what it

1    is that Mr. Aleynikov downloaded, then we cannot defend that

2    allegation.  The allegation -- in other words, if this was just

3    about the theft of a trade secret without having to show that

4    that trade secret had value, then their position would be

5    perfectly understandable, what we told you what you took and

6    that's all you need to know to defend it, you come in and show

7    us that you either didn't take it or what have you, come up

8    with whatever defense you have.

9            The point is because of the nature of the Economic

10    Espionage Act and how specific it is about what the government

11    has to prove, that you converted a trade secret to the economic

12    benefit of someone other than the owner himself and intending

13    that the offense injures the owner and they describe it as

14    Goldman's proprietary computer source code for its

15    high-frequency trading business.

16            We don't have to take them at their word that what was

17    downloaded would, in fact, be and was, in fact, part of the

18    larger whole, we are entitled to know what the larger whole was

19    so that we can refute the suggestion that this was something of

20    value.

21            I believe, your Honor, that what will be demonstrated

22    once we have the platform, I believe that our expert will be

23    able to show and will be able to testify that what was taken

24    was of no utility whatsoever without the rest of the platform,

25    that what was taken did not have independent value, and it

1    simply isn't enough to say you've got the code, we told you

2    what you took, what more do you want. That's not good enough

3    because I can't defend the case without being able to undermine

4    the core allegation that it was something of value.

5            When they tell the grand jury in presenting the

6    indictment that the value was, it was a part of or related to

7    this trading platform, that becomes the heart of the charge

8    against him. They didn't go to the grand jury and say indict

9    this case because Mr. Aleynikov downloaded some proprietary

10   information. That's not a crime. To be the crime -- your

11   Honor looks quizzical.

12           THE COURT: No. I mean, it's an element of the crime.

13           MR. MARINO: Yes, it is.

14           THE COURT: It's not the complete crime, there are

15   many elements, but it is part of the crime to take.

16           MR. MARINO: Without a doubt, to take a trade secret

17   is undoubtedly part of the crime. But to turn what is

18   essentially a civil allegation, you stole our trade secrets,

19   that crops up in civil cases all the time, to turn that into a

20   violation of the criminal laws of the United States, there are

21   other essential elements without which not. Those other

22   essential elements go to exactly what role that alleged trade

23   secret played in the larger platform.

24           That's why when we went to court they said he took the

25   whole platform, we've never had a theft on this scale before,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    this is something worth millions and millions of dollars. None
2    of that is true, none of that. What was downloaded does not
3    have a value.

4         Remember, in this case even though the allegation is,
5    well, you left Goldman to make more money at Teza and the
6    allegation specifically is Teza was the party that was going to
7    benefit --

8         THE COURT: And the defendant.

9         MR. MARINO: And the defendant. That's the specific
10   allegation.

11        I'm not mincing words. What I'm trying to say to your
12   Honor the notion was, and I don't think anybody would walk away
13   from it, I certainly hope not, he was taking the platform from
14   Goldman, going to Teza and he was going to benefit Teza and,
15   therefore, himself, he was going to make three times the money
16   and basically he was taking something that did not belong to
17   him, something that belonged to Goldman and was bringing it to
18   Teza. That's the gist of the what they're saying. Okay?

19        That's not true. We know, first of all, that it is
20   completely unsupported by any allegation that Teza ever was
21   offered or paid for anything of the sort.

22        THE COURT: Well, let's, if I could, if we could bring
23   you back to your first request.

24        MR. MARINO: Yes.

25        THE COURT: Okay. And obviously we are not trying the

1    case in front of the jury yet, so if we could just focus on the

2    first request.

3              Is there anything else that you wanted to say to make

4    your case for requiring Goldman to respond to your first

5    request?

6              MR. MARINO:  I can't defend the case that alleges that

7    my client took something of value to Goldman, to wit, a part of

8    its proprietary trading system, unless my expert is able to

9    analyze the proprietary trading system.  I can't do it.

10             This is like a scenario in which you are alleged to

11   have injured Coca-Cola by taking a trade secret Mr. Coca-Cola

12   that was part of its formula for Coke and what we find is what

13   you took was sugar.

14             When you tell me that I took sugar and you tell me --

15   tell my expert and here's the role that plays in the overall

16   trade secret, the notion that I violated a federal criminal law

17   becomes clear, the notion that it becomes silly it becomes

18   clear.

19             Their position is in part they got a concern that Mr.

20   Aleynikov ought not to be able to have access to this because

21   it's a secret.  Well, he had access to it throughout his entire

22   tenure at Goldman and we have agreed readily to whatever

23   protective order they want.

24             I note in their papers they indicated if your Honor is

25   inclined to require Goldman to produce the remainder of the

1    platform, that they would want a further protective order.

2         I don't care what protective order is entered. There

3    is no part of our defense that is interested in having this

4    material free and clear of some protective order, but I don't

5    understand how the government is going to be able to come into

6    court and prove the allegations of Count 1 of this indictment

7    that Mr. Aleynikov violated the Economic Espionage Act without

8    showing what relation the code he downloaded bore to the whole,

9    and that's the essence of why, unless I have it, I can't

10    undercut that and have my expert testify, no, it didn't, this

11    is actually something that was in a developmental stage, this

12    is actually something that was of no utility whatsoever outside

13    the platform.

14         Those are critical facts that bear on this type of

15    allegation of an economic espionage violation and that's why we

16    need what is in item number 1.

17         THE COURT: Thank you.

18         Mr. Friedrich.

19         MR. FRIEDRICH: Thank you, your Honor.

20         We pick up with the analogy that Mr. Marino raised --

21         THE COURT: Sugar?

22         MR. FRIEDRICH: This isn't about sugar. If Coca-Cola,

23    and I heard rumors, I don't represent them, it is alleged a

24    rumor that different people within the company know different

25    aspects of the formula and if one of those people who knew

1    different aspects about what went into one part of Coca-Cola

2    went out and sold how much sugar, how much corn syrup, how much

3    bubbly, that is an intellectual property and that would be an

4    intellectual property crime.

5         Here, again, the government has made clear in its

6    filing indictment, the indictment makes clear on its face that

7    this is not the theft of the entire platform.

8         The government says the papers it filed in this matter

9    it is a theft of many of the files and, indeed, paragraph 12 of

10   the indictment makes clear that the transfer of hundreds of

11   thousands of lines of source code for Goldman's high-frequency

12   trading system or Goldman's computer network, including files

13   relating to the platform and the trading algorithms.

14        I submit it is clear from the face of the indictment,

15   even it is not it is clear from the government's papers that

16   they have submitted that they are not alleging the theft of the

17   entire platform.

18        The defendant has had produced to him that portion of

19   the code which it is alleged he has stolen. He doesn't need

20   the remainder of the code, the remainder of what is highly

21   sensitive, the remainder of what is highly proprietary in order

22   to make the argument that he espoused here.

23        Unless the court has any questions about our

24   submission or the arguments we made on that point, I don't have

25   anything else, other than to emphasize this is incredibly

1    sensitive information, it is incredibly sensitive industry.

2              Thank you.

3              THE COURT:  And briefly, Ms. Rohr, do you have

4    anything you want to say on behalf of the government?

5              MS. ROHR:  Yes, just briefly, your Honor.

6              As stated by Goldman's counsel the government has not

7    alleged theft of the entire trading platform, the indictment in

8    paragraph 12 makes that clear.  The complaint also did not

9    allege the entire trading platform.

10             There were statements at the bail argument about the

11   platform, but in any case the indictment now alleges just a

12   portion of the trading platform and as I said in my paper that

13   has been provided to the defendant.

14             The defendant can defend himself in this case.  He

15   doesn't need the rest of the platform to argue -- to make his

16   arguments about intent or to make the argument about the value

17   of the item stolen.  The rest of the platform and the other

18   computer files are really irrelevant to those arguments.

19             THE COURT:  Okay.

20             I am going to deny the request for production in

21   response to request number 1.

22             The thrust of the written presentation by the

23   defendant, and he moved beyond that, but at least initially the

24   thrust of his presentation which was presented to the court in

25   a memorandum was to focus on the government's statements at his

1    detention hearing.

2            Whatever those statements were and whether they were

3    overbroad characterizations in the heat of the moment, whatever

4    they were that is not the charge that the defendant is going to

5    trial on.

6            I've read the indictment with care.  There is nothing

7    in the indictment that would permit the defendant to be

8    confused and, indeed, he is not confused, about whether or not

9    he is charged with the theft of the entire platform.

10           So he has been given in discovery, and it is

11   undisputed, the Rule 16 discovery, the specific portion of

12   Goldman's trade secrets that he is alleged to have taken in

13   violation of law.

14           So the argument that is being made now by the

15   defendant has moved on to identify two specific issues, and

16   that is his contention that he will be unable to show that the

17   theft of the particular items he has discovery of, which are a

18   portion of the trading platform, that the theft of those items,

19   one, don't benefit others and, two, will not hurt Goldman if

20   disclosed to others, and this is what he wants to show at trial

21   and what he believes the government has the burden of showing

22   in the affirmative, that it will benefit others and would hurt

23   Goldman if it was disclosed.

24           In making that argument he makes and analogy, and I

25   don't want to hoist him on his own petard analogy, if its sugar

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  it's sugar and if he wants to show that what was taken is
2  equivalent to taking sugar, he can show that now. You have a
3  chemist come in and analyze it as sugar; you have a computer
4  expert come in and analyze it as the computer equivalent of
5  sugar.

6  I don't find that he carried his burden at all of
7  showing that there is any need to have access to the entire
8  Goldman trading platform in order to either put the government
9  to its burden or to craft a defense along the lines that he has
10  suggested. As a result, I'm going to deny the request.

