# EXHIBIT A

1

12S4AGRS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4            v.                              10CR417(JSR)

5   SAMARTH AGRAWAL,

6            Defendant.

7   ------------------------------x

                                      New York, NY
8                                     February 28, 2011
                                      3:30 p.m.
9

10  Before:

11            HON. JED S. RAKOFF

12                                       District Judge

13                    APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    DANIEL W. LEVY
16  THOMAS G.A. BROWN
         Assistant United States Attorneys
17
    IVAN FISHER
18  CAROLYN SILANE
         Attorneys for Defendant
19

20

21

22

23

24

25

12S4AGRS





1    certainly a point we need to address.  But my recollection, and

2    this we will get into more detail when we talk about acceptance

3    of responsibility, is that your client testified as well as

4    stating to the probation office that he recognized he was doing

5    wrong when he conveyed whatever aspects of this he did convey

6    to his now employer, yes.

7            MR. FISHER:  No doubt about it.

8            THE COURT:  So what is it that I am missing --

9            MR. FISHER:  You are missing --

10           THE COURT:  -- from that simple admission, that bears

11   on the issue of intent.

12           MR. FISHER:  Quite a bit, with all due respect, quite

13   a bit.  There is this very important distinction between that

14   portion of the law that you accurately shared with the jury and

15   the guidelines interpretation of that law which you did not.

16   And that leaves us and you, I hope, with an openness to perhaps

17   some helpful guidance from me, but that leaves you with the

18   task of asking yourself what was he intending to do

19   subjectively, not objectively, what was he attempting to do,

20   and I want you to know what he was attempting to do was, one,

21   absolutely nothing within shouting range.

22           THE COURT:  Let's take the embezzlement analogy.

23   Supposing someone who is given possession of a car by the owner

24   of the car then decides that he could really benefit in his

25   attempt to get a new job with a used car salesman by giving the

12S4AGRS

1    used car salesman the car that he has embezzled now from his

2    employer.  So are you saying under my hypothetical he intended

3    to take what he knew was the employer's car and give it to

4    someone else who had no entitlement to it and he did so for the

5    purpose of helping him himself to get a job with his potential

6    new employer and are you saying that the loss in that situation

7    would be zero --

8         MR. FISHER:  No.

9         THE COURT:  -- or would it be the value of the car.

10        MR. FISHER:  It would be the value of the car, but you

11   are leaving out something.

12        THE COURT:  What am I leaving out.

13        MR. FISHER:  You are leaving out the key part which is

14   when he took that car and gave it to the new employer, was he

15   subjectively intending to harm the person from whom he was

16   taking it.  Now, it may well be that's what he was up to, maybe

17   not.  The point is --

18        THE COURT:  You think that if I take my employer's car

19   and without permission I give it to my prospective new employer

20   and the jury has found under my hypothetical that I did so

21   intentionally and with knowledge or intent to harm my employer

22   as well as benefit myself that nonetheless there is something

23   more that has to be shown before the value of that car can be

24   calculated as the loss under the guidelines.

25        MR. FISHER:  No.

12S4AGRS



1          THE COURT:   What's the difference here.

2          MR. FISHER:   The difference is that my client didn't

3    steal a car.

4          THE COURT:   No, he stole something infinitely more

5    valuable.

6          MR. FISHER:   And considerably different in terms of

7    what one could do with a car.   In your hypothetical there is

8    very little one can do with that car; you've just got to sell

9    the car.   Now with regard to these programs, there is a lot of

10   different things you can do with them.   One of the things you

11   can't do with them is compete with Soc Gen.   That's the point.

12   There is no way he --

13         THE COURT:   I go back to my very simpleminded analogy

14   because I am a simple fellow.

15         MR. FISHER:   No, your Honor.

16         THE COURT:   He takes this car and he gives it to his

17   prospective new employer.   His employer is a used car salesman

18   and this prospective new employer is a used car salesman and

19   they are in competition and the new used car salesman says

20   thank you very much but, you know, I specialize in Hondas and

21   Toyotas and this is a Ford and it won't be of much use to me.

22   You are saying under that scenario you think the guidelines

23   would place the value of the intended loss at zero.

