N.Y.S.D. Case #
10-cr-0096(DLC)

**CORRECTED MANDATE**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 6th day of June, two thousand and twelve.

Before:       DENNIS JACOBS,
                  *Chief Judge,*
                 GUIDO CALABRESI,
                 ROSEMARY S. POOLER,
                 *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 06, 2012

_____

UNITED STATES OF AMERICA,

          *Appellee,*

      v.

SERGEY ALEYNIKOV,

          *Defendant-Appellant.*

_____

**JUDGMENT**

Docket Number: 11-1126

The appeal in the above-captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the judgment of the district court is REVERSED and the matter is REMANDED in accordance with the Opinion of this Court.

The Judgment is entered *nunc pro tunc* to April 11, 2012.

                FOR THE COURT:

                Catherine O'Hagan Wolfe,
                Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CORRECTED MANDATE ISSUED ON 06/06/2012

1  **UNITED STATES COURT OF APPEALS**

2

3  **FOR THE SECOND CIRCUIT**

4

5  August Term, 2011

6

7

8  (Argued: February 16, 2012    Decided: April 11, 2012)

9

10  Docket No. 11-1126

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14  **UNITED STATES OF AMERICA,**

15

16  <u>**Appellee**</u>,

17

18  - v.-

19

20  **SERGEY ALEYNIKOV,**

21

22  <u>**Defendant-Appellant**</u>.

23

24  - - - - - - - - - - - - - - - - - - - -x

25

26  Before:        JACOBS, <u>Chief Judge</u>, CALABRESI and
27                 POOLER, <u>Circuit Judges</u>.

28

29       Sergey Aleynikov appeals from his conviction, following

30  a jury trial, for stealing and transferring proprietary

31  computer source code of his employer's high frequency

32  trading system in violation of the National Stolen Property

33  Act, 18 U.S.C. § 2314, and the Economic Espionage Act of

34  1996, 18 U.S.C. § 1832.  On appeal, defendant argues, <u>inter</u>

35  <u>alia</u>, that his conduct did not constitute an offense under

1   either statute.  He argues that: [1] the source code was not

2   a "stolen" "good" within the meaning of the National Stolen

3   Property Act, and [2] the source code was not "related" to a

4   product "produced for or placed in interstate or foreign

5   commerce" within the meaning of the Economic Espionage Act.

6   The judgment of the district court is reversed.  Judge

7   Calabresi concurs in the opinion and has filed an additional

8   concurring opinion.

9                       KEVIN H. MARINO, Marino,
10                      Tortorella & Boyle, P.C.,
11                      Chatham, NJ, <u>for</u>
12                      <u>Appellant</u>.
13
14                      JOSEPH P. FACCIPONTI (JUSTIN S.
15                      WEDDLE, <u>on the brief</u>), Assistant
16                      United States Attorney, <u>for</u>
17                      PREET BHARARA, United States
18                      Attorney, Southern District of
19                      New York, New York, NY, <u>for</u>
20                      <u>Appellee</u>.
21
22  DENNIS JACOBS, <u>Chief Judge</u>:
23
24      Sergey Aleynikov was convicted, following a jury trial

25  in the United States District Court for the Southern

26  District of New York (Cote, <u>J.</u>), of stealing and

27  transferring some of the proprietary computer source code

28  used in his employer's high frequency trading system, in

29  violation of the National Stolen Property Act, 18 U.S.C.

30  § 2314 (the "NSPA"), and the Economic Espionage Act of 1996,

1    18 U.S.C. § 1832 (the "EEA").  On appeal, Aleynikov argues,

2    <u>inter alia</u>, that his conduct did not constitute an offense

3    under either statute.  He argues that: [1] the source code

4    was not a "stolen" "good" within the meaning of the NSPA,

5    and [2] the source code was not "related to or included in a

6    product that is produced for or placed in interstate or

7    foreign commerce" within the meaning of the EEA.  We agree,

8    and reverse the judgment of the district court.