11  I have to say, and the circuit has spoken to the issue
12  this month in its decision on City of New York, a civil case,
13  June 9 decision by the Court of Appeals in Dinler against the
14  City of New York, about the limitation of protective orders,
15  either in attorneys' eyes only or filing under seal or any
16  number of levels of protection which we customarily apply when
17  we are dealing with highly sensitive material, and the parties
18  have made some arguments about protective orders in this case.

19  I don't feel I need to reach, with respect to request
20  number 1, the protective order issue. I find on its merits the
21  defendant has not made a showing that it has either a need for
22  or there is evidentiary value in having the specifics of the
23  additional trading platform code that the government is not
24  alleging the defendant stole.

25  That said, it's important to focus with care on that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    issue, because we are dealing with matters that are highly

2    sensitive. This is not a trivial decision, this is not a

3    decision that can be made quickly or without care. A lot of

4    this takes care for all the parties before me and so I have

5    taken particular care in thinking about this request, studying

6    the indictment as carefully as I can, understand precisely what

7    is being alleged and what a defendant would need to show in

8    response.

9         So with that ruling on item or request number 1, which

10   other items, then, are impacted by that ruling such that we

11   don't need to further consider them?

12         MR. MARINO: Are you addressing me, your Honor?

13         THE COURT: Whoever can answer that.

14         MR. MARINO: Well, it gets a little bit complicated,

15   because, as you go to item number 7, that seeks the content of

16   the logs from the specific corporate proxy serve containing

17   certain protocol records.

18         THE COURT: Well, 7 Goldman made a counterproposal so

19   I don't think I need to consider 7 right now.

20         MR. MARINO: If you go to items 9 through 12, the

21   intent there, your Honor, is to demonstrate the evolution of

22   the source code and, thus, the value of what was taken.

23         I'm not sure how to understand the court's ruling with

24   respect to the government's need to show the value of what was

25   taken. I think the government, as I read the Economic

1    Espionage Act, is going to have to show that what was taken is

2    a thing of value. I don't think there is any doubt that

3    showing merely that what was taken was a trade secret or had

4    proprietary value -- I'm sorry -- was of a proprietary nature

5    is sufficient.

6              So I guess as I'm hearing the court's --

7              THE COURT: Excuse me, I want to be precise because I

8    don't want to mislead anyone.

9              When we look at page 10 of the indictment, and that is

10   paragraph 16, that the defendant was asking me to focus on, the

11   issue of benefit and injury is, I believe, in terms of intent,

12   with the intent to convert such trade secret to the economic

13   benefit of someone other than the owner and intending and

14   knowing that the offense would injure the owner.

15             MR. MARINO: That's how I read it, yes, your Honor.

16             THE COURT: Okay. So we are talking about scienter

17   issues with respect to those two elements.

18             MR. MARINO: Yes.

19             THE COURT: And, of course, the fact that something

20   would benefit someone or would injure Goldman is relevant to

21   the scienter inquiry --

22             MR. MARINO: Yes.

23             THE COURT: It might be circumstantial evidence of

24   scienter, but the thrust of it is the scienter issue.

25             MR. MARINO: I completely agree with your Honor, the

1   thrust of it is the scienter issue, and when I look at this I

2   see an allegation -- of course, I have a lot of questions in my

3   mind now about how if the government initially thought the

4   entire platform was taken and then alleged in the indictment

5   that something less was taken what caused it to go from point A

6   to point B, but that's not for your Honor today.

7            THE COURT: No, and I don't think I would spend too

8   much time on that, Mr. Marino. You are a very experienced and

9   savvy attorney. You know that people say things in hearings

10  that are perhaps less precise than when they are crafting a

11  document. So, you know, I don't want to revisit my ruling on

12  number 1.

13           MR. MARINO: I understand.

14           THE COURT: I take my question off the table. I can

15  tell this is not a productive way to go. So we will just march

16  through these in the order in which they are listed and see if

17  we can make progress that way.

18           So number 2, I understand that there is consent to

19  that.

20           Number 3, I understand that a production has been made

21  and a search is still on-going.

22           Numbers 4 on 5, I understand there is consent to that.

23           So I think that takes us up to number 6, and that is

24  the specific written policy regarding the copying.

25           And if I remember the written presentations I received

1   on that, some policies of confidentiality policies, I will call

2   them, from Goldman have already been produced and I take it the

3   government has produced those on which it is intending to rely

4   at trial.

5           Is that correct, Ms. Rohr?

6           MS. ROHR: Yes, your Honor.

7           The defendant's revised item 6 had been modified a

8   little bit.

9           The government does not believe that it has or that it

10  has provided policies relating to working at home or the

11  copying or using of computer source codes specifically.

12          THE COURT: Okay. So you have provided the more

13  general confidentiality policies that have been reduced to

14  writing on which the government intends to rely at trial?

15          MS. ROHR: That's correct, your Honor.

16          THE COURT: Okay.

17          MR. FRIEDRICH: Just to clarify, I take it that that

18  would be in conjunction with the policies that Goldman Sachs is

19  producing with the other items earlier in the request.

20          In other words, those haven't been produced yesterday.

21  We are agreeing to produce them. If we have a confidentiality

22  order we should have them to Mr. Marino by the end of the week.

23          THE COURT: Okay.

24          Well, the government has produced what it is relying

25  on at trial, that's it's Rule 16 obligation, the written

1    documents on which it is relying on at trial. The defendant is

2    seeking additional written policies. They are being agreed to

3    and produced at least in part by Goldman.

4         So let me ask with respect to number 6, Mr. Friedrich,

5    is there a specific written policy of the kind that is being

6    described in paragraph 6?

7         MR. FRIEDRICH: Your Honor, let me answer it this way:

8         The answer is. I don't believe so, but I want to make

9    sure that I'm clear about the basis for that belief.

10        The indictment itself in terms of working outside the

11   home, that portion of the indictment, I believe what defendant

12   is referring to is that portion of the indictment -- and I just

13   want to get it -- I believe is set out in paragraph 14 in the

14   indictment.

15        MR. MARINO: That's correct, your Honor.

16        MR. FRIEDRICH: This does talk about transferring

17   certain files to one's home, but also about a lot of other

18   things, and saying I don't believe there is a specific policy

19   that has been identified about working at home, I don't want to

20   say that there are no policies that relate to this paragraph

21   because I believe that there are. So with that clarification,

22   I don't believe we have anything.

23        MR. MARINO: That clarification sort of swallows the

24   explanation from my perspective, your Honor.

25        THE COURT: Well, let's not talk about paragraph 14,

1    let's talk of this indictment, let's talk about paragraph 6 of

2    Exhibit A.  That is what is being requested.

3            MR. MARINO:  Yes.

4            THE COURT:  So does Goldman have reduced to writing a

5    written policy as described in paragraph 6 that has not yet

6    been produced or that it is not planning to produce?

7            MR. FRIEDRICH:  I don't believe so, your Honor, no.

8            THE COURT:  So this is no further policy is

9    responsive.

10           Then with respect to items 7 and 8, there was a

11   counterproposal made by Goldman, I believe.

12           MR. MARINO:  The counterproposal for 7 is sufficient,

13   your Honor.

14           Eight, however, what we need are the host names.  We

15   ask for the specific ID addresses --

16           THE COURT:  Let's not do that.  Counsel, it is

17   difficult for the reporter to take down this kind of code

18   reference.

19           MR. MARINO:  I apologize.

20           THE COURT:  And we are all looking at item eight.

21           MR. MARINO:  Yes, your Honor.

22           THE COURT:  So did you make a request yesterday in the

23   meet and confer process about the further modification you

24   would like to make to number 8.

25           MR. MARINO:  Your Honor, the meet and confer process I

1    don't think was exactly what you may expect so the answer is --

2          THE COURT:  Did you request it?

3          MR. MARINO:  I asked or requested to talk about each

4    and every one of these items and was told that Goldman would go

5    no further than what was in its written submission.  So that's

6    where we are.

7          THE COURT:  I am not going to get into this, okay,

8    back and forth, I'm just not going to.

9          Did you make a request in writing or otherwise of the

10   kind that you are making now on the record?

11         MR. MARINO:  Actually, your Honor, I'm not making a

12   request, I'm just clarifying that the host names are what is

13   important here and that is responsive to papers that Goldman

14   filed yesterday morning.

15         THE COURT:  Okay.

16         So I will let counsel talk about that and you will get

17   back to me if you can't reach agreement and if there is a

18   problem.

19         Okay.  That takes us to item 9.

20         Mr. Marino, you are going to have to give me some

21   background with respect to item 9.  Don't read it.

22         MR. MARINO:  The production of source code of the type

23   that was downloaded on June 5 actually goes through stages.

24   It's an evolutionary process.  And what we are requesting in

25   seeking the full content of the specific files and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    subdirectories is to demonstrate the evolution of the source

2    code and, thus, the value of what was taken.

3            In other words, if you are provided with the full

4    content of the specific files and subdirectories as requested

5    here, and I won't read the code letters, but if you are

6    provided with that, an expert can explain exactly where in the

7    evolutionary process what was downloaded existed, and this, of

8    course, has a direct bearing on the value of what was taken.

9    That's what that's about.

10            THE COURT: Okay.

11            Your "of course" is not clear to me. Whether it was

12    developed over the course of a decade or over the course of a

13    month, whether it was developed by teams of hundreds of people

14    or by one brilliant person, I'm not quite sure how that makes a

15    difference with respect to your ability to defend this charge.

16            MR. MARINO: The way it makes a difference is if you

17    see where in the evolutionary chain what was downloaded exists,

18    you will understand that its value was negligible in terms of

19    moving forward this platform.

20            No matter how you slice it, as I understand this whole

21    process, the value of the source code that was downloaded

22    obviously can only be assessed in the larger context in which

23    it was used as a trading device.

24            If an expert is provided with the full content of the

25    specific files and subdirectories, the expert will be able to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    say, okay, what was downloaded is not, in fact, something that
2    would be of value to anyone outside the context in which
3    Goldman used it.