24         MR. FISHER:   No, I am not saying that.   I am saying

25   something that's very importantly different.   The difference



12S4AGRS

1   has to do with the essence of very sophisticated complex

2   trading programs and a car.  Now the difference here is that

3   program which was plopped into his hands and which he later

4   improperly and beyond authority, as he very openly admitted to

5   you, abused the authority he had, went beyond it, and misused

6   it and committed a crime.  However, the crime he committed had

7   nothing whatsoever to do with any intention on his part to

8   compete with Soc Gen for the very easiest of reasons; it was

9   impossible.

10          THE COURT:  You are saying that I should infer a lack

11  of intent on his part, this goes to the arbitrage issue that

12  you so kindly provided me with some materials on, because not

13  only was it in your view impossible for Tower to compete, but

14  he understood or more importantly he believed and understood

15  that they could not compete.

16          MR. FISHER:  Yes.

17          THE COURT:  Do I have the entirety of the distinction

18  now you want to make.

19          MR. FISHER:  Not yet.

20          THE COURT:  The suspense is killing me.

21          MR. FISHER:  We made some considerable progress.

22          THE COURT:  You know, progress is a wonderful thing.

23  So go ahead.

24          MR. FISHER:  So here he is at Tower with this program

25  and the program with which he was familiar in terms of its

12S4AGRS

1   operation ate about $3 billion of free capital just about every

2   single day it operates which was its secret to success in terms

3   of index arbitrage because it didn't have to pay much if

4   anything for that 3 billion and it could get 3 billion from the

5   Fed any time it wanted because it was a bank.

6          Now, let's just step aside from poor little Tower.

7   Tower doesn't have 3 billion.  Tower doesn't have 300 million.

8   It has 25 million.  With $25 million as that quotation from

9   that book whose name I constantly forget, forgive me, but we

10  have correctly cited it, your Honor.

11         THE COURT:  It is The Complete Arbitrage Deskbook.

12         MR. FISHER:  Thank you, written by, this is neat,

13  written by the person who was in charge of Soc Gen's index

14  arbitrage trading in Tokyo and New York.  This person knew what

15  they were doing at Soc Gen.  And reading what he says, I am

16  sure you have, you know that that kind of trading operation

17  simply can't work without that money.

18         THE COURT:  The government says (A) that all those

19  figures are out of date and that at the time of this crime,

20  much less money was required and (B) that it does not follow

21  from the fact, even if it were true, that Tower couldn't do

22  exactly what Soc Gen was doing, that your client didn't intend

23  and believe that they could still have economic benefit from

24  receiving this information.

25         MR. FISHER:  With regard, your Honor, to the staleness

12S4AGRS

1   of the numbers, aside from that little bit of fun I had in

2   drafting this by referring to a case with the printed version

3   of a book next to a Kindle.  Do you remember that.  It occurred

4   to me highly unlikely that that book would be converted into a

5   Kindle if it was simply outdated and didn't matter.  But even

6   better was the footnote that we present on page 6 where

7   professors of apparent renown are writing articles citing this

8   antediluvian information in a book which no one but someone who

9   wants to take a long nap should be reading.  That's absurd.

10       The evidence the government claims it's positing,

11   where, what.  They have some testimony that there may be ways,

12   depending on your relationship with your broker, you can take

13   25 million and on a clear day with the sun shining, you might

14   get it up to 800 million.  I very much, I will confess, would

15   like to have the difference between 800 million and 3 billion;

16   that would be fun.

17       So my point is he had a different intention.  This is

18   what I have been I think taking too long to get to.  His

19   intention was to develop the infrastructure that was a main,

20   main element of these programs and design trading programs of

21   his own on top of, superimposed upon the very important, there

22   is no denying, very important, thanks to Android phones of

23   which I recently heard, I don't know if you ever heard, the

24   word platform is now a big deal.  These were going to be

25   platforms to programs he would design that did and would make



1   money with a mere $25 million.  And that was his intention.