9

10                   **BACKGROUND**

11      Sergey Aleynikov, a computer programmer, was employed

12    by Goldman Sachs & Co. ("Goldman") from May 2007 through

13    June 2009, developing computer source code for the company's

14    proprietary high-frequency trading ("HFT") system.  An HFT

15    system is a mechanism for making large volumes of trades in

16    securities and commodities based on trading decisions

17    effected in fractions of a second.  Trades are executed on

18    the basis of algorithms that incorporate rapid market

19    developments and data from past trades.  The computer

20    programs used to operate Goldman's HFT system are of three

21    kinds: [1] market connectivity programs that process real-

22    time market data and execute trades; [2] programs that use

1    algorithms to determine which trades to make; and [3]

2    infrastructure programs that facilitate the flow of

3    information throughout the trading system and monitor the

4    system's performance.  Aleynikov's work focused on

5    developing code for this last category of infrastructure

6    programs in Goldman's HFT system.  High frequency trading is

7    a competitive business that depends in large part on the

8    speed with which information can be processed to seize

9    fleeting market opportunities.  Goldman closely guards the

10   secrecy of each component of the system, and does not

11   license the system to anyone.  Goldman's confidentiality

12   policies bound Aleynikov to keep in strict confidence all

13   the firm's proprietary information, including any

14   intellectual property created by Aleynikov.  He was barred

15   as well from taking it or using it when his employment

16   ended.

17       By 2009, Aleynikov was earning $400,000, the highest-

18   paid of the twenty-five programmers in his group.  In April

19   2009, he accepted an offer to become an Executive Vice

20   President at Teza Technologies LLC, a Chicago-based startup

21   that was looking to develop its own HFT system.  Aleynikov

22   was hired, at over $1 million a year, to develop the market

4

1    connectivity and infrastructure components of Teza's HFT

2    system.  Teza's founder (a former head of HFT at Chicago-

3    based hedge fund Citadel Investment Group) emailed Aleynikov

4    (and several other employees) in late May, conveying his

5    expectation that they would develop a functional trading

6    system within six months.  It usually takes years for a team

7    of programmers to develop an HFT system from scratch.

8         Aleynikov's last day at Goldman was June 5, 2009.  At

9    approximately 5:20 p.m., just before his going-away party,

10   Aleynikov encrypted and uploaded to a server in Germany more

11   than 500,000 lines of source code for Goldman's HFT system,

12   including code for a substantial part of the infrastructure,

13   and some of the algorithms and market data connectivity

14   programs.[1]  Some of the code pertained to programs that

15   could operate independently of the rest of the Goldman

16   system and could be integrated into a competitor's system.

17   After uploading the source code, Aleynikov deleted the

18   encryption program as well as the history of his computer

19   commands.  When he returned to his home in New Jersey,

---

[1] In addition to proprietary source code, Aleynikov
also transferred some open source software licensed for use
by the public that was mixed in with Goldman's proprietary
code.  However, a substantially greater number of the
uploaded files contained proprietary code than had open
source software.

5

1    Aleynikov downloaded the source code from the server in
2    Germany to his home computer, and copied some of the files
3    to other computer devices he owned.

4        On July 2, 2009, Aleynikov flew from New Jersey to
5    Chicago to attend meetings at Teza.  He brought with him a
6    flash drive and a laptop containing portions of the Goldman
7    source code.  When Aleynikov flew back the following day, he
8    was arrested by the FBI at Newark Liberty International
9    Airport.

10        The indictment charged him with violating the EEA by
11   downloading a trade secret "that is related to or included
12   in a product that is produced for or placed in interstate or
13   foreign commerce," with the intent to convert such trade
14   secret and to injure its owner, to the economic benefit of
15   anyone other than the owner, <u>see</u> 18 U.S.C. § 1832(a) (Count
16   One); and with violating the NSPA, which makes it a crime to
17   "transport[], transmit[], or transfer[] in interstate or
18   foreign commerce any goods, wares, merchandise, securities
19   or money, of the value of $5,000 or more, knowing the same
20   to have been stolen, converted or taken by fraud," 18 U.S.C.
21   § 2314 (Count Two).  A third count charged him with
22   unauthorized computer access and exceeding authorized access

1   in violation of the Computer Fraud and Abuse Act, 18 U.S.C.

2   § 1030.

3       Aleynikov moved to dismiss the indictment for failure

4   to state an offense.  See Fed. R. Crim. P. 12(b)(3)(B).  The

5   district court dismissed Count Three of the indictment but

6   otherwise denied Aleynikov's motion.  United States v.

7   Aleynikov, 737 F. Supp. 2d 173 (S.D.N.Y. 2010).

8       As to Count One, the district court concluded: [1] the

9   stolen source code is a trade secret; [2] the HFT system

10  constitutes a "product" to which the source code relates

11  because the system was developed and modified through the

12  labor of Goldman's computer programmers; and [3] the HFT

13  system was "produced for" interstate commerce because it

14  facilitates the rapid execution of trades on financial

15  markets such as the New York Stock Exchange and NASDAQ.  Id.