4    And so, again, in proving, and I take your Honor's
5    point, in proving intent or disproving intent as the case may
6    be, that's a very important thing.

7    I mean, it's just how I understand the statute and
8    it's how I understand what's been charged here. So I don't
9    know how we can ask an expert to assess and be Rule 703 helpful
10   to the trier of fact on the subject of the value of what was,
11   in fact, downloaded if we don't place it in some sort of
12   context for the expert, and having this full content of the
13   specific files would enable the expert to explain exactly what
14   was taken. It still has to be something that you had intent to
15   harm economically the victim by taking.

16   And so, I mean, I don't want to re-engage the court in
17   a discussion of item 1, but I would love to know what the
18   product is that was prepared for or placed into interstate
19   commerce to know how I'm going to defend my client, who stands
20   charged with economic espionage, and that's -- I don't mean to
21   course over it, your Honor, I apologize if I have, but that's
22   where I'm coming from.

23   THE COURT: Thank you very much.

24   Mr. Friedrich.

25   MR. FRIEDRICH: This is analytically the same as item

1  number 1 as to which the court has already ruled, because it is
2  simply a developmental version of the same program. All the
3  same arguments both ways would apply. On that basis we object.
4  And the same thing can be said for five or six other requests I
5  take it we are going to go through.

6          THE COURT: Okay. Item 9, I don't have a clear
7  description from the defendant of what is important with
8  respect to the additional information it seeks through item 9.

9          If the argument is that what was taken is of no value
10 without the additional information, without having taken the
11 additional information reflected in request number 9, well,
12 that, which is what I understood the defendant to be saying,
13 that an expert can opine on, what was taken was worthless
14 and --

15         MR. MARINO: Can I just say briefly on that, very
16 briefly --

17         THE COURT: Mr. Marino, we are not going to go
18 backwards because we have a long way to go here. So your
19 request number 9 is denied. Okay.

20         So request number 10.

21         MR. MARINO: Request number 10, 11 and 12 for a
22 recursive list of these specific files, again, it's going to
23 show -- what is going to be developed here bears on the value.
24 I won't belabor the point. I understand the ruling that your
25 Honor has placed on the record. I understand.

1          I mean, I don't know what else to do unless you know

2     how a particular downloaded file interacts with the other

3     elements of the platform, you cannot articulate its value, and

4     that minds more sophisticated than mine in a technologically

5     sense, I don't know enough about it to opine on it, but I am

6     telling you what I have been charged with coming to Goldman and

7     getting is something that would enable this expert far more

8     learned in these matters than I am to say no, what was

9     downloaded, unless you tell me what it was interacting with, I

10    cannot speak to the value and no one could have -- no computer

11    programmer with this man's expertise could conceivably have

12    intended that it would be used to benefit a third party or harm

13    Goldman because it just doesn't exist in the abstract, and

14    that's the point.

15         I understand your Honor's ruling and I don't want you

16    to revisit it, but that is the cause of these requests.  That's

17    where it is coming from, because you have to --

18         THE COURT:  Will you explain to me what a recursive

19    list is or not?

20         MR. MARINO:  I think we are approaching the limit of

21    my understanding of it, but it's basically a list of file names

22    and trajectory.  You can trace where this has been and analyze

23    these codes based on this list, sort of explains to you how it

24    would work.

25         Without that -- I mean, I know that your Honor has

1   made clear that you think that an expert could assess this and

2   say this is of value, this is not of value, but truthfully, I

3   mean, the government is bearing the burden of proof at trial is

4   going to have to show that it is of value, and I sure hope they

5   are not coming into this courtroom with that platform, I hope

6   they are not going to show this jury here's where this

7   particular thing he downloaded fits into the platform, because

8   then I really would be completely disadvantaged in my attempt

9   to defend the case, because I can assure you that I am going to

10  come in and argue that it didn't have a value and they are

11  going to have to say yes, it did, here is how it interacted

12  with the algorithms to enable Goldman to dart in and out of

13  these funds and make these mean millions of dollars. That's

14  how they are going to have to present the case.

15       Again, it's just -- maybe conceptually, I know your

16  Honor has graciously referred to me as savvy, I'm not feeling

17  that savvy this morning, I'm feeling kind of ridiculous. I

18  tell you, I'm looking at this thing and trying to understand

19  what is the product that they are referring to and how do you

20  ever prove economic espionage unless you can prove what product

21  it' was that you either took or it comprised something that you

22  took?

23       How do you proof economic espionage with a statute

24  that specifically says on its face with intent to convert such

25  trade secrets that was related to and included in a product

1    that was produced for and placed in interstate and foreign

2    commerce without letting me know what the product was or see

3    the product or have the product or that my expert analyze the

4    product?

5                That's where I am.

6                THE COURT:  Thank you.

7                Okay.  So with respect to number 12, I think that

8    Goldman's response was that there were no responsive files with

9    respect to 12, if I remember correctly.

10               MR. FRIEDRICH:  Yes, your Honor.

11               THE COURT:  Okay.

12               So we are really dealing with items 10 and 11 right

13   now.  And I don't want to accept on the record with no response

14   what is sort of asserted as a foundational point in Mr.

15   Marino's last argument, which is that the government cannot

16   show and the defendant cannot defend this case without

17   explaining how the stolen material fits in the larger trading

18   platform and computerized trading system operated by Goldman

19   and, therefore, as a result the government is going to have to

20   bring into court and we will have to bring into court the

21   content of the remaining portions of the trading platform, all

22   the other source codes, the algorithms, everything in order to

23   make that first point, which is the stolen material relates to

24   a valuable trading program.

25               I don't accept that premise that you need to show the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to the jury the specifics that the government has the burden or

2    the defendant would be advantaged by having the specifics of

3    the rest of the source code available to it.

4            So that is that fundamental premise, I think, lurking

5    behind defense counsel's last argument and I don't want to

6    leave it unaddressed.

7            So to the extent that items 10 and 11 are seeking

8    information that would reflect the other portions of the source

9    code and components of the trading platform from Goldman that

10   the stolen material interacted with, that request is denied, so

11   10 and 11 are denied.

12           That brings us to 13, and those -- 13, 14 and 15, it's

13   possible we can take those as a group, I don't know.

14           MR. MARINO:  Thirteen is withdrawn, your Honor.

15           Fourteen and 15, again, for recursive list.

16           I think that this list is going to demonstrate that

17   the platform consisted of several packages.  To build and use a

18   package one would need all the files on which the package

19   depends and that Mr. Aleynikov did not download all the

20   elements necessary to build even one of these packages.

21           But, again, I see that it is somewhat related although

22   not exactly co-extensive with the other requests, but I think

23   your Honor understands.  Obviously we have a fundamental

24   disagreement over what the statute requires with respect to the

25   proofs that it is going to require.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Perhaps I'm mistaken as to the importance of the
2    products to the Economic Espionage Act, but I don't, I don't, I
3    don't think so, I think I'm aware of that. I'm not sure how to
4    find out what the product is, unless I have either the actual
5    platform produced or the recursive list that we have asked for,
6    I'm not sure I understand how we're going to defend a charge
7    that we took something that either was related to or was
8    included in a product that was produced for and placed in
9    interstate and foreign commerce.

10          I don't know what the product was, but that's what I'm
11   trying to get at.

12          THE COURT: I actually don't think there is any
13   fundamental disagreement on what the statute requires, at least
14   I haven't heard one, and I think it is somewhat disingenuous to
15   say you don't know what the product is that was stolen or how
16   what was stolen fits into the product.

17          In any event, request number 14 -- yes, counsel.

18          MR. FRIEDRICH: I'm sorry, your Honor. I just wanted
19   to make a brief factual point for the record that takes me to
20   the limits of my computer understanding.

21          I believe that recursive lists are a good bit more
22   detailed than just simply a list of files. It is a list of
23   files, but it also gives indication of the files that those
24   files interact with and how they interact.

25          THE COURT: That's what I understood from Mr. Marino's

1  description. It would basically, if you have it, show how the

2  stolen trade secrets -- and I'm just using that as a shorthand

3  so we know what we are talking about what is charged in the

4  indictment as having been taken in violation of law related to

5  the rest of the trading platform, and if you have the recursive

6  list you basically get to see everything the stolen material

7  interacted with in the course of it being used.

8      That's what I understood Mr. Marino to be explaining

9  to me.

10     Okay. Fourteen and 15 is denied for the reasons

11 already stated.

12     With respect to 16, I believe there is agreement.

13     With respect to 17, Goldman says there is nothing

14 responsive.

15     That brings us to item 18.

16     Goldman's response deals with 18, 19 and 20 in a

17 group, and so it may be possible for us to deal with 18, 19 and

18 20 as a group, but, Mr. Marino, I leave it to you.

19     MR. MARINO: Your Honor, I think we can deal with them

20 as a group.

21     I assure the court I'm not being disingenuous in any

22 way when I say I don't know what the product is that was

23 produced for or placed in interstate commerce. I don't know

24 what the product is.

25     I have had the benefit of a great deal of research and

1    reading by commentators on what product means in the context of

2    the Economic Espionage Act. I assure you there is no product

3    in this case that fits within that definition.

4         So no, I'm not being disingenuous, I am being very

5    honest and forthright.

6         THE COURT: Now you are focusing on a different word.

7         MR. MARINO: Product, your Honor.

8         THE COURT: So this is a different argument than I

9    think I've understood you to make so far, so let's deal with

10   that.

11        I'm on page 10, paragraph 16 of the indictment, and it

12   requires proof by the government that the defendant acted with

13   intent to convert such trade secrets that was related to and

14   included in a product that was produced for and placed in

15   interstate and foreign commerce, et cetera.

16        So are you now focusing on the word "product" as it is

17   used in that paragraph?

18        MR. MARINO: Yes, your Honor.

19        THE COURT: And what argument do you want to make

20   about the word "product"?