2   And he knew that that kind of trading could, would never

3   compete with Soc Gen in any way at all to any degree at all and

4   would cost Soc Gen nothing.

5          THE COURT:  Your view of the guidelines in this regard

6   is if I, forgive the term, steal, if I steal my employer's

7   property, they are secret, so that I can design a better

8   mousetrap, making use of their secret then adding on to it, and

9   I know that my better mousetrap that's going to be used by my

10  future employer won't be in competition with theirs, the

11  intended loss is zero.

12         MR. FISHER:  Yes.



13         THE COURT:  How can that be.  In other words, you take

14  something that is to Soc Gen not only a valuable secret, but

15  valuable because it is secret and because it is the fruit of

16  their and their inventors' ingenuity.

17         MR. FISHER:  Yes.

18         THE COURT:  And you say, well, because I am just going

19  to use it in a noncompetitive way, they were deprived of

20  nothing of value.  That runs totally contrary to common sense.

21  Forgive me for putting it that way.

22         MR. FISHER:  There are times when the guidelines run

23  totally contrary to common sense with all due respect to these

24  very wise promulgators of guidelines.  But maybe this is one of

25  them, but that's what it says here.  That's what the courts

12S4AGRS

1    that have construed that term have said, subjective intent, and

2    if he in his head understood that he would be taking $25

3    million in coming up with a program that would be superimposed

4    on the extremely valuable helpfully important DQS and ADP, the

5    evidence is very clear, he was very hesitant about that, but it

6    makes no difference for this argument, and knew absolutely knew

7    from the three years he was at Soc Gen that this wouldn't be

8    even a blip, a nothing, zero, zero damage, zero pecuniary harm,

9    zero impact.  So, that's why the appropriate intended loss

10   guidelines here is zero.

11          THE COURT:  On this issue before we go to acceptance

12   of responsibility, let me hear from the government.

13          MR. LEVY:  Your Honor, I did want to comment on a

14   couple things that were raised by your Honor's colloquy with

15   defense counsel.  That is first the notion that the defendant

16   was going to use the stolen computer code to do something else,

17   to somehow evolve in his own way or improve upon DQS once he

18   brought his knowledge from Soc Gen to Tower.  It's just not

19   there.  What I am mostly interested in is what happened at the

20   trial and the evidence that was offered.

21          Here is from page 677 of the transcript; this is the

22   testimony of Rakesh Kumar.  Based on these conversations and

23   what he had been talking about are the meetings with the

24   defendant.

25   "Q.  What was your understanding of the system that he was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12S4AGRS

1  going to build for you?

2  "A.  It was going to be an index arbitrage system based on the

3  index arbitrage system that he was working on at Soc Gen.

4  "Q.  How similar or different from the index arbitrage system

5  he worked on at Soc Gen?

6  "A.  My understanding was that maps and the indicator, the

7  logic part was going to be similar.  There were going to be

8  changes because of integrating it with Tower's infrastructure.

9  "Q.  These changes, were they major changes or minor changes or

10 where do they fall on that continuum?

11 "A.  Individually I think I would classify them as minor

12 changes."

13            There is more on this.  The government played a tape

14 of a  meeting that occurred on September 22.

15            THE COURT:  Maybe you misunderstood what I said.  I

16 don't think it matters, either in law or in fact, whether the

17 system he was going to build for them was exactly the same or

18 just substantially the same; why would that matter at all.

19            MR. LEVY:  I don't think it matters very much, but I

20 think the notion that defense counsel has suggested he was

21 going to make meaningful changes to the system once he got to

22 Tower is just not reflected in the evidence.

23            THE COURT:  I think you are right and I think that

24 some of the other things defense counsel said are not

25 consistent with my own recollection of the evidence but I don't





1    think it matters.  Even if it were as defense counsel is

2    suggesting, something that he was going to build upon, so what.

3    That's like saying, oh, I am stealing the Rolls Royce engine

4    from my employer but I am going to build a different car from

5    this Rolls Royce engine.  So what.