16  at 177-79.  The district court reasoned that the whole

17  purpose of the HFT system was "to engage in interstate and

18  foreign commerce."  Id. at 179.

19      As to Count Two, the court held that the source code

20  for Goldman's HFT system constitutes "goods" that were

21  "stolen" within the meaning of the NSPA because, though

22  source code is intangible, it "contains highly confidential

7

1    trade secrets related to the Trading System" that "would be

2    valuable for any firm seeking to launch, or enhance, a high-

3    frequency trading business."  <u>Id.</u> at 187.

4        Count Three was dismissed on the ground that Aleynikov

5    was authorized to access the Goldman computer and did not

6    exceed the scope of his authorization, and that authorized

7    use of a computer in a manner that misappropriates

8    information is not an offense under the Computer Fraud and

9    Abuse Act.  <u>Id.</u> at 192-94.

10       The jury convicted Aleynikov on Counts One and Two.  He

11   was sentenced to 97 months of imprisonment followed by a

12   three-year term of supervised release, and was ordered to

13   pay a $12,500 fine.  Bail pending appeal was denied because

14   Aleynikov, a dual citizen of the United States and Russia,

15   was feared to be a flight risk.

16       Aleynikov appealed his conviction and sentence,

17   arguing, among other things, that the district court erred

18   in denying his motion to dismiss the indictment in its

19   entirety.  The Government did not appeal the dismissal of

20   Count Three of the indictment.

21       On February 17, 2012, following oral argument, we

22   issued a short order reversing Aleynikov's convictions on

23   both counts, and indicated that an opinion would follow.

1

2                          **DISCUSSION**

3      On appeal, Aleynikov renews his challenge to the

4  sufficiency of the indictment on both Counts One and Two.[2]

5  As to Count One, he argues that the source code is not

6  "related to or included in a product that is produced for or

7  placed in interstate or foreign commerce" within the meaning

8  of the EEA.  As to Count Two, Aleynikov argues that the

9  source code--as purely intangible property--is not a "good"

10  that was "stolen" within the meaning of the NSPA.

11      Aleynikov's challenge requires us to determine the

12  scope of two federal criminal statutes.  Since federal

13  crimes are "solely creatures of statute," <u>Dowling v. United</u>

14  <u>States</u>, 473 U.S. 207, 213 (1985) (internal quotation marks

15  omitted), a federal indictment can be challenged on the

16  ground that it fails to allege a crime within the terms of

17  the applicable statute.  See <u>United States v. Pirro</u>, 212

18  F.3d 86, 91-92 (2d Cir. 2000).[3]  The sufficiency of an

---

[2] Aleynikov challenges his conviction and sentence on several additional grounds as well.  Because we conclude that the indictment failed to state an offense, we need not resolve these additional challenges.

[3] On appeal, both the Government and Aleynikov frame their arguments in terms of the sufficiency of the indictment rather than the sufficiency of the evidence.

1    indictment and the interpretation of a federal statute are

2    both matters of law that we review de novo.  See Fiero v.

3    Fin. Indus. Regulatory Auth., Inc., 660 F.3d 569, 573 (2d

4    Cir. 2011); Pirro, 212 F.3d at 92.

5        Statutory construction "must begin with the language

6    employed by Congress and the assumption that the ordinary

7    meaning of that language accurately expresses the

8    legislative purpose." United States v. Albertini, 472 U.S.

9    675, 680 (1985) (quoting Park 'N Fly, Inc. v. Dollar Park &

10   Fly, Inc., 469 U.S. 189, 194 (1985)).  "Due respect for the

11   prerogatives of Congress in defining federal crimes prompts

12   restraint in this area, where we typically find a narrow

13   interpretation appropriate." Dowling, 473 U.S. at 213

14   (internal quotation marks omitted).

15       We conclude that Aleynikov's conduct did not constitute

16   an offense under either the NSPA or the EEA, and that the

17   indictment was therefore legally insufficient.  We consider

18   the statutes in the order they were briefed: the NSPA first,

19   the EEA second.

20

---

Because the result and analysis would be the same under
either formulation, for the purposes of this opinion we
adopt the one used by the parties, and do not decide which
is doctrinally more sound.