21        MR. MARINO: I don't know what the product is. That's

22   the question. In other words, all of these requests at some

23   level are directed toward understanding what the product was.

24        We spoke for a while about value and I won't replow

25   that ground, but we're talking now about product. I read the

1    Economic Espionage Act to require that there be the theft of a

2    trade secret or the intent to convert a trade secret that was

3    related to and included in a product and not just any product

4    broadly conceived, but a product that was produced for and

5    placed in interstate and foreign commerce.

6         Was the platform produced for and introduced into

7    interstate and foreign commerce? Are they selling their

8    platform? Do they produce a product and place it into the

9    stream of commerce and is that what he's alleged to have done,

10   stolen a trade secret that related to that product that was

11   produced for and placed into interstate commerce?

12        I don't think so, but they are not being required to

13   produce the platform, we are not being required to identify the

14   platform, they are not being required to identify the product,

15   but we are being required to defend the allegation in the

16   indictment, and that's, that's where my consternation comes

17   from.

18        They say in paragraph 6, Goldman has not licensed its

19   trading algorithms or trading platform and has not otherwise

20   made them available to the public.

21        Is the trading platform the product within the meaning

22   of the Economic Espionage Act?

23        I'm not being disingenuous with the court, I'm being

24   very direct. That's a huge issue in the Economic Espionage Act

25   scholarship and I would like to know what the product is.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:   Okay.  Of course, that is a different

2    issue here --

3          MR. MARINO:   Yes.

4          THE COURT:   -- than has been identified before.

5          MR. MARINO:   It absolutely is, and I don't mean to

6    suggest, and I didn't mean to suggest that it had been

7    identified to you before, but I want the court -- as you can

8    see, it troubles me greatly to ever have a respected and

9    distinguish jurist to suggest that I have been disingenuous.  I

10   don't ever try to do that and I wasn't doing it here.  But I

11   think there is something fishy going on with this product and I

12   would love to know what it is.

13         THE COURT:   Okay.  So if there is a question about the

14   specificity of an indictment, that is dealt with through a bill

15   of particulars mechanism.

16         So if the issue is identification of the product and

17   understanding whether the government, as I think you alluded

18   to, Mr. Marino, paragraph 16 as is customary is putting in all

19   of the elements of the statute and they are listed with the

20   "and" as the linkage when obviously as we all know the

21   government can prove one or the other, so it can prove that the

22   intent was to convert such trade secret that was related to a

23   product that was produced for interstate commerce or a product

24   that was placed in interstate commerce, and if a defendant is

25   confused about the government's theory and what proof it's

1   going to have to meet at trial, it is absolutely entitled to

2   engage in that conversation with the government, and in this

3   district as everyone well knows you have to have those informal

4   discussions before you make a motion on seeking further

5   discovery.

6           Have you had such discussions with the government

7   already?

8           MR. MARINO: Yes, I have had many discussions with the

9   government. I have not -- let me just address -- respond to

10   one thing that your Honor said.

11           Obviously, I agree with your general comment about the

12   manner in which the grand jury is permitted to return an

13   indictment that parrots with the wording of the statute and the

14   fact that it says, for example, in this statute copied,

15   duplicated, sketched through, photograph, any one of those

16   would suffice.

17           I do not agree that that applies to the portion of the

18   statute that speaks to the requirement that this be related to

19   and included in a product that was produced for and placed in

20   interstate and foreign commerce. I think that is not

21   disjunctive, that is conjunctive, but I don't think that has

22   bearing necessarily on my argument, because I don't think the

23   quote unquote product definition fits here at all.

24           I don't think there is a product. Not only do I not

25   think there was a product that was produced for interstate

1  commerce, I don't think there was a product that was placed in
2  interstate commerce, I don't think it is a product at all. I
3  don't understand it.

4       Now, product has a definition under law. Now, that is
5  a subject for a motion to dismiss an indictment, and I would
6  love to make the motion to dismiss the indictment before --
7  obviously I intend to make it on July 16 or whatever date your
8  Honor has set, I think it's July 16.

9       THE COURT: It is.

10      MR. MARINO: And obviously we have prepared that
11  motion in skeletal form awaiting the information that we are
12  requesting here because I think it will be very enlightening to
13  the court.

14      I know that I'm being a pain in the neck here, your
15  Honor, I'm not trying to be but I feel that I am, but I need to
16  get to the bottom to present your Honor with why I believe this
17  Economic Espionage Act claim against Sergey Aleynikov is not
18  well made.

19      I would love to know from them. They can tell me this
20  very easily without my having to go through, as your Honor
21  said, you should go through the meet and confer style instead
22  of making motions and bill of particulars, what's the product
23  that is described in the indictment? What was the product that
24  was produced for and placed in interstate and foreign commerce?

25      THE COURT: Ms. Rohr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

| | |
|---|---|
| 1 | MS. ROHR: Thank you, your Honor. |
| 2 | This is a new argument. This was not previously |
| 3 | raised before. I am happy to engage in a discussion with |
| 4 | defense counsel before any motions are filed, but I do think |
| 5 | that regardless of that issue, the items subpoenaed are not |
| 6 | necessary to prove it's case. The items subpoenaed here that |
| 7 | is before the court is separate from a potential motion or |
| 8 | request for a bill of particulars on the word "product." |
| 9 | THE COURT: Okay. Good. |
| 10 | First of all, Mr. Marino, I am exquisitely conscious |
| 11 | of the fact that every lawyer before me has a job to do and a |
| 12 | client to represent, and you are not a pain in the neck, you |
| 13 | are a very skilled advocate who it is a pleasure to have in my |
| 14 | courtroom. But I am working hard to understand the arguments |
| 15 | here so I can respond directly. |
| 16 | I appreciate that we now have a new word and clause to |
| 17 | focus on in the indictment. I am going to let the government |
| 18 | and defense counsel focus on it and I'm going to return to |
| 19 | requests 18, 19 and 20, and with respect to 18, 19 and 20, I |
| 20 | think we sort of lost our way a bit. |
| 21 | MR. MARINO: These are part of the same, these are |
| 22 | part of the same argument or in the same vein. |
| 23 | For example, 18, 19 and 20 are related to one another. |
| 24 | Twenty seeking a dump of the contents of stock trading |
| 25 | parameter tables, well, those are necessary to make granular |

1    adjustments to the platform's behavior and the other elements

2    of the platform are inoperable without them and none of these

3    tables was included in the file transfers.

4            I'm trying to move through this conceptually, but

5    candidly, this is all part of the same thrust. I know your

6    Honor has given some -- you reacted to requests that we have

7    made. I don't want to suggest that you are ruling on a

8    carefully briefed motion addressed to each of these points

9    because you're not. We haven't given you the benefit of that,

10   we haven't put you in a position to do that and it's not right

11   to suggest otherwise, I haven't done that.

12           I made a request, I thought I was on firm ground

13   issuing the subpoena without coming to court in the first

14   place. As it turns out I should have not only come to court

15   and sought the subpoena, but laid out in exquisite detail why I

16   wanted these things and even group them together for you.

17           The motion that we made for approval nunc pro tunc was

18   made after we had made this -- prepared this list and, you

19   know, as you can see, we started out with 36 items, we are now

20   down to 26 items so we got rid of ten items right off the bat.

21   But I don't want there to be less than a full appreciation by

22   the court of why -- this is not a frivolous request. These

23   interconnected and interrelated requests, first of all, they

24   are not broken into bite sized pieces to makes it vexatious or

25   burdensome for Goldman, it is not being don for that reason.

1    I tried to with the endeavor of my client, who is an

2    expert in this area, to get to the very bottom of exactly what

3    was taken and why it could not be proven that what was taken

4    fits within the meaning of the statute.

5    I say this sort of to -- it's a longwinded way I think

6    of short-circuiting in some respects, but I don't want the

7    court to think that, you know, we are coming at this from all

8    these different angles for any reason other than to really try

9    to get our arms around exactly what it is that is going to be

10   presented at the trial against Mr. Aleynikov and what he can

11   present in his own affirmative defense to demonstrate that he

12   never intended to violate the Economic Espionage Act, and I

13   think to do that you really have to have an understanding of

14   exactly what he took and when he took it, and I just think the

15   only difference of opinion that we're having today goes to

16   whether and to what extent the other aspects of the platform

17   are necessary to enable one to understand exactly what the

18   nature of those downloaded files is. They just don't exist in

19   the abstract in a way that is understandable or meaningful.

20   Once you see them in their appropriate context then you have a

21   really clear insight into what any reasonably intelligent

22   computer programmer with Mr. Aleynikov's expertise could have

23   been thinking when he downloaded them, and that's what it's all

24   about.

25   Candidly, we can go through them individually, but

1  these last three, from here we move to security issues, but the
2  last ones that go to the platform, they are really all
3  emanating from that same way of looking at the case.

4  And I will be honest with you, it's my way of looking
5  at the case, it's sort of how I see it, it's how I have seen it
6  from the beginning.

7  You know, we're not -- I don't have a degree in
8  computer programming, I apologize, I confess to the court, I
9  don't have that. I tried to learn what I needed to learn to
10 translate that somewhat arcane world into a world I do
11 understand and to kind of distill from what has been charged
12 here what I really would need to get from the system to be able
13 to explain or be helpful to a jury that has, I'm suspecting,
14 less familiarity -- at least by that time I probably will know
15 more than I want to know about it, but they are expected to
16 know a lot less and I need to illuminate that for them. That's
17 what I owe Mr. Aleynikov for. That's what makes all of these
18 requests.

19 I explain it that way because I hear myself going over
20 and over and I don't want to be vexatious to the court but I'm
21 trying to understand it and I'm trying to explain it and I'm
22 trying to get them to identify it because I don't think that is
23 an Economic Espionage Act fit and that's what much of the case
24 law and scholarship that I have steeped myself in over the past
25 six weeks has taught me and I'm trying as a preliminary

1    appraiser to bring that to your Honor to make sure that I have

2    this whole thing nailed down and understood in the right wait.