6              MR. LEVY:  Fair enough.

7              THE COURT:  Go ahead.

8              MR. LEVY:  I am happy to --

9              THE COURT:  I think if you can with reasonable brevity

10   we should of course get the record straight.

11             MR. LEVY:  The government played a portion of a

12   meeting that was recorded that the defendant was on, Government

13   Exhibit 505, page 6, where he was talking about the system that

14   he wanted to build.  He said, so the way SG works, he was

15   interrupted, then he said, is the way we will start it.  One of

16   the Tower people said, perfect.  Then the defendant said, I

17   don't want to, he was interrupted, change a lot.  But it is not

18   the best system.  So the notion that he was going to evolve the

19   system in any meaningful way is just not reflected in the

20   testimony.

21             THE COURT:  Also, I suspect you are getting to this,

22   implicit in this is if, as defense counsel argues, Tower

23   couldn't use the system and the defendant knew that they

24   couldn't use the system, why are they both agreeing to build

25   substantially the same system as part of his new employment.

12S4AGRS

1   That makes no sense at all.  That contemporaneous view is

2   infinitely more direct evidence of what was intended or what

3   was not intended than any hypothetical about the financial

4   requirements for such a system.

5           MR. LEVY:  As we set out in our sentencing submission,

6   there was quite a bit of testimony that the amount of money

7   that Tower did have available both cash that it had combined

8   with borrowing would have been able to obtain was sufficient to

9   effectively run the system, that is, make some money from the

10  system.  I think, notwithstanding Mr. Fisher's suggestion that

11  somehow Soc Gen had access to billions of dollars in capital,

12  there actually was not any testimony in the record reflecting

13  what amount of capital it deployed in running DQS.

14          As a firm, it may have had access to billions of

15  dollars.  It could have been a facility run through the Federal

16  Reserve.  I have no idea.  The point is in this case, in this

17  record, there was nothing saying the amount of money that Soc

18  Gen used to run this particular system, which gets to the

19  relevance of this book.  I looked quite a bit at the book.  It

20  doesn't talk about high-frequency trading.  It doesn't talk

21  about exchange-traded funds which began to be sort of available

22  before the publication of this book but they were rather

23  crucial to the running of Soc Gen's index arbitrage system,

24  because as you will recall, it was trading futures on the

25  index, stocks individually underlying the index, and the

12S4AGRS



1    exchange-traded fund that represented the index, and it was

2    taking advantage of the arbitrage opportunities among those

3    three sets of instruments.

4        That this book does not talk about exchange-traded

5    funds suggests perhaps that it might not be relevant so much to

6    determining what is the appropriate amount of capital that

7    would be necessary to running an index arbitrage system.  That

8    it does not talk about high-frequency trading suggests that

9    it's completely irrelevant.  The fact is that the evidence that

10   we set out that was adduced at trial made clear that there was

11   plenty of money for Tower to use to run this system profitably.

12       More importantly, I am not sure why the amount of

13   money that Soc Gen would have had to run this system versus the

14   amount of money that Tower had to run the system makes any

15   difference whatsoever.  The point is two competing firms

16   running largely identical strategies would be going after,

17   seeking to identify and taking advantage of the same arbitrage

18   opportunities.  Whoever gets there first is going to win.

19       There was some evidence that came out at trial that

20   Tower's infrastructure would allow them to execute the same

21   strategy faster meaning they are going to win more often than

22   they are going to lose or at least more often than Soc Gen

23   might win.

24       THE COURT:  That's the whole heart of the ultimate

25   economic benefit of this high-speed trading; it only works



12S4AGRS

1   because you gets in faster than anyone else.

2         MR. LEVY:  You identify the opportunities faster; you

3   are able to trade on the opportunities faster.

4         THE COURT:  Would the loss not be the same if what was

5   clearly not the case here but if Tower had said to the

6   defendant or if the defendant had otherwise believed, well,

7   they can't use it right now because they are not yet equipped

8   economically to make use of this but in five years they will be

9   good enough to do it.  It might be more difficult, you might

10  have to put into the equation some discount factors, but it

11  would still not be a zero calculation.  The intent would be to

12  put them in a position to cause that loss.