10

I

The NSPA makes it a crime to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."  18 U.S.C. § 2314.  The statute does not define the terms "goods," "wares," or "merchandise."  We have held that they provide "a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce."  <u>In re Vericker</u>, 446 F.2d 244, 248 (2d Cir. 1971) (Friendly, <u>C.J.</u>) (quoting <u>United States v. Seagraves</u>, 265 F.2d 876, 880 (3d Cir. 1959)).  The decisive question is whether the source code that Aleynikov uploaded to a server in Germany, then downloaded to his computer devices in New Jersey, and later transferred to Illinois, constituted stolen "goods," "wares," or "merchandise" within the meaning of the NSPA. Based on the substantial weight of the case law, as well as the ordinary meaning of the words, we conclude that it did not.

**A.**

We first considered the applicability of the NSPA to
the theft of intellectual property in <u>United States v.
Bottone</u>, 365 F.2d 389 (2d Cir. 1966) (Friendly, <u>J.</u>), in
which photocopied documents outlining manufacturing
procedures for certain pharmaceuticals were transported
across state lines.  Since the actual processes themselves
(as opposed to photocopies) were never transported across
state lines, the "serious question" (we explained) was
whether "the papers showing [the] processes that were
transported in interstate or foreign commerce were 'goods'
which had been 'stolen, converted or taken by fraud' in view
of the lack of proof that any of the physical materials so
transported came from [the manufacturer's] possession."  <u>Id.</u>
at 393.  We held that the NSPA was violated there, observing
that what was "stolen and transported" was, ultimately,
"tangible goods," notwithstanding the "clever intermediate
transcription [and] use of a photocopy machine."  <u>Id.</u>
However, we suggested that a different result would obtain
if there was no physical taking of tangible property
whatsoever:  "To be sure, where no tangible objects were
ever taken or transported, a court would be hard pressed to

12

1    conclude that 'goods' had been stolen and transported within
2    the meaning of 2314." Id.  Hence, we observed, "the statute
3    would presumably not extend to the case where a carefully
4    guarded secret formula was memorized, carried away in the
5    recesses of a thievish mind and placed in writing only after
6    a boundary had been crossed." Id.  Bottone itself thus
7    treats its holding as the furthest limit of a statute that
8    is not endlessly elastic:  Some tangible property must be
9    taken from the owner for there to be deemed a "good" that is
10   "stolen" for purposes of the NSPA.

11        Bottone's reading of the NSPA is confirmed by the
12   Supreme Court's opinion in Dowling v. United States, 473
13   U.S. 207 (1985), which held that the NSPA did not apply to
14   an interstate bootleg record operation.  Dowling rejected
15   the Government's argument that the unauthorized use of the
16   musical compositions rendered them "stolen, converted or
17   taken by fraud."  Cases prosecuted under the NSPA "have
18   always involved physical 'goods, wares, [or] merchandise'
19   that have themselves been 'stolen, converted or taken by
20   fraud'"--even if the stolen thing does not "remain in
21   entirely unaltered form," and "owes a major portion of its
22   value to an intangible component." Id. at 216.

13

1 "This basic element"--the taking of a physical thing--

2 "comports with the common-sense meaning of the statutory

3 language: by requiring that the 'goods, wares [or]

4 merchandise' be 'the same' as those 'stolen, converted or

5 taken by fraud,' the provision seems clearly to contemplate

6 a physical identity between the items unlawfully obtained

7 and those eventually transported, and hence some prior

8 physical taking of the subject goods." Id.[4]

9     We join other circuits in relying on Dowling for the

10 proposition that the theft and subsequent interstate

11 transmission of purely intangible property is beyond the

12 scope of the NSPA.

13     In a close analog to the present case, the Tenth

14 Circuit affirmed the dismissal of an indictment alleging

15 that the defendant transported in interstate commerce a

16 computer program containing source code that was taken from

17 his employer. United States v. Brown, 925 F.2d 1301, 1305,

---

[4] In holding the NSPA inapplicable to copyright
infringement, Dowling also relied on particular features of
the Copyright Act, including the carefully calibrated
criminal penalties for infringement:  Applying the NSPA to
copyright infringement would be a "blunderbuss solution to a
problem treated with precision when considered directly."
Id. at 226.  At the same time, the Court's reasoning and
analysis focuses on the pure intangibility of a copyright,
and the requirement under the NSPA that there be a physical
taking and removal of goods.

1309 (10th Cir. 1991).  Citing <u>Dowling</u>, the court held that
the NSPA "applies only to physical 'goods, wares or
merchandise'" and that "[p]urely intellectual property is
not within this category.  It can be represented physically,
such as through writing on a page, but the underlying,
intellectual property itself, remains intangible."  <u>Id.</u> at
1307.  The Court concluded that "the computer program itself
is an intangible intellectual property, and as such, it
alone cannot constitute goods, wares, merchandise,
securities or moneys which have been stolen, converted or
taken" for purposes of the NSPA.  <u>Id.</u> at 1308.