3    That's where I'm coming from.

4         THE COURT:  Okay.  Thank you.

5         I can assure you you are not being vexatious, it is

6    important to make sure that I am analyzing this carefully and

7    thoroughly and the defendant has a full opportunity to be

8    heard.

9         Obviously I denied the first requests for a conference

10   for a failure to comply with Rule 17(c) and then defense

11   counsel made a written submission, I believe, as an order to

12   show cause to that effect, but I have to go back and look at

13   the specific papers, but that I understood to be a written

14   17(c) submission so I think the defendant had a full

15   opportunity to present whatever it wanted in terms of writing

16   to support these requests.  Obviously, we have gone through a

17   process meet and confer to try to make sure that only real

18   disputes are presented to me.

19        I think Mr. Marino's oral explanation, again, with

20   respect to 18 to 20 confirms in my mind there is absolutely no

21   need to produce the specifics, that is, the precise content and

22   source code used in the aspects of the trading platform that

23   the defendant did not take from Goldman.

24        To the extent the defendant wants to make an argument,

25   which he apparently has described through his counsel and

1    apparently from what counsel is saying is supported by a
2    defense expert that what the defendant took and what has been
3.   produced to him in Rule 16 discovery is the basis for the
4    government's charges of theft, and, again, I'm using that as a
5    shorthand, is only one component of what you would need to run
6    a successful trading program and platform.

7         You can make that argument and explain all the
8    functions that a trading platform performs and must be able to
9    perform to function effectively without having the precise
10   source code that does that for Goldman or for any other firm.
11   You can demonstrate that to be able to take quickly and analyze
12   and catalog trading that has just occurred on an exchange, on a
13   variety of exchanges and somehow translate that and organize it
14   in a way that the formulae that you have developed for your own
15   trading strategy can learn from it and react to it and create a
16   revised trading strategy, all of that can be explained to a
17   jury without having access to and demonstrating to the jury the
18   precise solution that Goldman has created for each step of that
19   process.

20        Goodman is not alone in doing this kind of high-volume
21   high-frequency trading. These are things that are known in the
22   industry and there are a lot of different solutions that
23   companies have developed and what makes the program valuable to
24   Goldman is is its their solution, other firms have other
25   solutions, and apparently a company that had wanted to hire the

1    defendant wanted to have its solution as charged in the

2    indictment.

3            So requests 18, 19 and 20 are denied.

4            That brings us to 21 through 26.

5            MR. MARINO: And these all proceed from a single

6    argument as well, your Honor.

7            The fundamental disagreement here is there isn't any

8    doubt that it's an element of the offense that what was taken

9    was something that the owner took reasonable measures to

10   protect. That falls within the definition of a trade secret.

11   And all of these requests for the various security access lists

12   and specific list, all of these go to this security issue.

13           I guess Goldman's position is we just have to show

14   it's reasonable, we don't have to show that other additional

15   measures could have been taken.

16           I will stand corrected in one way.

17           23, 24 and 25 also go to exceeding authorized access.

18   Those are issues on unauthorized access.

19           But between the reasonable methods they used to

20   protect trade secrets and the authorized access issues, I think

21   your Honor understands why we feel we need those to adequately

22   defend the case.

23           I guess the point being, it's really not enough to

24   say, well, judged by some objective standard these are

25   reasonable measures if we can identify and demonstrate that, in

1    fact, there were many, many measures that Goldman could have
2    taken to protect that it did not.

3            Maintaining a firewall which was designed to prevent
4    outsiders from accessing the information stored on Goldman's
5    computer network is an allegation made at page 4, paragraph
6    8(a) of the indictment.

7            So whether Goldman maintained a firewall that was
8    designed to prevent outsiders from accessing information stored
9    on its computer network creates a need on our part to assess
10   those firewalls and that's what these requests are designed
11   for.

12           THE COURT:  Mr. Friedrich.

13           MR. FRIEDRICH:  Let me break these into pieces, if I
14   can, your Honor.  I will deal first with 21, 22 and 26 and then
15   23, 24 and 25.

16           As to the first set, the language that Mr. Marino just
17   read from the indictment talking about firewalls is
18   specifically referencing designing to prevent outsiders from
19   accessing the information.

20           The requests that he has phrased are not about
21   outsiders getting in, they are geared toward insiders getting
22   out, and that's a key distinction.  They have asked for
23   something different than what is alleged here in terms of the
24   firewall policies.

25           Secondly, they are asking for information that is

1    incredibly granular in nature, give us all of your policies.

2            I would note requests 21 and 22 have no date

3    parameters whatsoever. These are incredibly broad requests

4    that are asking for incredible granular details about something

5    that is incredibly sensitive to Goldman, how they protect

6    insiders from sending things outside of the company.

7            From the prospective of Goldman it is something that

8    is overbroad, it's not necessary. Saying the government has to

9    prove reasonable measures I don't believe entitles the

10   defendant to every single detail of routing, whether or not it

11   had anything to do with this case or not during a complete

12   non-specified points of time.

13           Then as to 23, 24 and 25, similarly, here, your Honor,

14   there is just a difference of opinion as to what the 1030

15   charge means. This is not a case in which the defendant hacked

16   into an internal system, the indictment itself makes clear the

17   defendant had access, but that what he used that access for and

18   what he used it to do otherwise ran afoul of the company's

19   internal policies.

20           So all of the information they asked for in 23, 24 and

21   25 is really technical information about who was allowed access

22   to what as a matter of Goldman's internal security system.

23   That is not an issue in Count 3. The indictment itself makes

24   clear that the programmers who worked on the code had access to

25   the code.

1          THE COURT: I'm going to hear from you again, Mr.

2    Marino, I just want to make sure I captured Mr. Friedrich's

3    last point before I do.

4          In fact, I'm going to go back. Let's go to 21, 22 and

5    26.

6          What is a security access list? Information security

7    access list?

8          MR. FRIEDRICH: I believe that that is what ACL

9    appeared there as well which I believe is access control list,

10   which is apart of the instructions that are part of the

11   firewall.

12         THE COURT: Okay.

13         And request 21 and 22 further includes the phrase

14   "outbound access."

15         MR. FRIEDRICH: Yes.

16         THE COURT: So that is your point about these are

17   security protocols that Goldman has put in place to try to

18   monitor whether people who have authorized access to

19   information and/or are employed by Goldman are sending the

20   information out of Goldman in a way that raises suspicion?

21         MR. FRIEDRICH: Yes, that's correct, or in some

22   instances may simply stop the traffic.

23         And if I may just finish, the portion of the

24   indictment that Mr. Marino read at page 8, paragraph A, the

25   measure -- maintaining a firewall which was designed to prevent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  outsiders from accessing.

2  MR. MARINO: And C goes to insiders. C goes to

3  blocking certain transfers of information outside of Goldman's

4  computer network and monitoring some transfers of information

5  by employees outside of Goldman's computer network.

6  MR. FRIEDRICH: To me that is a different and new

7  argument.

8  All that I would say even in the cases that they cite,

9  for example, I believe it's the Sheer case out of the Central

10 District of California, it makes clear when you are talking

11 about reasonable measures, the focus of that is the outside-in

12 as opposed to the other way around, that that is supposed to be

13 the focus of the inquire.

14 Even if that information is irrelevant, our position

15 would be that still shouldn't entitle defendant to granular

16 access every single step whether it has anything to do with

17 this defendant or this indictment that the company took to

18 protect its internal systems.

19 THE COURT: I want to put 23 to 25 aside for a moment

20 and just deal with 21, 22 and 26 and lay that to rest if I can.

21 Mr. Marino, is there one of the three counts that this

22 is most pertinent to in your mind?

23 MR. MARINO: Yes, Count 3.

24 THE COURT: So in paragraph 20 of the indictment there

25 is the phrase, "access a protected computer without

1   authorization and exceeded authorized access."

2          Is that the phrase you are focusing on here?

3          MR. MARINO: Yes, your Honor. And below, access a

4   computer server maintained by Goldman and copied Goldman's

5   proprietary computer source code for Goldman's high-frequently

6   trading business.

7          (Pause)

8          THE COURT: I don't know why Count 3 requires the

9   information solicited in paragraphs 21, 22 and 26. Part of the

10  government's theory, as I understand it, in the indictment is

11  that -- I'm looking at paragraph 9 -- is that Mr. Aleynikov,

12  while employed at Goldman, worked on source codes relating to

13  the platform's connection to NASDAQ and that at no time during

14  his employment was he responsible for developing or maintaining

15  any of Goldman's trading algorithms, but what he downloaded

16  were files relating to both the platform and the algorithms,

17  the trading algorithms.

18         So that's part of the background information in the

19  indictment.

20         Then in Count 3 we have we have a charged violation of

21  Title 18, United States Code, Section 1030, and this charges

22  the defendant, again, he had to have acted with the defined

23  scienter for commercial advantage and private financial gain,

24  et cetera, but the act is that he accessed the protected

25  computer without authorization and exceeded authorized access,

1    and then, of course, the charge continues.

2            So I don't know why you would need Goldman's processes

3    and procedures for tracking what is described in 21 and 22 as

4    outbound access and 26 as firewall policies. I don't see the

5    linkage either in what the government will have to prove or

6    what the defendant would like to show.

7            MR. MARINO: Your Honor, if 23, 24 and 25, if we have

8    those items, we would be able to show that Mr. Aleynikov never

9    accessed anything that he wasn't authorized to access.

10            THE COURT: I'm on 21, 22 and 26.

11            MR. MARINO: I'm sorry, your Honor, 21, 22 and 26,

12    your Honor go to, from my perspective, these are firewall

13    policies that are impacted, right, and I think if you look at

14    page 4, paragraph 8(c) of the indictment, at various times

15    relevant to this indictment, Goldman had taken various measures

16    to protect its high-frequency trading systems source code,

17    including the following, and item C is blocking certain

18    transfers of information outside of Goldman's computer network

19    and monitoring some transfers of information by employees

20    outside of Goldman's computer network.