13        MR. LEVY:  I think that's right, although the

14  difference between what happened here and what happened, what

15  would happen under that scenario actually underscores why there

16  is economic loss in this case, because the whole point of

17  bringing the defendant from Soc Gen to Tower was that his was a

18  proven system, it was a money-making system, and it radically

19  reduced the amount of time that they would have to wait to

20  realize those profits as opposed to the five-year time horizon

21  that your Honor just hypothesized.

22        THE COURT:  All the points you are making are exactly

23  right.  My hypothesis was a proven system but just one that

24  they were not economically ready to take advantage of, but once

25  they grew they would be able to take advantage of it.  They

12S4AGRS

1   with counsel.  If he wants to whisper in your ear something he

2   wants you to raise, I will give you a minute to do that.

3           MR. FISHER:  Before bending down to whisper, I just

4   want to note, your Honor, that on my own score card of these

5   proceedings, of the two critical issues in this case, I am 0

6   for 2.

7           THE COURT:  Statistically, I suspect there were many,

8   many times that Alex Rodriguez went 0 for 2 before the season

9   was over yet he did all right.  You have had many more trials,

10  you have had many successful trials in the past.  You will have

11  many successful trials I am sure still to come.  So I wouldn't

12  be so bothered.  Your client perhaps may be more bothered, but

13  he shouldn't be; he has very good counsel in this case.

14          MR. FISHER:  I will bend over, with the court's

15  permission.

16          (Pause)

17          MR. FISHER:  Thank you, your Honor.

18          THE COURT:  Let's turn to acceptance of

19  responsibility.  Here, it's the government I need to hear from

20  first, because the probation office concluded that 2-point

21  credit should be given for acceptance of responsibility.  The

22  government makes much of the fact that the defendant went to

23  trial and of course he therefore doesn't qualify for the third

24  point which is given when you don't put the government to the

25  expense and burden of preparing for trial, so forth.

1          But the guidelines do recognize there are unusual

2    cases where someone who goes to trial still may have accepted

3    responsibility and they give an example of someone who is

4    preserving a legal issue.   I think that is something akin to

5    what happened here.   The defense had a view of the indictment

6    that they believe allowed them to argue that if at the moment

7    he took the codes home, he had not yet formed an intent to give

8    them to Tower, things to that effect, that not under the law

9    generally but under the terms of the indictment, that he would

10   be entitled to a judgment of acquittal if the jury at least

11   credited his testimony.

12         It was a view of the indictment that this court did

13   not agree with.   Counsel made a calculated decision, and these

14   are always tough strategic calls, not to raise this pretrial.

15   No pretrial request was made for a determination of this issue

16   of law either before Judge Koeltl who originally had the case

17   or before me.   Defense counsel even went so far as to commit in

18   his opening statement that his client would take the stand, not

19   knowing yet whether the court would agree or disagree with his

20   interpretation of the indictment.

21         The matter came to a head after the court issued the

22   second version of its proposed charge but of course defense

23   counsel could have brought it to a head at any previous time

24   and chose not to.   But I would note for the record that, first,

25   at the time that the second version of the charge was delivered

12S4AGRS

1    to defense counsel while the defendant had already begun his

2    testimony, he had not reached any point of the testimony that

3    bore on the issue that the charge was concerned with.

4         Second, more fundamentally, I assume that the

5    defendant's testimony would have been the same under any set of

6    circumstances. When defense counsel committed with his

7    client's full knowledge and consent that his client would take

8    the stand at the very outset of the trial, clearly, this wasn't

9    with the implicit suggestion, well, I will give kind of

10   testimony if the charge is one way and I will give a different

11   factual testimony if the charge went the other way. I would

12   never believe that either Mr. Fisher or his client would do

13   that.

14        But the result of all this was that under the charge

15   as the court gave it and the testimony that Mr. Agrawal gave,

16   it seemed to the court that he was essentially admitting all

17   elements of the charge as the court interpreted the indictment.