   Similarly, the Seventh Circuit has held that numerical
"Comdata codes" used by truckers to access money transfers
at truck stops constitute intangible property the theft of
which is not a violation of the NSPA.  <u>United States v.
Stafford</u>, 136 F.3d 1109 (7th Cir. 1998).  The court reasoned
that the codes themselves were not "goods, wares, or
merchandise," but rather "information"; that the defendant
had not been charged with transporting pieces of paper
containing the codes; and that the only conduct charged was
"transferring the codes themselves, which are simply
sequences of digits."  <u>Id.</u> at 1114-15.

1       The First Circuit has also concluded that the NSPA does

2  not criminalize the theft of intangible things:  The NSPA

3  "does not apply to purely 'intangible information,' the

4  theft of which is punishable under copyright law and other

5  intellectual property statutes" but "*does apply* when there

6  has been 'some tangible item taken, however insignificant or

7  valueless it may be, absent the intangible component.'"

8  <u>United States v. Martin</u>, 228 F.3d 1, 14-15 (1st Cir. 2000)

9  (quoting <u>Brown</u>, 925 F.2d at 1307, 1308 n.14).

10      The Government argues that a tangibility requirement

11  ignores a 1988 amendment, which added the words "transmit[]"

12  and "transfer[]" to the terms: "transport[], transmit[], or

13  transfer[]."  The Government contends that the added words

14  reflect an intent to cover generally transfers and

15  transmissions of non-physical forms of stolen property.  The

16  evident purpose of the amendment, however, was to clarify

17  that the statute applied to non-physical electronic

18  transfers of *money*.  See <u>United States v. Piervinanzi</u>, 23

19  F.3d 670, 678 n.6 (2d Cir. 1994).  Money, though it can be

20  intangible, is specifically enumerated in § 2314 as a thing

21  apart and distinct from "goods," "wares," or "merchandise."

22  The addition to the possible means of transport does not

1    bespeak an intent to alter or expand the ordinary meaning of

2    "goods," "wares," or "merchandise" and therefore does not

3    obviate the Government's need to identify a predicate good,

4    ware, merchandise, security, or money that has been stolen.

5

6                                    **B.**

7         By uploading Goldman's proprietary source code to a

8    computer server in Germany, Aleynikov stole purely

9    intangible property embodied in a purely intangible format.

10   There was no allegation that he physically seized anything

11   tangible from Goldman, such as a compact disc or thumb drive

12   containing source code, so we need not decide whether that

13   would suffice as a physical theft.  Aleynikov later

14   transported portions of the source code to Chicago, on his

15   laptop and flash drive.  However, there is no violation of

16   the statute unless the good is transported with knowledge

17   that "the same" has been stolen; the statute therefore

18   presupposes that the thing stolen was a good or ware, etc.,

19   *at the time of the theft*.  The wording "contemplate[s] a

20   physical identity between the items unlawfully obtained and

21   those eventually transported."  <u>Dowling</u>, 473 U.S. at 216.

22   The later storage of intangible property on a tangible

medium does not transform the intangible property into a stolen good.

The infringement of copyright in <u>Dowling</u> parallels Aleynikov's theft of computer code.  Although "[t]he infringer invades a statutorily defined province guaranteed to the copyright holder alone[,] . . . he does not assume physical control over the copyright; nor does he wholly deprive its owner of its use."  <u>Id.</u> at 217.  Because Aleynikov did not "assume physical control" over anything when he took the source code, and because he did not thereby "deprive [Goldman] of its use," Aleynikov did not violate the NSPA.

As the district court observed, Goldman's source code is highly valuable, and there is no doubt that in virtually every case involving proprietary computer code worth stealing, the value of the intangible code will vastly exceed the value of any physical item on which it might be stored.  <u>See</u> <u>Aleynikov</u>, 737 F. Supp. 2d at 187.  But federal crimes are "solely creatures of statute."  <u>Dowling</u>, 473 U.S. at 213 (internal quotation marks omitted).  We decline to stretch or update statutory words of plain and ordinary meaning in order to better accommodate the digital age.

1                          **II**

2      We next consider the sufficiency of the indictment as

3  to the EEA.  As with the NSPA count, we conclude that the

4  indictment was insufficient as a matter of law.