21            So that's a specific charge as to the measures that

22    Goldman took to the protect its system from these transfers.

23    And the requested information, I believe, goes directly to

24    that, to the reasonableness of those procedures.

25            THE COURT: Okay.

1                 So let us say the government fails to offer any

2    evidence in support of this background paragraph 8(c) at trial,

3    well, it's not going to make any difference with respect to its

4    ability, I don't think, to prove a violation of Count 3.

5                 Let us say that the government does provide evidence

6    that Goldman took various measures to protect its source code

7    as described subparagraph C, blocking transfers outside -- is

8    the government planning to offer evidence at trial to that

9    effect?

10               MS. ROHR: Your Honor, the government intends to, the

11   government intends to offer evidence of the reasonableness of

12   the steps taken to protect the confidential information. The

13   government intends to offer testimony about the measures taken,

14   but doesn't intend to offer the granular level policies about

15   firewalls and other restrictions as sought for in this request.

16               THE COURT: Okay.

17               We are focusing now on Goldman's policies to track

18   outward bound delivery of restricted information, not the steps

19   that Goldman is taking to prevent hacking into a system. The

20   focus now is on subparagraph 8(c) and requests 21, 22 and 26.

21               So is the government planning to offer evidence at

22   trial with respect to Goldman's efforts to prevent its

23   employees who otherwise had access, besides, you know, the

24   restrictive policies and communication of confidentiality

25   needs, but its programs and internal policing mechanisms to

1  prevent the hijacking of information by employees, the theft of

2  information by employees?

3      MS. ROHR:  The government plans on introducing

4  testimony to that effect, but not on introducing any written

5  policies or computer codes that are designed to effect those

6  mechanisms.

7      THE COURT:  Okay.  Well, you just said policies.  I

8  think you already produced written policies.

9      MS. ROHR:  What I am trying to say is the government

10  plans on introducing testimony to the fact that these

11  procedures exist, but not actual electronic or paper procedures

12  and processes.  The government does not intend to get into the

13  details of how these programs function, which is our

14  understanding of what these requests seek, but the existence

15  generally of the existence of such policies, yes, the

16  government planned on introducing testimony to that effect.

17      MR. MARINO:  This is exactly my point, your Honor.

18  The government IS GOING to put someone from Goldman on the

19  stand and that person is going to testify that Goldman took

20  reasonable measures, and specifically, they are going to

21  testify they have firewalls in place that protect against just

22  this sort of improper conduct.

23      The only problem is, I'm not going to have had access

24  to those firewalls so I'm not going to be able to effectively

25  cross-examine that person and, in fact, the government proves

1    too much with that answer as it relates back to the platform

2    because that's how they are going to address the platform, too.

3    Someone is going to get on that witness stand and say to the

4    jury this was a critical part of our platform. And what am I

5    going to say, no, it wasn't?

6         THE COURT: Well, you already described, you know, you

7    have an expert who is going to say what the defendant took is

8    useless information, that a platform requires a whole host of

9    components and without the theft of that broad array of

10   components what was taken was absolutely of no value to anyone.

11        MR. MARINO: How about they get on the witness stand

12   from Goldman and say, as the indictment alleges and as they

13   said all along, what was taken was really critical, really

14   valuable, really, really essential to our entire multi-million

15   dollar trading platform.

16        What am I going to do? I'm going to cross-examine

17   them, and believe me, I know how to do that, but I'm not going

18   to be able to cross-examine them in any kind of meaningful way.

19   I'm not going to be able to develop my case in the way that I

20   should be permitted to develop my case because this is a "trust

21   me" scenario. They are going to get up and say this is really

22   important; and I want to be able to say, okay, let's walk

23   through exactly what you had there and let me show you why it

24   wasn't really important.

25        Isn't it tremendously helpful to the trier of fact to

1    actually have meat on the bones with that?  I mean, that's,

2    that's, that's what it is all about.

3         Yes, they are going to say, yeah, we had reasonable

4    measure, by the way, we had firewalls in place, but if I have

5    already got the firewalls I can say let's walk through each and

6    every one of those firewalls, and I will put my expert on the

7    stand and the expert is going to way these firewalls wouldn't

8    in anyway, shape or form, prevent not just Mr. Aleynikov but

9    anyone working there from moving these things freely about.

10   Well, then they haven't made out what they need to make out to

11   show the reasonableness of their measure, but I'm being

12   deprived of the opportunity of doing that.

13        That's the gist of my argument.

14        MS. ROHR:  Briefly, your Honor, we are discussing

15   items 22, 23 and 26.  We are moving backwards by the suggestion

16   the government is going to intend to offer evidence relating to

17   portions of the platform that the defendant did not allegedly

18   steal.  We haven't may any representation to the effect, and I

19   don't need defense counsel to put words in my mouth about what

20   we intent to offer at trial.

21        THE COURT:  Well, I wouldn't restrict yourself,

22   Ms. Rohr.

23        This is not the trial.  I don't have motions in

24   limine, I don't have the expert reports before me that might

25   prompt motions in limine.

1          I suspect that both sides in the case are going to

2     explain generally how what the defendant took fits in the

3     larger goal of the high-speed trading program that is described

4     in the indictment and how it relates to that.

5          The issue is, does the government need to show or

6     would it be helpful to the defendant to show the source code

7     and the specific algorithms that constitute the other

8     components of the Goldman's trading strategy, and my analysis

9     is absolutely not, that would not be helpful to the jury.  They

10    would not be able to understand it.  It's not going to be

11    helpful to the defendant.

12          The way this will be litigated and the only way

13    conceptually it could be litigated is not down with the

14    specifics of the source code or the algorithms, but on a much

15    higher plane with respect to a description of the elements more

16    generally that constitute a trading platform and a trading

17    strategy in terms of high-speed trading.

18          Some issues will be in dispute, some will not at this

19    trial, and the fact that Mr. Aleynikov was working on a

20    component of Goldman's high-frequency trading business I don't

21    think is in dispute, at least I haven't heard that it is.

22          Okay.  So returning to the firewalls, insofar as

23    Goldman has them to track and police, monitor outbound access

24    of security information, this is, I think, another excellent

25    example of requests that are too specific.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Well, I like specific requests to give us all the

2    ability to talk about the same thing, but the problem is not

3    that it is a specific request is that it is asking for the

4    underlying data, it's not asking for the existence of policies

5    or procedures on a general enough level that it would actually

6    be useful in the way the defendant is describing it to me.

7          You do not need the actual access list as described in

8    21 and 22. Now, there may be a component of 26 that I will

9    require Goldman to respond to. So I'm denying 21 and 22.

10         I am going to ask -- I think this is our second

11   request, number 8 was the other one, that I'm reserving on.

12         I want Goldman to explore with defense counsel whether

13   there is a way that, in generic terms, firewall policies

14   blocking outward bound Internet access can be provided to the

15   defendant, and I'm hoping that the government will be involved

16   in these discussions because it may very well be on the level

17   of generality that the government's witness or witnesses are

18   going to want to convey to the jury so the defendant should not

19   be hearing for the first time at trial, then, the kinds of

20   policies or mechanisms in generic sense that Goldman uses to

21   block outward bound access. Okay.

22         So I'm hoping everyone will consult on that.

23         Let's go to 23 and 24 and 25.

24         I'm going to impose on you, Mr. Friedrich. I want you

25   to start again with your analysis of those three.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

| | |
|---|---|
| 1 | MR. FRIEDRICH: Yes, your Honor. |
| 2 | Maybe I can explain it this way: |
| 3 | In cases that talk about the way in which 130 is |
| 4 | charged, there are many cases that talk about the distinction |
| 5 | between someone broke in by means of overcoming a security |
| 6 | barrier and then there are cases that talk about regardless of |
| 7 | the barriers this is a violation of policy. |
| 8 | I don't speak for the government, but in terms of this |
| 9 | indictment on its face, it would seem to be the latter based |
| 10 | upon the portions of Count 3 that lay out the statutory |
| 11 | language as the court has mentioned and then after the part |
| 12 | that says to wit, it says follows: |
| 13 | In violation of Goldman's policies and its |
| 14 | confidentiality agreement with Goldman accessed a computer |
| 15 | server maintained by Goldman and copied Goldman's proprietary |
| 16 | computer source code for Goldman-type frequency trading |
| 17 | business, and then it goes on and so forth. |
| 18 | Based on the indictment on its face, this would seem |
| 19 | to be a case of violation of policies which have already been |
| 20 | or will be produced as opposed to the things that the defendant |
| 21 | has asked for within 23, 24 and 25. |
| 22 | All of those are about, as I read them, sort of who |
| 23 | was in the desires club in terms of what employees have access. |
| 24 | That's not relevant to this case because the indictment, again, |
| 25 | on its face in paragraph, page 4, paragraph 8(b), when the |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    indictment within paragraph 8(b) speaks to the limiting access

2    only to Goldman employees who had reason to access that source

3    code such as programmers.

4            From the face of the indictment it is clear that the

5    programmers were allowed access. I don't believe there is

6    anything in the indictment that suggests this was about

7    breaking in or not having computer access itself, rather, it's

8    a case about violation of policies and that's the basis for the

9    1030 charge.

10           THE COURT: And have both policies been produced

11   either by the government or by you in response to this

12   subpoena?

13           MR. FRIEDRICH: What we are agreeing to produce by our

14   letter, we will have those to the defendant by the end of the

15   week.

16           MR. MARINO: 23 asks for that specific policy. 23

17   requests for UNIX group membership policies showing the group

18   names of which the Aleynikov account was a part of 6/5/2009.