18   I was impressed with that. It's a shame the guidelines are

19   always so rigid. It's wonderful at least that they are not

20   binding on the court. I would have thought that this kind of

21   unusual situation might in theory have called for a 1-point

22   credit rather than a 2-point credit. It sort of doesn't quite

23   fit perfectly, the 2-point credit situation. But the

24   guidelines doesn't give me a choice; it's either zero points or

25   two points. I am leaning towards the 2-point credit.

12S4AGRS

1   now you are grown up enough to learn this level of physics so

2   sit in my classes.  He gave me what he gave everyone else and

3   that's what I learned, equality.

4           Then I come to the bank and I see how, today I don't

5   realize why they hired me if they had to treat me so different.

6   I had put, my mother had put, my father had put 25, 27 years

7   hard work making me what I am.  I achieve something they will

8   feel happy and with their happiness I will be motivated to

9   achieve more then I will achieve something and they will be

10  happy.  It was a very nice positive spiral, upward spiral.  Now

11  it has been, now I think in future it's going to be a bit of a

12  negative spiral that I have to face.  I will find so many

13  hurdles which will make her sad.  Her sadness will make me sad

14  which will increase the hurdles.

15          This negative spiral which I am about to enter into is

16  something that is a challenge I have to face to again make this

17  negative spiral a positive spiral again.  But that glow she has

18  lost, the crystal she had which has been shattered, broken, is

19  irreplaceable.  That I know for a fact now.  I will try to make

20  up to it again.  It's an impossible task which is why I think I

21  will be busy for my entire life now.

22          THE COURT:  Thank you very much.

23          Well, it was interesting hearing Mr. Agrawal's

24  articulate remarks.  I have to say I was more taken with the

25  portion of his remarks that came from the heart than from the

12S4AGRS

1   head.   The portions from the head were in the court's view

2   rationalizations offered in mitigation, I don't doubt the

3   sincerity of them, but they did not come to grips, as his later

4   remarks did, with the fact that the serious mistake he made has

5   as its perhaps most intensely injured victims, his own mother,

6   his own family.

7          When one reflects on how the devotion a loving parent

8   can give such promise and carry with it such foundation on

9   which to build, as Mr. Agrawal was in the process of building,

10  a laudable and successful career, the shame that he is feeling

11  must indeed, as his counsel has also noted, be intense.   That

12  is a factor relevant to the court's determination because it is

13  in fact part of the punishment he has suffered and will

14  continue to suffer.

15         It is regretfully not unique to this case.   More often

16  than not, the primary victims real victims, crime after crime,

17  are the people who have devoted their lives, their love, their

18  energies to the upbringing of a person who then by betraying

19  society also betrays them.   I do not minimize in any of those

20  cases, including this one, the self-inflicted punishment that

21  arises therefrom.

22         But on the other hand, it is incumbent on any

23  sentencing judge to always keep many different focuses.   You

24  have to look at the human being before you first and foremost,

25  but you have to look at the crime, you have to look at society,

12S4AGRS



you have to look at the future, you have to look at the
implications for the rule of law.  In balancing those, as
Section 3553(a) recognizes so much more completely and so much
more astutely than the sentence guidelines, it's a complicated
and nuanced difficulty.

The guidelines in white-collar cases, as I have had
occasion to elaborate on in other cases at much greater length
than I will here, place in the court's view an inordinate
emphasis on the loss calculation.  The calculation that this
very case illustrates is not without its own problems.  While I
am convinced that the calculation in this particular case was
if anything on the low side, to build so much of the guidelines
range on that one factor seems to me to be inherently
unbalanced in all but very few cases.




The injury to society is of course relevant and is
reflected perhaps to some degree by the loss, though even then
there are so many difficulties both in calculating the loss and
in determining what it really means.  Here, for example, the
heart of the injury suffered by Soc Gen was the loss of the
product of its ingenuity and its creating a method of trading
that gave it a competitive advantage.  That's a different kind
of loss than, for example, the kind of loss you might have in a
more conventional securities fraud case where it might be a
function of how much people invested in an overstated account,
overstated financial report or something like that, or invested

12S4AGRS

1   because of an overstated financial report.