5

6                         **A.**

7      The EEA contains two operative provisions.  The first

8  section (18 U.S.C. § 1831(a)), which is not charged in the

9  indictment, applies to foreign espionage and is expressed

10  broadly:  "Whoever, intending or knowing that the offense

11  will benefit any foreign government, foreign

12  instrumentality, or foreign agent, knowingly . . . without

13  authorization . . . downloads, uploads, . . . transmits,

14  . . . or conveys a trade secret" is guilty of a federal

15  offense, and may be imprisoned for up to 15 years.  18

16  U.S.C. § 1831(a).

17      Aleynikov, however, was charged with violating 18

18  U.S.C. § *1832*, which imposes the italicized limitation

19  (which is not found in § 1831):  "Whoever, with intent to

20  convert a trade secret, *that is related to or included in a*

21  *product that is produced for or placed in interstate or*

22  *foreign commerce*, to the economic benefit of anyone other

1    than the owner thereof, and intending or knowing that the

2    offense will, injure any owner of that trade secret,

3    knowingly . . . without authorization . . . downloads,

4    uploads, . . . transmits, . . . or conveys such information"

5    is guilty of a federal offense, and may be imprisoned for up

6    to 10 years.  <u>Id.</u> § 1832(a) (emphasis added).

7         Thus there is a limitation--that products be "produced

8    for" or "placed in" interstate or foreign commerce--in the

9    statute Aleynikov is charged with violating, a limitation

10   that does not appear in the otherwise parallel foreign

11   espionage statute.  "Where Congress includes particular

12   language in one section of a statute but omits it in another

13   section of the same Act, it is generally presumed that

14   Congress acts intentionally and purposely in the disparate

15   inclusion or exclusion."  <u>Russello v. United States</u>, 464

16   U.S. 16, 23 (1983) (internal quotation marks and alteration

17   omitted).  The requirement that products be "produced for"

18   or "placed in" interstate or foreign commerce therefore must

19   be read as a term of limitation.

20        The legislative history confirms this.  The version of

21   § 1832 that appeared in the original Senate bill did not

22   contain the limiting language.  It applied to any person who

steals "proprietary economic information having a value of
not less than $100,000"; it did not specify whether that
economic information relates to a product produced for or
placed in interstate commerce, and instead contained a
categorical finding that "the development and production of
proprietary economic information involves every aspect of
interstate commerce and business."  S. 1556, 104th Cong.
§§ 2(a), 3 (2d Sess. 1996), <u>reprinted in</u> S. Rep. No. 104-
359, at 1, 3.  The limiting language was introduced in the
House Bill.  <u>See</u> H.R. Rep. No. 104-788, at 2 (1996),
<u>reprinted in</u> 1996 U.S.C.C.A.N. 4021, 4021.  The words of
limitation in § 1832 were deliberately chosen.

The natural reading that takes account of the distinct
meaning of the paired phrases ("produced for" and "placed
in") is that § 1832(a) identifies two separate but related
categories.  Products "placed in" commerce have already been
introduced into the stream of commerce and have reached the
marketplace.  Products that have not yet been "placed in"
commerce but are still being developed or readied for the
marketplace can properly be described as being "produced
for," if not yet actually "placed in," commerce.  Reading
the statute in this way gives effect to both categories of

1   product (those "produced for" commerce and those "placed in"

2   commerce), without making one a subset of the other.

3       This interpretation has the added virtue of construing

4   the two categories of product in relationship to one another

5   (a sequential or temporal relationship), and finds support

6   in the doctrine of statutory interpretation which instructs

7   that words in a statute are known by the company they keep.

8   See Gustafson v. Alloyd Co., Inc, 513 U.S. 561, 575 (1995)

9   (invoking this doctrine "to avoid ascribing to one word a

10  meaning so broad that it is inconsistent with its

11  accompanying words, thus giving unintended breadth to the

12  Acts of Congress" (internal quotation marks omitted)).  The

13  statute would fall short of critical protections if it

14  applied only to the theft of trade secrets relating to those

15  products that had already been "placed in" the marketplace;

16  left vulnerable would be the class of trade secrets inhering

17  in products that have not yet been placed on the market,

18  such as prototypes--precisely the kinds of trade secrets

19  that are likely to attract espionage.  Congress thus plugged

20  a gap by extending the statute's coverage to include

21  products "produced for" commerce as well as those already in

22  the marketplace.