19           MR. FRIEDRICH: My understanding of the use of the

20   word policies as used in 23 and 26 where the court has asked us

21   to confer and, of course, I am happy to do that, policies for

22   the purposes of UNIX chosen firewalls has a far more technical

23   meaning than attorneys might use the word policies in terms of

24   something of general application, more in the order of rules,

25   so as I understand it, when we talk about UNIX policies it is

1      more on the order of X is allowed, Y is not, then Z is

2      something different as opposed to something of general

3      application.

4              To come back to my overall point, all of these

5      specific requests the defendant has made are really questions

6      that go to underlying computer access to the code which doesn't

7      seem to be disputed from the face of the indictment and on that

8      basis those requests are not relevant. This is not the type of

9      1030 case that would implicate those requests.

10             MR. MARINO: Your Honor, Count 3 of the indictment

11     charges that Mr. Aleynikov accessed a computer server

12     maintained by Goldman and copied Goldman's proprietary computer

13     source code for Goldman's high-frequency trading business. The

14     allegation is exceeded access.

15             In a relatively recent decision from the northern

16     district of California, United States versus Nosal, the court

17     said, an individual only exceeds authorized access if he has

18     permission to access a portion of the computer system but uses

19     that access to obtain or alter information in the computer that

20     he or she is not entitled to so obtain or alter.

21             There is simply no way to read that definition to

22     incorporate corporate policies governing use of information

23     unless the word "altered" is interpreted to mean

24     misappropriate. Such an interpretation would define the plain

25     meaning of the word alter as well as common sense.

1          That is exactly the argument that Goldman is making

2     here that was rejected there.

3          This Count 3, notwithstanding Mr. Friedrich's

4     characterization of it, is inexplicably, from my perspective, a

5     charge of unauthorized access or exceeding authorized access.

6          Once the policy is produced showing that Mr. Aleynikov

7     had authorized access to the entire system, that count will go

8     by the wayside, but I need to have that from Goldman. I can't

9     get it except from them.

10         THE COURT: Okay.

11         Ms. Rohr, what is the government's theory with respect

12    to Count 3 and authorization or lack thereof?

13         MS. ROHR: The government's view is that the defendant

14    had authorization to access the source code that he stole, but

15    that in accessing it the way he did and for the purposes he did

16    he exceeded authorized access or then there is also case law at

17    that point he lacked authorized access because at that point he

18    was not accessing the material for the purposes that he was

19    supposed to be accessing them.

20         THE COURT: Is there any written Goldman policy that

21    you are relying on that would explain what purposes he was

22    given access for so that he can reasonably be said to

23    understand from that policy that he did not have authorization

24    for some other purpose?

25         MS. ROHR: The government does not have in mind a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    particular Goldman policy that is set forth access, no.

2         In other words, your Honor, if I might clarify that,

3    the government intends at trial to introduce evidence the

4    defendant access rights and confidentiality of the information

5    and the purposes to which the defendant was allowed to access

6    the computer code, but the government did not have in mind any

7    tracking logs or UNIX group membership policies of the kinds

8    sought by these requests.

9         THE COURT: So it sounds like the government and the

10   defendant are going to stipulate that the defendant had, or not

11   disputing whether you stipulate or not, are not disputing that

12   the defendant had authorization to access the particular parts

13   of the computer system that the government then contends the

14   defendant downloaded and stole?

15        MS. ROHR: Yes, to the extent as contrasted to

16   somebody, say, hacks in from outside of the system or someone

17   who did not have any access at all to the computer source code.

18   The government's contention is, as I said, when he did access

19   it, it was an improper intent, he exceeded authorized access.

20   There his no dispute that the defendant in the course of his

21   job duties had assess to the code that he stole.

22        THE COURT: So Count 3 depends on the government's

23   legal theory that even if you have authorized access, if you

24   act with an improper purpose, then you are violating the

25   statute?

1       MS. ROHR: Yes, your Honor, because at that point he

2   exceeds authorized access or he lacked authorized access. The

3   authorization assumes that a person will be using the materials

4   for the purposes for which they are granted access.

5       THE COURT: Whether that raises a host of other issues

6   about the legal viability of the government's theory on Count 3

7   I leave for another day, but with respect to the issue before

8   me, which is the defendants need for the information sought in

9   23 through 25, I deny those requests as unnecessary given what

10   the government has just represented on the record.

11       And you agree, Mr. Marino?

12       MR. MARINO: I do, your Honor.

13       THE COURT: So that leaves two items that I may have

14   to resolve if the parties are unable to reach agreement, and

15   that is items 8 and 26. Good.

16       MR. FRIEDRICH: Just as a housekeeping matter, your

17   Honor, in terms of confidentiality order, should we just submit

18   it to the court?

19       THE COURT: I understand you have made some further

20   revisions and you now have agreement, so if you will just get

21   me the revised copy.

22       Do you have it with you?

23       MR. FRIEDRICH: Yes, I do.

24       THE COURT: Okay. I will look at it right now and if

25   I see a problem then it would be efficient for me to raise it

1   with counsel.

2          (Handing to the court)

3          (Pause)

4          It is fine with me.  I am happy to sign it.

5          Okay.  So I've signed the original.

6          It needs your signature, Mr. Marino, and if you are

7   prepared to sign it then we could make copies for everyone and

8   get the original filed.

9          MR. MARINO:  May I approach, your Honor?

10         THE COURT:  Thank you.

11         (Pause)

12         MR. MARINO:  I had one further request for the court.

13         With respect to items 8 and 26 where your Honor has

14  instructed us to confer, I wonder if we might do that now, that

15  is.

16         THE COURT:  Yes.

17         MR. MARINO:  And the last item, I believe it will

18  obviate at least a portion of the motion for bill of

19  particulars if the government, as your Honor suggested, speaks

20  to us about the definition of a product.

21         I want to file our motion and I'm going to file our

22  motion on July 16.  I think it would make it a lot easier if

23  they would just tell me what the product is rather than ask

24  your Honor to order them to tell me what the product is, I

25  would have it in that event.

1           If I understood your Honor, you instructed us to talk

2    to one another about that.

3           THE COURT:  Yes.  I think I refer to the local

4    criminal Rule 16.1.  So you have to have those informal

5    discussions with the government and then after you do so you

6    can make an application to me.  So I will let the parties have

7    informal discussions first.

8           MR. MARINO:  Fine.

9           ' THE COURT:  I think we will just give you our jury

10   room.  You will or won't be able to make progress.

11          MR. MARINO:  That's great.

12          )  THE COURT:  Items 8 and 26.  I am hoping that you do,

13   but if you need access to phones, those are available, too.

14          MR. FRIEDRICH:  The judicial equivalent of an Allen

15   charge.

16          THE COURT:  Yes.

17          MR. FRIEDRICH:  Does the court have in mind we will

18   report back to you after this or at some other time?

19          THE COURT:  If you resolve it, I don't need to see

20   you.

21          If you don't resolve it, I'm available to hear you

22   further.

23        · MR. MARINO:  Thank you very much.

24          THE COURT:  You will let Ms. Rojas know.

25          MS. ROHR:  Your Honor, if I might, this is the first

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    time I heard this argument about the significance of product.

 2         THE COURT:  I am not ordering you to do anything.

 3         MS. ROHR:  Thank you, your Honor.

 4         THE COURT:  About the word product.

 5         MS. ROHR:  I would just -- rather than meet and confer

 6    right now --

 7         THE COURT:  I am not ordering you to meet and confer

 8    over the word product.

 9         MS. ROHR:  Thank you.

10         THE COURT:  Under the local Criminal Rule 16.1,

11    defense counsel has an obligation to raise it with the

12    government in the first instance and I will let that process

13    happen, and counsel, you will figure out how long you need that

14    process to go on before it is ripe for me.

15         MS. ROHR:  Thank you, your Honor.

16         THE COURT:  Yes.  Good.

17         Thank you all.

18                              - - -

19

20

21

22

23

24

25

# EXHIBIT D



LEXSEE



Analysis
As of: Nov 20, 2010

**UNITED STATES OF AMERICA, - against - WESTLEY PALOSCIO, Defendant.**

**99 Cr. 1199 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2002 U.S. Dist. LEXIS 12976*

**July 16, 2002, Decided
July 17, 2002, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part,
Motion denied by, in part *United States v. Paloscio, 2003
U.S. Dist. LEXIS 6047 (S.D.N.Y., Apr. 10, 2003)*

**PRIOR HISTORY:** *United States v. Paloscio, 2002
U.S. Dist. LEXIS 11115 (S.D.N.Y., June 21, 2002)*

**DISPOSITION:** [*1] Defendant's motion for ad-
mission of government admissions granted, subject to
limitations. Defendant's motion for unsealing and pro-
duction of search warrants and materials submitted in
support of their issuance denied.

**LexisNexis(R) Headnotes**

*Evidence > Hearsay > Exemptions > Statements by
Party Opponents > General Overview*
[HN1] The evidentiary use of prior jury argument is cir-
cumscribed by requiring (1) that the district court be sat-
isfied that the prior argument involves an assertion of
fact inconsistent with similar assertions in a subsequent
trial, (2) that the inconsistency be clear and of a quality
which obviates any need for the trier of fact to explore
other events at the prior trial, and (3) that the court find
that the statements of counsel were such as to be the
equivalent of testimonial statements by the defendant.
The district court should, at a hearing outside the pres-
ence of the jury, determine that the inference the prose-
cution seeks to draw from the inconsistency is a fair one
and that an innocent explanation for the inconsistency
does not exist.

*Evidence > Hearsay > Exemptions > Statements by
Party Opponents > General Overview*
[HN2] The rules set out in McKeon in circumscription of
the admissibility of prior statements of counsel are ap-
plicable to prior jury argument only.