2          These are not things that can be quantified in a way

3   that warrants the huge weight that the guidelines accord to the

4   loss calculation.  So I am not inclined to give a guidelines

5   range here more than passing weight in my determination.  I

6   think I have already indicated the factors that I think do

7   weigh heavily.  One was the fact that any way you look at it,

8   this was a theft of something big and valuable and important.

9   I don't need to put a number on it to recognize that this was a

10  significant misappropriation; second, that Mr. Agrawal was the

11  prime mover; third, that this was, this conduct, that was

12  inconsistent with the way he had otherwise conducted his life.

13          This was not conduct that represented the work of a

14  professional thief or, short of that, someone who knew no

15  difference between right or wrong or how to follow right or

16  wrong.  Mr. Agrawal knew the difference between right and wrong

17  and conducted himself in most of his life on the right side of

18  that line, but in this case, crossed that line.  The rest of

19  his life cannot be forgotten and is not forgotten by this

20  court.  It also bears, I must say, on one of the more

21  particular factors set forth in 3553(a) which is specific

22  deterrence.  I tend to agree with defense counsel that there is

23  no need for much punishment here in terms of specific

24  deterrence because it's very unlikely Mr. Agrawal will engage

25  in this conduct again.





1    The last of the factors, and I don't mean to suggest
2  that I have not considered all the factors under Section
3  3553(a), I have with some length in my mind, but the last one I
4  want to emphasize because it is quite an important factor is
5  general deterrence.  For reasons that I think I have already
6  alluded to, the need for general deterrence is substantial
7  here.  This is a sophisticated crime.  It is a crime that
8  others will undoubtedly be tempted to do because of both the
9  nature of the valuableness of the secrets that are stolen and
10  also the ability by persons more corrupt than Mr. Agrawal to
11  conceal and obscure their theft.

12    But I do not believe that the guidelines range of
13  five, six, almost seven years is what is sufficient but no more
14  than necessary to carry out all the functions of Section
15  3553(a).  It seems to me that a nonguidelines sentence
16  considerably less than that can achieve full general deterrence
17  as well as recognizing all the other factors I have alluded to.

18    So the sentence of the court is that the defendant is
19  sentenced to three years imprisonment, 36 months, to run
20  concurrently on each count, followed by two years supervised
21  release, again concurrent on each of the two counts.  No fine
22  will be imposed because the court makes a finding that this
23  defendant, despite his prior assets, is no longer in a position
24  to pay any meaningful fine now or in the foreseeable future.
25  There is, however, a special assessment of $200 that is

12S4AGRS



1    mandatory and must be paid.

2        The terms of supervised release are, first, the

3    mandatory conditions that the defendant shall not commit any

4    other federal, state, or local crime; the defendant shall not

5    illegally possess a controlled substance; the defendant shall

6    not possess a firearm or destructive device; and the defendant

7    shall cooperate in the collection of DNA.

8        The fifth mandatory condition, the drug testing

9    condition is suspended based on the court's determination that

10   defendant poses a low risk of future substance abuse.  There

11   will also be imposed the standard conditions of supervision 1

12   through 13.  They appear on the face of the judgment and will

13   be gone over with the defendant by the probation officer when

14   the defendant reports to begin his period of supervised

15   release, which may or may not happen, given the possibility of

16   deportation.

17       Finally, there are the special conditions; first, the

18   defendant shall obey the immigration laws and comply with the

19   directives of the immigration authorities; second, that the

20   defendant within 72 hours of release from custody will report

21   to the nearest probation office to begin his period of

22   supervised release.  He will be supervised by the district of

23   his residence.

24       Before I advise the defendant with respect to appeal,

25   is there anything else, first, from the government.



12S4AGRS

1          MR. BROWN:  No, your Honor.

2          THE COURT:  Anything further from defense counsel.

3          MR. FISHER:  No, your Honor.

4          THE COURT:  So Mr. Agrawal you have the right to

5  appeal this sentence.  Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  If you can't afford counsel for any such

8  appeal, the court will appoint one for you free of charge.

9          Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Very good.

12          That concludes this matter.

                              -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25