1    The district court interpreted the phrase "produced
2    for" interstate or foreign commerce more broadly.  It held
3    that the HFT system was "produced for" interstate commerce
4    because "the sole purpose for which Goldman purchased,
5    developed, and modified the computer programs that comprise
6    the Trading System was to engage in interstate and foreign
7    commerce" and because "Goldman uses the Trading System to
8    rapidly execute high volumes of trades in various financial
9    markets" and "[t]he Trading System generates many millions
10   of dollars in annual profits." Aleynikov, 737 F. Supp. 2d
11   at 179.  Under that interpretation, a product is "produced
12   for" interstate or foreign commerce if its purpose is to
13   facilitate or engage in such commerce.

14   The district court erred by construing the phrase--
15   "produced for . . . interstate or foreign commerce"--"in a
16   vacuum." See Davis v. Mich. Dep't of Treasury, 489 U.S.
17   803, 809 (1989).  "It is a fundamental canon of statutory
18   construction that the words of a statute must be read in
19   their context and with a view to their place in the overall
20   statutory scheme." Id.  That way, a statutory phrase
21   "gathers meaning from the words around it." Jones v. United
22   States, 527 U.S. 373, 389 (1999) (internal quotation marks

23

1    omitted).  The district court's broad interpretation of the

2    phrase "produced for" commerce becomes untenable in light of

3    the paired phrase "placed in" commerce.  Since every product

4    actually sold or licensed is by definition produced for the

5    purpose of engaging in commerce, every product that is

6    "placed in" commerce would necessarily also be "produced

7    for" commerce--and the phrase "placed in" commerce would be

8    surplusage.  This interpretation is inconsistent with "one

9    of the most basic interpretive canons, that a statute should

10   be construed so that effect is given to all its provisions,

11   so that no part will be inoperative or superfluous, void or

12   insignificant."  <u>Corley v. United States</u>, 556 U.S. 303, 314

13   (2009) (internal quotation marks and alteration omitted);

14   <u>see also</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001) ("It is

15   our duty to give effect, if possible, to every clause and

16   word of a statute." (internal quotation marks omitted)).

17   "Judges should hesitate to treat statutory terms in any

18   setting as surplusage, and *resistance should be heightened*

19   *when the words describe an element of a criminal offense*."

20   <u>Jones v. United States</u>, 529 U.S. 848, 857 (2000) (internal

21   quotation marks and alterations omitted; emphasis added).

22

1      Even construed in isolation, the phrase "produced for

2  . . . interstate or foreign commerce" cannot command the

3  breadth that the district court and the Government ascribe

4  to it.  See generally Fed. Commc'ns Comm'n v. AT & T Inc.,

5  131 S. Ct. 1177, 1184 (2011) ("[C]onstruing statutory

6  language is not merely an exercise in ascertaining 'the

7  outer limits of [a word's] definitional possibilities'

8  . . . ." (quoting Dolan v. U.S. Postal Serv., 546 U.S. 481,

9  486 (2006)).  At oral argument, the Government was unable to

10  identify a single product that affects interstate commerce

11  but that would nonetheless be excluded by virtue of the

12  statute's limiting language.[5]  And even if one could

13  identify one such example, or two, it would not be a

14  category that would demand the attention of Congress, or be

15  expressed in categorical terms.

16      If § 1832(a) was intended to have such a sweep, we

17  would expect to see wording traditionally understood to

---

[5] The only example provided by the Government of a trade secret that affects interstate commerce but that is beyond the purview of the EEA was a proprietary training manual for stock brokers.  But by the Government's explanation, such a trade secret would not be covered because the broker to whom it relates is a person and not a "product," not because the training manual was not "produced for . . . interstate or foreign commerce" as the Government interprets that phrase.

1   invoke the full extent of Congress's regulatory power under

2   the Commerce Clause.  Notably, the EEA was enacted the year

3   after the Supreme Court issued its landmark decision in

4   United States v. Lopez, which held that Congress's Commerce

5   Clause authority is limited to those activities that

6   "substantially affect interstate commerce."  514 U.S. 549,

7   558-59 (1995).[6]  The Supreme Court observes a distinction

8   between "legislation invoking Congress' full power over

9   activity substantially 'affecting . . . commerce'" and

10  legislation which uses more limiting language, such as

11  activities "'in commerce,'" and thereby does not purport to

12  exercise the full scope of congressional authority.  Jones,

13  529 U.S. at 856 (quoting Russell v. United States, 471 U.S.