*Constitutional Law > Bill of Rights > Fundamental
Freedoms > Freedom of Speech > Scope of Freedom*
*Criminal Law & Procedure > Search & Seizure >
Search Warrants > Affirmations & Oaths > General
Overview*
*Criminal Law & Procedure > Discovery & Inspection >
Discovery by Defendant > Jencks Act > General Over-
view*
[HN3] The public has no qualified *First Amendment*
right of access to warrant materials during the
pre-indictment stage of an ongoing criminal investiga-
tion. Nor is the public entitled to access to the materials
under either the common law or *Fed. R. Crim. P. 41(g)*.
This does not mean that, if the persons whose affidavits
were submitted to obtain the warrants should testify,
their affidavits are exempt from *18 U.S.C.S. § 3500*.

**COUNSEL:** For WESTLEY PALOSCIO, DEFENDANT: John M. Murphy, Jr., Staten Island, NY USA.

For WESTLEY PALOSCIO, DEFENDANT: Joseph Tacopina, Howard S. Weiner, Law Offices of Joseph Tacopina, Martin Jay Siegal, New York, NY USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

In this Memorandum and Order, the Court considers a number of the parties' pending motions. In the case of motions described in the government's letter to the Court of May 22, 2002, the numbers assigned to the motions in that letter are indicated.

**1.**

Defendant's motion (# 11) for exclusion of expert testimony offered by the government regarding tests for the presence of gunshot residue ("GSR") claimed to have been found in a certain automobile is denied. The results of the testing, which was done through scientifically based techniques for identifying GSR, are admissible under the requirements set forth in *Fed.* [*2] *R. Evid. 702*, and in *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, and their progeny. Defendant has advanced several challenges to the application of those techniques in the present case: such challenges, in the Court's estimation, go to the weight of the expert testimony, but do not render it inadmissible.

**2.**

Defendant objects (# 12) to the government's proposal to have Danielle Masella (the daughter of Joseph Masella), who will be called as a witness by the government, present during the trial prior to her testimony. Normally, of course, she would be excluded under *Fed. R. Evid. 615*, but the government contends that she is entitled to be present because she is "a person authorized by statute to be present," *id., to wit, 42 U.S.C. § 10606(b)(4)*, which would only permit her exclusion upon a finding that her testimony "would be materially affected if the victim hears other testimony at trial," *id.*, which, according to the government, cannot happen because she "will not be [*3] testifying about any incident or conversation as to which the Government plans to call

any other witness (or as to which there is, to the Government's knowledge, any other available witness)." (Gov't Letter, Feb. 10, 2002, at 2.) The Court will reserve decision on the issue until the government supplies the Court with a complete proffer as to Ms. Masella's testimony. (*See* Def. Letter, Feb. 4, 2002, at 7.)

**3.**

Defendant moves (# 9) for an order admitting, pursuant to *Fed. R. Evid. 801(d)(2)(B)* & *(D)*, "various statements of the Government made in the course of their prosecution of the instant case" (Def. Letter, Jan. 23, 2002, at 1): the statements in question were made on the record on December 17 and 21, 1999, during a hearing on the government's motion for pretrial detention of Vincent Palermo held by Magistrate Judge Maas, in a December 29, 1999, letter from the government to this Court submitted on Palermo's appeal from Judge Maas' order detaining Palermo, and on the record on December 29, 1999, during a hearing on the appeal by this Court. The substance of the statements defendant seeks to introduce in evidence is that Palermo, "a top boss of the [DeCavalcante] Family" [*4] (*id.* at 2 (quoting Gov't Letter to Court, Dec. 29, 1999, at 3)), "sanctioned and ordered the murder of Joseph Masella." (Def. Letter to Court, Jan 23, 2002, at 3 (quoting Gov't Letter to Court, Dec. 29, 1999, at 7).) The government, subsequent to the Palermo detention hearing and appeal, has come to the "conclusion that Palermo was not involved in Masella's murder." (Gov't Letter to Court, Jan. 30, 2002, at 6.)

The government opposes the motion. (*Id., passim.*)

In *United States v. McKeon, 738 F.2d 26 (2d Cir. 1984)*, the court sustained the admission against a defendant in a criminal case of statements made by the defendant's counsel in a previous trial of the same case, but [HN1] "circumscribed the evidentiary use of prior jury argument," *738 F.2d at 33*, by requiring (1) that the district court "be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial," (ii) that the "inconsistency . . . be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial," and (iii) that the court find that "the statements of counsel were such as to be [*5] the equivalent of testimonial statements by the defendant." *Id.* The court also said that the district court should, at a hearing outside the presence of the jury, determine that "the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist." *Id. See also United States v. Orena, 32 F.3d 704, 716 (2d Cir. 1994)*.

The *McKeon* holding has been applied to require the admission of a bill of particulars supplied by the government at an earlier trial of the same case, **United States**

*v. GAF Corp., 928 F.2d 1253, 1258-62 (2d Cir. 1991)*, and of prosecution opening and closing arguments in an earlier related case. *United States v. Salerno, 937 F.2d 797, 811, 952 F.2d 623 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317, 120 L. Ed. 2d 255, 112 S. Ct. 2503 (1992)*. The Second Circuit has also "suggested that affidavits filed in furtherance of an application for the installation of an electric monitor and a subsequent search may constitute admissions of a party opponent, and be used as such against the government by a criminal defendant." *GAF, 928 F.2d at 1260* **[\*6]** (citing *United States v. Ramirez, 894 F.2d 565, 570 (2d Cir. 1990)*. The Second Circuit has pointed out that [HN2] the rules set out in *McKeon* in circumscription of the admissibility of prior statements of counsel are applicable to prior jury argument only. *United States v. Arrington, 867 F.2d 122, 127 (2d Cir. 1989)*.

The motion for admission of government admissions is granted, subject to limitations discussed below.

It cannot be said that the admissions will "not contradict a single prior representation made by the Government to the district court." *United States v. Purdy, 144 F.3d 241, 246 (2d Cir. 1998)*. They plainly do. The admissions, moreover, are assertions of fact, and are testimonial since they are proffers of evidence, based on the knowledge of investigating agents. They are also more than an investigative theory, since they were presumably made with the intention that the Court rely on them in detaining Palermo. They are, as well, relevant to the issue of defendant's guilt or not of at least Counts Three and Four of the Tenth Superseding Indictment.

The government says that it has not materially altered its theory of the **[\*7]** case with respect to the murder of Masella, but the Court regards the fact that the government now contends that Palermo did *not* sanction the murder to be just as material to the charges contained in Counts Three and Four of the Tenth Superseding Indictment -- alleging that defendant conspired to murder, and murdered and aided and abetted the murder of, Masella, "for the purpose of gaining entrance to and maintaining and increasing [his] position[] in the Decavalcante Organized Crime Family" (Tenth Superseding Indictment PP 20, 22) -- as was the assertion that he did sanction the murder. The government has asserted as fact that Palermo was a top boss of the Family responsible for the supervision of the killing of Masella (Gov't Letter, Dec. 29, 1999, at 3), that Palermo had Masella shot and killed (*id.* at 4), and that "the evidence proffered by the Government [at the original detention hearing before Judge Maas] established in clear and convincing fashion that Palermo sanctioned and ordered the murder of Joseph Masella." (*Id.* at 7.) The government's withdrawal of the contention that Palermo sanctioned and ordered the Masella murder could certainly be viewed by the **[\*8]**

jury as suggesting that defendant would not have had a motive of the sort alleged in Counts Three and Four to participate in the murder of Masella. [1]

> 1  The government had, originally, proposed to offer expert testimony by an organized crime expert which would have included testimony to "the fact that the boss must sanction any murder." (Gov't Letter, Jan. 2, 2002, at 2.) The Court understands, however, that the government's present intention is not to offer that testimony.

*Fed. R. Evid. 403* does not preclude the offer of the admissions. To the extent that the government is prejudiced, it is fair prejudice. To avoid any unnecessary waste of time, however, defendant is to identify a reasonably brief selection of the admissions, and the government may then identify a similarly reasonably brief selection to show that its theory of the case is not entirely changed. Neither side is to refer, in this connection, to the indictment of Palermo for the Masella murder, since that is not a government admission.

**4.**

**[\*9]** The government's motion for an order quashing the subpoena served by defendant on the Court's Pretrial Services Office is denied. The subpoena (returnable at the Court's chambers), will, however, be reviewed *in camera* by the Court, *see United States v. Pena, 227 F.3d 23 (2d Cir. 2000)* and disclosed if, and to the extent, appropriate according to that case.

**5.**

Defendant's motion for the unsealing and production of the search warrants and materials submitted in support of their issuance sealed by Magistrate Judge Azrack of the United States District Court for the Eastern District of New York is denied. [2] Defendant does not assert a personal privacy interest in the automobile which is the subject of the search. The government represents that the warrants, and the materials submitted in support of their issuance, relate to an ongoing investigation of persons other than defendant in connection with the Joseph Masella homicide, and that disclosure might jeopardize the ongoing investigation. (Gov't Letter, July 8, 2002, at 2.) In such circumstances, [HN3] "the public has no qualified *First Amendment* right of access to warrant materials during the pre-indictment stage **[\*10]** of an ongoing criminal investigation. Nor is the public entitled to access to the materials under either the common law or *Fed. R. Crim. P. 41(g)*." *Times Mirror Co. v. United States, 873 F.2d 1210, 1221 (9th Cir. 1989); see also In re Search Warrant Executed Feb. 1, 1995, 1995 U.S. Dist. LEXIS 9475, No. M 18-65, 1995 WL 406276, at \*3 (S.D.N.Y. July 7, 1995)*. This determination does not mean that, if either of the agents whose affidavits were submitted to

obtain the warrants should testify in the present case, their affidavits are exempt from *18 U.S.C. § 3500*.

    2    The Court assumes herein, *arguendo,* that it would have the power to unseal matter sealed by order in a different district.

SO ORDERED.

Dated: July 16, 2002

Lawrence M. McKenna

U.S.D.J.