14  858, 859-60 & n.4 (1985)).  The temporal proximity between

15  the enactment of the EEA and the decision in Lopez makes

16  significant the omission from the EEA of the language

17  blessed in that case as invoking the outer limit of

18  Congress's regulatory authority.

---

[6] Lopez held that Congress may regulate three
categories of activity under its commerce power: [1] "the
use of the channels of interstate commerce"; [2] "the
instrumentalities of interstate commerce, or persons or
things in interstate commerce"; and [3] activities that
"substantially affect interstate commerce."  Id.  It is the
third of the three categories that is at issue in this case.

26

1                               **B.**

2        Goldman's HFT system was neither "produced for" nor

3   "placed in" interstate or foreign commerce.  Goldman had no

4   intention of selling its HFT system or licensing it to

5   anyone.  <u>Aleynikov</u>, 737 F. Supp. 2d at 175.  It went to

6   great lengths to maintain the secrecy of its system.  The

7   enormous profits the system yielded for Goldman depended on

8   no one else having it.  Because the HFT system was not

9   designed to enter or pass in commerce, or to make something

10  that does, Aleynikov's theft of source code relating to that

11  system was not an offense under the EEA.

12       Even if we were to conclude that the phrase "produced

13  for . . . interstate or foreign commerce" is susceptible to

14  a broader reading than we think it will bear, it would at

15  most render § 1832(a) facially ambiguous, which would not

16  assist the prosecution.  "[A]mbiguity concerning the ambit

17  of criminal statutes should be resolved in favor of lenity."

18  <u>Rewis v. United States</u>, 401 U.S. 808, 812 (1971).  And "when

19  choice has to be made between two readings of what conduct

20  Congress has made a crime, it is appropriate, before we

21  choose the harsher alternative, to require that Congress

22  should have spoken in language that is clear and definite."

                                27

1    <u>United States v. Universal C.I.T. Credit Corp.</u>, 344 U.S.

2    218, 221-22 (1952).

3        The conduct found by the jury is conduct that Aleynikov

4    should have known was in breach of his confidentiality

5    obligations to Goldman, and was dishonest in ways that would

6    subject him to sanctions; but he could not have known that

7    it would offend this criminal law or this particular

8    sovereign.

9

10                      **CONCLUSION**

11        For the foregoing reasons, the judgment of the district

12    court is reversed.

13

1    CALABRESI, J., concurring:

2         I join the majority opinion in its description of the facts and history of this case, and in its

3    discussion in Part I, which deals with the National Stolen Property Act ("NSPA"). I also join Part

4    II, which considers the Economic Espionage Act ("EEA"), but as to that act I wish to add a few

5    thoughts.

6         I agree with the majority that the text of the EEA is such that it would require stretching

7    to cover Aleynikov's acts. But texts must always be read in context, and context includes not

8    only the whole of the statute (well addressed by the majority), but also the "mischief" the law

9    was enacted to address. This is not the same as legislative history. It is significant that when

10   English courts were not allowed to look at Hansard (the account of the laws' passage through

11   Parliament), they nevertheless could, and frequently did, consider the circumstances because of

12   which a law was introduced and passed. That is, they considered the situational context and

13   mischief. *See Gorris v. Scott*, (1874) 9 L.R. Exch. 125 (Eng.) (refusing to apply an order of the

14   Privy Council to a mischief different from that which prompted the issuance of the order); *see*

15   *generally Heydon's Case*, (1584) 76 Eng. Rep. 637 (Exch.) 638; 3 Co. Rep. 7a, 7b ("[T]he office

1

1    of all the Judges is always to make such construction as shall suppress the mischief, and advance

2    the remedy, and to suppress subtle inventions and evasions for continuance of the mischief . . .

3    .").

4          The EEA was passed after the Supreme Court and the Tenth Circuit said the NSPA did

5    not cover intellectual property. *See Dowling v. United States*, 473 U.S. 207, 226 (1985); *United*

6    *States v. Brown*, 925 F.2d 1301, 1307-08 (10th Cir. 1991). While the legislative history can be

7    read to create some ambiguity as to how broad a reach the EEA was designed to have, it is hard

8    for me to conclude that Congress, in this law, actually meant to exempt the kind of behavior in

9    which Aleynikov engaged. *See* H.R. Rep. No. 104-788, at 6 (1996), *reprinted in* 1996

10   U.S.C.C.A.N. 4021, 4024-25 (citing *Brown*). I am not dissenting because I recognize the strength

11   of the majority's analysis of the text and the legislative history, and because, as the majority

12   says, ambiguous criminal statutes must be read in favor of the defendant. Nevertheless, while

13   concurring, I wish to express the hope that Congress will return to the issue and state, in

14   appropriate language, what I believe they meant to make criminal in the EEA.

2